No. 24–2066

# In the
# United States Court of Appeals
# for the Seventh Circuit

CRAIG DULWORTH and BRIANNA DULWORTH,

*Plaintiffs-Appellants,*

v.

EXPERIAN INFORMATION SOLUTIONS, INC., AND
EQUIFAX INFORMATION SERVICES, LLC,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Indiana
Case No. 1:22–cv–00469
The Honorable Jane Magnus-Stinson

## BRIEF OF APPELLEE EXPERIAN INFORMATION SOLUTIONS, INC.

Christopher A. Hall
David J. Sandefer
JONES DAY
110 North Wacker Dr.
Chicago, IL 60606
312–782–3939
chall@jonesday.com
dsandefer@jonesday.com

Jeffrey R. Johnson
  *Counsel of Record*
John C. Brinkerhoff Jr.
JONES DAY
51 Louisiana Ave NW
Washington, DC 20001
202–879–3939
jeffreyjohnson@jonesday.com
jbrinkerhoff@jonesday.com

*Counsel for Defendant-Appellee Experian Information Solutions, Inc.*

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2066

Short Caption: Craig Dulworth, et al. v. Experian Information Solutions, Inc., et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Experian Information Solutions, Inc.

_____

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Jones Day

_____

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

        Experian PLC

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        Experian PLC

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Jeffrey R. Johnson     Date: 12/20/2024

Attorney's Printed Name:  Jeffrey R. Johnson

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** [✔]   **No** [ ]

Address:  51 Louisiana Ave. NW

Washington, D.C. 20001

Phone Number:  (202) 879-7684     Fax Number:  (202) 626-1700

E-Mail Address: jeffreyjohnson@jonesday.com

rev. 12/19 AK

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................iii

STATEMENT REGARDING ORAL ARGUMENT..........................................xi

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT .........................................................2

STATEMENT OF THE ISSUES.............................................................3

STATEMENT OF THE CASE ...............................................................3

I.    LEGAL BACKGROUND ............................................................3

II.   FACTUAL BACKGROUND .........................................................5

    A.    Experian's Procedures ......................................................5

    B.    The Dulworths' Bankruptcy and Reaffirmation Agreement.........6

III.  PROCEDURAL HISTORY ..........................................................9

STANDARD OF REVIEW ...............................................................11

SUMMARY OF ARGUMENT ...........................................................12

ARGUMENT ...............................................................................16

I.    THE DULWORTHS FAILED TO ESTABLISH STANDING ..............16

    A.    The Dulworths Cannot Establish Reputational Harm...............17

    B.    The Dulworths Cannot Establish Pecuniary Harm....................21

    C.    The Dulworths Cannot Establish Emotional Distress ..............26

        1.    The Dulworths Forfeited Reliance on Emotional Distress.................................................................26

        2.    The Dulworths Fail to Establish Cognizable Emotional Distress .....................................................27

II.   THE DULWORTHS BASE THEIR SUIT ON AN INACTIONABLE LEGAL INACCURACY..........................................37

    A.    The Effect of the Reaffirmation Agreement Is a Legal Question ......................................................................39

    B.    The Dulworths' Pivot to Payment History is Meritless..............46

# TABLE OF CONTENTS
(continued)

**Page**

III.   THE DULWORTHS FAIL TO PROVE THAT EXPERIAN'S PROCESSES WERE UNREASONABLE, MUCH LESS WILLFULLY VIOLATED THE FCRA .................................................. 51

IV.   THE DULWORTHS CANNOT SHOW EXPERIAN VIOLATED, MUCH LESS WILLFULLY VIOLATED, § 1681i ................................ 54

CONCLUSION ................................................................... 57

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AMG Trade Dist., LLC v. Nissan N. Am., Inc.*,
813 F. App'x 403 (11th Cir. 2020) ............................................................... 23

*Basden v. Prof. Transp., Inc.*,
714 F.3d 1034 (7th Cir. 2013)...................................................................... 30

*Bates v. CitiMortgage, Inc.*,
844 F.3d 300 (1st Cir. 2016) ....................................................................... 50

*Biggs v. Vill. of Dupo*,
892 F.2d 1298 (7th Cir. 1990).............................................................. 28, 29

*Blanch v. Trans Union, LLC*,
333 F. Supp. 3d 789 (M.D. Tenn. 2018) ..................................................... 49

*Bodenstab v. Cook Cnty.*,
569 F.3d 651 (7th Cir. 2009)....................................................................... 23

*Brill v. TransUnion LLC*,
838 F.3d 919 (7th Cir. 2016)....................................................................... 37

*Brown v. CACH, LLC*,
94 F.4th 665 (7th Cir. 2024) ...................................................................... 25

*Brunett v. Convergent Outsourcing, Inc.*,
982 F.3d 1067 (7th Cir. 2020).............................................................. 25, 33

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ..................................................................................... 23

*Chaitoff v. Experian Info. Sols., Inc.*,
79 F.4th 800 (7th Cir. 2023) ..............................................................*passim*

*Childress v. Experian Info. Sols., Inc.*,
    790 F.3d 745 (7th Cir. 2015)........................................................ 53

*Chuluunbat v. Experian Info. Sols., Inc.*,
    4 F.4th 562 (7th Cir. 2021) ................................................*passim*

*Cole v. U.S. Capital*,
    389 F.3d 710 (7th Cir. 2004)........................................................ 46

*Cox v. Zale Del., Inc.*,
    239 F.3d 910 (7th Cir. 2001)................................................ 44, 48

*Denan v. Trans Union LLC*,
    959 F.3d 290 (7th Cir. 2020)................................................*passim*

*Denius v. Dunlap*,
    330 F.3d 919 (7th Cir. 2003)........................................ 28, 29, 32

*Diadenko v. Folino*,
    741 F.3d 751 (7th Cir. 2013)........................................................ 17

*Dinerstein v. Google, LLC*,
    73 F.4th 502 (7th Cir. 2023) ...................................................... 35

*Ewing v. MED-1 Sols., LLC*,
    24 F.4th 1146 (7th Cir. 2022) ............................................... 18, 19

*Foster v. PNC Bank*,
    52 F.4th 315 (7th Cir. 2022) ................................... 20, 25, 32, 35

*Frazier v. Equifax Info. Servs., LLC*,
    112 F.4th 451 (8th Cir. 2022) .............................................*passim*

*Freeman v. Ocwen Loan Serv., LLC*,
    113 F.4th 701 (7th Cir. 2024) .............................................*passim*

*FTC v. Credit Bur. Ctr., LLC*,
    937 F.3d 764 (7th Cir. 2019)................................................ 24, 56

*Garland v. Orlans, PC*,
    999 F.3d 432 (6th Cir. 2021)......................................................... 35

*Gilbank v. Wood Cnty. Dep't of Human Servs.*,
    111 F.4th 754 (7th Cir. 2024) (en banc)...................................... 12

*Groff v. Wells Fargo Home Mortg., Inc.*,
    108 F. Supp. 3d 537 (E.D. Mich. 2015) ....................................... 49

*Hackett v. City of South Bend*,
    956 F.3d 504 (7th Cir. 2020)................................................. 26, 27

*Hammer v. Equifax Info. Servs., LLC*,
    974 F.3d 564 (5th Cir. 2020)................................................. 47, 48

*Hekel v. Hunter Warfield, Inc.*,
    118 F.4th 938 (8th Cir. 2024) ...................................................... 35

*Horsch v. Wells Fargo Home Mortg.*,
    94 F. Supp. 3d 665 (E.D. Pa. 2015) ............................................. 49

*Hummel v. St. Joseph Cnty. Bd. of Comm'rs*,
    817 F.3d 1010 (7th Cir. 2016)...................................................... 11

*In re Albright*,
    554 B.R. 832 (Bankr. N.D. Ohio 2016) ...................................... 44

*In re Booth*,
    242 B.R. 912 (B.A.P. 6th Cir. 2000) .......................................... 44

*In re Dulworth*,
    No. 18-07856 (Bankr. S.D. Ind.)....................................................6

*In re Lee*,
    356 B.R. 177 (Bankr. N.D.W. Va. 2006) .................................... 45

*In re Price*,
    370 F.3d 362 (3d Cir. 2004) ........................................................ 43

*In re Torres*,
367 B.R. 478 (Bankr. S.D.N.Y. 2007)........................................................ 50

*In re Zombro*,
2008 WL 1752211 (Bankr. E.D. Va. Apr. 14, 2008) .................................. 50

*Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*,
529 F.3d 371 (7th Cir. 2008)..................................................................... 23

*Lamando v. Rocket Mortg.*,
2024 WL 264034 (N.D.N.Y. Jan. 24, 2024)............................................... 49

*Lawrence v. Paramount Res. Mortg. Grp., Inc.*,
2020 WL 6689371 (D. Or. July 20, 2020) ................................................. 49

*Losch v. Nationstar Mort. LLC*,
995 F.3d 937 (11th Cir. 2021)................................................ 38, 39, 40, 44

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .................................................................................. 16

*Metro-North Commuter R. Co. v. Buckley*,
521 U.S. 424 (1997).................................................................................. 35

*Mitze v. Colvin*,
782 F.3d 879 (7th Cir. 2015)..................................................................... 21

*Moreland v. Dieter*,
395 F.3d 747 (7th Cir. 2005)..................................................................... 21

*Mwangangi v. Nielsen*,
48 F.4th 816 (7th Cir. 2022) ..................................................................... 27

*Myers v. Equifax Info. Servs., LLC*,
2022 WL 4292179 (S.D. Ind. Sept. 16, 2022)........................................... 42

*Nekony v. Painter*,
653 F.2d 1164 (7th Cir. 1981).............................................................. 28, 32

*Patterson v. Howe,*
    96 F.4th 992 (7th Cir. 2024) ........................................................ 34

*Pavlock v. Holcomb,*
    35 F.4th 581 (7th Cir. 2022) ........................................................ 19

*Pearson v. Ramos,*
    237 F.3d 881 (7th Cir. 2001) ........................................................ 35

*Pennell v. Global Tr. Mgmt., LLC,*
    990 F.3d 1041 (2021) .......................................................... 21, 33

*Persinger v. Sw. Credit Sys., LP,*
    20 F.4th 1184 (7th Cir. 2021) ...............................................*passim*

*Pierre v. Midland Credit Mgmt., Inc.,*
    29 F.4th 934 (7th Cir. 2022) ........................................... 25, 32, 33

*Pucillo v. Nat'l Credit Sys., Inc.,*
    66 F.4th 634 (7th Cir. 2023) ................................................ 23, 33

*Reichardt v. Trans Union LLC,*
    2019 WL 1359119 (D. Ariz. Mar. 26, 2019) ................................. 49

*Ruffin-Thompkins v. Experian Info. Sols., Inc.,*
    422 F.3d 603 (7th Cir. 2005) ........................................... 20, 29, 53

*Safeco Ins. Co. of Am. v. Burr,*
    551 U.S. 47 (2007) ...................................................................... 54

*Sarver v. Experian Info. Sols.,*
    390 F.3d 969 (7th Cir. 2004) ................................................*passim*

*Schueller v. Wells Fargo & Co.,*
    559 F. App'x 733 (10th Cir. 2014) ............................................. 49

*Stecklein & Rapp Chartered v. Experian Info. Sols., Inc.,*
    113 F.4th 858 (8th Cir. 2024) ..................................................... 56

*Steinmetz v. Am. Honda Fin.*,
447 F. Supp. 3d 994 (D. Nev. 2020) ............................................................. 49

*Stern v. St. Anthony's Health Ctr.*,
788 F.3d 276 (7th Cir. 2015)...................................................... 32, 35

*Taggart v. Lorenzen*,
587 U.S. 554 (2019) ........................................................................... 51

*Todman v. Baltimore*,
104 F.4th 479 (4th Cir. 2024) ....................................................... 23

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........................................................ 16, 17, 20, 35

*Turner v. J.V.D.B. & Assocs., Inc.*,
330 F.3d 991 (7th Cir. 2003)........................................................ 50

*Tusen v. M&T Bank*,
2017 WL 4990524 (D. Minn. Oct. 31, 2017) ............................... 49

*Tutwiler v. Kijakazi*,
87 F.4th 853 (7th Cir. 2023) ......................................................... 22

*Tyson v. Nationstar Mortg., LLC*,
2016 WL 3348400 (E.D. Mo. June 16, 2016) ............................... 49

*United States v. All Funds*,
783 F.3d 607 (7th Cir. 2015)........................................................ 32

*United States v. Balistrieri*,
981 F.2d 916 (1992).......................................................................... 29

*Wadsworth v. Kross, Lieberman & Stone, Inc.*,
12 F.4th 665 (7th Cir. 2021) ......................................................... 33

*Wantz v. Experian Info. Sols.*,
486 F.3d 829 (7th Cir. 2004)........................................................ 24, 28, 29

*Warner v. Experian Info. Sols., Inc.,*
    931 F.3d 917 (9th Cir. 2019)........................................................... 55

*Weigel v. Target Stores,*
    122 F.3d 461 (7th Cir. 1997)..................................................... 30, 35

*White v. Experian Info. Sols., Inc.,*
    2008 WL 11518799 (C.D. Cal. Aug. 19, 2008) ........................... 50

*Whitehouse v. LaRoche,*
    277 F.3d 568 (1st Cir. 2002) .............................................. 7, 41, 43

*Younger v. Experian Info. Sols., Inc.,*
    817 F. App'x 862 (11th Cir. 2020) ............................................... 56

**STATUTES**

11 U.S.C. § 524.................................................................*passim*

11 U.S.C. § 727................................................................... 39

15 U.S.C. § 1681.................................................................3

15 U.S.C. § 1681a.................................................................4

15 U.S.C. § 1681b................................................................ 55

15 U.S.C. § 1681e.............................................................*passim*

15 U.S.C. § 1681i.............................................................*passim*

15 U.S.C. § 1681m............................................................... 24

15 U.S.C. § 1681n............................................................ 9, 27, 52

15 U.S.C. § 1681o.................................................................9

15 U.S.C. § 1681s-2.................................................................4

**OTHER AUTHORITIES**

7th Cir. R. 28.................................................................2

12 C.F.R. § 1022.41 ................................................................. 3, 4

16 C.F.R. pt. 600 ................................................................... 49

Am. Bankr. Inst., *Reaffirmation Agreements* (2d ed. 2010) ............................ 49

Fed. R. App. P. 28 ................................................................... 2

Fed. R. Bankr. 4007 ................................................................. 8

Fed. R. Bankr. 7001 ................................................................. 8

Fed. R. Civ. P. 56 ................................................................ 11, 30

FTC Interpretive Guidance, 2011 WL 3020575 (2011) ..................... 48, 50, 55

Restatement (Second) of Torts .................................................... 36

Restatement (Second) of Contracts (1981) ....................................... 43

Restatement (Third) of Torts: Physical and Emotional Harm
(2011) ......................................................................... 36

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a) and Circuit Rule 34(f), Experian respectfully submits that oral argument is unnecessary.  But if oral argument would be of assistance to the Court, Experian stands ready to provide it.

## INTRODUCTION

After emerging from their fourth bankruptcy, Appellants Craig and Brianna Dulworth struggled to obtain new credit.  They blamed Experian for that difficulty and sued it under the Fair Credit Reporting Act (FCRA).  They reasoned that Experian failed to mediate their disagreement with a creditor over whether one of their debts had been discharged in bankruptcy (as the creditor reported) or rather had been "reaffirmed" in bankruptcy pursuant to a specialized and highly regulated form of contract (as the Dulworths insisted).

The district court rightly ruled that the Dulworths had no business suing Experian.  By the close of discovery, it was clear that Experian did not cause any adverse credit decision.  Shorn of their animating theory of harm, the Dulworths fell back on an unpleaded claim of emotional distress, which they founded on four sentences of their own testimony.  Unsurprisingly, they did not persuade the district court, which entered judgment for Experian.

Now on appeal, the Dulworths assail that judgment with a host of conclusory standing theories, nearly all of which are forfeited.  And none presents a colorable basis for standing, whether because precedent squarely forecloses the argument or because zero evidence substantiates the alleged harm.

Standing is not the Dulworths' only problem.  It is well established that the FCRA does not require credit reporting agencies (CRAs) like Experian to

ensure legal accuracy, which encompasses questions that require the application of law to fact.  The purported inaccuracy here is quintessentially legal: whether the reaffirmation agreement the Dulworths signed was valid.  The Dulworths' demands on Experian would have required a dive into not only state contract law, but also the Bankruptcy Code's reticulated, prophylactic scheme for these agreements, which is designed and strictly enforced to ensure that debtors are not coerced into surrendering bankruptcy's fresh start.  But in a materially identical case involving far less legal complexity and uncertainty, this Court rejected the idea that consumers can require CRAs to simply assume contractual validity, holding that the claim before it presented an inactionable legal dispute.  So also here.

Even if the Dulworths could establish both standing and a cognizable inaccuracy, they still would not be entitled to reversal.  They cannot prevail on their claim that Experian failed to follow "reasonable procedures" to ensure accuracy because this Court has repeatedly blessed the procedures Experian followed here.  For similar reasons, they cannot show that Experian willfully violated the FCRA, foreclosing statutory and punitive damages.

## JURISDICTIONAL STATEMENT

Appellants' jurisdictional statement is complete and correct with respect to the statutory bases for the district court's and this Court's jurisdiction.  *See* Fed. R. App. P. 28(a)(4); 7th Cir. R. 28(a)(2), (b). However, as explained below,

the district court lacked subject-matter jurisdiction over Plaintiffs' claims because they did not establish Article III standing.

## STATEMENT OF THE ISSUES

1.     Whether the Dulworths satisfied their burden to show standing to pursue claims under 15 U.S.C. § 1681e(b) and § 1681i(a) against Experian.

2.     Whether the Dulworths' claimed inaccuracy presents a purely factual dispute cognizable under 15 U.S.C. § 1681e(b) or § 1681i(a).

3.     Whether the Dulworths established that Experian's reliance on a vetted creditor's reporting was unreasonable under 15 U.S.C. § 1681e(b).

4.     Whether the Dulworths established that Experian willfully violated 15 U.S.C. § 1681e(b) or § 1681i(a) by not reporting their debt as reaffirmed in bankruptcy.

## STATEMENT OF THE CASE

## I.     LEGAL BACKGROUND.

The FCRA regulates the "elaborate mechanism" of credit reporting in the United States, 15 U.S.C. § 1681(a)(2), which involves hundreds of millions of consumer credit files and over a billion updates to those files each month, *see Denan v. Trans Union LLC*, 959 F.3d 290, 294 (7th Cir. 2020).  Within this system, data "furnishers" (typically creditors) and CRAs serve "discrete functions." *Denan*, 959 F.3d at 294.  Furnishers provide information about consumers' credit performance to CRAs. *Id.*; 12 C.F.R. § 1022.41(c).  CRAs, in

turn, compile that data and provide it to third parties in the form of credit reports. *Denan*, 959 F.3d at 294; *see* 15 U.S.C. § 1681a(f).

To regulate this system, the "FCRA imposes duties on consumer reporting agencies and furnishers in a manner consistent with their respective roles in the credit reporting market." *Denan*, 959 F.3d at 294. Relevant here, furnishers have a "[d]uty … to provide accurate information" and to correct inaccurate information they report. 15 U.S.C. § 1681s-2; 12 C.F.R. § 1022.41(a).

The FCRA places no "comparable duty" on CRAs. *Denan*, 959 F.3d at 295 ("only furnishers are tasked with accurately reporting liability."). When preparing credit reports, CRAs must "follow reasonable procedures to assure maximum possible accuracy." 15 U.S.C. § 1681e(b). And when a consumer disputes inaccurate information in his credit file, CRAs must "conduct a reasonable reinvestigation." *Id.* § 1681i(a)(1)(A).

The FCRA's division of labor recognizes that a CRA's duty under §§ 1681e(b) and 1681i "never reaches beyond questions of fact." *Chaitoff v. Experian Info. Sols., Inc.*, 79 F.4th 800, 814 (7th Cir. 2023). CRAs are thus not required to investigate or resolve disputes that involve legal questions or even the "appl[ication of] law to facts." *Chuluunbat v. Experian Info. Sols., Inc.*, 4 F.4th 562, 568 (7th Cir. 2021). This makes sense. Furnishers "assume[] the risk and bear the loss of unpaid debt, so they are in a better position to

4

determine the legal validity of a debt." *Denan*, 959 F.3d at 295.  Consumers

thus must resolve legal disputes over debt with them, not CRAs.  *See, e.g.*,

*Chuluunbat*, 4 F.4th at 569; *Denan*, 959 F.3d at 295.  After all, Congress never

meant to "require consumer reporting agencies to arbitrate disputes between

consumers and credit grantors as to completeness or accuracy of information

in the consumer's file."  S. Rep. No. 104-185, at 43 (1995).

## II.    FACTUAL BACKGROUND.

### A.    Experian's Procedures.

Experian collects data and creates credit reports for hundreds of millions

of consumers in the United States.  *See* App. 378; *Sarver v. Experian Info. Sols.*,

390 F.3d 969, 972 (7th Cir. 2004).  Due to the enormous volume of information

it processes, Experian relies on data furnishers, the actual parties to the

underlying transactions that Experian reports.  Suppl. App. 162 at 21:20–25;

App. 378.  Experian ensures data furnishers provide accurate information by

requiring them to undergo a "vetting process" before reporting credit

information from them.  App. 378.  If Experian determines that the furnisher

provided unreliable data, it does not report that data and remediates any

issues created by that furnisher.  *See id.*

When a consumer disputes information in their credit file, Experian

reviews any supporting documentation the consumer provides to determine

whether it can correct the file internally.  Suppl. App. 169 at 28:16–21; App.

5

380. If not, Experian contacts the furnisher to verify the accuracy of its reporting by issuing an Automated Consumer Dispute Verification (ACDV) form. App. 380. The furnisher then has 30 days to provide a response that allows Experian to evaluate the accuracy of the disputed information. *See* Suppl. App. 170 at 29:18–23.

Like other CRAs, Experian also applies a front-end process, known as its "Global Security Policy," to filter written disputes that do not come directly from the affected consumer. App. 381. Consistent with the FCRA's mandates and longstanding federal guidance, this policy ensures that unauthorized users do not access consumer credit files. *See infra* at 55–56. Under this policy, Experian evaluates the envelope and other exterior features of incoming mail to determine whether it is similar to third-party mail, which often is sent in bulk. App. 381. Suspicious letters are opened and reviewed to determine if they appear to have been sent directly by a consumer. *Id.* Letters determined to be third-party mail are not processed as disputes. *Id.*

## B.    The Dulworths' Bankruptcy and Reaffirmation Agreement.

Faced with obligations to over 100 creditors, the Dulworths sought bankruptcy protection in October 2018. *See In re Dulworth*, No. 18-07856 (Bankr. S.D. Ind.) (filed Oct. 12, 2018). One of those creditors was Ally Financial, which had recently extended them an automobile loan secured by a 2016 Kia Sedona. Suppl. App. 50 at 57:17–58:5; *id.* at 117 at 174:8–175:11.

6

This was the Dulworths' fourth bankruptcy as a couple. *See id.* at 35 at 42:2–8.

Ordinarily, Ally would have simply repossessed the vehicle. The Dulworths sought to avoid that through a reaffirmation agreement, which if valid would preserve the underlying debt from the bankruptcy discharge. *See id.* at 53 at 60:11–61:3; 11 U.S.C. § 524(c). These agreements implicate a complicated portion of the Bankruptcy Code, which applies "detailed prophylactic measures" to regulate reaffirmation agreements. *Whitehouse v. LaRoche*, 277 F.3d 568, 574 n.4 (1st Cir. 2002); *see infra* at 42–44. The agreement here instructed the Dulworths that they could cancel it at any time prior to discharge or within 60 days of the signing date, whichever was later. App. 210. It likewise warned that if the Dulworths did not follow various instructions, then "the reaffirmation agreement is not effective, even though you have signed it." *Id.* The Dulworths filed the reaffirmation agreement on the bankruptcy court docket, but the court did not adjudicate its validity.

A month later, the bankruptcy court entered a discharge order. *See* App. 214–15. That order did not specify which of the Dulworths' hundred-plus debts were discharged. *See id.* It instead provided "only a general summary of the bankruptcy discharge," warning that "the law is complicated" and that interested parties "should consult an attorney to determine the exact effect of the discharge in this case." *Id.* at 215. Instead of listing which of the

7

Dulworths' debts were or were not discharged, the order simply stated "[m]ost debts are covered by the discharge, but not all." *Id.* at 214–15.

Afterward, Ally took the position that the underlying debt was discharged in bankruptcy and reported as much to Experian. Because Ally was a vetted data furnisher, Experian categorized that debt accordingly, listing it as "Discharged through Bankruptcy Chapter 7/Never late" in Brianna's and Craig's credit files. *Id.* at 61, 380.

The Dulworths noticed Experian was reporting their loan as discharged about two and a half years later. *Id.* at 60–61. In response, they "repeatedly contacted Ally requesting that it correct the misreported loan information." Br. 6. Ally reiterated its position that the debt was discharged, a position it would maintain even after this suit was filed. App. 380; Suppl. App. 1–11 ¶¶ 13–15, 51–53.

The Dulworths did not respond by seeking clarification on the scope of the discharge order from the bankruptcy court. *See* Fed. R. Bankr. 4007(a), 7001(6), (9). Instead, they sought to force Experian to mediate their active dispute with Ally: "After [the Dulworths] concluded that Ally would not respond, Plaintiffs each submitted multiple disputes to" Experian. Br. 6.

To send the dispute letters to Experian, the Dulworths relied on counsel, who, in turn, outsourced the task to a third-party bulk mailer. The letters were "nearly identical to other letters" from bulk mailers "in both verbiage and

8

formatting," were addressed to the same incorrect building that is not listed on any consumer-facing resources as other bulk mail, and failed to disclose the existence of the Dulworths' counsel. App. 380–81. Due to glaring indicators that the letters were bulk mail, Experian classified the Dulworths' disputes as originating from a third party. *Id.* It thus did not process the reinvestigation requests. *Id.*

Experian's classification, however, ultimately did not matter. Because the validity of a reaffirmation agreement cannot be determined based on the face of the agreement, Experian cannot internally resolve reinvestigation requests implicating them. App. 380. Experian instead sends an ACDV request to the data furnisher. *Id.* When Experian became aware of the Dulworths' disputes, it sent ACDV inquiries to Ally, which "verified that the disputed information was accurate and that Plaintiffs' auto loan had not been reaffirmed." *Id.*

## III.  PROCEDURAL HISTORY.

The Dulworths filed suit against Experian and Equifax, alleging willful and negligent FCRA violations. *See id.* at 63–65; 15 U.S.C. §§ 1681n(a), 1681o(a). They claimed that Experian failed to follow "reasonable procedures" when preparing credit reports because it did not proactively monitor individual bankruptcy dockets to confirm furnisher reporting. App. 64. Experian also allegedly failed to reasonably investigate their challenge to Ally's

interpretation of the scope of the bankruptcy discharge. *Id.* at 64–65. The Dulworths later added a claim against Ally, which ultimately settled. *Id.* at 72.

Experian and Equifax moved for summary judgment. Experian observed that the Dulworths had failed to prove damages under the FCRA, noting that they were "[w]ithout proof of financial harm" due to the absence of any evidence of adverse credit decisions based on its reporting. Suppl. App. 199–203. On the merits, Experian explained that the Dulworths premised their case on a claimed legal inaccuracy—the validity of the reaffirmation agreement—which is not cognizable against CRAs under the FCRA. Experian also argued that its reporting procedures had already passed muster in this Court and that, in all events, the Dulworths could not prove any willful violation.

The district court ruled in Experian's favor. Reframing Experian's damages argument, the court ruled that the Dulworths had failed to establish standing. It observed that they did not dispute Experian's argument regarding the absence of financial harm. App. 21–22. And as for emotional distress— the only theory of standing the Dulworths defended in their response—the court ruled that what little testimony the Dulworths offered almost entirely "relate[d] to the filing of their bankruptcy or their failed efforts to get Ally to change how it was reporting the Ally Loan to the CRAs—and not to the actions of the CRAs." *Id.* The "only evidence the Dulworths point to regarding the

CRAs actions," the court continued, "is testimony from Brianna Dulworth that she did not follow through with the CRAs regarding her dispute of the reporting of the Ally Loan because she 'was frustrated.'" *Id.* at 21. That statement was too conclusory to support injury. *Id.* at 21–22. Finally, the court noted the possibility of reputational harm from the publication of false credit information, but concluded that the Dulworths lacked record evidence to show that Experian had actually published false information. *Id.* at 22–23.

The court likewise agreed with many of Experian's merits arguments when resolving the Dulworths' identical claims against Equifax. Relevant here, it held that their claims were premised on an alleged legal dispute over the validity of the reaffirmation agreement and that reliance on Ally's reporting was not unreasonable under § 1681e(b). *Id.* at 25–31. This appeal followed.

## STANDARD OF REVIEW

This Court reviews "*de novo* questions of both standing and the merits" resolved at summary judgment. *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1015 (7th Cir. 2016). Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The Court may "affirm the district court's grant of summary judgment … on any ground supported by the record" when the claims at issue were

11

disputed below. *Gilbank v. Wood Cnty. Dep't of Human Servs.*, 111 F.4th 754, 787 (7th Cir. 2024) (en banc) (reaching the merits where the district court erroneously dismissed on jurisdictional grounds because the defendant had moved for summary judgment on the relevant claims).

## SUMMARY OF ARGUMENT

**I.** The district court correctly concluded that the Dulworths lacked standing to sue Experian. On appeal, most of the Dulworths' standing theories are forfeited, and all are meritless.

**A.** The Dulworths have not established reputational harm, which requires them to prove that Experian sent false information to a third party that understood the defamatory significance of the material. The Dulworths' only evidence is a page in their credit file indicating that certain third parties made credit inquiries on them. But this Court has held that this exact evidence is insufficient, reasoning that the mere existence of credit inquiries "indicate[s] nothing about [a] third party's assessment of [a plaintiff's] creditworthiness." *Freeman v. Ocwen Loan Serv., LLC*, 113 F.4th 701, 708 (7th Cir. 2024). And even if the Dulworths could prove publication, they could not trace it to their reinvestigation claim under § 1681i(a) because every single credit inquiry they cite predated their reinvestigation requests to Experian.

**B.** The Dulworths fare no better with their belated attempt to prove pecuniary harm from adverse credit reporting, wasted time, and unspecified

"expenses."  They never pleaded facts to support these injuries, and their arguments are so cursory as to be forfeited.  Anyway, the Dulworths never raised these points before the district court, even as Experian put them on notice through its damages argument. These claims are also all meritless. The Dulworths cite no evidence that any creditor took adverse action because of Experian's reporting or that they otherwise suffered pecuniary harm.  And even if they could, their theory of wasted time is not cognizable.

**C.**    Finally, the Dulworths forfeited standing based on emotional distress.  The district court ruled that they could not trace what few statements they made regarding emotional distress to Experian's reporting.   The Dulworths do not respond, instead rehashing the same arguments they did below.  That triggers forfeiture.

Anyway, the Dulworths' conclusory testimony does not satisfy this Court's standard for FCRA damages.  And more fundamentally, this Court has been clear that such hazily described emotional distress alone is not cognizable to support standing in closely analogous circumstances.

**II.**    The purported inaccuracy at the heart of the Dulworths' FCRA claims is legal and thus falls outside of the "accuracy" requirements of both § 1681e(b) and § 1681i(a).

**A.**    The Dulworths' asserted inaccuracy turns on the validity of their reaffirmation agreement.  That inquiry is materially indistinguishable from

13

*Chuluunbat*, 4 F.4th 562, where plaintiffs disputed who owned their debt because their purported creditors could not produce a debt-assignment agreement. This Court held that the plaintiffs necessarily raised a legal dispute because disputes over debt ownership would still implicate the underlying validity of an assignment agreement, even if only applying law to facts. This remained so even though the plaintiffs' actual argument—that the agreements did not exist—was factual rather than tied to some legal infirmity.

This accords with this Court's decision in *Chaitoff*, which clarified that a dispute is factual if it does not "require [a CRA] to investigate beyond the face of the documents [the consumer] provided." 79 F.4th at 815. In that case, the consumer provided the CRA with both a copy of an agreement that on its face required the furnisher to report the existence of a payment plan, as well as written confirmation from the furnisher that the consumer had complied with the agreement. These documents distinguished *Chaitoff* from *Chuluunbat*, because they liquidated any legal disputes over validity.

Even if there were a greater burden, this case would satisfy it. Reaffirmation agreements are a heavily regulated, closely scrutinized form of contract. These regulations include not just state contract law, but also prophylactic requirements that must be met before a reaffirmation agreement is valid. Resolving whether a purportedly reaffirmed debt was discharged necessarily would require understanding and applying these prophylactic

14

requirements, as bankruptcy courts regularly must do when they reopen bankruptcy proceedings to determine the validity of a reaffirmation agreement. Given these requirements, contractual validity simply cannot be assumed. Indeed, it is not obvious that the reaffirmation agreement at issue here is valid under these requirements.

**B.** The Dulworths also claim that the mere fact they were making payments was material, regardless of the underlying agreement, because creditors ostensibly would care about their "ability to adhere to a payment schedule." But the overwhelming weight of legal authority, federal guidance, and industry standards all agree that voluntary payments without an underlying debt are not a material omission under the FCRA. And in the context of bankruptcy discharge, concluding otherwise is contrary to the Bankruptcy Code, where reporting payments on discharged debt is evidence of contempt that plaintiffs can sue to enforce.

**III.** Legal falsity aside, the Dulworths cannot show that Experian's reporting processes were unreasonable under § 1681e(b). This Circuit has repeatedly held that CRAs may rely on furnisher reporting in the absence of prevalent unreliable information from that furnisher. Experian relied on Ally's reporting only after Ally was vetted, and the Dulworths do not contend that Experian had notice that Ally was unreliable. Its processes were thus not unreasonable, and certainly not willfully violative of the FCRA.

**IV.**    Finally, the Dulworths cannot show that Experian unreasonably, much less willfully, failed to reinvestigate their disputes.  Experian classified their letters as third-party bulk mail because the letters had glaring indicators that they were, in fact, just that.  Experian's third-party mail policy is based on a reasonable interpretation of the FCRA's prohibition on unauthorized disclosure of consumer reports.  And there is no suggestion that Experian recklessly applied that policy here.

## ARGUMENT

## I.    THE DULWORTHS FAILED TO ESTABLISH STANDING.

Because litigants must establish the "irreducible constitutional minimum" of standing, the Dulworths could maintain their suit against Experian only if they suffered a concrete and particularized injury that is both traceable to Experian's allegedly unlawful conduct and redressable by the court.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–61 (1992).  Whether an alleged harm is "concrete" turns on whether it "has a close relationship to a harm traditionally recognized as a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021).  "[T]raditional tangible harms" like physical injury or pecuniary damage often "readily qualify as concrete."  *Id.*  Some intangible harms also qualify, but only if they have "a close historical or common law analogue."  *Freeman*, 113 F.4th at 708.

The Dulworths developed their case on the assumption that Experian's allegedly inaccurate reporting caused them to suffer adverse credit actions. They were thus caught flat-footed when Experian pointed out that that every single adverse action they identified was based on reporting from other CRAs. But discovery had closed, and they were at the "put up or shut up moment in [this] lawsuit." *Diadenko v. Folino*, 741 F.3d 751, 757–58 (7th Cir. 2013). So they responded with what they had: an unpleaded, cursory discussion of emotional harm founded on a few conclusory statements. Now on appeal and faced with the district court's rejection of their fallback, the Dulworths try again. Cobbling together inapposite evidence, they present novel theories that they never pursued in discovery, much less presented to the district court. Most of these arguments are forfeited several times over. None has merit.

### A.    The Dulworths Cannot Establish Reputational Harm.

The Dulworths first argue that they suffered a "reputational harm" akin to the common-law tort of defamation. Br. 23. Grabbing onto select parts of the district court's analysis, they assert that they "would have standing if [they] could show that a CRA's inaccurate credit reports were published to third parties." *Id.* That is true so far as it goes, which is not very far: the Dulworths cannot show publication or traceability.

1.    As the Dulworths acknowledge, establishing standing through the defamation analogue requires them to prove publication. *See, e.g.,*

17

*TransUnion*, 594 U.S. at 432. Relevant here, an "essential" requirement that "has always been necessary to prove publication" is that "the third party must understand the defamatory nature of the communication." *Ewing v. MED-1 Sols., LLC*, 24 F.4th 1146, 1154 (7th Cir. 2022); *accord Freeman*, 113 F.4th at 709.

This Court's decisions in *Freeman* and *Ewing* are illustrative. The plaintiff in *Freeman* alleged reputational harm from an allegedly false characterization of a debt's status. 113 F.4th at 709. And there, the "record indicate[d] that [third parties] requested [plaintiffs'] credit report from [the CRA]" and that "those reports contained [the] inaccurate reporting." *Id.* Critically, however, "none of this evidence amount[ed] to specific facts establishing that [the defendant] disseminated the inaccurate reporting to a third party … who understood the defamatory significance of the inaccurate reporting." *Id.* at 710. Evidence that "merely shows that [a CRA] included … inaccurate reporting in its own credit reports," this Court held, cannot support reputational harm because it "indicate[s] nothing about [a] third party's assessment of [the consumer's] creditworthiness." *Id.*

*Ewing*, 24 F.4th 1146, depicts the other side of the coin. There, defendant furnishers erroneously reported disputed debt as undisputed to TransUnion. But unlike the plaintiff in *Freeman*, the plaintiffs in *Ewing* had evidence that "TransUnion understood the defamatory significance" of that

18

information: when the creditors "eventually recorded the debts as disputed," the plaintiffs' "credit score[s] rose." *Id.* at 1149–50, 54. That showed "TransUnion's assessment of their creditworthiness took into account whether a debt was disputed or not." *Id.* at 1154. No such evidence exists here.

Here, the lone evidentiary support that the Dulworths cite is their reinvestigation demands, which happen to contain partial copies of their credit disclosure statement from Experian, which, in turn, happens to note that certain entities made some sort of inquiries into their credit files. *See* Br. 24 (citing App. 250, 277, 307–08, 336). Because the Dulworths never developed this argument in discovery, they can point to no other evidence from any of these entities related to publication.

This case is thus on all fours with *Freeman.* The Dulworths' unadorned reference to credit inquiries, without more, asks the Court to assume that third parties understood the defamatory significance of particular information from the fact that they requested credit reports. But that is precisely what *Freeman* held was insufficient. *See* 113 F.4th at 709–10.

2.     Even if publication could be inferred, the Dulworths' argument for reputational harm is on its own terms not "fairly traceable to [Experian's] allegedly illegal action" for purposes of the Dulworths' reinvestigation claim

19

under § 1681i(a). *Pavlock v. Holcomb*, 35 F.4th 581, 590 (7th Cir. 2022).[1]  Of course, "plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion*, 594 U.S. at 431.  And under § 1681i(a), "Experian must be notified of an error before it is required to reinvestigate." *Sarver*, 390 F.3d at 971.

The Dulworths argue that they suffered reputational harm from credit inquiries that appeared in "copies of Experian's credit reports, which were included in Plaintiffs' disputes to Experian." Br. 24.  In other words, the Dulworths only claim reputational harm from inquiries that occurred *prior to* the Dulworths' disputes and thus *prior to* any opportunity for Experian to reinvestigate. *See* App. 250, 277, 307–08, 336 (reporting that the latest inquiry was made in June 2021 and earliest reinvestigation request was made in September 2021).  This Court has repeatedly rejected standing where, as here, the plaintiff's alleged injuries predated the defendant's alleged FCRA violation. *See, e.g.*, *Foster*, 52 F.4th at 322 (harm from decrease in credit that occurred a year before reinvestigation request not traceable to alleged reinvestigation); *see also Sarver*, 390 F.3d at 971 (similar for damages causation); *Ruffin-Thompkins v. Experian Info. Sols., Inc.*, 422 F.3d 603, 609 (7th Cir. 2005) (same).

---

[1] The Dulworths' separate claim under § 1681e(b) fails for distinct reasons discussed elsewhere. *See infra* at 36–53.

**B.     The Dulworths Cannot Establish Pecuniary Harm.**

The Dulworths next briefly invoke monetary damages, arguing that they "received less favorable credit offers in connection with the CRA Defendants' inaccurate reporting" and "suffered pecuniary losses in the form of lost time and expenses as a result of Defendants' inaccurate reporting." Br. 25. These arguments are both forfeited and meritless.

1.     The Dulworths' attempt to ground standing in pecuniary harm is forfeited three times over. To start, the Dulworths failed to plead facts to support harms from "loss of time and related expenses" in their complaint. Br. 25 (citing only inapposite allegations regarding reputational and credit harm). Even at summary judgment, courts "reviewing potential injuries for standing purposes … are constrained by the operative complaint." *Persinger v. Sw. Credit Sys., LP*, 20 F.4th 1184, 1190 (7th Cir. 2021); *accord, e.g.*, *Freeman*, 113 F.4th at 708. The Dulworths "cannot broaden [their] complaint by inserting a new injury" that they did not plead. *Pennell v. Global Tr. Mgmt., LLC*, 990 F.3d 1041, 1045 (2021) (finding forfeiture at summary judgment).

Second, the Dulworths' arguments regarding pecuniary harm on appeal reduce to two sentences—one vaguely referencing "lost time and expenses" and the other gesturing (for the first time on appeal) at adverse credit decisions. *See* Br. 25. They present no analysis for either conclusion. And they cite no record evidence to substantiate any "lost time and expenses," referencing only

21

their legal filings below. *See id.* These citations are inapposite and cannot incorporate other filings by reference. *See, e.g.*, *Mitze v. Colvin*, 782 F.3d 879, 882 (7th Cir. 2015). Such "[p]erfunctory … arguments are waived." *Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005).

Finally, the Dulworths improperly raise these arguments for the first time on appeal. In response to Experian's summary-judgment argument that the Dulworths had failed to show they suffered any actual damages from its purported FCRA violations, *see* Suppl. App. 199–203, the Dulworths discussed only emotional distress. They "thus forfeited arguments resting on any other [injuries] by failing to discuss them in [their] district court brief." *Tutwiler v. Kijakazi*, 87 F.4th 853, 857 (7th Cir. 2023). Although the Dulworths suggest that they raised pecuniary harm below, they cite a portion of the factual background section of their summary-judgment brief that makes no mention of any expenses linked to Experian. *See* Br. 25. Nowhere in their brief, much less in the argument section, did they claim that they suffered a particular pecuniary injury. That is a forfeiture. *See Tutwiler*, 87 F.4th at 857.

The Dulworths contend that they could not forfeit pecuniary harm because the district court framed the absence of evidence regarding their injuries in terms of standing, while Experian characterized it as a damages problem. To the Dulworths, this distinction somehow deprived them of notice

that they needed to present "the full range of [their] injuries and damages." Br. 28–29.[2]

This makes no sense. For example, district courts unquestionably may take *sua sponte* action against parties—including "enter[ing] summary judgment[]"—"so long as the losing party was on notice that she had to come forward with *all of her evidence*." *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) (emphasis added). As *Celotex* itself makes clear, this standard does not require notice that a particular legal issue is in play. Instead, the losing party has notice "where the evidence relating to" an issue that was raised "was the same for the … claims not addressed" in briefing but resolved *sua sponte*. *Bodenstab v. Cook Cnty.*, 569 F.3d 651, 661 (7th Cir. 2009) (finding notice); *accord, e.g.*, *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 384–85 (7th Cir. 2008) (finding notice where plaintiff failed to present sufficient evidence on a disputed claim and "would have to show the same things" for undisputed ones).

---

[2] As an initial matter, the Dulworths forfeited any objection to a lack of notice. All five Circuits to consider the issue have held that parties who "fail to object to the court's *sua sponte* entry of summary judgment … will be found to have waived their objection on appeal." 10A C. Wright & A. Miller, Federal Practice and Procedure § 2720.1 (4th ed. 2024); *see, e.g.*, *AMG Trade Dist., LLC v. Nissan N. Am., Inc.*, 813 F. App'x 403, 407 (11th Cir. 2020) (adhering to published holdings from the Fifth, Eighth, and Tenth Circuits); *Todman v. Baltimore*, 104 F.4th 479, 496 (4th Cir. 2024); *see also Pucillo v. Nat'l Credit Sys., Inc.*, 66 F.4th 634, 637 n.2 (7th Cir. 2023). To the extent the issue remains open, there is no reason to create a circuit split.

Here, the Dulworths were on notice that they needed to present evidence of pecuniary harm because Experian squarely argued below that they could not "show that they suffered damages as a result of the inaccurate information" and that they were "without financial harm."  Suppl. App. 199–201.  And in the context of pecuniary harm, the evidentiary subject matter for both damages and standing—whether the Dulworths can show monetary harm—is the same. Yet the Dulworths chose not to respond to this point outside of pressing emotional distress.  *See* Suppl. App. 237–39.  It was their "duty to package, present, and support their arguments."  *FTC v. Credit Bur. Ctr., LLC*, 937 F.3d 764, 770 (7th Cir. 2019).  To the extent the Dulworths chose to present half of their case, they cannot fault the district court for basing its decision on that choice.

**2.**    The Dulworths' decision was perhaps understandable: neither of their belated arguments for pecuniary harm passes muster.

Start with adverse credit decisions.  Experian correctly observed below that the Dulworths have no evidence connecting it to any such event, and the record has not changed on appeal.  Lenders are obligated to disclose any CRAs that furnished reports that formed any part of the basis for an adverse action against any consumer.  *See* 15 U.S.C. § 1681m(a)(3).  And not a single one of them identified Experian as a source of information here.  Consider the Dulworths' lone record citation on this point, which is a denial letter from

24

Teachers Credit Union that lists *Equifax* as the only source of information. *See* App. 74; *see Wantz v. Experian Info. Sols.*, 486 F.3d 829, 834 & n.1 (7th Cir. 2004). To reiterate: there is no evidence that Experian had anything to do with any of the adverse credit actions alleged in this suit.

The Dulworths' conclusory references to pecuniary harm from "loss of time" and unspecified "related expenses" fare no better. Those assertions do not provide sufficient detail to conclude that the injury exists. If a plaintiff cannot create a genuine dispute over financial harm by simply claiming he had to sell items for a loss without "any evidence of a single item that he actually sold, how much it sold for, and what the fair market value was," *Foster v. PNC Bank*, 52 F.4th 315, 323 (7th Cir. 2022), then it is certainly not enough to just mention "related expenses." That is especially true here, where the most obvious expense the Dulworths faced—the cost of counsel hired before raising disputes with Experian—does not count. *See, e.g.*, *Freeman*, 113 F.4th at 709; *Brunett v. Convergent Outsourcing, Inc.*, 982 F.3d 1067, 1069 (7th Cir. 2020).

Finally, to the extent the Dulworths invoke wasted time as an injury distinct from pecuniary harm, that harm is not legally cognizable. This Court has recognized as much, holding for example that a plaintiff cannot sue a debt collector solely because those collection efforts "interrupted [plaintiff's] self-employment to mull over [her] memories and scour [her] records about the asserted debt." *Brown v. CACH, LLC*, 94 F.4th 665, 667 (7th Cir. 2024).

Instead, that plaintiff must "produce evidence" of how those "debt-collection efforts … reduce[d] [her] self-employment income." *Id.*; *see, e.g.*, *Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934, 939 (7th Cir. 2022) (holding that making calls to debt collectors and seeking legal advice were insufficiently "related to an injury that our legal tradition recognizes as providing a basis for a lawsuit"). Otherwise, every plaintiff who requested a reinvestigation under § 1681i would have standing by virtue of the fact that they took the time to dispute a purportedly inaccurate report.

## C.    The Dulworths Cannot Establish Emotional Distress.

The Dulworths finally argue that they have standing due to emotional distress. This argument too is both forfeited and meritless.

### 1.    The Dulworths Forfeited Reliance on Emotional Distress.

As this Court has recognized, an "appellant who does not address the *rulings and reasoning* of the district court forfeits any arguments she might have that those rulings were wrong." *Hackett v. City of South Bend*, 956 F.3d 504, 510 (7th Cir. 2020). The district court rejected the Dulworths' claim on traceability grounds, holding that almost none of their (scant) testimony on emotional distress related to Experian's reporting. App. 21; *see supra* at 11. The only exception was Brianna's bare statement that she "was frustrated" by Experian, which was far too conclusory. App. 21.

26

On appeal, the Dulworths do not acknowledge, much less dispute, this reasoning. They instead mischaracterize the district court as "apparently concluding" that the inclusion of "any conclusory statements about the plaintiffs' feelings" eliminated all "value whatsoever" from more detailed testimony. Br. 27. The district court did not make such a nonsensical conclusion. It was traceability, not the mere inclusion of a conclusory statement, that defeated the Dulworths' evidence. They stubbornly refuse to acknowledge this fact, even as they cite the exact record pages the court rejected on traceability grounds to nonresponsively argue that their testimony was sufficiently specific. *Id.* at 27–28. Because they "failed to engage with the district court's reasoning," much less offer a basis to disagree with it, they have forfeited any challenge to it. *Hackett*, 956 F.3d at 510 (finding forfeiture); *see, e.g.*, *Mwangangi v. Nielsen*, 48 F.4th 816, 829 (7th Cir. 2022) (same).

### 2. The Dulworths Fail to Establish Cognizable Emotional Distress.

On the merits, the Dulworths do not establish a concrete injury related to emotional distress. Applying caselaw related to showing "actual damages" under the FCRA, *see* 15 U.S.C. § 1681n(a)(1), they contend that a few passing sentences in their testimony related to stress and frustration are sufficient. They are wrong several times over.

27

Accepting the Dulworths' argument on its own terms, their conclusory assertions of emotional distress fail to satisfy this Circuit's strict standard for damages. These deficiencies become even more stark when this Circuit's standing precedent is considered, which has rejected purely psychological harm as a concrete injury in closely related circumstances. And even setting this precedent aside, the Dulworths make no attempt to ground their harm in the historical inquiry that this Circuit requires for intangible harms.

1.     When interpreting the meaning of "actual damages" under the FCRA, this Court has "maintained a strict standard for a finding of emotional damage." *Sarver*, 390 F.3d at 971. A plaintiff must "explain the circumstances of his injury in reasonable detail," which will allow examination of whether the evidence is sufficient to create a triable issue on the existence of emotional damages. *Id.* Additionally, this Court "require[s] that a plaintiff show *demonstrable* emotional distress." *Biggs v. Vill. of Dupo*, 892 F.2d 1298, 1305 (7th Cir. 1990).

This standard is truly "strict." This Circuit's precedent is a graveyard of attempted claims grounded in purported evidence of emotional distress. This includes bare statements, such as that plaintiffs suffered from "stress" and "anger." *Persinger*, 20 F.4th at 1194; *accord, e.g.*, *Denius v. Dunlap*, 330 F.3d 919, 929–30 (7th Cir. 2003) (recognizing that "bare allegations by a plaintiff that the defendant's conduct made him 'depressed,' humiliated,' or the like are

not sufficient to establish injury" absent exceptional circumstances). It also encompasses conclusory statements adorned with a few factual details. *See, e.g.*, *Wantz*, 386 F.3d at 833 (testimony of distress from witnessing others check credit report and see inaccurate information); *Nekony v. Painter*, 653 F.2d 1164, 1172–73 (7th Cir. 1981) (testimony that plaintiff was so "depressed" and "completely humiliated" that he could not seek other employment); *Biggs*, 892 F.2d at 1304–05 (testimony of distress from being fired and worry about how his family would react); *Denius*, 330 F.3d at 929–30 (distress from a firing that left plaintiff unemployed in his sixties).[3]

Although the Dulworths promise that their testimony was sufficiently detailed, their briefing is glaringly devoid of any actual quotations. That is because the passing testimony they cite does not come close to providing any meaningful detail of emotional distress for either of them.

**Craig.** Craig seeks to ground standing only in "his own feelings of stress and frustration" from trying to dispute the loan. Br. 28. He testified only that

---

[3] In some circumstances, "bare allegations [of emotional distress]" can be sufficient for damages when "the facts underlying the case are so inherently degrading that it would be reasonable to infer that a person would suffer emotional distress from the defendant's action." *Denius*, 330 F.3d at 929. But this narrow category was reserved to egregious cases, most notably those involving racial discrimination, "one of the relics of slavery." *United States v. Balistrieri*, 981 F.2d 916, 932 (1992). This Court has repeatedly recognized that an inaccuracy in a credit report is a far cry from invidious racial discrimination. *See Ruffin-Thompkins*, 422 F.3d at 610 (distinguishing *Balistrieri*); *Wantz*, 386 F.3d at 834 (same).

he suffered from "aggravation" and that "trying to fix things" was "very frustrating." App. 231. These generic references to stress, aggravation, and frustration are precisely the sort of "conclusory statements" that this Court has repeatedly rejected. *E.g.*, *Persinger*, 20 F.4th at 1194; *Sarver*, 390 F.3d at 971.

**Brianna.** Brianna likewise focuses on how she "felt frustrated" with the process of disputing the debt without providing any further detail regarding those conclusory assertions of emotional distress. Br. 27–28. The only distinction is that she argues in passing that "she suffers from high blood pressure and discussed with her physician how this physical condition might be connected to all of the emotional stress she experienced." *Id.* at 28.

This anemic argument—she "discussed" how her blood pressure "might be connected" to "all" of her emotional stress—merely engages in speculative possibilities. Indeed, that she "discussed" with a doctor how her high blood pressure "might be connected" to stress, Br. 28, falls short of even *arguing* that she had high blood pressure *because* of anything having to do with her credit reports. Rule 56 demands more. *See, e.g.*, *Basden v. Prof. Transp., Inc.*, 714 F.3d 1034, 1938 (7th Cir. 2013) (plaintiff's speculation that "a diagnosis from a specialist and the use of prescription medication would allow her to return to work" was insufficient to prove ability to work under ADA); *Weigel v. Target Stores*, 122 F.3d 461, 468–69 (7th Cir. 1997) (psychiatrist's statement that

"there was a good chance" plaintiff could return to work with treatment was "too conclusory and uninformative to be given any weight").

The record is even more decisive. Brianna never testified that she sought treatment for high blood pressure. Nor did she produce any evidence related to her medical history, a subject uniquely within her ken. Instead, she cites only two statements related to blood pressure: (1) "I have high blood pressure" and (2) that her high blood pressure "started a few years ago" and predated the bankruptcy itself. App. 226–27, at 241:21–24, 242:16–21. Brianna does not point to any medical records or other evidence to substantiate any physical manifestations of stress, much less a diagnosis that could establish medical causation. Other than her bare statement that she has high blood pressure, Brianna testified that she merely "*spoke* to [her] medical doctor in regard[] to *stress*." *Id.* at 226, at 241:4–7. And when asked whether she was prescribed anything for stress, Brianna answered only that her doctor "sent me to have some blood work done," *id.* at 242:13–15, without clarifying or providing evidence of the results of those tests.

Brianna's passing reference to "blood pressure" falls short of explaining the "circumstances of [the] injury in reasonable detail." *Sarver*, 390 F.3d at 971. She identifies no evidence, even in her own testimony, to support she spoke to a doctor about blood pressure, or (if so) that she was ever diagnosed with hypertension, or (if so) that this preexisting condition got worse. Nor does

31

she clarify when any exacerbation (assuming it existed) happened—for example, following the bankruptcy, or her subsequent attempts to dispute Ally's reporting, or her subsequent attempts to force Experian to intervene in her dispute with Ally.  Her reference to blood pressure thus provides no basis for this Court to understand the "circumstances" surrounding her stress.  At most, it is akin to bare statements regarding depression or anxiety that this Court has repeatedly emphasized are insufficient.  *See, e.g.*, *Denius*, 330 F.3d at 929–30; *Nekony*, 653 F.2d at 1172–73; *see also, e.g.*, *Foster*, 52 F.4th at 321–22 (rejecting plaintiff's bare statements that he had flood insurance and was current on loans where he failed to provide details or documentation).

At bottom, Brianna "could have sought additional medical treatment or testing … and could have obtained non-speculative, non-conclusory evidence" that would have resolved whether she had high blood pressure, whether any connection existed between Experian and her blood pressure, and otherwise illustrated the circumstances (or lack thereof) surrounding her stress.  *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 289 (7th Cir. 2015) (affirming summary judgment where plaintiff presented only an expert's "speculative, untested suggestions").  But she did not.  And what little she did produce is insufficient to satisfy this Court's strict standard for damages.

2.     The Dulworths likewise face a more fundamental problem: This Court has repeatedly made clear in materially identical circumstances that

32

such hazily described "psychological harm, standing alone, cannot amount to an Article III injury in fact." *Freeman*, 113 F.4th at 711; *accord, e.g.*, *United States v. All Funds*, 783 F.3d 607, 616 (7th Cir. 2015) (similar); *Pierre*, 29 F.4th at 939 (similar). Indeed, this Court has held that a plaintiff suing under the FCRA could not ground standing in stress because "stress … is not a concrete injury." *Persinger*, 20 F.4th at 1191 (citing *Wadsworth v. Kross, Lieberman & Stone, Inc.*, 12 F.4th 665, 668–69 (7th Cir. 2021)). And applying this prohibition in the closely related context of the Fair Debt Collections Practices Act, this Court has likewise recognized that Article III standing cannot be grounded in evidence, however detailed, that a plaintiff suffers from "anxiety," or felt "worr[ied]," "annoyed," "confused," "intimidated," "fear," "infuriate[ed]," "indigna[nt]," or "embarrassed." *Pierre*, 29 F.4th at 939; *Wadsworth*, 12 F.4th at 668–69; *Freeman*, 113 F.4th at 710; *Pennell*, 990 F.3d at 1045; *Pucillo*, 66 F.4th at 638.

Instead, plaintiffs instead "must show a harm beyond emotional response, such as an adverse credit rating." *Pucillo*, 66 F.4th at 639. In other words, they must "tie" psychological harm "to an injury" that is in fact cognizable. *Brunett*, 982 F.3d at 1068. The classic example is a false characterization of a debt that leads a debtor to "act[] to her detriment [due to] confusion," *Pennell*, 990 F.3d at 1045—for instance, by paying it unnecessarily.

Neither of the Dulworths establishes any such related harm. As discussed, their testimony does not provide any detail of emotional distress beyond conclusory statements of stress, unlinked to Experian and undetailed beyond a bare assertion of "blood pressure." *See supra* at 30. And to the extent that Experian is required to shadowbox on standing possibilities despite the Dulworths' failure to invoke this precedent, the only theoretically plausible outlet would not apply. Specifically, this Court has left open whether standing would require the Dulworths to resolve the open question whether emotional distress "might confer standing if [it] manifest[s] in harm that is supported by a medical diagnosis." *Patterson v. Howe*, 96 F.4th 992, 999 n.1 (7th Cir. 2024). They, of course, do not try to do so. *See id.* at 999.

In all events, this case is not a candidate to decide whether to recognize this form of standing. The closest the Dulworths come is Brianna's bare argument regarding blood pressure. Again, allegations that she "discussed" with a doctor how her high blood pressure "might be connected" to stress, Br. 28, fall short of even *arguing* that blood pressure in fact did "manifest" from her stress, much less that such a manifestation was "supported by a medical diagnosis," *Patterson*, 96 F.4th at 999; *see supra* at 30. In fact, the Dulworths argued below that they "are not that required to have sought medical assistance to prove [emotional distress] damages." Suppl. App. 237.

Understandably, then, Brianna does not even try to argue on appeal that she received a diagnosis for *anything*.

The record is in accord. As discussed, Brianna does not point to any medical records or other evidence to substantiate any physical manifestations of stress, much less a diagnosis that could establish medical causation. *See supra* at 31. Even if she were competent to provide a medical opinion herself, this testimony would be "insufficient [and] conclusory as a legal matter." *Foster*, 52 F.4th at 321–22; *see, e.g.*, *Stern*, 788 F.3d at 289; *Weigel*, 122 F.3d at 468–69; *see also Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001) (plaintiff was not competent to testify about "causal relation" between purported injury and medical symptoms). The Dulworths thus provide nothing to overcome this Court's rulings on the application of standing doctrine to emotional distress.

3. Even if this caselaw did not apply, the Dulworths would have to "identif[y] a 'close historical or common-law analogue' for [their] asserted injury." *Dinerstein v. Google, LLC*, 73 F.4th 502, 511 (7th Cir. 2023) (quoting *TransUnion*, 594 U.S. at 424). The Dulworths have not done so—and could not do so if they tried. After all, multiple Circuits have joined this Court in rejecting hazily sketched emotional distress as a concrete injury. *See, e.g.*, *Hekel v. Hunter Warfield, Inc.*, 118 F.4th 938, 943 (8th Cir. 2024); *Garland v. Orlans, PC*, 999 F.3d 432, 439–40 (6th Cir. 2021).

These holdings are understandable. The "analogue" for standing purposes must be a harm "*traditionally* recognized as providing a basis for a lawsuit in American courts." *Dinerstein*, 73 F.4th at 511 (quoting *TransUnion*, 594 U.S. at 424). But of course, the common law's default tort rules *precluded* recovery for emotional distress "*unless* the distress f[ell] within certain specific categories that amount to recovery permitting *exceptions*." *Metro-North Commuter R. Co. v. Buckley*, 521 U.S. 424, 429 (1997); *see also Garland*, 999 F.3d at 440 ("While 'a great deal of conduct may cause emotional harm,'" actionable harm for intentional infliction of emotional distress was limited to "'a very small slice of human behavior.'" (quoting Restatement (Third) of Torts: Physical and Emotional Harm § 46 cmt.a)). The limited circumstances in which these damages were allowed differed significantly from any distress resulting from FCRA violations.[4]

*     *     *

At bottom, any harm the Dulworths may have suffered cannot be attributed to Experian, which had nothing to do with any relevant credit

---

[4] *See, e.g.*, Restatement (Second) of Torts § 47 & cmt. a (among other limits, allowing damages for intentional infliction of emotional distress only when the defendant intended to cause emotional distress, rather than simply intended to violate "any other … legally protected interests"); *id.* § 313(1) (among other limits, allowing damages for negligent infliction of emotional distress only when that distress causes "illness or bodily harm").

decision.   To the extent they suffered actionable injuries, their claims lie elsewhere.

## II.   THE DULWORTHS BASE THEIR SUIT ON AN INACTIONABLE LEGAL INACCURACY.

Turning to the merits, the Dulworths' claims under § 1681e(b) and § 1681i(a) require establishing that Experian reported inaccurate information. *See Frazier v. Equifax Info. Servs., LLC*, 112 F.4th 451, 455 (8th Cir. 2022). Relevant here, it is well-established that the statutory meaning of "accuracy [under § 1681e(b) and § 1681i(a)] … never reaches beyond questions of fact." *Chaitoff*, 79 F.4th at 814; *see Denan*, 959 F.3d at 297.   CRAs are thus not required to resolve legal disputes or even "apply[] law to facts." *Chuluunbat*, 4 F.4th at 568.   Proof of a purely factual inaccuracy is a "threshold requirement for claims under both sections," *id.* at 567, that the plaintiffs have the burden to affirmatively demonstrate, *see, e.g.*, *Denan*, 959 F.3d at 294; *see also Brill v. TransUnion LLC*, 838 F.3d 919, 922 (7th Cir. 2016) (holding that plaintiffs cannot "invoke[] the statutory duty of reinvestigation … to shift the burden of proof" to prove inaccuracy to CRAs).

The FCRA's distinction between legal and factual inaccuracies is not a technicality.   It resolves *who* holds the burden to address legal disputes and bears the risk of failing to do so.   Legal questions are "outside the competency of a consumer reporting agency," so requiring it to resolve such questions would

inappropriately "graft responsibilities of data furnishers and tribunals onto" it. *Chuluunbat*, 4 F.4th at 568. Instead, "[o]nly furnishers are tasked with accurately reporting liability." *Id.* This Court has repeatedly recognized, then, that plaintiffs should "confront the creditors who are in the best position to respond" because they "shoulder th[e] burden" of accurately reporting legal liability. *Id.* at 568–69; *accord Denan*, 959 F.3d at 295. This case proves the point: the Dulworths have already settled with Ally, and if further questions remain, they can move in the bankruptcy court to clarify the discharge order.

In practice, "the central question" when adjudicating a plaintiff's burden to show factual inaccuracy "is whether the alleged inaccuracy turns on applying law to facts or simply examining facts alone." *Chuluunbat*, 4 F.4th at 568. The exemplar case of a legal dispute occurs where a consumer raises a legal defense to a debt. *See, e.g.*, *Denan*, 959 F.3d at 295.

On the other hand, "CRAs can read and understand legal documents," and asking them to do so does not necessarily raise a legal question. *Chaitoff*, 79 F.4th at 815. Thus, disputes that do not require a CRA "to investigate beyond the face of the documents it was provided" are not legal, at least so long as those documents are "of unquestioned authenticity." *Id.* The paradigmatic example of such a dispute occurs where a CRA is asked only to "tak[e] notice of a previously resolved legal dispute," because that legal dispute has been liquidated into a fact. *Id.* So, for example, when a bankruptcy court reopens a

case to discharge a previously reaffirmed debt, "there is no doubt that [the debt in question] was discharged" and thus no legal dispute.  *Losch v. Nationstar Mort. LLC*, 995 F.3d 937, 941, 946 (11th Cir. 2021).

Here, the Dulworths and Ally signed a reaffirmation agreement, but the bankruptcy court never adjudicated its validity.  Instead, it entered only a heavily qualified discharge order that warned interested parties to "consult an attorney to determine the exact effect of discharge in this case."  App. 214–15.  After Ally reported the relevant loan as discharged, the Dulworths attempted to persuade it to change positions.  When that failed, they then demanded that Experian mediate their dispute with Ally over the validity of the debt.

Given these facts, the district court was correct.  Although the Dulworths attempt to repackage their claimed "inaccuracy," their claim stubbornly reduces to a legal dispute—whether their debt to Ally was discharged—and that question turns on the legal effect of a heavily regulated contract.

## A.  The Effect of the Reaffirmation Agreement Is a Legal Question.

As framed below, the purportedly inaccurate "information" at issue is Experian's description of the Ally loan as discharged.  There is no dispute that the debt would have been discharged in the absence of a valid reaffirmation agreement.  *See* 11 U.S.C. § 727(b).  Nor is there a dispute that the debt would not have been discharged in the presence of a valid one.  *See id.* § 524(c).  The

question is thus whether Experian could determine whether the reaffirmation agreement was valid without "investigat[ing] beyond the face of the documents it was provided." *Chaitoff*, 79 F.4th at 815.

It could not. The only relevant documents the Dulworths provided Experian were (portions of) the reaffirmation agreement and the bankruptcy court's vague discharge order. *See, e.g.*, App. 280–87. But as the district court correctly concluded, proving the mere existence of the agreement "does not necessarily mean that [the agreement] was valid," which is a legal question. *Id.* at 28. And unlike cases such as *Losch*, the bankruptcy court here did not adjudicate the validity of the reaffirmation agreement or otherwise make clear the scope of its discharge order. *See* 995 F.3d at 941, 946.

This analysis is all that is required under this Circuit's precedent to reject the Dulworths' claims. But if more were needed—either on the complexity of the legal issues or the particular infirmities that Experian would have had to resolve before reporting the debt as validly reaffirmed—this suit remains an obvious one for affirmance.

1. *Chuluunbat* is materially indistinguishable. There, as here, the disputed information turned on the existence of valid agreements, in that case agreements to assign debt. 4 F.4th at 567. The plaintiffs likewise assumed that legal agreements are presumptively valid, arguing that "all that the [CRAs] need to ascertain is whether a purchase and sale agreement for [the]

debts exists." *Id.* This Court disagreed: "any investigation into whether the creditors were assigned the debts involves interpreting the legal validity of the assignment." *Id.* at 568.

Notably, *Chuluunbat* did *not* turn on the reasons why debtors and creditors disagreed on ownership of the debt—indeed, the actual dispute concerned the plaintiffs' factual contention that the assignment contracts did not exist. *Id.* at 565. Regardless of the nature of the underlying dispute, the plaintiffs ultimately "question[ed] the legal relationship of different parties to … debts, which is a task for a court." *Id.* at 568; *see also id.* at 568 ("[W]hether something is considered a factual question in a court does not resolve whether it is an inaccuracy under the FCRA.").

So also here. Ally consistently "report[ed] to Experian that [the] auto loan was included in [the] Chapter 7 bankruptcy." App. 380. And the Dulworths' "broad assertion that [the debt was reaffirmed] necessarily required [Experian] to make a legal determination about whether the plaintiffs or creditor[] [was] right about" the debt's discharge. *Chuluunbat*, 4 F.4th at 569. After all, the validity of the reaffirmation agreement is a necessary prerequisite to the Dulworths' position, and that question turns on both "applicable nonbankruptcy [contract] law," 11 U.S.C. § 524(c), as well as "detailed prophylactic measures" in the Bankruptcy Code," *Whitehouse*, 277 F.3d at 574 n.4; *see, e.g.*, 11 U.S.C. § 524.

41

The Dulworths make much of *Chaitoff*, which built on *Chuluunbat* to illustrate when a dispute *does* reduce to "just determining if an assignment agreement exists." *Chuluunbat*, 4 F.4th at 568.  It does not help them.  There, the consumer gave the CRA a "confirmation" in writing from the creditor that the consumer had "completed on time" his obligations pursuant to a Trial Period Plan that would modify his debt.  *Chaitoff*, 79 F.4th at 810.  And "critically for [this Court's] purposes," the face of that plan—the validity of which the creditor had acknowledged in writing—required that creditor to "report [the consumer's] … entry into a [TPP] in accordance with the requirements of the [FCRA]."  *Id.*  After the creditor failed to do so, the consumer disputed "the omission of his TPP from his credit report."  *Id.* at 812.

This Court ruled that nothing "about the [consumer's] alleged inaccuracy required Experian to investigate beyond the face of the documents it was provided."  *Id.* at 815.  Those "documents"—of "unquestioned authenticity"—both confirmed the validity of the TPP and facially required reporting that agreement to CRAs.  *Id.*  Therefore, the consumer's dispute was simply about "[t]he existence of [his] TPP," which "was [ ] factual—not legal."  *Id.*

The critical difference here is that the documents that the Dulworths provided—*i.e.*, part of the agreement itself and the generic discharge order that actively warned Experian to consult an attorney—did not allow Experian to resolve the dispute by reading them.  Thus, the dispute was not simply about

the existence of the reaffirmation agreement anymore than the dispute in *Chuluunbat* was about the mere existence of assignment agreements. And under that decision, the Dulworths cannot simply demand that Experian presume the underlying validity of a legal document. Indeed, the district court showed its familiarity with the complications that can accompany reaffirmation agreements in the past as it has addressed the same issue in a putative class action brought by the same law firm representing Plaintiffs here. *See Myers v. Equifax Info. Servs., LLC*, 2022 WL 4292179, at *30 (S.D. Ind. Sept. 16, 2022) (requiring CRAs to determine the validity of a reaffirmation agreement would mandate CRAs to make "a legal determination ... that 'exceeds the competencies' of the CRAs[] and that is [a determination] which the CRAs are not required to make under the FCRA").

2.     Even if this Circuit's caselaw imposed some higher bar, this dispute would clear it. Reaffirmation agreements are in a different league from the contract in *Chuluunbat*, which found a legal dispute in well-trodden contractual standards, the existence of which "necessarily" implicated a legal question over validity. 4 F.4th at 568 (citing without discussing or quoting Restatement (Second) of Contracts § 317 (1981)). And even focusing on this particular dispute, Experian would have had to make complicated legal determinations before resolving the scope of discharge.

43

a.     Reaffirmation agreements have a "long history" of abuse, 4 Collier on Bankruptcy ¶ 524.04 (16th ed. 2024), and are "viewed as a classic evil in bankruptcy law," *In re Price*, 370 F.3d 362, 378 (3d Cir. 2004).  The Code thus imposes a raft of requirements designed to "regulate and scrutinize" them.  *Id.* These "detailed prophylactic measures … have been applied strictly by courts." *Whitehouse*, 277 F.3d at 574 n.4 (cleaned up).

The Code's stringent requirements made this agreement contingent at the time of discharge and, separately, would have required Experian to enter complex legal waters.  For contingency, debtors have a statutory right to unilaterally rescind reaffirmation agreements "within sixty days after [the] agreement is filed with the court" simply "by giving notice of rescission to the holder of [the] claim."  11 U.S.C. § 524(c)(4).  The face of the reaffirmation agreement, of course, does not reveal whether an attempted, much less valid, rescission occurred, an action that may or may not require court approval depending on the circumstances.  *Compare, e.g.*, *Losch*, 995 F.3d at 941 (describing a bankruptcy court granting a motion to rescind affirmation even after the deadline), *with, e.g.*, *In re Booth*, 242 B.R. 912, 916 (B.A.P. 6th Cir. 2000) (oral rescission is allowed unless parties contract for different notice).

Diving deeper into the Code reveals a host of "legal requirements" that "parties must meet" to "have a valid" reaffirmation agreement.  *Chuluunbat*, 4 F.4th at 568; *see also Cox v. Zale Del., Inc.*, 239 F.3d 910, 917 (7th Cir. 2001)

(a reaffirmation agreement "is enforceable only if all the statutory conditions … are satisfied").  Consider the "lengthy and confusing" mandatory disclosure requirements, which a leading treatise speculates will require "many law firms … to draft forms that comply with these complicated … provisions." 4 Collier on Bankruptcy ¶ 524.04 (2024).  These requirements cannot be waived by a debtor after the fact.  *See* § 524(c)(2).  And as the treatise notes, "[t]here is … a potential for much litigation" over these provisions.  Collier, *supra* ¶ 524.04; *see, e.g.*, *In re Albright*, 554 B.R. 832, 836–37 (Bankr. N.D. Ohio 2016) (collecting decisions invalidating reaffirmation agreements because "statutorily required disclosures … were not included").

**b.**　　These requirements are not easily applied to the Dulworths' agreement.  The Code requires a "Summary of Reaffirmation Agreement" and a disclosure informing the debtor that the summary "'is made pursuant to the requirements of the Bankruptcy Code.'" 11 U.S.C. § 524(k)(3)(B).  It seems no such summary or disclosure of the debtor's legal rights was made in the agreement that the Dulworths signed.  *See In re Lee*, 356 B.R. 177, 181 (Bankr. N.D.W. Va. 2006) (invalidating agreement without, *inter alia*, the summary). The Code requires disclosing that debtors can "overcome" the presumption of undue hardship if they explain to the court how they can make payments, 11 U.S.C. § 524(k)(6)(A), which reduces the chance that debtors falsely overstate ability to pay.  The agreement apparently does not provide that disclosure.

45

More broadly, even where disclosures are provided, the language often departs from that of the Code, which creates "the peril of litigating whether the disclosures had been properly made." 4 Collier, *supra* ¶ 524.04.[5]  Overlaying these requirements is a mandate that disclosures be "made clearly and conspicuously." 11 U.S.C. § 524(k)(2).  That much is not clear here, considering that most of the required disclosures were packed into the end of the document in smaller font than the agreement itself.  *See, e.g.*, *Cole v. U.S. Capital*, 389 F.3d 710, 731 (7th Cir. 2004).

This is not to say the reaffirmation agreement is necessarily invalid. The point is that the FCRA does not put Experian in the uncomfortable position of answering that question.  At bottom, the "alleged inaccuracies here necessarily involve interpreting legal rights to a debt and making legal judgments." *Chuluunbat*, 4 F.4th at 569.  And "[w]hat the plaintiffs cannot do … is place the burden for determining whether their debt[] [was] validly re[affirmed] onto the consumer reporting agencies, where it does not belong." *Id.*

## B.    The Dulworths' Pivot to Payment History is Meritless.

The Dulworths have no answer to this Circuit's precedent.  Indeed, they do not cite *Chuluunbat* for anything other than two unrelated and

---

[5] *Compare, e.g.*, § 524(k)(3)(I) (requiring statement that the disclosure "'does not use the word 'may' to give the creditor specific permission'"), *with* App. 211 ("when this disclosure refers to what a creditor 'may' do, it is not giving any creditor permission to do anything").

unobjectionable propositions. But they clearly recognize its force. They strain to gloss their dispute into one of fact. Br. 33–34. They thus recast the "inaccuracy" as relating to only the "objectively verifiable fact" of their "post-bankruptcy payment history" and "performance" under the agreement. *Id.* To distance themselves from the validity of the agreement, they contend that their "ability to adhere to a payment schedule" was itself "material to any creditors' assessment" of them. *Id.* According to the Dulworths, Experian purportedly knew about this history because of the ACDV that Ally sent to Equifax which both listed the debt as discharged and the account as "current." *Id.*

The Dulworths play a shell game. Their payment history is an "objectively verifiable fact" in the same way the color of the Kia securing their loan is. Yet nobody contends Experian is liable because it did not report the latter. The Dulworths argue payment history is actionable only because they smuggle in a new, lynchpin premise for the first time on appeal: that their "ability to adhere to a payment schedule" is inherently material. This argument is necessary to separate their payment history from the validity of the reaffirmation agreement, which otherwise would be the only basis for making the omission actionable. *See Frazier*, 72 F.4th at 776 (omission is actionable only if it "can be expected to adversely affect credit decisions"). And because the validity of the reaffirmation agreement is an obvious legal question, *see supra* at 39–46, their case rises and falls on their new premise.

47

The Dulworths' new theory, which remains unsupported beyond their conclusory assertion, would drastically expand Experian's reporting obligations—to include, for example, a church that wanted to report how poorly its congregants adhered to their annual tithing commitments. It is also unsupported. Applying the same materiality standard, the Fifth Circuit has held that "the omission of a single credit item"—there, the consumer's full (and favorable) payment history on a credit card—does not render a report 'inaccurate' or 'misleading.'" *Hammer v. Equifax Info. Servs., LLC*, 974 F.3d 564, 568 (5th Cir. 2020); *accord Frazier*, 72 F.4th at 776 (adopting the Fifth Circuit's materiality standard). After all, CRAs disclose that their reporting is not comprehensive, which "would be impossible" to accomplish anyway given that furnishers provide information only on a voluntary basis. *Id.*; *see also* FTC Interpretive Guidance, 2011 WL 3020575, at *60 (2011) ("CRAs are not required to include all existing derogatory or favorable information about a consumer in their reports."). Thus, a single omission is categorically different from an omission that renders an affirmative disclosure misleading. *Cf. Chaitoff*, 79 F.4th at 815–16.

Splitting with *Hammer*, however, would not be enough, for the Dulworths must prove materiality without relying on the validity of the underlying debt. The authority is overwhelmingly against them there. When reaffirmation agreements are invalid (or never entered), debtors still make

48

voluntary payments on discharged debts to stave off foreclosure or repossession, as the Bankruptcy Code explicitly allows. *See* 11 U.S.C. § 524(f). These voluntary payments have "only to do with the debtor's desire to retain his property and nothing to do with an unenforceable promise to pay." *Cox*, 239 F.3d at 915.

Litigants have repeatedly tried to impose liability under the FCRA on the theory that voluntary payments must appear on credit reports. These suits have produced "consensus that a credit report which indicates a discharge in bankruptcy, without mention of subsequent payments, is accurate as there is no legal requirement for a report to reflect such payments." *Lamando v. Rocket Mortg.*, 2024 WL 264034, at *7 (N.D.N.Y. Jan. 24, 2024).[6] That consensus reflects longstanding "industry standards [which] require that a debt discharged in bankruptcy be reported to a credit reporting agency with the notation 'Discharged in bankruptcy' and with a zero balance due." *Groff*, 108 F. Supp. 3d at 541; *see also, e.g.*, Am. Bankr. Inst., *Reaffirmation Agreements*

---

[6] *See, e.g.*, *Schueller v. Wells Fargo & Co.*, 559 F. App'x 733, 737 (10th Cir. 2014); *Groff v. Wells Fargo Home Mortg., Inc.*, 108 F. Supp. 3d 537, 542 (E.D. Mich. 2015); *Horsch v. Wells Fargo Home Mortg.*, 94 F. Supp. 3d 665, 674–75 (E.D. Pa. 2015); *Reichardt v. Trans Union LLC*, 2019 WL 1359119, at *3 (D. Ariz. Mar. 26, 2019); *Steinmetz v. Am. Honda Fin.*, 447 F. Supp. 3d 994, 1005 (D. Nev. 2020); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 793–94 (M.D. Tenn. 2018); *Tyson v. Nationstar Mortg., LLC*, 2016 WL 3348400, at *5 (E.D. Mo. June 16, 2016); *Tusen v. M&T Bank*, 2017 WL 4990524, at *3 (D. Minn. Oct. 31, 2017); *Lawrence v. Paramount Res. Mortg. Grp., Inc.*, 2020 WL 6689371, at *2 (D. Or. July 20, 2020).

4 (2d ed. 2010) ("[P]ayments on a discharged debt generally are not [reported].").  Unsurprisingly, then, federal guidance has likewise long advised that a "consumer report may include an account that was discharged in bankruptcy (as well as the bankruptcy itself), as long as it reports a zero-balance due to reflect the fact that the consumer is no longer liable for the discharged debt."  FTC Interpretive Guidance, 2011 WL 3020575, at *61 (citing 16 C.F.R. pt.600 app'x § 607(b)(6) (1990)).

Indeed, concluding otherwise would undercut other areas of the law.  To start, it could put Experian on a collision course with the injunction that governs its bankruptcy reporting.  That injunction requires Experian to adopt procedures to "prevent the subsequent reporting of a[n] … account balance" for debts discharged under Chapter 7.  *White v. Experian Info. Sols., Inc.*, 2008 WL 11518799, at *4 (C.D. Cal. Aug. 19, 2008); *see* App. 379 (noting Experian's compliance by "suppress[ing] any post-petition payment information that the furnisher has reported").  To accept the Dulworths' argument would require Experian to report such a balance.

It could also create tension with the Bankruptcy Code.  Depending on the particular circumstances, reporting a current balance on a discharged debt may be incomplete or misleading.  *See, e.g.*, *Turner v. J.V.D.B. & Assocs., Inc.*, 330 F.3d 991, 995 (7th Cir. 2003); *see, e.g.*, *In re Zombro*, 2008 WL 1752211, at *7 (Bankr. E.D. Va. Apr. 14, 2008) (entering injunction requiring reporting "a

zero balance due"). And "false or outdated reporting to credit reporting agencies, even without additional collection activity" can violate discharge orders. *In re Torres*, 367 B.R. 478, 486–87 (Bankr. S.D.N.Y. 2007) (marveling at the "sheer number of such cases" and denying dismissal in a contempt proceeding where a creditor reported a balance on a discharged loan). The logic is that debtors may be "coerc[ed] into paying a discharged debt to avoid" negative consequences on their credit reports. *Bates v. CitiMortgage, Inc.*, 844 F.3d 300, 306 (1st Cir. 2016).

*Requiring* regulated entities to report this data would thus put furnishers and CRAs between the FCRA's rock and the Bankruptcy Code's hard place, triggering a new front of litigation over any credit reporting that a debtor can colorably allege violates a discharge order. *See Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019) (holding that "subjective belief" is not a defense to bankruptcy contempt). Importantly, however, there is no need to even consider this step. It is enough that the Dulworths make no effort to actually satisfy their burden to show that the simple omission of voluntary payments, divorced from any valid debt, is a material one under the FCRA.

## III. THE DULWORTHS FAIL TO PROVE THAT EXPERIAN'S PROCESSES WERE UNREASONABLE, MUCH LESS WILLFULLY VIOLATED THE FCRA.

The FCRA requires CRAs to "follow reasonable procedures to assure maximum possible accuracy of the information concerning" consumers when

preparing credit reports. 15 U.S.C. § 1681e(b). Whether Experian did so must be considered in light of the scope of its operations, which include "receiv[ing] information … on over 1.3 billion consumer credit accounts or trade lines on a monthly basis." *Denan*, 959 F.3d at 294. "[G]iven the complexity of the system and the volume of information involved, a mistake does not render [Experian's] procedures unreasonable." *Sarver*, 390 F.3d at 972.

Against this backdrop, this Court has repeatedly held that § 1681e(b) allows CRAs to rely on furnisher reporting in "the absence of notice of prevalent unreliable information from" that furnisher. *Sarver*, 390 F.3d at 972 (affirming summary judgment on § 1681e(b) claim); *accord, e.g.*, *Chaitoff*, 79 F.4th at 816–17 (same). Concluding otherwise would cripple the system by requiring individualized review of billions of credit lines. *Sarver*, 390 F.3d 972.

This standard vindicates Experian, which relied on Ally's reporting pursuant to its normal vetting processes. But even if a violation could somehow exist, it would not be willful, precluding statutory or punitive damages. *See* 15 U.S.C. § 1681n(a).

1. Experian complied with § 1681e(b) because it treated Ally as a reliable furnisher based on its vetting procedures. *See* App. 30–31; *supra* at 5. The Dulworths do not challenge that vetting process. Nor do they claim Experian had "notice of prevalent unreliable information" that should have led it to review Ally's transactions more closely. Thus, these claims fail.

52

Instead, the Dulworths argue that Experian did have notice for two reasons.  First, they contend that Ally's initial ACDV response to Equifax was facially inconsistent, reflecting both that the debt was discharged and a current balance on the debt.  Second, they argue that the face of the bankruptcy docket "would have given at least some indication of whether the Ally Loan had been reaffirmed."  Br. 36.  Neither has merit.

Both arguments turn on requiring Experian to proactively examine each individual credit file.  That is precisely what this Court has consistently held is not required under § 1681e(b). *See, e.g.*, *Sarver*, 390 F.3d at 972; *Chaitoff*, 79 F.4th at 816.  Indeed, this Court has specifically rejected interpreting that provision to require individual review of bankruptcy dockets.  *See Childress v. Experian Info. Sols., Inc.*, 790 F.3d 745, 747 (7th Cir. 2015).

The Dulworths are also wrong that these documents would have given notice.  The mere filing of a reaffirmation agreement could not have given Experian notice because Experian would still have to determine the agreement's validity.  *See supra* at 39.  In such a circumstance, "at least some indication" of a valid agreement, Br. 36, is simply not enough.  And as for the ACDV response, Ally's responses to both Experian and Equifax came only in response to the Dulworths' disputes.  Neither CRA had access to them when initially reporting the Ally loan, so they could not possibly provide timely

"notice of the alleged omission." *Chaitoff*, 79 F.4th at 816; *see, e.g.*, *Sarver*, 390 F.3d at 971; *Ruffin-Thompkins*, 422 F.3d at 608

Moreover, the response that the Dulworths reference was sent to *Equifax* under its separate ACDV system, so it could not possibly give *Experian* notice. For Experian, the undisputed record is that Ally "did not report that Plaintiffs' auto loan was reaffirmed in bankruptcy, but instead reported that it was included in bankruptcy." App. 380. "Thus, Experian reported it that way, as it had no notice that the account had been reaffirmed." *Id.*

**2.** Because Experian's processes were reasonable, it necessarily did not *willfully* violate § 1681e(b), which is a prerequisite to statutory and punitive damages. To establish willfulness, the Dulworths must prove at least that Experian violated the FCRA in "reckless disregard of its statutory duty." *Chaitoff*, 79 F.4th at 819; *see Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 48 (2007). Experian, of course, could not have willfully violated § 1681e(b) for following its normal procedures, which this Court has repeatedly blessed.

## IV. THE DULWORTHS CANNOT SHOW EXPERIAN VIOLATED, MUCH LESS WILLFULLY VIOLATED, § 1681I.

The Dulworths cannot meet their burden to establish that Experian violated its reinvestigation obligations under § 1681i, and they certainly cannot show that its actions constituted a willful violation of that provision. Because the Dulworths invoked only a legal dispute, they did not properly

dispute "the completeness or accuracy" of information in their report within the meaning of § 1681i(1)(A). They thus cannot clear § 1681i(a)'s "threshold requirement." *Chuluunbat*, 4 F.4th at 567; *see Denan*, 959 F.3d at 296–97.

But even had they raised a proper dispute under § 1681i(a), the Dulworths still could not show willfulness. Willfulness excludes any violations that are a result of "careless" conduct or an objectively reasonable interpretation of the FCRA. *Safeco*, 551 U.S. at 69. And absent affirmative evidence of indifference, a CRA does not willfully violate the FCRA when it "followed its normal procedures" but still "fail[s] to detect an omission." *Chaitoff*, 79 F.4th at 819; *accord, e.g.*, *Persinger*, 20 F.4th at 1197 ("reasonable compliance efforts" cannot produce a willful violation).

Experian's response to the Dulworths' demands was not willfully violative of § 1681i. The FCRA imposes no duty to reinvestigate—and indeed creates a risk of liability—when a request for reinvestigation comes from a third party. *See, e.g.*, *Warner v. Experian Info. Sols., Inc.*, 931 F.3d 917, 921 (9th Cir. 2019) (holding that no duty to investigate exists when the consumer "played almost no part in submitting the dispute letter"); FTC Interpretive Guidance, 2011 WL 3020575, at *70 (endorsing exclusion of third-party disputes). The FCRA requires Experian to adopt reasonable procedures to guard against furnishing consumer reports for impermissible purposes. 15 U.S.C. §§ 1681b(a), 1681e(a). One permissible purpose, however, is the FCRA's

requirement that Experian provide "a consumer report … as that file is revised as a result of [a] reinvestigation" dispute.  § 1681i(a)(1)(A).  But the only reinvestigations that fall within this authorization are those in which "the consumer notifies the agency directly" of the dispute.  *Id.*

Experian adopted its Global Security Policy to ensure that it responds only to statutorily authorized reinvestigation requests, which in turn avoids potential liability for unlawful disclosure.  The Dulworths do not mention, much less challenge the propriety of this policy, which other courts have held is founded on a reasonable interpretation of the FCRA.  *See, e.g.*, *Younger v. Experian Info. Sols., Inc.*, 817 F. App'x 862, 870 (11th Cir. 2020).

Because the Dulworths do not mention Experian's Global Security Policy or otherwise address the facts surrounding its response, they likewise do not contend that Experian recklessly applied its policy to their disputes.  That alone is dispositive against their burden to show willfulness.  *See, e.g.*, *Credit Bur. Ctr., LLC*, 937 F.3d at 770.

In all events, the Dulworths could not show willfulness even if they tried. The Dulworths cite the Eighth Circuit's ruling that "a CRA may not ignore a consumer dispute simply because the dispute was sent by the consumer's attorney."  Br. 37 (citing *Stecklein & Rapp Chartered v. Experian Info. Sols., Inc.*, 113 F.4th 858 (8th Cir. 2024)). Experian has no such policy: it filters out only those dispute notices that appear to be from bulk third-party services,

whether or not an attorney hired such a service.  And in the Dulworths' case, Experian had good reason to treat their letters as third-party mail: they were in fact sent by a third-party mailing house; they were "formatted exactly the same with just the details of each disputed item [being] different" as other bulk mail, Suppl. App. 180 at 39:1–3; and they were improperly addressed to an administrative building with a non-public address absent from any of Experian's consumer-facing materials, App. 380–81.  To find *anything* suggesting a "direct" connection with the Dulworths, Experian would have to have a policy of sifting through and assessing whether bulk mail had a consumer signature buried somewhere within, which would defeat the purpose of this lawful policy.  The similarity between the Dulworths' letters and others sent by the third-party service was unsurprising, as the Dulworths openly admitted to contributing little to the drafting of their disputes, Suppl. App. 82 at 108:22–23, while their counsel did not identify themselves in the letter or place the letter on firm letterhead, *see, e.g.*, App. 248.  Thus, there can be no willful violation of § 1681i(a).

## CONCLUSION

This Court should affirm the judgment of the district court.

Dated: December 20, 2024

Respectfully Submitted,

Christopher A. Hall
David J. Sandefer
JONES DAY
110 N. Whacker Dr.
Chicago, Ill. 60606
312–782–3939
chall@jonesday.com
dsandefer@jonesday.com

*/s/* Jeffrey R. Johnson
Jeffrey R. Johnson
  *Counsel of Record*
John C. Brinkerhoff Jr.
JONES DAY
51 Louisiana Ave NW
Washington, DC 20001
202–879–3939
jeffreyjohnson@jonesday.com
jbrinkerhoff@jonesday.com

*Counsel for Experian Information Solutions, Inc.*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), as modified by Circuit Rule 32(c), because, as calculated by Microsoft Word 365, it contains 13,482 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), as modified by Circuit Rule 32(b), because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 13–point Century Schoolbook font.

Dated: December 20, 2024

<u>/s/ Jeffrey R. Johnson</u>

## CERTIFICATE OF SERVICE

I hereby certify that, on December 20, 2024, pursuant to Federal Rule of Appellate Procedure 25 and Circuit Rule 25(a), I electronically filed NOTICE via the CM/ECF system and service was accomplished on counsel of record by that means.


Dated: December 20, 2024

<u>/s/ Jeffrey R. Johnson</u>