No. 24–2066

# In the
# United States Court of Appeals
# for the Seventh Circuit

CRAIG DULWORTH and BRIANNA DULWORTH,

*Plaintiffs-Appellants,*

v.

EXPERIAN INFORMATION SOLUTIONS, INC., AND
EQUIFAX INFORMATION SERVICES, LLC,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Indiana
Case No. 1:22–cv–00469
The Honorable Jane Magnus-Stinson

## APPELLEE EXPERIAN INFORMATION SOLUTIONS, INC.'S
## SUPPLEMENTAL APPENDIX

Christopher A. Hall
David J. Sandefer
JONES DAY
110 North Wacker Dr.
Chicago, IL 60606
312–782–3939
chall@jonesday.com
dsandefer@jonesday.com

Jeffrey R. Johnson
 *Counsel of Record*
John C. Brinkerhoff Jr.
JONES DAY
51 Louisiana Ave NW
Washington, DC 20001
202–879–3939
jeffreyjohnson@jonesday.com
jbrinkerhoff@jonesday.com

*Counsel for Defendant-Appellee Experian Information Solutions, Inc.*

# **TABLE OF CONTENTS**

Defendant Ally Financial Inc.'s Answer to Amended Complaint (ECF 82) ..................................................................... Suppl. App. 1

Excerpts of Deposition Testimony of Brianna Dulworth (ECF 181-1) ..................................................................…….Suppl. App. 12

Excerpts of Rule 30(b)(6) Deposition Testimony of Christina Hamilton, Experian Representative (ECF 183-4)............................ Suppl. App. 152

Equifax Information Services, LLC's and Experian Information Solutions, Inc.'s Brief in Support of Their Joint Motion for Summary Judgment (ECF 186) ....................................... Suppl. App. 180

Plaintiffs' Opposition to Equifax Information Services, LLC's and Experian Information Solutions, Inc.'s Joint Motion for Summary Judgment (ECF 196)......................................................... Suppl. App. 215

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Jeffrey R. Johnson

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

CRAIG DULWORTH and
BRIANNA DULWORTH,

        Plaintiffs,

v.

EQUIFAX INFORMATION SERVICES,
LLC; EXPERIAN INFORMATION
SOLUTIONS, INC.; and ALLY FINANCIAL
INC.,

        Defendants.

Civil Action No. 1:22-cv-00469-JMS-MJD

**DEFENDANT ALLY FINANCIAL INC.'S ANSWER AND AFFIRMATIVE
DEFENSES TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

Defendant Ally Financial Inc. ("Ally" or "Defendant"), by counsel, submits its Answer

and Affirmative Defenses in response to the Second Amended Complaint (the "SAC") of

Plaintiffs Craig Dulworth and Brianna Dulworth ("Plaintiffs").

1.      The allegations set forth in Paragraph 1 of the SAC are a characterization of this

action, which are not subject to denial or admission. To the extent a response is required, Ally

denies that it violated the Fair Credit Reporting Act or that it is liable to Plaintiffs under any

theory whatsoever.

2.      The allegations set forth in Paragraph 2 of the SAC contain statements and

conclusions of law, to which no response is required. To the extent the allegations are contrary

to law, they are denied.

3.      The allegations set forth in Paragraph 3 of the SAC contain statements and

conclusions of law, to which no response is required. To the extent the allegations are contrary

to law, they are denied.

4.      Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 4 of the SAC, and it therefore denies the same.

5.      Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 5 of the SAC as they pertain to another defendant, and it therefore denies the same.

6.      Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 6 of the SAC as they pertain to another defendant, and it therefore denies the same.

7.      Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 7 of the SAC as they pertain to another defendant, and it therefore denies the same.

8.      Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 8 of the SAC as they pertain to another defendant, and it therefore denies the same.

9.      Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 9 of the SAC as they pertain to other defendants, and it therefore denies the same.

10.      Ally admits the allegations in Paragraph 10 of the SAC.

11.      The allegations in Paragraph 11 of the SAC contain statements and conclusions of law which require no response and/or refer to documents which speak for themselves.  To the extent the allegations are contrary to the law or vary from the documents to which they refer, they are denied.

2

12.     The allegations set forth in Paragraph 12 of the SAC refer to documents which speak for themselves.  To the extent the allegations vary from the documents to which they refer, they are denied.

13.     The allegations set forth in Paragraph 13 of the SAC are denied.

14.     The allegations set forth in Paragraph 14 of the SAC are denied.

15.     The allegations set forth in Paragraph 15 of the SAC are denied.

16.     Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 16 of the SAC, and it therefore denies the same.

17.     Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 17 of the SAC, and it therefore denies the same.

18.     Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 18 of the SAC as they pertain to another defendant, and it therefore denies the same.

19.     Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 19 of the SAC as they pertain to another defendant, and it therefore denies the same.

20.     Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 20 of the SAC, and it therefore denies the same.

21.     Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 21 of the SAC as they pertain to another defendant, and it therefore denies the same.

22.     The allegations set forth in Paragraph 22 of the SAC refer to documents which speak for themselves.  To the extent the allegations vary from the documents to which they refer, they are denied.

23.     Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 23 of the SAC as they pertain to other defendants, and it therefore denies the same.

24.     Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 24 of the SAC as they pertain to another defendant, and it therefore denies the same.

25.     Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 25 of the SAC as they pertain to another defendant, and it therefore denies the same.

26.     The allegations set forth in Paragraph 26 of the SAC refer to documents which speak for themselves.  To the extent the allegations vary from the documents to which they refer, they are denied.

27.     Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 27 of the SAC as they pertain to other defendants, and it therefore denies the same.

28.     Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 28 of the SAC as they pertain to another defendant, and it therefore denies the same.

29.     Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 29 of the SAC as they pertain to another defendant, and it therefore denies the same.

30.     The allegations set forth in Paragraph 30 of the SAC refer to documents which speak for themselves.  To the extent the allegations vary from the documents to which they refer, they are denied.

31.    Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 31 of the SAC as they pertain to another defendant, and it therefore denies the same.

**COUNT I**
**Violations of the Fair Credit Reporting Act**
**Defendants Equifax and Experian**

32.    Ally incorporates by reference its responses to the foregoing paragraphs of Plaintiffs' SAC as though fully set forth herein.

33.    Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 33 of the SAC as they pertain to other defendants, and it therefore denies the same.

34.    Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 34 of the SAC as they pertain to other defendants, and it therefore denies the same.

35.    Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 35 of the SAC as they pertain to other defendants, and it therefore denies the same.

36.    Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 36 of the SAC, and it therefore denies the same.

37.    Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 37 of the SAC as they pertain to another defendant, and it therefore denies the same.

38.    Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 38 of the SAC as they pertain to another defendant, and it therefore denies the same.

39.     The allegations set forth in Paragraph 39 of the SAC contain statements and conclusions of law, to which no response is required.  To the extent the allegations are contrary to law, they are denied.

40.     The allegations set forth in Paragraph 40 of the SAC contain statements and conclusions of law, to which no response is required.  To the extent the allegations are contrary to law, they are denied.

41.     Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 41 of the SAC as they pertain to other defendants, and it therefore denies the same.

42.     Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 42 of the SAC, and it therefore denies the same.

43.     The allegations set forth in Paragraph 43 of the SAC refer to documents which speak for themselves.  To the extent the allegations vary from the documents to which they refer, they are denied.

44.     Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 44 of the SAC as they pertain to other defendants, and it therefore denies the same.

45.     Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 45 of the SAC as they pertain to other defendants, and it therefore denies the same.

46.     The allegations set forth in Paragraph 46 of the SAC are denied.

47.     The allegations set forth in Paragraph 47 of the SAC are denied.

48.     Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 48 of the SAC as they pertain to other defendants, and it therefore denies the same.

49.     Ally is without information sufficient to form a belief about the truth and falsity of the allegations set forth in Paragraph 49 of the SAC as they pertain to other defendants, and it therefore denies the same.

Ally denies that Plaintiff is entitled to any of the relief sought in the unnumbered "WHEREFORE" paragraph following the second Paragraph 49 of the SAC, including subparts (a) through (e) thereto.

**Count II:
Violations of the Fair Credit Reporting Act
<u>Defendant Ally Financial, Inc.</u>**

50.     Ally incorporates by reference its responses to the foregoing paragraphs of Plaintiffs' SAC as though fully set forth herein.

51.     The allegations set forth in Paragraph 51 of the SAC are denied.

52.     The allegations set forth in Paragraph 52 of the SAC are denied.

53.     The allegations set forth in Paragraph 53 of the SAC are denied.

54.     The allegations set forth in Paragraph 54 of the SAC are denied.

55.     The allegations set forth in Paragraph 55 of the SAC are denied.

56.     The allegations set forth in Paragraph 56 of the SAC are denied.

57.     The allegations set forth in Paragraph 57 of the SAC are denied.

58.     The allegations set forth in Paragraph 58 of the SAC are denied.

59.     The allegations set forth in Paragraph 59 of the SAC are denied.

60.     The allegations set forth in Paragraph 60 of the SAC are denied.

61.     The allegations set forth in Paragraph 61 of the SAC are denied.

Ally denies that Plaintiff is entitled to any of the relief sought in the unnumbered "WHEREFORE" paragraph following the second Paragraph 61 of the SAC, including subparts (a) through (e) thereto.

## VI.    DEMAND FOR JURY TRIAL

Ally denies, generally and specifically, any and all allegations in the SAC not specifically admitted in the paragraphs above.

Ally denies that it is liable to Plaintiffs in any manner whatsoever under any theory whatsoever.

Ally reserves the right to rely upon any and all defenses as may become known through discovery or at trial.

Ally reserves the right to amend its Answer to Plaintiffs' SAC to conform to the evidence as determined in discovery or at trial.

## <u>AFFIRMATIVE AND OTHER DEFENSES</u>

Ally hereby sets forth the following affirmative and other defenses to the SAC, without assuming the burden of proof on such defenses that would otherwise rest with the Plaintiffs.

1.    The SAC fails to state a plausible claim for which relief can be granted and should be dismissed pursuant to Fed. R. Civ. P. 12. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009). Ally reserves the right to file a Motion for Judgment on the Pleadings or other dispositive motion seeking dismissal of all Plaintiffs' claims.

2.    Ally avers that some or all of the claims made in the SAC may be barred because Plaintiffs lack standing to the extent they have suffered no injury-in-fact.

3.    Ally denies that Plaintiffs sustained any damages and denies that it proximately caused any of the damages claimed by Plaintiffs.

4.      Plaintiffs cannot recover from Ally to the extent that any damages that Plaintiffs may have suffered, which Ally continues to deny, directly and proximately resulted from Plaintiffs' acts and/or omissions.

5.      Plaintiffs cannot recover from Ally to the extent that any damages Plaintiffs may have or will suffer as alleged in the SAC, which Ally continues to deny, have been and/or will be proximately caused, in whole or in part, by the negligent, willful, or tortious acts and/or omissions of persons or entities over whom Ally had no control, and for whose conduct Ally is not responsible, which bars or diminishes any recovery by Plaintiffs against Ally.

6.      Plaintiffs' claims may be barred, in whole or in part, to the extent Plaintiffs have not suffered any actual damages.

7.      Plaintiffs' claims may be barred, in whole or in part, to the extent Plaintiffs have failed to mitigate their damages.

8.      Plaintiffs' claims are barred, in whole or in part, by the doctrine of laches and/or the statute of limitations contained in 15 U.S.C. § 1681p.

9.      To the extent Plaintiffs asserts a claim for punitive damages, the SAC fails to state a claim for relief for punitive damages.  Additionally, Ally states that while it does not believe Plaintiffs have stated a claim for punitive damages, even if they prove an entitlement to any such punitive damage award, Ally is entitled to the affirmative defense that any such award comports with the Due Process clause under the Constitution of the United States of America.

10.     Ally reserves the right to assert additional defenses (affirmative and otherwise) as this action progresses and reserves the right to rely upon any and all defenses (affirmative and otherwise) as may become known through discovery or at trial.

WHEREFORE, Defendant Ally Financial, Inc., by counsel, respectfully requests that the Court dismiss all of the Plaintiffs' claims against Ally, with prejudice, enter judgment in favor of

Ally and against Plaintiffs, and award Ally such other and further relief as the Court may deem

just and appropriate.

Dated: September 2, 2022                    Respectfully submitted,

                                           **ALLY FINANCIAL, INC.**

                                            s/  Mark D. Kundmueller
                                           Ethan G. Ostroff, Esq.
                                           Mark D. Kundmueller (Atty. No. 28427-71)
                                           TROUTMAN PEPPER HAMILTON SANDERS LLP
                                           222 Central Park Avenue, Suite 2000
                                           Virginia Beach, VA  23462
                                           Telephone No. (757) 687-7586
                                           Facsimile No. (757) 687-7510
                                           Email: Ethan.Ostroff@troutman.com
                                                    mark.kundmueller@troutman.com

                                           *Counsel for Defendant Ally Financial Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 2, 2022, I caused a copy of the foregoing *Answer and*

*Affirmative Defenses to Plaintiffs' Second Amended Complaint* to be electronically filed with the

U.S. District Court, Southern District of Indiana, and notice will be sent by operation of the

Court's electronic filing system to all ECF participants.

*s/ Mark D. Kundmueller*
Mark D. Kundmueller

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

CRAIG DULWORTH and BRIANNA
DULWORTH,

              Plaintiff,

    v.

EQUIFAX INFORMATION SERVICES LLC
and EXPERIAN INFORMATION
SOLUTIONS INC.,

              Defendants

Case No. 1:22-cv-00469-JMS-MJD

# EXHIBIT 1

## Excerpts of Deposition Testimony of Brianna Dulworth (2/27/2023)

## FILED IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT AND SUPPORTING BRIEF

Page 1

1                    BRIANNA DULWORTH

2               UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF INDIANA
3                 INDIANAPOLIS DIVISION

4

5    CRAIG DULWORTH AND BRIANNA
     DULWORTH,
6

7               PLAINTIFFS,

8
     V.                    CIVIL ACTION: 1:22-CV-00469-JMS-MJD
9

10
     EXPERIAN INFORMATION SOLUTIONS
11   INC., ET AL.,

12
                DEFENDANTS.
13

14

15   DEPONENT:  BRIANNA DULWORTH

16
     TAKEN:      FEBRUARY 27, 2023
17

18   REPORTER:    DANNIELLE COPELAND
                  REGISTERED DIPLOMATE REPORTER
19                CERTIFIED REALTIME REPORTER
                  CALIFORNIA CSR 14444
20                TENNESSEE LICENSE 807
                  WASHINGTON CSR 22000824
21

22
          STENOGRAPHICALLY REPORTED REMOTELY VIA ZOOM
23                     VIDEOCONFERENCE

24

25   JOB NUMBER 222978

Case 1:22-cv-00469-JMS-MJD   Document 181-1   Filed 10/06/23   Page 3 of 140 PageID #:
Case: 24-2066   Document: 38   1068   Filed: 12/20/2024   Pages: 262

Page 4

```
 1                    BRIANNA DULWORTH

 2          THE DEPOSITION OF BRIANNA DULWORTH,

 3    TAKEN PURSUANT TO NOTICE HERETOFORE FILED, VIA

 4    ZOOM VIDEOCONFERENCE, ON FEBRUARY 27, 2023, AT

 5    APPROXIMATELY 9:47 A.M., EASTERN TIME, UPON

 6    ORAL EXAMINATION, AND TO BE USED IN ACCORDANCE

 7    WITH THE FEDERAL RULES OF CIVIL PROCEDURE.

 8

 9                   ***   ***   ***

10                     APPEARANCES

11

12              VIA ZOOM VIDEOCONFERENCE

13

14

15    FOR THE PLAINTIFFS:
      MICHAEL RAPP, ESQ.
16    STECKLEIN & RAPP
      748 ANN AVENUE
17    KANSAS CITY, MISSOURI 66101

18

19    FOR THE DEFENDANT EXPERIAN:
      DAVID SANDEFER, ESQ.
20    JONES DAY
      110 NORTH WACKER DRIVE
21    CHICAGO, ILLINOIS 60606

22

23    FOR THE DEFENDANT EQUIFAX:
      KATHERINE ROBINSON, ESQ.
24    SEYFARTH SHAW LLP
      233 SOUTH WACKER DRIVE
25    CHICAGO, ILLINOIS 60606
```

Case 1:22-cv-00469-JMS-MJD   Document 181-1   Filed 10/06/23   Page 4 of 140 PageID #:
Case: 24-2066   Document: 38   1069   Filed: 12/20/2024   Pages: 262

Page 22

1                        BRIANNA DULWORTH

2          Q.        And was it a difficult decision for

3    you and your husband to file for Chapter 7

4    bankruptcy?

5          A.        Very much.

6          Q.        And why was it difficult?

7          A.        Sorry.

8                    Well, because my husband was sick

9    from 2010 to 2018, and so I just tried really

10   hard -- sorry; I'm so sorry -- not to have to

11   go that route.  I worked -- I worked really

12   hard to keep us afloat.  So --

13         Q.        And Ms. Dulworth, I really want to

14   be empathetic; and if you could use a few

15   minutes, we can definitely take an earlier

16   break, whatever would be easier for you; or we

17   can push forward?

18         A.        No, go ahead.  I'm fine.  I'm fine.

19   Thank you.

20         Q.        So since we have to explore some

21   reasons for the bankruptcy, I really want to do

22   whatever is easiest for you on that.

23                   Was filing hard on you and your

24   family?

25         A.        It was hard on me, yes.

Page 23

```
 1                     BRIANNA DULWORTH

 2        Q.     And why was it -- why was filing or

 3   making the decision to file bankruptcy, why was

 4   that difficult for you?

 5        A.     Just because I spent eight years

 6   trying to make ends meet and making good

 7   decisions to do whatever I could to keep our

 8   children housed while my husband was at his

 9   worst.  Sorry.

10        Q.     And -- sorry.

11        A.     The first four years, he didn't

12   even really know a life existed due to the

13   multiple seizures every day.  And so just as a

14   mom of adolescents, looking at me and knowing

15   my decisions will create the way that they

16   think of things as an adult, you know, I

17   just -- I just felt like a failure after

18   working so hard to keep it together.

19               I'm sorry.

20        Q.     No.  There is -- there's no reason

21   to apologize.

22               You refer to your husband having

23   seizures.

24               What was it that he and -- and you

25   also refer to him having health issues.
```

1                           BRIANNA DULWORTH

2               What was it that he was dealing

3    with at the time or continues to deal with that

4    caused the -- that caused the medical bills?

5        A.     He has neurosarcoidosis.  Well,

6    it's actually called sarcoidosis with

7    neurological manifestations.  We didn't know

8    what was causing them for four years, so he had

9    anywhere between 10 to 20 seizures every day.

10              I really didn't think he was going

11   to make it, so that's when I went to school to

12   try to get a degree to raise our kids, so --

13       Q.     And --

14       A.     -- he -- after four years, we

15   finally received a diagnosis.  He still has a

16   lot of trouble.  I -- there's a lot of

17   cognitive, like, deficits due to the multiple

18   seizures that he had.  Just -- it just changed

19   life for us.

20       Q.     Thank -- thank you for sharing --

21   for sharing that, Mrs. Dulworth.

22       A.     Sure.

23       Q.     Focusing -- focusing on the

24   bankruptcy itself, or refocusing on that, are

25   you and your husband still feeling the effects

Page 25

```
 1                    BRIANNA DULWORTH

 2    of filing bankruptcy today?

 3         A.    Yes.

 4               MR. RAPP:  Objection, phrase of the

 5    question.

 6    BY MR. SANDEFER:

 7         Q.    And what sort of effects are you

 8    feeling with regard to the bankruptcy today?

 9               How is it affecting you and your

10    husband?

11         A.    Well, we live with our son, we have

12    high interest rate credit cards; and we get

13    turned down a lot of things -- on a lot of

14    things due to it.

15         Q.    So --

16         A.    It -- go ahead.

17         Q.    So it's fair to say that it's

18    affected your quality of life and living

19    situation, right?

20         A.    Yes.  Parts of it, yes.

21         Q.    And is it also fair to say that

22    it's affected the credit you have received and

23    the interest rates on that credit?

24         A.    Yes.

25         Q.    And how did you find your
```

Page 26

```
 1                    BRIANNA DULWORTH
 2   bankruptcy attorney?
 3        A.    Through a co-worker's family
 4   member, I mean, just like as a referral.
 5        Q.    And do you remember who your
 6   bankruptcy attorney was?
 7        A.    John Steinkamp.
 8        Q.    Did you sign any agreements with
 9   Mr. Steinkamp -- or let me rephrase that.
10              Did you sign any agreements with
11   Mr. Steinkamp?
12        A.    Yes.
13        Q.    Do you know if any of those
14   agreements were for Mr. Steinkamp to pull your
15   credit reports?
16        A.    Yes.
17        Q.    Thank you.
18              So going back to what we were
19   talking about earlier with regard to the
20   bankruptcy, did you understand that filing the
21   bankruptcy would be bad for your credit?
22        A.    Yes.
23        Q.    And that's the primary downside of
24   filing for bankruptcy, right?
25        A.    Yes.
```

Page 27

1                            BRIANNA DULWORTH

2        Q.     But the upside of filing bankruptcy

3    is that you don't have to pay back money that

4    you legitimately owe, right?

5        A.     That's -- yes.

6               MR. RAPP:  Objection, phrase of the

7    question, calls for an opinion.

8    BY MR. SANDEFER:

9        Q.     So again, the downside is it's

10   virtually impossible to secure new loans

11   afterwards, right?

12              MR. RAPP:  Objection, calls for an

13   opinion.

14              THE WITNESS:  No.

15   BY MR. SANDEFER:

16       Q.     And when you said no there, can you

17   tell me why you do not believe the downside is

18   that it becomes virtually impossible for you to

19   secure new loans?

20              MR. RAPP:  Objection.  You're

21   mischaracterizing her testimony; and also,

22   we're -- we're assuming facts that we're not

23   even talking about right there.

24              You can answer.

25              THE WITNESS:  I mean, you can

Page 28

1                    BRIANNA DULWORTH

2    secure loans at a -- I mean, a very high

3    interest rate.

4    BY MR. SANDEFER:

5         Q.    But would you -- but would you also

6    say that it's more difficult to receive new

7    loans?

8         A.    Well, yes.  It -- it was difficult

9    after it worked.

10        Q.    And that's because -- well, let me

11   rephrase.

12              So when you get a bankruptcy

13   discharge -- and this is with regard to the

14   upside that we were discussing -- that means

15   you do not owe your creditors money anymore,

16   correct?

17        A.    Yes.

18        Q.    And that's money that you had

19   promised to pay them, correct?

20        A.    Yes.

21        Q.    At the time of filing for your

22   bankruptcy, did you contemplate you may need to

23   monitor your credit closely?

24        A.    Yes.

25        Q.    Did you understand at the time that

Page 29

BRIANNA DULWORTH

1

2  you were needing to submit disputes to the

3  credit bureaus that there were issues with your

4  credit?

5       A.    Prior to the bankruptcy, is that

6  what you're asking?

7       Q.    Yes.

8       A.    No.  I didn't understand --

9       Q.    And --

10      A.    -- things.

11      Q.    And you clarified prior to the

12 bankruptcy.

13            At what point in time did you learn

14 that you may need to submit credit disputes to

15 the credit bureaus if there were issues with

16 your credit?

17      A.    Af- -- before or after?

18      Q.    Oh, I'm --

19      A.    I don't understand what you're

20 referring to.

21      Q.    Absolutely.  I -- I can rephrase,

22 hopefully with some added clarity.

23            When did you learn -- at what point

24 in time did you learn that you may need to

25 submit dispute with the credit bureaus if there

Page 30

1                          BRIANNA DULWORTH

2      are issues with your credit?

3          A.      After my bankruptcy.

4          Q.      And when after your bankruptcy?

5                  Was it a few months after filing,

6      or would you mind telling me the general

7      timeframe?

8          A.      I would assume -- I -- not assume.

9                  Like, nine months to a year.  I --

10     I don't know the exact time, but -- but we

11     started looking at it for a specific reason.

12         Q.      And what specific reason were you

13     looking into it?

14                 MR. RAPP:  Objection, asked and

15     answered.

16     BY MR. SANDEFER:

17         Q.      And, Mrs. Dulworth, you can answer.

18         A.      Because although -- I tried to

19     figure out when possibly my husband and I could

20     buy a house, and so --

21         Q.      And --

22         A.      -- I wanted to learn about that as

23     a possibility.

24         Q.      Okay.  Did you understand that

25     disputes from consumers were a way for credit

Page 31

                          BRIANNA DULWORTH

1

2    reporting agencies to correct their reporting?

3         A.     No, I didn't understand anything

4    like that.

5         Q.     When you looked into the process

6    for disputing, I believe you mentioned nine --

7    nine months or so after the bankruptcy, did you

8    learn then that disputes were a way that credit

9    reporting agencies could correct their

10   reporting?

11        A.     After some investigating, I spoke

12   to a mortgage broker that my son went through

13   and explained to him that we filed bankruptcy

14   and just to be able to purchase a little home

15   would be great.

16              And I was told that after 18 months

17   of a bankruptcy that you can get pre-approved,

18   but you can't close to two years; and then we

19   were explained, like, the different loans that

20   could be and what your credit score would have

21   to be.

22              And so that's when I started

23   looking at, like, the credit score and looking

24   up our credit report, to learn about that.

25        Q.     At the time that you filed

Page 32

```
 1                    BRIANNA DULWORTH

 2    bankruptcy, did you consider that there may be

 3    future litigation related to your credit?

 4         A.    No.  I don't even know what

 5    litigation means -- meant.

 6         Q.    Ah.  And I'm happy to clarify.

 7               Kind of filing suit or things that

 8    could get you called into court, that there

 9    could be other proceedings?

10         A.    No.

11         Q.    So was that something that was

12    maybe a possible upside, that you could avoid

13    debt collectors -- debt collectors or that sort

14    of suit related to your debts and get it

15    wrapped up in one proceeding in your

16    bankruptcy?

17               MR. RAPP:  Objection, phrase of the

18    question, asked and answered.

19               You can still answer if you'd like.

20               THE WITNESS:  I don't even

21    understand what your question was.  I'm sorry.

22    BY MR. SANDEFER:

23         Q.    Absolutely.  I'm happy to -- to

24    repeat and reclarify.

25               Was -- or did you see it as a
```

Page 33

                              BRIANNA DULWORTH

 1

 2    possible upside of filing for bankruptcy that

 3    you could wrap up the -- any -- or any

 4    proceeding that related to the debts you owed

 5    into one proceeding, into your bankruptcy, to

 6    deal with it at one time?

 7         A.    I still don't understand your

 8    question.

 9         Q.    Okay.  We can just move on from

10    that.

11         A.    I'm sorry.

12         Q.    Oh, you're -- you're totally fine.

13    There's no need to apologize.

14               So far we've been talking about the

15    Chapter 7 bankruptcy that you filed in 2018.

16               Was that your first bankruptcy

17    filing?

18         A.    No.

19         Q.    And how many times have you filed

20    previously?

21         A.    One other time.

22         Q.    Okay.  So let's go to Tab 1 in your

23    binder.

24         A.    Hold on.

25               (EXHIBIT 1 WAS MARKED FOR

Case 1:22-cv-00469-JMS-MJD   Document 181-1   Filed 10/06/23   Page 16 of 140 PageID #:
Case: 24-2066   Document: 38   1081   Filed: 12/20/2024   Pages: 262

Page 34

```
 1                      BRIANNA DULWORTH

 2      IDENTIFICATION.)

 3                      MR. RAPP:  If I can go off the

 4      record quickly.

 5                      (RECESS TAKEN.)

 6      BY MR. SANDEFER:

 7          Q.     Apologies, Ms. Dulworth, to cut you

 8      off.  I wanted to make sure we were back on the

 9      record before you went back to address

10      something.

11          A.     Okay.  So when you asked me about

12      the previous bankruptcy -- which thank you for

13      giving me a break; I was getting emotionally

14      overloaded -- I know there was one time, maybe

15      two, and I -- because I can't remember -- there

16      was a Chapter 13 that we filed and canceled,

17      and so I don't recall what was canceled and

18      what wasn't.

19                      I know that there was more than

20      one.  My husband worked at International

21      Harvester.  And there was -- having a job like

22      that, there was lots of layoffs and strikes and

23      the union stuff; so sometimes it was hard to

24      keep up.

25          Q.     So there may have been two prior
```

Page 35

```
 1                    BRIANNA DULWORTH
 2    bankruptcies?
 3         A.     Yes.
 4         Q.     Okay.
 5         A.     But I don't know if there were
 6    Chapter 7 or 13.  I can't recall.  I'm sorry.
 7         Q.     That's totally okay.
 8                We can just start walking through
 9    those now?
10         A.     Okay.
11         Q.     If you don't mind, if you can flip
12    to Tab 1.
13                Do you -- do you recognize this
14    document?
15         A.     Hold on.  Some of your pages fell
16    out.
17                Do I recognize this document?
18         Q.     Yes.
19         A.     I mean, I don't -- I recognize it.
20    Like, I seen it yesterday.
21         Q.     If you look at the case title,
22    would you mind reading the case title on the
23    first page.
24                It's kind of small.  It's under
25    case information, just bolded.
```

 1                    BRIANNA DULWORTH

 2        A.     Oh, this docket -- this docket

 3   is --

 4        Q.     No.

 5               If you go below that and you look

 6   at case title, it should be about a fifth of

 7   the way down.

 8        A.     I don't know what you're wanting me

 9   to -- do you mean under the case information?

10        Q.     Yes, under case information.

11        A.     And what -- what do you want me to

12   read?

13        Q.     Would you read the words to the

14   right of it?

15        A.     By the court?

16        Q.     Um --

17        A.     I'm so sorry.  I don't know what

18   you're referring to.

19        Q.     No, you are -- you're okay.

20               It reads:  "In re:  Craig Scott

21   Dulworth, Brianna Lashall Dulworth."

22               Do you see that?

23        A.     Uh-huh, yes.

24        Q.     And do you understand that to refer

25   to you and your husband?

Page 37

1                    BRIANNA DULWORTH

2        A.    Yes.

3        Q.    And was this your first bankruptcy

4   filing?

5        A.    Yes.  Well, was this back in 1996?

6        Q.    So are you reading the date filed

7   line?

8        A.    I'm just reading the date filed

9   line.

10       Q.    And that reads September 13th of

11  1996, correct?

12       A.    Yes, sir.

13       Q.    And it shows a date of discharge of

14  December 20th, 1996, right?

15       A.    Yes.

16       Q.    And the Craig Scott Dulworth that's

17  listed, is that your husband?

18       A.    Yes.

19       Q.    And is this your -- your first

20  bankruptcy?

21       A.    Yes.

22       Q.    And this was also a Chapter 7

23  bankruptcy, correct?

24       A.    Yes.

25       Q.    Did you reaffirm any debts in this

Page 38

```
 1                    BRIANNA DULWORTH

 2    bankruptcy?

 3         A.     I don't recall.

 4         Q.     Did you monitor your credit

 5    after --

 6         A.     If you turn the page, it says so.

 7         Q.     Right.

 8                Under Docket Entry 16, do you

 9    understand that to refer to your Reaffirmation

10    Agreement?

11         A.     Yes.

12         Q.     Did you run into any difficulties

13    with this Reaffirmation Agreement?

14         A.     No.

15         Q.     Did you monitor your credit after

16    this Chapter 7 filing?

17         A.     No, not the way I did this time.

18         Q.     Okay.  Is it fair to say that you

19    did not send any disputes to credit reporting

20    agencies?

21         A.     No, I didn't.

22         Q.     So no major problems related to the

23    bankruptcy filing or your credit afterwards?

24                MR. RAPP:  Objection, asked and

25    answered.
```

Suppl. App. 31

Page 39

1                          BRIANNA DULWORTH

2                    MR. SANDEFER:  And I can reclar- --

3    and I can reclarify.

4    BY MR. SANDEFER:

5         Q.    So there were not any issues with

6    regard to credit reporting, correct?

7         A.    None that --

8                    MR. RAPP:  Objection, asked and

9    answered.

10                   THE WITNESS:  None that I am aware

11   of.

12                   (EXHIBIT 2 WAS MARKED FOR

13   IDENTIFICATION.)

14   BY MR. SANDEFER:

15        Q.    Okay.  Let's flip to Tab 2.

16        A.    This was a very long time ago.

17        Q.    And do you recognize this document?

18        A.    I'm looking at it.

19               Do I recognize it to what's in my

20   memory?

21               No, but I can see it.

22        Q.    Okay.  Do you understand this to

23   refer to a separate bankruptcy proceeding?

24        A.    Yes.  It looks like from 2003.

25        Q.    And Craig Dulworth is also listed

Page 40

```
 1                    BRIANNA DULWORTH

 2    as a joint debtor here as well, right?

 3         A.    Yes.

 4         Q.    And this is the same Craig Dulworth

 5    that is your husband?

 6         A.    Yes.

 7         Q.    And this bankruptcy docket refers

 8    to another Chapter 7 proceeding, correct?

 9         A.    Yes.

10         Q.    And this shows that you filed a

11    bankruptcy on Sep- -- excuse me.

12               Does this show you filed a

13    bankruptcy on June 20th, 2003?

14         A.    Yes.

15         Q.    And that was less than eight years

16    after your first Chapter 7 bankruptcy, right?

17         A.    Yes.

18         Q.    Did that raise any sort of

19    problems?

20         A.    Problems how?

21               Can you explain that?

22         Q.    Did filing two bankruptcies within

23    that period of time raise any legal issues that

24    you are aware of?

25         A.    Not that I recall.
```

Page 41

```
 1                    BRIANNA DULWORTH

 2        Q.     Did you monitor your credit after

 3   this bankruptcy filing?

 4        A.     No.

 5        Q.     Is it fair to say that you did not

 6   send in any disputes to credit reporting

 7   agencies?

 8        A.     Yes.

 9               (EXHIBIT 3 WAS MARKED FOR

10   IDENTIFICATION.)

11   BY MR. SANDEFER:

12        Q.     Let's go ahead and flip to Tab 3.

13               Let me know when you flip to Tab 3.

14        A.     Sorry.  Some of them came out.

15        Q.     The -- the same thing happened to

16   me last night.  I had a number of pages fall

17   out, so no need to apologize.

18        A.     Sorry.

19        Q.     It took me 20 minutes to get them

20   back inside.

21               And have you tipped -- have you

22   flipped to the third tab?

23        A.     Yes.  I'm sorry.

24        Q.     And do you recognize this document?

25        A.     I mean, I'm looking at it.
```

Page 42

1                    BRIANNA DULWORTH

2        Q.      Do you understand this to refer to

3    a bankruptcy that was filed in August of 2009?

4        A.      Yes, of Chapter 13, that I

5    canceled.

6        Q.      So this was your third bankruptcy

7    filing prior to the one at issue in this case?

8        A.      Yes.

9        Q.      And Craig Scott Dulworth is listed

10   as a joint debtor here as well, right?

11       A.      Yes.

12       Q.      And the petition shows that it was

13   filed on August 12th, 2009.

14               Does that sound correct to you?

15       A.      If that's what -- if this is what

16   it says.

17       Q.      Is that your recollection?

18       A.      I don't have a recollection of the

19   dates that far back.  I'm sorry.

20       Q.      Do you remember why you filed a

21   Chapter 13 bankruptcy?

22       A.      Yeah.  Like I said, my husband and

23   Navistar, he would be laid off.  At this point

24   he was switched over to the machine side, and

25   they actually closed the plant.

Page 43

```
 1                    BRIANNA DULWORTH

 2              He had to totally switch kinds of

 3    jobs.  He went to school for heating and

 4    cooling at that time to be a tech, and so that

 5    is why we filed this, due to that.

 6              But with the heating and cooling

 7    and he started working, that was canceled

 8    because that became a better job than I

 9    expected, which thankfully so.

10       Q.    So did you and your husband cancel

11    this bankruptcy because your financial

12    situation changed?

13       A.    Yes, with his job.  Yes.

14       Q.    Okay.  So moving on to a separate

15    topic, so you had filed bankruptcy several

16    times before you filed for bankruptcy October

17    2018, correct?

18       A.    Yes.

19       Q.    And so you were generally familiar

20    with the process, correct?

21       A.    Yes.

22       Q.    And I -- is it also correct in

23    saying that you and your husband were aware

24    that filing for bankruptcy would hurt your

25    credit?
```

Page 44

```
 1                    BRIANNA DULWORTH
 2        A.    Well, yes.
 3        Q.    And did you expect it would be hard
 4   to secure credit after bankruptcy?
 5        A.    Did I what?
 6        Q.    Did you expect that it would be
 7   hard to secure credit after your -- after
 8   filing for bankruptcy in 2018?
 9        A.    No, it's not hard to secure credit.
10   It's hard to secure good interest rates,
11   normally.
12        Q.    So you expected to be able to
13   secure credit, just you may have to pay a
14   premium for it, right?
15        A.    Yes.
16        Q.    Did you discuss with your
17   bankruptcy attorney before you filed for
18   bankruptcy the sort of negative outcomes?
19              MR. RAPP:  Objection.  That's going
20   to be under attorney client privilege.
21              MR. SANDEFER:  I'll move on from
22   that.
23   BY MR. SANDEFER:
24        Q.    What was your personal
25   understanding of how long it would take after
```

Page 45

```
 1                    BRIANNA DULWORTH

 2   your bankruptcy discharge to recover in terms

 3   of credit, for things to go back to normal?

 4        A.     Oh, I don't recall, like, having

 5   those -- that timeline, not until after the

 6   2018 -- I mean, if -- I mean, I do -- I know

 7   you're going back to the previous ones.  And so

 8   you guys -- I've already shared about my

 9   husband's job.

10             But our oldest daughter had -- was

11   diagnosed with a rare illness when she was

12   seven; so, sadly, that took me out of the

13   workforce often.

14             So we went to Chicago and Milwaukee

15   and every place that we could; so

16   unfortunately, we didn't have the most --

17   easiest cards dealt to us.

18        Q.     All right.  So -- and if you need a

19   break, again, just let me know --

20        A.     No.

21        Q.     Okay.

22        A.     I really didn't expect it to be

23   this emotional.  I apologize.

24        Q.     And -- and I can kind of repeat or

25   rephrase the question.
```

Page 46

```
 1                    BRIANNA DULWORTH

 2         A.     Please do.

 3         Q.     Was it your understanding that it

 4    may take years after your bankruptcy discharge

 5    for your credit to get back to normal in terms

 6    of the lines of credit you can receive at the

 7    interest rates you could receive beforehand?

 8              MR. RAPP:  Objection, calls for a

 9    legal conclusion.

10              THE WITNESS:  Thank you.

11   BY MR. SANDEFER:

12         Q.     Mrs. Dulworth, unless your attorney

13    instructs you to not answer, you can still

14    answer.

15              MS. ROBINSON:  You can still

16    answer.

17              THE WITNESS:  Could you repeat the

18    question?

19   BY MR. SANDEFER:

20         Q.     Absolutely.

21              Was it your understanding that it

22    could take years -- and I -- I can rephrase it

23    as well.

24              Was it your understanding that it

25    would take years for the effects of the
```

Page 47

1                    BRIANNA DULWORTH

2   bankruptcy discharge to no longer negatively

3   affect your receiving credit?

4        A.     And when was -- when are you

5   referring to?

6        Q.     After the 2018 bankruptcy.

7               And thank you for asking a

8   clarification question.

9        A.     On certain things, on -- on some

10  things.

11              After the 2018 bankruptcy, I --

12  maybe just because I'm older, but I looked into

13  things more; and I had more hope after that

14  one.  I had a specific goal, and I was going to

15  do what I could to...

16        Q.     And you mentioned earlier that you

17  were unable to secure a -- a home mortgage for

18  a period of time after your bankruptcy filing,

19  correct?

20        A.     When?  After the 2018, is that --

21        Q.     Yes.

22        A.     -- what you're referring to?

23               Yes, I -- yes.  I -- there's more

24  to that, but yes.

25        Q.     Okay.  You mentioned earlier that

Page 48

```
 1                      BRIANNA DULWORTH
 2    it was difficult for you to file in October
 3    2018.
 4                 Would you say that it was upsetting
 5    to you that you had to file for bankruptcy?
 6         A.    It was upsetting, and it almost,
 7    like, grieved me.
 8         Q.    And when you say "grieved," can you
 9    explain what you are referring to there?
10         A.    Because I just felt like a failure,
11    and I couldn't get things together.
12         Q.    And so it sounds like filing for
13    bankruptcy caused you some emotional pain,
14    right?
15         A.    In 2018, yes.
16         Q.    And can you describe that?
17         A.    I mean, like, defeated.  I -- I
18    mean, embarrassed because I just feel like we
19    could not ever get things right.  Something
20    always happened.
21                 And we're not the type of people
22    who don't work and who don't want to -- I mean,
23    we are servants to our lenders, typically; and
24    we're not the type the people who don't want to
25    do better.  Just circumstances has just
```

Page 49

```
 1                    BRIANNA DULWORTH

 2   changed, and I got older and our kids got

 3   older, and I just -- I just wanted to do

 4   better.  I wanted a fresh start.  I wanted to

 5   purchase a home and stop renting with my age --

 6        Q.     So filing --

 7        A.     I'm sorry.  Go ahead.

 8        Q.     So filing for bankruptcy in 2018

 9   was really hard for you and your husband?

10        A.     Yeah.  I mean -- yes.  It -- it

11   saddened me greatly.

12        Q.     And --

13        A.     And not that the others didn't, but

14   it -- I'm a -- I was younger, and my kids were

15   younger.  Things were just, you know, different

16   than this time for me.

17        Q.     And separate --

18        A.     And I had -- I'm sorry.  Go ahead.

19        Q.     Oh, sorry.  I didn't mean to cut

20   you off.

21        A.     No.  Just this one is, like, I was

22   the head of the household, you know, since my

23   husband couldn't be.  So, yeah, I felt like a

24   failure.

25        Q.     And separate from those feelings,
```

Page 50

```
 1                    BRIANNA DULWORTH

 2    did filing for bankruptcy cause you stress?

 3         A.    It caused me sadness, not -- not

 4    stress, but just sadness.  Yeah.

 5         Q.    I'm sorry to hear that.

 6               We're about -- or I am about to

 7    walk through that bankruptcy filing.  So again,

 8    if you need to take a break, just let me know;

 9    and we can absolutely do so.

10         A.    No.  It is what it is now.  I

11    didn't expect it, but it's here.  So...

12               (EXHIBIT 4 WAS MARKED FOR

13    IDENTIFICATION.)

14    BY MR. SANDEFER:

15         Q.    So let's turn to Tab 4.

16         A.    Okay.  That is in the binder.

17         Q.    And I want to kind of understand

18    what you did and why here.

19         A.    Sure.

20         Q.    Do you recognize this petition?

21         A.    When you ask me that, I don't

22    recognize -- like, it's in my memory from

23    yesterday; but I can see it.

24         Q.    Does it seem at all familiar to

25    you?
```

Page 51

1                      BRIANNA DULWORTH

2          A.      I mean, familiar, I don't know.  I

3      mean, maybe we just have different views of

4      what "familiar" is -- the term is, but I can

5      see that it is Chapter 7, 2018.

6          Q.      And does anything seem off to you

7      about it, or is this something that you believe

8      was filed in your bankruptcy proceedings in

9      2018?

10              MS. ROBINSON:  Objection, calls for

11     speculation.

12              THE WITNESS:  I don't know.

13     BY MR. SANDEFER:

14         Q.      Would it help if I gave you a

15     minute to review the document?

16         A.      I mean, no.  I still don't -- I

17     mean, if this was filed, then -- then it was

18     filed.  I just don't have a recollection of all

19     these words or the specific pages.

20         Q.      Okay.

21         A.      I don't -- I don't get this out

22     and, like, read it in my spare time, so...

23         Q.      If you look to the first page, it

24     lists two debtors, Craig Scott Dulworth and

25     Brianna Lashall Dulworth, correct?

Page 52

```
 1                    BRIANNA DULWORTH

 2        A.      Yes, sir.

 3        Q.      And you understand that to refer to

 4   you and your husband?

 5        A.      Yes, sir.

 6        Q.      And I mentioned a minute ago that

 7   this seemed to refer to a Chapter 7 bankruptcy

 8   in 2018.

 9               Do you understand this refers to

10   the same bankruptcy that we've been discussing,

11   which is the bankruptcy that was filed in 2018

12   by you and your husband?

13        A.      Yes, sir.

14        Q.      Let's start by flipping to page 9.

15               And the page numbers are at the

16   top.  It's a little bit confusing there because

17   there's several subfilings within it?

18        A.      Yes.  Page 9 of 115?

19        Q.      Yes.

20        A.      Okay.  Yes.

21        Q.      If you look to Part 3, that shows

22   that your combined monthly income was

23   $4,091.74, correct?

24        A.      Yes.

25        Q.      And that's roughly $50,000 a year,
```

Page 53

1                      BRIANNA DULWORTH

2   a little bit less, perhaps?

3        A.    Yes.

4        Q.    That was the combined income of you

5   and your husband at the time you filed the

6   bankruptcy petition, right?

7        A.    Yes.

8        Q.    So let's flip to page 11.

9              And you understand -- I'll -- I'll

10  rephrase that.

11             This section refers to -- or do you

12  understand this section refers to property?

13             And you can flip through them if

14  it's helpful.

15             And let me rephrase that.

16             Do you understand this section to

17  refer to property that you and your husband

18  owned?

19       A.    Yes.

20       Q.    Okay.  If you turn to page 15, and

21  let me know when you're there.

22       A.    Okay.  All right.  I'm here.

23       Q.    Under Number 32, it says:

24  "Potential FECPA claim against GLA Collection

25  Co, Incorporated," correct?

Page 54

1                           BRIANNA DULWORTH

2          A.     What number?  I'm sorry.

3          Q.     30 -- oh, my apologies, 33.

4          A.     And what did you say that it said?

5          Q.     Do you -- do you see where it says:

6     "Potential FECPA claim against GLA Collection

7     Co, Inc."?

8          A.     Oh, yeah.  In the little square.

9     Yes.

10         Q.     Did you understand that to refer to

11    a potential legal claim?

12         A.     No.

13         Q.     And what was your understanding of

14    that?

15         A.     I don't have any understanding of

16    that.

17         Q.     So it's not familiar to you?

18                MR. RAPP:  Objection, answered --

19    asked and answered.

20                You can still answer if you'd like.

21                THE WITNESS:  I mean, no, not that

22    I recall.

23    BY MR. SANDEFER:

24         Q.     Do you know who GLA Collection Co,

25    Incorporated is?

Page 55

```
 1                     BRIANNA DULWORTH

 2        A.      Not that I recall.

 3        Q.      So is it fair to say that you

 4   never -- or you are unaware of filing any

 5   lawsuit against GLA Collection Co,

 6   Incorporated?

 7              MR. RAPP:  Objection, asked and

 8   answered.

 9              You can still answer if you'd like.

10              THE WITNESS:  Sorry.  I'm trying to

11   be think back in my brain.

12              There was one -- something that had

13   to do with some type of statement or something

14   that was misdone or mis -- something -- no.

15   Yeah, I can't remember the, like, details of it

16   in regards to that.

17   BY MR. SANDEFER:

18        Q.      So you vaguely remember -- or now

19   that you're looking at this, are you vaguely

20   remembering some details?

21        A.      Just that our attorney said that

22   their -- they didn't do something correctly.

23   And outside of that, I don't -- I don't

24   remember.

25        Q.      Okay.
```

Page 56

1                          BRIANNA DULWORTH

2          A.      I'm sorry.

3          Q.      No, there's no reason to apologize.

4    I know this was a few years ago.

5                  So looking through this section, if

6    you flip back to the first and second page, or

7    if you want to flip throughout, there's --

8    would it be fair to say most of you and your

9    husband's assets were in the two vehicles the

10   two of you had ownership interest in?

11         A.      Yes, sir.

12                 MR. RAPP:  I'm sorry.  What -- what

13   page are you looking at, David?

14                 MR. SANDEFER:  The first and second

15   page of that, so pages 11 and 12 of Tab 4.

16   BY MR. SANDEFER:

17         Q.      And, Mrs. Dulworth, would you mind

18   repeating your answer?

19         A.      Yeah.  Those were two assets that

20   we had during that time.

21         Q.      And most of your assets were

22   involved -- or most of your assets related to

23   ownership interests in the two cars, correct?

24         A.      Yes.

25         Q.      So let's flip to page 19, again

Page 57

```
 1                    BRIANNA DULWORTH

 2    using the enumeration at the top.  And let me

 3    know when you've flipped to page 19.

 4         A.     Yes, I have it.

 5         Q.     At the top of the page, do you see

 6    where it says:  "Schedule D, Creditors Who Have

 7    Claims Secured by Property"?

 8         A.     Yes.

 9         Q.     Do you understand what a "secured

10    claim" is?

11         A.     That there's a physical --

12    something that they can come and get if you

13    don't pay.

14                Does that make sense?

15         Q.     Yes, it does.  Thank you.

16         A.     Okay.

17         Q.     The first -- and it's listed as

18    2.1, but the first list of secured claims shows

19    Ally Financial as a creditor, correct?

20         A.     Yes.

21         Q.     And is this the account at issue in

22    this lawsuit?

23         A.     Yes.

24         Q.     And to the right it says:  "2016

25    Kia Sedona," correct?
```

Page 58

```
 1                     BRIANNA DULWORTH

 2       A.     Yes.

 3       Q.     And that's the vehicle that's

 4  related to this lawsuit, right?

 5       A.     Yes.

 6       Q.     Can you recall what you originally

 7  paid for the Kia Sedona?

 8       A.     I don't.

 9       Q.     Okay.  If you look at Column A, it

10  lists the amount of the claim as $19,000,

11  right?

12       A.     Yes.  That's what it shows.

13       Q.     So is it your understanding of that

14  that you owed $19,000?

15       A.     I don't recall.

16       Q.     Does that sound correct to you on

17  what's listed on the document?

18       A.     I don't -- I mean, I don't recall

19  what I thought then --

20       Q.     Okay.

21       A.     -- about that.  I'm sorry.

22       Q.     No, no need to apologize.

23              I'm going to ask you a similar

24  question with regard to Column B, and your

25  answer may be the same.
```

Page 59

1                        BRIANNA DULWORTH

2              Under Column B, it says:

3      "Collateral of value that supports the claim,"

4      correct?

5         A.     Yes.

6         Q.     And also under that, it lists

7      $19,000, right?

8         A.     Yes, sir.

9         Q.     So do you understand Column B to

10     refer to the value of the vehicle?

11        A.     I mean, that's what it says.

12        Q.     And does that comport with your

13     recollection?

14              MR. RAPP:  Objection.

15              THE WITNESS:  I don't have a

16     recollection of how much --

17     BY MR. SANDEFER:

18        Q.     Okay.

19        A.     -- it was.

20        Q.     And your answer, again, may be

21     similar for Column C.

22              Under -- underneath unsecured

23     portion, if any, it lists $0, right?

24        A.     Yes.

25        Q.     Do you understand this to indicate

Page 60

```
 1                    BRIANNA DULWORTH

 2    that your ownership in the Kia Sedona was

 3    valued at $0 after the creditor's interest was

 4    taken into account?

 5         A.    No.  I mean, I -- i don't recall.

 6    Like, I don't understand what you're referring

 7    to or what it means.

 8         Q.    Okay.  I -- I can ask it

 9    differently.

10         A.    Okay.

11         Q.    Is it correct that you still owed

12    money on the Kia Sedona?

13         A.    Yes.

14         Q.    And you still owed a sizable amount

15    on the Kia Sedona, correct?

16         A.    Yes.

17              MR. RAPP:  Objection, form of the

18    question.

19    BY MR. SANDEFER:

20         Q.    And perhaps, as listed here, you

21    owed as much on the vehicle as it was worth?

22         A.    No -- yes, I mean, if that's what

23    those Column A and B means.

24         Q.    And why would you want to keep the

25    Kia Sedona if you owed as much as it was worth?
```

Page 61

```
 1                    BRIANNA DULWORTH

 2        A.     I have to have a car to get to

 3   work.

 4        Q.     Understandable.

 5               So next is an auto loan with

 6   OneMain for a 2006 Chevy Silverado?

 7        A.     Uh-huh.

 8        Q.     And I'll just go through this more

 9   quickly.

10        A.     Sure.

11        Q.     Do the columns show you owed about

12   $9,700 on a car that was worth about $10,500?

13        A.     Yeah, looks like it.

14        Q.     So -- let me rephrase.

15               You also wanted to continue to keep

16   the Chevy Silverado, correct?

17        A.     I don't -- I don't remember.  I

18   don't recall.

19               You should tell people these

20   questions first, so they can get their memories

21   intact.

22        Q.     I -- I definitely do not mean to

23   surprise you on anything, and point well taken.

24               Do you remember -- and I

25   understand, again, that some of these items may
```

Page 62

1                    BRIANNA DULWORTH

2      be from a few years ago.

3              Do you remember entering into a

4      Reaffirmation Agreement to keep the Chevy

5      Silverado?

6         A.    I don't recall that.

7         Q.    Do you and your husband still own

8      the Chevy Silverado?

9         A.    No.  No.  My husband, at that

10     point, wasn't allowed to drive anymore; so for

11     that amount of time, like, we didn't need -- we

12     couldn't even use two vehicles.

13        Q.    So is it fair to -- I'll rephrase

14     that.

15              Was the -- the Chevy Silverado

16     given up in bankruptcy, or was it forfeited in

17     bankruptcy?

18        A.    I think it was forfeited.

19        Q.    And let's turn to page 21 again,

20     using the enumeration at the top.

21        A.    21?

22        Q.    Yes.

23        A.    Okay.  All right.

24        Q.    And this section was creditors you

25     owe money to; but that debt is not secured with

Page 63

1                          BRIANNA DULWORTH

2     any property, correct?

3          A.      The one that's showing, like the --

4     oh, yeah, well, it says -- yeah, unsecured

5     claims.

6          Q.      So it's your understanding that

7     this Section E/F is referring to creditors you

8     owe money to but where the debt is not secured?

9          A.      Yes.

10         Q.      So unlike a car or house you might

11    want to keep, here there's no collateral for

12    these creditors, right?

13         A.      Correct.

14         Q.      And you have not paid back any of

15    these creditors, correct?

16         A.      Not that I'm aware of.

17         Q.      Do you recall roughly how many

18    unsecured creditors there were?

19         A.      No.

20         Q.      If you can flip to -- let's see.

21    Give me a minute.

22                 So on page 21, do you see where it

23    says 4.1 and to the right has AF&I?

24         A.      Where is it, 21?

25         Q.      On page 21, the first creditor is

Page 64

```
 1                    BRIANNA DULWORTH

 2    listed as AF&I, right?

 3         A.     Okay.  Yes.

 4         Q.     And to the left of that, there's a

 5    box that says 4.1, correct?

 6         A.     Yes.

 7         Q.     And if you flip through, the boxes

 8    are consecutively numbered such that it is

 9    listing the number of creditors in that box,

10    correct, such as 4.1, 4.2, 4.3?

11         A.     Uh-huh.

12         Q.     Would you mind giving a yes or no?

13         A.     Oh, I'm sorry.  Yes.

14         Q.     So if you'll flip to page 54, let

15    me know when you --

16                MR. RAPP:  What page?

17                MR. SANDEFER:  54, using the top

18    enumeration.

19    BY MR. SANDEFER:

20         Q.     And Mrs. Dulworth, if you can just

21    let me know when you reach page 54.

22         A.     Yes, I'm here.  Thank you.

23         Q.     The last creditor listed is X-ray

24    Physicians of Shelbyville, correct?

25         A.     Yes.
```

Page 70

```
 1                    BRIANNA DULWORTH

 2   differs.  You're -- I'm not understanding,

 3   like -- because you're just saying in general.

 4   BY MR. SANDEFER:

 5        Q.    Absolutely.  I can -- I can provide

 6   further clarification.

 7              When you and your husband decided

 8   to file for bankruptcy, did you understand that

 9   a consequence would be in the period of time

10   following it, for whether that's months, days,

11   years, that you would have to deal with, at

12   some level, issues pertaining to obtaining

13   credit?

14        A.    Yes.

15        Q.    Do you understand that as a general

16   matter, unless you take some affirmative step,

17   all of the debts listed in your Chapter 7

18   bankruptcy would have been discharged?

19        A.    Do I understand that?

20        Q.    Yes.

21        A.    That all of them, unless they were

22   reaffirmed --

23        Q.    Yes.

24        A.    -- yes.  Yes.

25        Q.    So if you turn to -- and this is
```

Page 71

1                          BRIANNA DULWORTH

2      page 80, using the, again, enumeration at the

3      top.

4              A.      Okay.

5              Q.      That should read:  "Official Form

6      108."

7                      Let me know when you flip to that.

8              A.      Yeah, I got it.  Yes.  I'm sorry.

9              Q.      And for both of the vehicles that

10     we discussed earlier, the 2016 Kia Sedona and

11     the 2006 Chevy Silverado, these are both listed

12     on this page, correct?

13             A.      Yes.

14             Q.      And for both of these vehicles, you

15     indicated that you intended to retain the

16     properties and enter into reaffirmation

17     agreements?

18             A.      Yes.

19             Q.      Though at that time the debts had

20     not been reaffirmed, correct?

21             A.      I don't know.

22                     MR. RAPP:  Objection, calls for

23     legal speculation.

24     BY MR. SANDEFER:

25             Q.      At the time you filed your

Page 72

```
 1                    BRIANNA DULWORTH

 2    bankruptcy petition, do you remember if you had

 3    filed a Reaffirmation Agreement for either

 4    vehicle?

 5                MR. RAPP:  Objection, asked and

 6    answered.

 7    BY MR. SANDEFER:

 8         Q.    And you can answer, Mrs. Dulworth.

 9         A.    The Ally, this -- that one, yes.

10         Q.    And to clarify, are you saying that

11    at the time you filed your bankruptcy petition,

12    you had filed a Reaffirmation Agreement for the

13    Ally financial trade line?

14         A.    Yes.

15         Q.    Okay.  Let's -- and just want to

16    note as we move forward, Mrs. Dulworth, this

17    document was filed -- the petition was filed on

18    October 20th, 2018.  So if you wouldn't mind

19    flipping to page 5 -- or not page 5, Tab 5.

20         A.    Okay.

21                (EXHIBIT 5 WAS MARKED FOR

22    IDENTIFICATION.)

23    BY MR. SANDEFER:

24         Q.    Do you recognize this document?

25                And I understand the answer may be
```

Page 73

1                    BRIANNA DULWORTH

2    similar to the ones that you said earlier,

3    which is -- it's not nighttime reading for you.

4         A.    I mean, I see -- I can see the

5    document.

6         Q.    Do you understand this to be the

7    Reaffirmation Agreement with Ally Bank?

8         A.    Yes, it says so.

9         Q.    And if you look at the top, it said

10   that it's filed on December 20th, 2018,

11   correct?

12        A.    Yes.

13        Q.    And so that's a couple months after

14   you filed the bankruptcy petition, right?

15        A.    Yes.

16        Q.    So it wasn't filed at the time of

17   your bankruptcy petition, but, rather, later

18   on?

19             MS. ROBINSON:  Objection, the

20   document speaks for itself.

21             You can still answer.

22             THE WITNESS:  I mean, I -- it -- it

23   looks like that that was true, yes.

24   BY MR. SANDEFER:

25        Q.    So let's turn to page 2 of this,

Page 74

```
 1                    BRIANNA DULWORTH
 2   using the enumeration at the top -- or
 3   actually, if you give me one second.
 4          A.    Okay.
 5          Q.    Actually, if you don't mind
 6   flipping to page 3 or -- my apologies, page 4.
 7   It also says page 2 underneath it, but page 4
 8   using the enumeration at the very top.
 9          A.    Yes.
10          Q.    This shows that you paid -- and I'm
11   looking at Section 6 here.
12                Does this show you paid $23,617.66
13   for the vehicle?
14                MR. RAPP:  Objection, the document
15   speaks for itself.
16                You can still answer.
17                THE WITNESS:  Yeah.  I mean, it's
18   what it says, yes.
19   BY MR. SANDEFER:
20          Q.    Is that your recollection, that you
21   paid allegation over $23,000 for the Kia
22   Sedona?
23                MR. RAPP:  Objection, asked and
24   answered previously.
25                But you can still answer, if you
```

Page 75

                    BRIANNA DULWORTH

1

2    can.

3                THE WITNESS:  I don't know exactly

4    what we paid for the Kia Sedona.

5    BY MR. SANDEFER:

6        Q.    Okay.  This Reaffirmation

7    Agreement -- more broadly, for this to have any

8    effect, Ally Financial had to agree to it,

9    right?

10               MR. RAPP:  Objection, calls for

11   legal speculation.

12               You can still answer, if you can.

13               THE WITNESS:  I don't know the

14   answer to that.

15   BY MR. SANDEFER:

16       Q.    Okay.  If you flip to page 6,

17   though, Ally Financial did sign and agree to

18   the Reaffirmation Agreement, right?

19               MR. RAPP:  Objection, document

20   speaks for itself.

21               But you can still answer, if you

22   can.

23               THE WITNESS:  Yes, that's what it

24   states.

25

Case 1:22-cv-00469-JMS-MJD   Document 181-1   Filed 10/06/23   Page 53 of 140 PageID #:
Case: 24-2066   Document: 38   1118   Filed: 12/20/2024   Pages: 262

Page 76

```
 1                    BRIANNA DULWORTH

 2   BY MR. SANDEFER:

 3        Q.    And presumably Ally Financial has

 4   knowledge of this agreement that they signed,

 5   right?

 6               MR. RAPP:  Objection, calls for an

 7   opinion.  There's no way she can possibly know

 8   what Ally knows or doesn't know, but she can

 9   assume things based upon a signature --

10               MR. SANDEFER:  Michael -- Michael,

11   if you don't mind, if you can just keep your --

12   if you can avoid speaking objections and just

13   keep them to proper objections, that would be

14   much appreciated.

15               MS. ROBINSON:  Let's sidebar this

16   for a second.

17               Go off the record, please.

18               MR. SANDEFER:  Yes, let's go off

19   the record.

20               (RECESS TAKEN.)

21   BY MR. SANDEFER:

22        Q.    Ms. Dulworth, as a consequence of

23   the Reaffirmation Agreement, the Ally debt was

24   not discharged, correct?

25               MR. RAPP:  Objection, calls for
```

Page 85

1                    BRIANNA DULWORTH

2    contacted -- I want to make sure I understand

3    just what part that you're asking.  I -- I -- I

4    don't know what it is -- so what -- like, could

5    you just rephrase that?  I'm sorry.

6    BY MR. SANDEFER:

7         Q.     Sure.

8                Did you take any steps after your

9    bankruptcy in 2018 to repair the damage to your

10   credit?

11               MR. RAPP:  Objection to the form of

12   the question.

13               But you can still answer.

14               THE WITNESS:  So to repair the

15   damage to my credit, meaning, like, the damage

16   that the bankruptcy caused?

17   BY MR. SANDEFER:

18        Q.     Yes.

19        A.     I think that there's a certain

20   amount of time that that will continue.

21               Like, to in- -- to increase my

22   credit score, I mean, we did -- after speaking

23   to a mortgage broker person -- I believe that's

24   what it's called; he was called that -- they

25   told me that after sharing what all needs to

Page 86

1                          BRIANNA DULWORTH

2     happen in order to buy a house and what our

3     credit score needs to be for certain loans, I

4     started looking into that and asking -- I even

5     asked -- we -- we've banked with the same bank

6     for 20 years.  And I even went in and asked

7     her, like, the manager at the time, like, what

8     would be a great way to repair our credit,

9     wanting to get it up.

10                    I mean, she gave me some advice.  I

11    asked, I mean, my -- my cousin who does

12    financials for a big firm what would be a great

13    thing.

14                    I mean, this was, to me, our chance

15    that I was going to do it right and that we

16    were going to be able to buy a house.

17                    And I did get a couple credit

18    cards.  They just said to pay them and try to

19    keep the balance down low and -- and, I mean,

20    that's -- that's what I did.

21                    I pulled our credit report.  I got

22    that app on the form with the Credit Karma.  I

23    don't know if that's good or bad, but that's

24    the only way I knew I could do it without

25    getting charged.

Page 87

1                    BRIANNA DULWORTH

2              I did that free credit thing where

3    you get your once a year, your big credit; and

4    I tried to read through that and understand

5    things.  So --

6         Q.    Okay.  That --

7         A.    -- I think that's what you're

8    asking.

9         Q.    Yes.  Thank you for that response.

10   I want to dive into a couple of points.

11             You mentioned that you requested

12   one or more copies of your credit report.

13             Can you tell me how you requested

14   those?

15        A.    It was at freecreditreport.com --

16        Q.    Okay.

17        A.    -- is where I went in.

18        Q.    And you also mentioned you applied

19   for new credit cards.

20             Was this to build your credit back

21   up?

22        A.    Yes.

23        Q.    And with -- can you recall with

24   whom you opened those credit -- those credit

25   cards with?

Page 88

1                    BRIANNA DULWORTH

2       A.      I think Capital One and maybe

3  First PREMIER.

4               I'm not -- I'm not really quite for

5  sure what the first ones were.

6       Q.      So you did apply for new credit

7  after applying for those new credit cards?

8       A.      Yes.  It was like a thousand

9  percent interest rate.

10      Q.      Were you denied credit anywhere?

11      A.      Oh, yeah.  A lot.

12      Q.      And how many -- how many times were

13  you denied credit?

14              Do you remember?

15      A.      I couldn't -- I couldn't count

16  them.

17      Q.      Do you remember who those denials

18  were with?

19      A.      Some of them was with -- when we

20  tried to go get another car, a different

21  vehicle.  So there were several that came in

22  there.

23              Due to the choice that we had to

24  make because we -- because we couldn't buy a

25  house, Lowe's, Home Depot, and just -- First

Page 89

```
 1                    BRIANNA DULWORTH

 2    Financial -- I mean, that's our bank that we

 3    bank at.

 4         Q.     And do you still have those denial

 5    letters?

 6         A.     I gave some of them to my

 7    attorneys --

 8         Q.     And --

 9         A.     -- and some of them -- I mean -- I

10    mean, and some of them, no.

11              I didn't really know that all of

12    this was going to be necessary.  I just thought

13    people just -- it's cliche to say I thought

14    people should just do what they're supposed to

15    do when I had to file bankruptcy.  I -- but

16    I -- but I did.  Yeah.  Sorry.

17         Q.     And is it fair to say that you gave

18    your attorneys the denial letters that you

19    have, that you may not have all of the denial

20    letters?

21              You mentioned earlier that you gave

22    some.

23         A.     Yeah.  No, I don't -- I -- I had

24    received denial letters before even contacting

25    an attorney.  Like, we started this process and
```

Page 90

1                          BRIANNA DULWORTH

2      tried to do it on my own and tried to learn

3      through outside resources as far as what we

4      needed to do to make sure our credit was a

5      certain way.

6                    And then it wasn't until I actually

7      learned that things were not being recorded

8      with Ally, and I still even tried to contact

9      Ally on numerous occasions and tried to figure

10     it out because we just wanted it to get fixed

11     because we just wanted to buy a house.

12                   So -- and it wasn't until later on

13     that we actually contacted John Steinkamp,

14     which was our bankruptcy lawyer, to ask what to

15     do because we just weren't really getting

16     anywhere ourselves; and we didn't really know

17     what to do.

18          Q.     And did John Steinkamp refer you to

19     your current counsel, Michael Rapp with

20     Stecklein & Rapp?

21          A.     Yes.

22          Q.     And do you recall if you had to

23     sign a retention agreement?

24          A.     I don't recall.

25          Q.     Do you remember how much you're

Page 91

```
 1                    BRIANNA DULWORTH

 2    paying your counsel or if the amount you can

 3    recover is capped?

 4         A.    I don't recall.

 5              MR. RAPP:  Objection, privilege.

 6              (EXHIBIT 7 WAS MARKED FOR

 7    IDENTIFICATION.)

 8    BY MR. SANDEFER:

 9         Q.    Okay.  So let's move on to Tab 7,

10    interrogatory responses.

11              And, Mrs. Dulworth, do you

12    recognize this document?

13         A.    I've seen it before.

14         Q.    Okay.  And did you answer these or

15    did your lawyers?

16         A.    Oh, no.  I did.

17         Q.    And --

18         A.    I mean, I provided the answers to

19    them.  I didn't put them on this paper.

20         Q.    Understandable.

21         A.    Okay.

22         Q.    And were your answers truthful?

23         A.    Oh, yes, sir.

24         Q.    So let's flip to page 8, and I'd

25    like to direct you to your response to
```

Suppl. App. 71

Page 92

```
 1                    BRIANNA DULWORTH

 2   Interrogatory Number 11.

 3                And if you would like, you can have

 4   a chance to read that.

 5       A.    Yeah.  "Plaintiffs caused to be

 6   mailed written disputes to Experian on

 7   September 8th, 2021.  Plaintiffs received

 8   written confirmation of the receipts of those

 9   disputes from the United States Postal Service

10   showing that they were received by Experian on

11   September the 13th, 2021."

12       Q.    And I would like to direct your

13   attention to that kind of first clause or

14   sentence there.

15                What did you mean when you wrote

16   "caused to be mailed"?

17       A.    What part?

18       Q.    The -- the phrase "caused to be

19   mailed," did you mail the disputes directly?

20                Did you stop by the post office, or

21   did someone else?

22       A.    Well, when I did it prior -- you

23   mean -- when I did it prior to seeking counsel,

24   then one was mailed my own personal self.

25                And then after I had counsel, then
```

Page 93

```
 1                    BRIANNA DULWORTH

 2    they helped me with those disputes.  I don't

 3    know how to write that stuff out.

 4         Q.    Sure.  And -- and I can be kind of

 5    a little bit more clear.

 6               So that kind of first clause there,

 7    it references letters sent on September 8th,

 8    2021; and I believe that's what you're

 9    referring to when you mentioned after you

10    retained counsel.

11               Can you be clear as to did you send

12    the letters, or did your counsel send the

13    letters?

14         A.    Well, my -- my counsel mailed them.

15         Q.    Okay.  And let's go to page -- or

16    one follow-up question.

17         A.    Yeah.

18         Q.    The -- if you look at Interrogatory

19    Number 12, it refers to letters sent on

20    November 2nd, 2021.

21         A.    Okay.

22         Q.    Do you see that?

23         A.    Uh-huh.

24         Q.    And did the same occurrence happen

25    there where your counsel mailed the letters?
```

Page 94

```
 1                    BRIANNA DULWORTH

 2       A.      Yes.  I mean, that -- they're --

 3   they're my counsel.

 4       Q.      Okay.  Just wanted to clarify.

 5               If you don't mind going to page 9

 6   and looking at Interrogatory Number 13.

 7       A.      Uh-huh.

 8       Q.      Would you mind reading your

 9   response.

10       A.      "Plaintiffs no longer believe that

11   Defendants' violations resulted in Brianna

12   Dulworth denial of credit increase on line of

13   credit she owes with Comenity Bank."

14       Q.      So just to clarify, is it correct

15   to say that you no longer believe that

16   Experian's reporting no longer led Comenity

17   Bank to deny you a credit increase?

18       A.      Can my lawyer help?

19               I don't know what --

20       Q.      I -- since it's your response, I --

21   I really need your response here.  I can

22   rephrase it, if that would be helpful.

23       A.      I mean, yes, please -- please

24   rephrase it.

25       Q.      Is my understanding correct that
```

Page 95

```
 1                        BRIANNA DULWORTH

 2   you're not alleging you were denied an increase

 3   on a line of credit due to reporting by any of

 4   the defendants?

 5        A.    That I'm -- that I denied?

 6        Q.    So I can --

 7        A.    I'm so sorry.  I really don't

 8   understand what you're asking.

 9        Q.    Absolutely.  I can -- I can -- I

10   can rephrase it again.

11              The interrogatory refers to an

12   allegation in Paragraph 46 where plaintiffs

13   allege they were denied a credit increase on a

14   Comenity Bank trade line.

15              Your response reads:  "Plaintiffs

16   no longer believe that Defendant's violations

17   resulted in Brianna Dulworth's denial of a

18   credit increase on a line of credit she owns

19   with Comenity Bank."

20              My question is:  Is it correct to

21   say that you no longer believe that Experian

22   and the rest of the defendants, the reporting

23   by those entities, led Comenity Bank to deny

24   you a credit increase?

25        A.    I still -- I still don't
```

Page 96

```
 1                    BRIANNA DULWORTH

 2   understand.

 3        Q.    Sure.  I -- right.  And I -- I may

 4   have to keep rephrasing this because this is --

 5        A.    No.  I'm --

 6        Q.    -- an important point.  And I know

 7   you're not trying to be difficult --

 8        A.    No, I'm --

 9        Q.    It's just confusing.

10              Is your answer here truthful, that

11   the plaintiffs no longer believe that

12   Defendants' violations resulted in a denial of

13   a credit increase on a Comenity Bank trade

14   line?

15              MR. RAPP:  Objection, asked and

16   answered and form of question.

17              As a side note, David, it might be

18   better to pull out that document, the denial

19   letter from Comenity Bank.

20              MR. SANDEFER:  We don't have that

21   as an exhibit.  I'm really just asking about

22   her response here.

23              THE WITNESS:  I -- I'm trying to

24   think about what all conversations took place

25   during that time, and I can't -- I'm -- I don't
```

Page 103

```
 1                       BRIANNA DULWORTH
 2    emotional and mental anguish?
 3         Q.    I --
 4         A.    Is that your question?
 5         Q.    I can repeat the question.
 6                I'll just start -- start at the top
 7    with that.
 8                You can read where it states:
 9    "Plaintiff suffered emotional and mental
10    anguish, frustration, and annoyance from being
11    deterred from applying for credit."
12                But we just discussed you applying
13    for credit earlier after your bankruptcy, so I
14    just wanted to clarify.
15                Were you deterred from applying for
16    credit, or were you not?
17         A.    Like, deterred from applying
18    credit -- like, I guess I just maybe missed --
19    I mean, I applied for credit.  I didn't get
20    credit.  I mean, we wasn't approved for credit.
21                Anyone can apply for credit.  I
22    mean...
23         Q.    So you did not avoid applying for
24    credit because of the Ally Bank trade line on
25    your credit report; you continued to apply for
```

Case 1:22-cv-00469-JMS-MJD   Document 181-1   Filed 10/06/23   Page 67 of 140 PageID #:
Case: 24-2066   Document: 38   1132   Filed: 12/20/2024   Pages: 262

Page 104

1                    BRIANNA DULWORTH

2    credit, correct?

3         A.    Not -- but not the mortgage and --

4    because of that.

5         Q.    So --

6         A.    Like, we couldn't get any type of

7    pre-approval.  Like, we wasn't able to --

8    things wasn't good enough to do that, to do the

9    mortgage, to try to get a pre-approval.

10        Q.    And did you avoid applying for the

11   mortgage due to the bankruptcy or due to the

12   Ally Bank trade line that was showing your

13   credit report?

14        A.    Well, it would have to be the Ally

15   because you can file for a house after

16   bankruptcy.  18 months you can get a

17   pre-approval, and in two years you can close if

18   your credit score validates that, is what I was

19   told.

20        Q.    So it was your credit score that

21   was holding you back from applying for a

22   mortgage?

23             MR. RAPP:  Objection, asked and

24   answered.

25             You can still answer.

Case 1:22-cv-00469-JMS-MJD   Document 181-1   Filed 10/06/23   Page 68 of 140 PageID #:
Case: 24-2066   Document: 38   1133   Filed: 12/20/2024   Pages: 262

Page 105

```
 1                    BRIANNA DULWORTH

 2            THE WITNESS:  I mean, yes.  That's

 3     what made me look into the whole credit stuff

 4     anyways.

 5     BY MR. SANDEFER:

 6            Q.    Okay.

 7            A.    I'm really sorry.  I'm trying to

 8     answer it the best I can.

 9            Q.    No.  I -- I -- I appreciate your

10     candor, and I'm always happy to clarify.

11                That -- the very last clause there

12     refers to -- it states:  "Credit damage may

13     affect Plaintiffs' interest rates and current

14     loans."

15                Do you see that?

16            A.    Which one?

17                Are we still on 20?

18            Q.    Yes.

19            A.    Yes.

20            Q.    And what loans are you referring to

21     here?

22            A.    Well, I don't know what all

23     specific ones.  I mean, there are several loans

24     that I -- we applied for.  I mean, the -- so I

25     can't list you which ones, like, you know,
```

Page 106

```
 1                      BRIANNA DULWORTH

 2    specifically -- like, which ones we applied for

 3    and did not get.

 4         Q.    Well, this clause refers to

 5    plaintiffs interest rates on current loans,

 6    correct?

 7               MR. RAPP:  Objection, form of the

 8    question.

 9               You can still answer.

10               And objection, misstates testimony.

11               But you can still answer, if you'd

12    like.

13               THE WITNESS:  That the interest

14    rates on current loans?

15               Well -- well, yeah, the interest

16    rates are higher.

17    BY MR. SANDEFER:

18         Q.    And --

19         A.    And to --

20         Q.    And why are the interest rates

21    higher on these current loans that you're

22    referring to here?

23         A.    Well, two reasons:  One, the

24    bankruptcy; and two, we hadn't established well

25    enough credit to get better ones.
```

Page 107

```
 1                      BRIANNA DULWORTH

 2          Q.     Okay.

 3                 MS. SANDEFER:  Mrs. Dulworth,

 4      Michael, before I get to the next section, it

 5      may take a little bit.  So I don't know if

 6      you'd want a break now or down the road.  Up to

 7      the two of you.

 8                 MR. RAPP:  This would be a good

 9      time, actually.

10                 MR. SANDEFER:  Okay.  Do you want

11      to reconvene in five minutes?

12                 MR. RAPP:  That should be enough

13      time.

14                 MR. SANDEFER:  Okay.

15                 (RECESS TAKEN.)

16                 MR. SANDEFER:  I'm going to

17      circulate the next exhibit in the chat.

18                 (EXHIBIT 8 WAS MARKED FOR

19      IDENTIFICATION.)

20      BY MR. SANDEFER:

21          Q.     Ms. Dulworth, if you don't mind

22      turning to Tab 8.

23          A.     Okay.  I'm here.

24          Q.     So if you look through, these are

25      two letters sent to Experian in September and
```

Page 108

```
 1                    BRIANNA DULWORTH

 2    November of 2021.  The letters themselves

 3    should begin on -- if you look in the bottom

 4    right-hand corner on Dulworth '656 and Dulworth

 5    '919.

 6              Have you seen these before?

 7    A.       Yes.

 8              I'm looking at page -- is it --

 9    that says "Case Mail"; is that correct.

10    Q.       Yes, that's the first page.

11              But if you flip to the next page

12    beginning at '656 --

13    A.       Okay.

14    Q.       -- at the very bottom right-hand

15    corner, the letters themselves begin on '656

16    and '919?

17    A.       And -- and what are you asking?

18    Q.       Have you seen these letters before?

19    A.       Have I seen them?

20    Q.       Yes.

21    A.       I mean, yes.

22    Q.       And did you draft these letters?

23    A.       No, I did not draft them.

24    Q.       Did you draft part of them?

25    A.       I honestly don't remember.
```

Page 109

1                      BRIANNA DULWORTH

2        Q.      You don't remember drafting part of

3    them, or you don't remember if you drafted them

4    in the first place?

5        A.      I mean, it's not -- I don't really

6    know how to answer.  Like, I helped -- I helped

7    write them, if that's -- it's my information,

8    my -- you know, my wording, like, my -- my

9    information.

10              Like, I helped write them, if that

11   makes any sense.  But to actually put it on

12   paper, then my -- I mean, I -- I had counsel to

13   help me figure this out.

14       Q.      So diving into that a little bit

15   more, so your -- your counsel, they were the

16   ones who put pen to paper and wrote the

17   letters; but they used your information.

18              Is that correct to say?

19              MR. RAPP:  Objection to the form of

20   the question, asked and answered.

21              You can still answer, if you'd

22   like.

23              THE WITNESS:  I mean, yes, I helped

24   them write it.  It's my information.

25

Page 110

```
 1                    BRIANNA DULWORTH

 2   BY MR. SANDEFER:

 3        Q.     I need a bit more clarity.

 4               When you said you "helped write the

 5    letters," can you describe to me what you mean

 6    by the word "help"?

 7        A.     I gave them information.

 8        Q.     And then they used that information

 9    to write the letters?

10        A.     Yes.  And then when I reviewed them

11    prior to them, and then I agreed with

12    everything that was said because it was my

13    information.

14               MR. RAPP:  Objection still stands.

15   BY MR. SANDEFER:

16        Q.   Did you make any --

17               MR. RAPP:  Asked and answered.

18   BY MR. SANDEFER:

19        Q.     Did you make any revisions?

20               MR. RAPP:  Objection, asked and

21    answered.  And that goes to privilege.

22               MR. SANDEFER:  Are you directing

23    your client to not answer?

24               MR. RAPP:  No, she can answer that,

25    if she likes.
```

Page 111

1                    BRIANNA DULWORTH

2              THE WITNESS:  I don't recall if I

3     made revisions.

4     BY MR. SANDEFER:

5         Q.    So let's turn to the second page of

6     either letter, so that would be either '657 or

7     '9- -- or actually, my apologies.

8              Let's go to the first page of

9     either letter, so either '656 or '919.  And

10    just let me know when you've turned to one of

11    those.

12        A.    I'm at '656.

13        Q.    Do you see the last sentence where

14    it says:  "I have cut and pasted the wrong part

15    from the report here."

16        A.    I do see that.

17        Q.    And if you flip to the next page,

18    do you see there is a screenshot or printout

19    from Experian?

20        A.    Yes, I see that.

21        Q.    How did you determine that this

22    part of your credit report was incorrect?

23        A.    When I --

24              MR. RAPP:  Objection to the form of

25    the question.

Page 112

1                    BRIANNA DULWORTH

2                You can answer, if you like.

3                THE WITNESS:  Like, how did I --

4     when I looked at my credit report, how did I

5     know that this was not correct reporting?

6                Is that what you're asking?

7     BY MR. SANDEFER:

8         Q.    Well, how did you determine that

9     this screenshot was the -- quote, "the wrong

10    part of the report"?

11               Did --

12               MR. RAPP:  Objection to the form of

13    the question.

14               Go ahead.

15               THE WITNESS:  I don't recall.  I

16    don't remember.

17    BY MR. SANDEFER:

18        Q.    Do you know if you or your

19    attorneys cut and pasted this part of the

20    credit report?

21        A.    I don't remember that either.

22        Q.    And we may have touched on this

23    earlier.

24               But did you or your attorneys send

25    out these letters?

Page 113

1                    BRIANNA DULWORTH

2              MR. RAPP:  Objection, asked and

3    answered.

4              You can still respond, if you can.

5              THE WITNESS:  Yeah.  I -- I don't

6    recall.

7    BY MR. SANDEFER:

8        Q.    Okay.  I want to dive into these a

9    bit more.

10             So let's turn to the -- the first

11   page which you referred to earlier that has

12   "Case Mail" up at the top.

13       A.    Oh, yeah.

14       Q.    And if you look a little bit under

15   that, it says:  "USPS mail certificate of

16   delivery."

17             Do you see that?

18       A.    Yes.

19       Q.    Do you -- and one more thing to

20   call attention to.

21             Do you see where it says:  "Case

22   Mail Digital Post Service" at the very -- at

23   the very top?

24       A.    Yes.

25       Q.    Do you know what "Case Mail Digital

Page 114

```
 1                    BRIANNA DULWORTH
 2    Post Service" is?
 3        A.     No.
 4        Q.     Did you hire Case Mail Digital Post
 5    Service, or did your attorneys?
 6               MR. RAPP:  Objection to the form of
 7    the question, asked and answered.
 8               You can still respond if you know
 9    the answer.
10               THE WITNESS:  I don't know the
11    answer.
12    BY MR. SANDEFER:
13        Q.     Okay.  Next, I'd like you to turn
14    to -- it'll have Dulworth '667 in the bottom
15    right-hand corner.
16        A.     I'm sorry, '66...
17        Q.     7.
18        A.     '667?
19        Q.     Yes.
20        A.     Okay.  Okay.  I'm here.
21        Q.     At the very top, do you see where
22    it says:  "Dear Anne Lamoy"?
23        A.     Yes.
24        Q.     Do you know who Anne Lamoy is?
25        A.     I do.
```

Case 1:22-cv-00469-JMS-MJD   Document 181-1   Filed 10/06/23   Page 78 of 140 PageID #:
Case: 24-2066   Document: 38   1143   Filed: 12/20/2024   Pages: 262

Page 115

                              BRIANNA DULWORTH

1

2        Q.      And who is she?

3        A.      She works at the attorney's office.

4        Q.      And looking at this page, does this

5    seem to be a confirmation of delivery?

6                MR. RAPP:  Objection, form of the

7    question.  Document speaks for itself.

8                You can still answer, if you know.

9                THE WITNESS:  I mean, I don't -- I

10   don't know what it's -- I see signatures.  I

11   don't know what it -- it's supposed to look

12   like.  I don't work for the Postal Service.

13   BY MR. SANDEFER:

14       Q.      I -- I -- I do not either.

15               But a follow-up question.

16               Was this a document that you

17   requested with regard to the mail that you sent

18   Experian?

19       A.      That I requested?

20       Q.      Yes.

21       A.      I -- I really don't -- I really

22   don't understand.  And I'm so sorry.  I'm not

23   really trying to be -- I'm not an ignorant

24   person.

25               I just -- I'm just getting so

Page 116

```
 1                    BRIANNA DULWORTH

 2   confused by your questioning.  Like, I have

 3   counsel.  Like, I gave them the information.

 4   They communicated often.  We did paperwork

 5   together.  I signed.  They sent.

 6              Like, I don't -- I don't -- I don't

 7   know what else you want me to say.  I can't --

 8   I mean -- I mean, about each and every single

 9   one of these, I just -- I don't recall a lot.

10   It's been a while.

11        Q.    Okay.

12        A.    And I wish I did.

13        Q.    No.  I -- I -- I appreciate your

14   candor here.  I'll -- I'll move on from this.

15              Let's flip to the first page of

16   either of the actual letters.  And so let --

17   this will have either Dulworth '655 or Dulworth

18   '918 -- or excuse me, either Dulworth '656 at

19   the bottom or Dulworth '919.

20        A.    Are we still in 8?

21        Q.    Yes.

22        A.    Okay.  You said '656?

23        Q.    Yes, or either '619 [sic], either

24   of the letters that you sent -- or that were

25   sent.
```

Page 117

1                    BRIANNA DULWORTH

2         A.     Okay.  '656 I'm here.

3         Q.     Do you see the address where it

4    says Experian Solutions, Inc., and then it has

5    an address beneath it?

6         A.     Yes.

7         Q.     Did you -- did you find that

8    address or did your attorneys?

9         A.     I'm sure it's my attorneys.  I

10   don't have that in my portfolio of addresses.

11        Q.     Okay.  Do you know what software

12   was used in preparing the dispute letters?

13             MR. RAPP:  Objection, form of the

14   question.

15             You can still answer if you know

16   it.

17             THE WITNESS:  What did you even

18   say?

19   BY MR. SANDEFER:

20        Q.     Happy to repeat it.

21             Do you know what software was used

22   in preparing the dispute letters?

23        A.     No.

24        Q.     Okay.  And --

25        A.     I mean, do you --

Page 118

1                        BRIANNA DULWORTH

2                I mean, like, am I supposed to know

3    that?

4        Q.    I'm -- I'm just asking questions

5    regarding the letters.

6        A.    Okay.

7        Q.    And apologies, also, if some of the

8    questions are confusing, again.  I'm just

9    trying to understand what -- what happened

10   here.

11               I'd like you to turn to the last

12   page of either letter.  So if you were

13   looking -- if you were looking at the first,

14   the last page -- substantive page would be

15   Dulworth '659.

16               And can you let me know when you

17   flip to it?

18       A.    Yeah.  I'm here.

19       Q.    And is that your signature on the

20   letter?

21       A.    Yes.  That's done electronically.

22   Yes.

23       Q.    And so you signed electronically?

24       A.    Yes.

25       Q.    Okay.  That's all I need to know on

1                     BRIANNA DULWORTH

2    that.

3               So I'd next like you to flip to Tab

4    9.

5               MR. SANDEFER:  And I'll circulate

6    that in the chat for everyone else.

7               (EXHIBIT 9 WAS MARKED FOR

8    IDENTIFICATION.)

9    BY MR. SANDEFER:

10       Q.    Let me know when you've flipped to

11   Tab 9.

12       A.    I'm here.

13             Can I just say ditto and put it on

14   the record if these are going to be the same

15   questions?

16       Q.    These questions will be much

17   briefer; but I apologize, we do have to go

18   through some of these.

19             So these letters -- and I'll give

20   you a chance to review, if you'd like.

21             The letters themselves should begin

22   on '686 and '954.  I'll give you a chance to

23   flip through.

24             Let me know when you've had a

25   chance to find them.

Case 1:22-cv-00469-JMS-MJD   Document 181-1   Filed 10/06/23   Page 83 of 140 PageID #:
Case: 24-2066   Document: 38   1148   Filed: 12/20/2024   Pages: 262

Page 120

1                         BRIANNA DULWORTH

2          A.      Yes, I'm glancing at them.

3          Q.      And are these letters sent by your

4    husband to Experian?

5          A.      No.   By counsel.

6          Q.      Okay.

7          A.      With -- with our help.

8          Q.      Okay.   And that's -- like I said,

9    it would be a lot briefer on that point.

10                 So -- and you may be happy to hear

11   this.  I am -- I'll soon be wrapping up, at

12   least my portion.

13         A.      You're my favorite person just for

14   saying that.

15         Q.      Would you mind flipping to Tab 10.

16         A.      Okay.

17                 (EXHIBIT 10 WAS MARKED FOR

18   IDENTIFICATION.)

19   BY MR. SANDEFER:

20         Q.      And we do have a little bit more to

21   get through, but should be on the tail end.

22         A.      Okay.   Thank you.

23         Q.      You're alleging in this suit that

24   Ally Financial neglected to inform the credit

25   bureaus of the reaffirmation, right?

Page 121

```
 1                    BRIANNA DULWORTH

 2              MR. RAPP:  Objection,

 3    mischaracterizes the testimony and the

 4    pleadings, and form of the question.

 5              But you can answer, if you can.

 6              THE WITNESS:  I mean, yes; and our

 7    payments at the time wasn't even reported, that

 8    we paid the payments.

 9   BY MR. SANDEFER:

10        Q.    And when did you learn that?

11        A.    When I counted the green

12    checkmarks.

13        Q.    And did you contact Ally Financial

14    and ask them to update your reporting?

15        A.    Yes, sir.

16        Q.    And how many times would you say

17    that you did that?

18              MR. RAPP:  Objection, form of the

19    question.

20              THE WITNESS:  Up to seven.  I mean,

21    it was several times.  And I even received

22    responses back that it would be corrected

23    within 30 to 45 days, so I had to wait 30 to 45

24    days to see if they were corrected; and they

25    were not corrected.
```

Page 122

1                    BRIANNA DULWORTH

2               So I called again, and I was told

3     that they would escalate it and it would be

4     within 30 to 45 days; and it never was.

5               So then I was -- then I called on a

6     couple of occasions, and I cannot recall the

7     date at the time and -- because at this point I

8     didn't really realize it was going to be --

9     that they wouldn't just do it, but -- and was

10    told that they would escalate it and I would

11    get a return call back from someone in one to

12    two business days; and I never returned any

13    calls.

14              And at that point, I just -- I knew

15    that they -- I wasn't -- that they weren't

16    going to do anything.

17    BY MR. SANDEFER:

18         Q.    And if -- if you need a minute --

19         A.    I'm fine.

20         Q.    Okay.  So I -- I wanted to focus

21    here on Experian's consumer disclosures.

22              So looking at Tab 10, this is an

23    April 26th, 2021, Experian Consumer Disclosure.

24              Have you seen this before?

25         A.    Where are you at?

Page 123

```
 1                    BRIANNA DULWORTH

 2      Q.      Tab 10.

 3      A.      On the very first page?

 4      Q.      Yes.

 5      A.      Okay.  I see it.

 6      Q.      And have you seen this before?

 7      A.      Yes.

 8      Q.      Do you know if your lawyers

 9  requested this for you, or did you request it?

10      A.      I believe both requested credit

11  reports.  I requested all of them initially;

12  and then if they did, I had to sign paperwork

13  to allow them to.

14      Q.      Okay.

15      A.      But it was -- and it was a bear.

16              Oh, yes, and please note that, too.

17              This is terribly hard, to get your

18  credit report.  If you guys can make that

19  easier, that would be nice.

20      Q.      If you wouldn't mind flipping to

21  the second page and looking at the very top, do

22  you see the Ally Financial trade line?

23      A.      Yes.

24      Q.      And that's the account at issue in

25  this lawsuit, right?
```

Case 1:22-cv-00469-JMS-MJD   Document 181-1   Filed 10/06/23   Page 87 of 140 PageID #:
Case: 24-2066   Document: 38   1152   Filed: 12/20/2024   Pages: 262

Page 124

1                    BRIANNA DULWORTH

2          A.     Yes.

3          Q.     And it's -- under status on the

4    right-hand side, it says:  "Discharged through

5    Bankruptcy Chapter 7," correct?

6          A.     Uh-huh.

7          Q.     But you kept paying it, right?

8          A.     Yes.

9          Q.     And who originally noticed the

10   mistake?

11         A.     I did.

12         Q.     And did you send it to Experian to

13   investigate the reporting?

14         A.     I'm not for sure which one I

15   disputed, but I did send a dispute to --

16   actually, I believe two; and I -- I believe,

17   like, I sent to two --

18         Q.     And do you recall --

19         A.     -- but I don't remember which one

20   it was.

21         Q.     And when you say "which one it

22   was," can you provide some clarity there?

23         A.     I don't know which one I sent the

24   dispute to, like, me -- the one that I -- I

25   sent at the very beginning when I had a lack of

Page 125

1                          BRIANNA DULWORTH

2      knowledge of anything to do because you could

3      do it online.  It -- it was an option, and you

4      could mail it; and it was an option.

5                   And I only know all of that because

6      of Google.

7           Q.    So but when you say you weren't

8      sure which one you -- since you were -- were

9      you referring to -- one more time?

10          A.    I -- I don't remember.  When I had

11     done it before, I contacted legal, which credit

12     bureau --

13          Q.    Okay.

14          A.    -- I sent it to of the three.

15          Q.    So you're not sure if you sent it

16     to TransUnion, Equifax, or Experian?

17          A.    No.  I'm sorry.

18          Q.    No, no need to apologize.

19                   Why did you not sends dispute

20     letters to all three?

21          A.    Well, I didn't really know that was

22     a thing.

23                   I didn't -- when we pulled our

24     credit, I mean, I'm not an expert; and I was

25     just looking at what I had in front of me, and

```
 1                    BRIANNA DULWORTH
 2    I didn't really know -- I thought all of them
 3    reported to all of them.  Like, I don't know.
 4    I -- apparently I should have.
 5         Q.    So if you go to the second-to-last
 6    page of this tab.
 7         A.    Uh-huh.
 8         Q.    Actually, that's wrong.  I guess it
 9    would be third-to-last.  It says page 16 of 18
10    at the bottom.
11         A.    Yeah.
12         Q.    Let me know when you're there.
13         A.    I'm here.
14         Q.    Do you see at the very top where it
15    says:  "How to contact Experian"?
16         A.    Yep, I see it.
17         Q.    And do you see where it has three
18    options to contact Experian?
19         A.    I do.
20         Q.    Okay.  Do you understand this
21    referred to three ways to dispute your results
22    or get in contact with Experian?
23         A.    Uh-huh.
24         Q.    Is there any reason why you -- and
25    I know you mentioned earlier that you sent a
```

Page 127

```
 1                    BRIANNA DULWORTH

 2    dispute letter to either TransUnion, Equifax,

 3    or Experian.

 4              Is there a reason why you did not

 5    follow through with one of these contact

 6    methods?

 7        A.    Because I -- I mean, honestly, at

 8    this point, I was -- I was frustrated.  I

 9    didn't even know -- I mean, I didn't even know

10    what to do.

11              I don't -- this is not my

12    specialty.  I don't know about this stuff, and

13    that's the reason why I sought legal counsel.

14              In all honesty, I -- I was just --

15    it was just exhausting.

16        Q.    But there were these options that

17    you are -- let me rephrase.

18              But you do interpret these contact

19    methods as providing means for you to contact

20    Experian had you wanted to do so?

21        A.    I --

22              MR. RAPP:  Objection --

23              THE WITNESS:  I didn't --

24              MR. RAPP:  Objection to the form of

25    the question, asked and answered.
```

Page 128

1                    BRIANNA DULWORTH

2              But you can still answer, if you'd

3     like.

4              THE WITNESS:  Yeah.  So I didn't

5     have this piece of paper in front of me to

6     know, like, I could call; I could do this; I

7     could do this.  I hadn't dealt with credit

8     bureaus.  I didn't know a lot about them.

9              And so to my ignorance and to the

10    lack of just easy finding for my own self, I

11    did not know all of this stuff.  I did what

12    I -- everything that I found and what I thought

13    that I could do.

14             And at this point, again, I had

15    already dealt with Ally; and I just got legal

16    counsel.

17   BY MR. SANDEFER:

18        Q.    So if you flip back to the second

19    page in this --

20        A.    Uh-huh.

21        Q.    -- do you see where it says:  "Your

22    potentially negative account activity

23    continued"?

24             MR. RAPP:  Which page are you

25    looking at?

```
 1                   BRIANNA DULWORTH

 2              THE WITNESS:  2 of 18?

 3              MR. SANDEFER:  It's 2 of 18.  Also,

 4    it's Dulworth EXP '20?

 5              THE WITNESS:  Yeah.  Which one?

 6    I'm sorry.

 7  BY MR. SANDEFER:

 8        Q.    The second page in the tab.

 9        A.    Yes.  Yes.  I'm sorry.  Yes.  I'm

10    here.

11        Q.    This shows several accounts that

12    are potentially negative, correct?

13        A.    What do you mean, in this -- like,

14    as far as Ally, American, is that what you're

15    referring to?

16        Q.    Yes.

17        A.    Yes.

18              MR. RAPP:  Objection, document

19    speaks for itself.

20  BY MR. SANDEFER:

21        Q.    And there are four counts on this

22    page that are showing as discharged through

23    Bankruptcy Chapter 7, one of which is Ally,

24    correct?

25        A.    Yes.
```

Page 130

                        BRIANNA DULWORTH

1

2       Q.      And if you flip to the next page,

3    it has another account that says:  "Discharge

4    through Bankruptcy Chapter 7" and another

5    account with -- that was closed, correct?

6               It's also reported as potentially

7    negative?

8       A.      Which -- which one are you

9    referring to?

10      Q.      So I -- I can break these up.

11              In addition to the four accounts

12   that we just discussed, the next page also

13   shows a JPMCB Auto --

14      A.      Uh-huh.

15      Q.      -- that shows discharge through

16   Bankruptcy Chapter 7, right?

17      A.      Yes.

18      Q.      And then the account below is also

19   listed as potentially negative, correct,

20   another JPMC Auto?

21      A.      Yes.

22      Q.      And beneath that, it's showing a --

23   under bankruptcies, it's showing a bankruptcy,

24   correct?

25      A.      Yes.

Page 162

```
 1                    BRIANNA DULWORTH

 2        Q.     So I think -- it's unfortunate you

 3   can't access them yourself because I think the

 4   easiest course -- I'll just ask you if the

 5   answers are complete or if there's anything

 6   you'd like to change.

 7              So if you -- I don't know if

 8   there's a way to give you control.

 9              MR. RAPP:  You could try to resend

10   them and see if she can open it.

11              MS. ROBINSON:  Try to re-upload

12   them in the chat?

13              MR. RAPP:  Yeah.

14              MS. ROBINSON:  I'll try that.

15              THE WITNESS:  And are we trying to

16   do -- are we on 7, is that what it is?

17              MS. ROBINSON:  Yeah.  This is 7.

18              THE WITNESS:  Okay.

19              MS. ROBINSON:  Let me stop sharing

20   for one second, and I'll see if I can re-upload

21   them in the chat.  Okay.  I just resent it.

22              See if you can download that now,

23   if that's any different for you.

24              THE WITNESS:  No.

25              MS. ROBINSON:  Maybe -- Michael, if
```

Page 163

1                         BRIANNA DULWORTH

2    I email them to you, could you forward them on?

3                MR. RAPP:  Let me go ahead -- I've

4    got them up right now because I was able to

5    download them.  Let me go ahead and just send

6    7, 8, and 9.

7                MS. ROBINSON:  Yeah.

8                MR. RAPP:  -- to Ms. Dulworth, and

9    we'll see what happened.  Okay?

10               Because they're all -- they're all

11   documents that we prepared anyway, so it should

12   not be a major issue.

13               MS. ROBINSON:  Ms. Dulworth, do you

14   have access to your email right now --

15               THE WITNESS:  Yes.

16               MS. ROBINSON:  -- if your counsel

17   emails them to you?  Okay.

18               THE WITNESS:  Yes.

19               MS. ROBINSON:  So maybe you can

20   download them that way.

21               THE WITNESS:  And we're on 7?

22               MS. ROBINSON:  Yeah.

23               THE WITNESS:  Okay.  I was able to

24   actually download it.

25               MS. ROBINSON:  Oh, you were?  Okay.

Page 164

 1                    BRIANNA DULWORTH

 2              THE WITNESS:  Yeah.  I did

 3    something with the error message, and then all

 4    of a sudden it -- that red X went away.  So --

 5              MS. ROBINSON:  Okay.

 6              THE WITNESS:  -- whatever that

 7    means.  So we should be good, though.

 8    BY MS. ROBINSON:

 9        Q.    Okay.  Well, go ahead and take a

10    minute to review the document, if you need to.

11    Just let me know when you've reviewed them.

12        A.    Okay.

13        Q.    All right.  So are the statements

14    that you made in these interrogatory responses

15    accurate and truthful?

16        A.    Yes.

17        Q.    Are there any statements in this

18    document that you would like to change or add

19    to?

20        A.    No.

21              I mean, I would need time to really

22    read, but -- them all, but no.

23        Q.    Okay.  And if you feel like you

24    need more time, just let me know.

25        A.    Right now I'm worried if my roof is

```
 1                    BRIANNA DULWORTH

 2   going to blow off.

 3         Q.     You're worried what?  Sorry.

 4         A.     If the roof is going to blow off.

 5   The wind is --

 6         Q.     Yeah, you're getting the same wind

 7   I am.

 8                How far are you from Indianapolis?

 9         A.     Maybe 15 minutes south.

10         Q.     Yeah.  So you're getting the same

11   weather I am.  Hopefully we'll both be okay.

12         A.     I hope so.

13         Q.     All right.  But as you've reviewed

14   it, there are no statements that you'd like to

15   change?

16         A.     That's correct.

17         Q.     Okay.  I just want to touch briefly

18   on your response to Interrogatory Number 6,

19   which is on page 7 of the PDF.

20         A.     Okay.

21         Q.     You state that you were -- "On

22   July 24th, 2021, Teachers Credit Union notified

23   plaintiff that she had been denied a request

24   for auto loan based upon information in her

25   Equifax credit file.
```

Page 166

```
1                    BRIANNA DULWORTH
2             "On July 17th, 2021, Teachers
3    Credit Union notified Plaintiff that she had
4    been denied a request for an auto loan based
5    upon information in her Equifax credit file."
6             Do you see that?
7        A.    Yes.
8        Q.    Did you submit two separate auto
9    loan applications to Teachers Credit Union?
10       A.    I'm not for sure what the
11   dealership did.
12       Q.    Okay.  So you don't know why you
13   received two separate denial letters?
14       A.    No.
15       Q.    Okay.  Do you recall the date you
16   applied for an auto loan through Teachers
17   Credit Union?
18       A.    No, not the exact date.
19       Q.    Do you know --
20       A.    I know it was for a couple of days
21   because we were trying to do a larger down
22   payment to see if that would have made a
23   difference.
24       Q.    And do you recall why, exactly, you
25   were denied?
```

Page 167

```
1                       BRIANNA DULWORTH

2           A.      No.  I don't have the letters in

3      front of me.

4           Q.      Did you eventually obtain an auto

5      loan?

6           A.      Yes.

7           Q.      When was that; do you recall?

8           A.      No, not the exact date.

9                   I mean, it was around that time, in

10     July.

11          Q.      Around July of 2021?

12          A.      Yes.

13          Q.      And who did you obtain the loan

14     with?

15          A.      Capital One Auto Finance.

16          Q.      Okay.  Do you know the terms of

17     that loan?

18          A.      I don't remember.  I think 6

19     percent was, like, the interest rate; and I'm

20     not quite -- I don't remember the rest.  I just

21     know what I pay them every month.

22          Q.      Was it the same terms you were

23     looking to get through Teachers Credit Union?

24          A.      I don't know.  Like, I didn't do

25     that.  Like, the person at the auto dealership
```

Page 168

```
 1                        BRIANNA DULWORTH
 2     did that stuff.
 3          Q.    Okay.  So you -- you don't know the
 4     specifics of the terms of that auto loan?
 5          A.    No.  That was done -- I mean, I
 6     think they do a request to several different
 7     places.
 8                (EXHIBIT 17 WAS MARKED FOR
 9     IDENTIFICATION.)
10     BY MS. ROBINSON:
11          Q.    Okay.  So let's go ahead and look
12     at EFX 8, which I'll try loading it again.  See
13     if that makes a difference.
14          A.    No.  I can download now.
15          Q.    Okay.
16          A.    Yeah, and I --
17          Q.    You can open that?
18          A.    Yeah.  I -- I fixed the error, and
19     we're good now.
20          Q.    Okay.  All right.
21                Do you recognize this document?
22          A.    Yes.
23          Q.    Are these your responses to
24     Equifax's Request for Production of Documents?
25          A.    Yes, they're my responses.
```

Page 169

1                          BRIANNA DULWORTH

2        Q.      Do you recall what you did to

3    search for documents responsive to these

4    requests?

5        A.      Yeah.  I went to the mailbox.

6                As far as -- I mean, they were

7    coming in.  I mean, this was about the time

8    that I had first contacted them, so they said

9    that they would need actual -- the

10   documentation of those, and so I started

11   keeping them, and so --

12       Q.      Go ahead and take a second to

13   review the document.

14       A.      Okay.

15       Q.      And just let me know -- go ahead

16   and read through your responses.  Go ahead and

17   let me know when you're -- when you're ready.

18       A.      Okay.  Thank you.

19               I mean, it's a long document.  I've

20   looked through all of it.  I'd be here a long

21   time if I really wanted to read through all of

22   it.

23       Q.      Did you notice anything you'd like

24   to change or add in your responses?

25       A.      No, not by looking at it.

Page 170

1                     BRIANNA DULWORTH

2       Q.      So in preparing -- in helping your

3   attorneys prepare responses to these requests,

4   what did you do to search for documents that

5   were responsive?

6       A.      I don't know what exactly you're

7   referring to.  I mean, are you -- what are

8   you -- I'm sorry.  I don't know what you're

9   referring to.

10              Can you, like, rephrase it, or...

11      Q.      So when the requests are asking

12  for, let's say, Number 5, a copy of any

13  applications for credit signed by you, there's

14  some objections; and in the end of that

15  paragraph is -- I'm looking at page 2 -- it

16  says, "Plaintiffs have provided all responsive

17  nonprivileged documents within Plaintiffs'

18  care, custody, control -- custody, and

19  control."

20              So what did you do to search for

21  documents responsive to this request?

22      A.      I don't recall.  Like, I -- I don't

23  know.

24      Q.      Okay.  Do you recall searching your

25  email?

Case 1:22-cv-00469-JMS-MJD   Document 181-1   Filed 10/06/23   Page 103 of 140 PageID #:
Case: 24-2066   Document: 38   1168   Filed: 12/20/2024   Pages: 262

Page 171

```
1                         BRIANNA DULWORTH

2          A.     I mean, the email, like the mail,

3      like, I don't know exactly what it says about

4      the -- the part that you read in regards to

5      the -- the actual -- what part did you read

6      again?

7                     In regards to the actual

8      applications?

9                     Like, I -- we wouldn't have the

10     actual applications; but, I mean, of course,

11     I'm sure I looked through emails or the mail

12     or -- I don't really recall everything that we

13     did back then.

14         Q.     Okay.  All right.

15                    Okay.  And then the last document

16     up there is EFX 9, the RFA responses.

17         A.     Okay.

18         Q.     Which I think that will be Exhibit

19     18.

20                    (EXHIBIT 18 WAS MARKED FOR

21     IDENTIFICATION.)

22     BY MS. ROBINSON:

23         Q.     Are you able to open that document?

24         A.     Yes, I am.

25         Q.     Do you recognize the document?
```

Page 172

```
 1                    BRIANNA DULWORTH

 2        A.     Yes.

 3        Q.     And these are your responses to

 4   Equifax's Request for Admission?

 5        A.     Yes, ma'am.

 6        Q.     Go ahead and take a second to

 7   review it.  Just let me know when you're done.

 8        A.     Okay.  Thank you.

 9               Okay.  I've reviewed it.

10        Q.     Okay.

11        A.     A lot shorter on the answers on

12   this one.

13        Q.     Yeah, they are.

14               Do you have anything to change or

15   add to these statements?

16        A.     No, ma'am.

17        Q.     So they're accurate and truthful?

18        A.     Yes, ma'am.

19        Q.     All right.

20               MS. ROBINSON:  I think I can be

21   done for now.  We can go ahead and let Ally

22   move forward with their questions.  Let me just

23   make sure.

24               I may have a few -- A couple

25   follow-up things at the end, but in the
```

Page 173

```
 1                        BRIANNA DULWORTH

 2   interest of time, we can go ahead and move on

 3   to Ally.

 4               THE WITNESS:  Okay.

 5               MR. KUNDMUELLER:  If we can take

 6   about four, five minutes, then I'll get all of

 7   the -- the documents that we're going to use

 8   uploaded, and that should speed things up.

 9               MS. ROBINSON:  Great.  Okay.

10               Thank you, Ms. Dulworth.

11               THE WITNESS:  Thank you.

12               MR. RAPP:  We might need a little

13   bit more than five minutes, though.  So let's

14   just -- actually, if we can just come back on

15   at 52 after and just call it ten, if that's

16   okay with everybody.

17               MR. KUNDMUELLER:  Sure.

18               (RECESS TAKEN.)

19

20                        EXAMINATION

21

22   BY MR. KUNDMUELLER:

23       Q.    Good afternoon and welcome back.

24   My name is Mark Kundmueller, and I represent

25   Ally Financial.
```

Page 174

```
1                    BRIANNA DULWORTH
2              You're a pro at this by now.  So I
3    just wanted to tell you to please keep doing
4    what you've been doing; and if there's a time
5    when you need to take a break or anything like
6    that, please just let me know.  Okay?
7         A.    Yes.  Thank you.
8         Q.    Okay.  Is there a time when you
9    obtained an auto loan from Ally Financial?
10        A.    Yes.
11        Q.    Do you recall when that was?
12        A.    I don't.  Hold on, and I'll --
13        Q.    Well --
14        A.    It --
15        Q.    If I could, if this would help, let
16   me -- let me introduce what I have marked as
17   Ally 1 --
18        A.    Okay.
19        Q.    -- which I believe will be Exhibit
20   19.
21        A.    Uh-huh.
22              (EXHIBIT 19 WAS MARKED FOR
23   IDENTIFICATION.)
24              THE WITNESS:  And it says the date
25   is July 27th of 2018.
```

Page 175

```
 1                    BRIANNA DULWORTH

 2   BY MR. KUNDMUELLER:

 3        Q.     Okay.  Have you seen this document

 4   before?

 5        A.     Yes.

 6        Q.     And can you identify it for us, or

 7   what it purports to be?

 8        A.     Our loan agreement that was signed

 9   at the dealership.

10        Q.     And what was the loan for?

11        A.     A car.  A Kia Sedona.

12        Q.     Okay.  A Kia Sedona.

13        A.     Or Sorento.  I'm sorry.  Sorento.

14        Q.     Were you the primary driver of that

15   vehicle?

16        A.     Yes.  The only driver.  Yes.

17        Q.     Okay.  Your name is listed as a

18   buyer, and also your husband, Craig Dulworth,

19   is listed as a buyer, correct?

20        A.     Yes, sir.

21        Q.     Okay.  What was the interest rate

22   on the -- on the loan for this vehicle?

23        A.     15.74.

24        Q.     Okay.  And do you know what the

25   total cost of the vehicle itself was?
```

Page 176

1                     BRIANNA DULWORTH

2                MR. RAPP:  Objection to the form of

3      the question.

4                You can answer, if you can.

5                THE WITNESS:  Like the total cost,

6      including the titles and the fees and the

7      warranties, is that what you're asking for?

8                Because it's on the paper here in

9      front of us.

10     BY MR. KUNDMUELLER:

11          Q.    Okay.

12          A.    The $23,617.66.

13          Q.    Was the amount -- the amount

14     financed, correct?

15          A.    Yes.

16          Q.    Okay.  And then on top of that,

17     there's a -- a finance charge for the interest

18     over the life of the loan, correct?

19          A.    I'm assuming so.  I'm not a banker.

20          Q.    If you scroll down to the -- on the

21     right-hand side of the page, is -- is that your

22     signature that appears --

23          A.    Yes, sir.

24          Q.    -- three times on the page?

25          A.    Yes.

Page 177

1                    BRIANNA DULWORTH

2        Q.      And right below your signature, is

3    that your husband's signature?

4        A.      Yes, sir.

5        Q.      What was the -- the length, the

6    term of this particular loan?

7        A.      That's what I do to exhale.

8        Q.      If you --

9        A.      75 payments.

10        Q.      Okay.  And those payments were

11    approximately $500 each?

12        A.      Yes, sir.

13        Q.      Okay.  In July of 2018, this is

14    approximately three months before you filed

15    your bankruptcy petition?

16        A.      Yes, sir.

17        Q.      At the time you entered this

18    agreement, were you already considering filing

19    for bankruptcy?

20        A.      No, sir.

21        Q.      When did you make your decision

22    that you needed to file for bankruptcy?

23        A.      Afterwards; after I bought the car.

24        Q.      Do you recall approximately when?

25        A.      No.  I mean, there's a lot of

Page 178

```
1                    BRIANNA DULWORTH
2    things that went into that.
3         Q.    When -- when you say that, what do
4    you mean?
5               Can you explain?
6         A.    In regards to our medical bills,
7    where they were at; our other car loan -- I
8    mean, our truck loan; new medical bills coming
9    in.
10        Q.    Once you entered into this
11   agreement, did you make your payments as agreed
12   each month?
13        A.    I believe so.  I believe there was
14   one time we was a day or two late.  I'm not
15   quite for sure.  But -- but most of the time.
16        Q.    Did you eventually pay this loan
17   off in full?
18        A.    Like, due to getting another car.
19        Q.    Do you know when that occurred?
20        A.    Sometime in I think July of -- I
21   would have to look -- '21, 1st of August of
22   '21.
23        Q.    If you could please turn to what
24   I've marked as Ally Exhibit 2, which I believe
25   is going to be Exhibit 20.
```

Page 191

```
 1                        BRIANNA DULWORTH

 2     like -- if you can.

 3                THE WITNESS:  Could you repeat the

 4     question?

 5     BY MR. KUNDMUELLER:

 6          Q.     Sure.

 7                What's the basis for your claim

 8     that you've been harmed by Ally Financial?

 9                MR. RAPP:  Again, same objections,

10     which is calls for a legal conclusion.

11                But you can still answer, if you

12     can.

13                THE WITNESS:  I still don't -- I

14     still don't quite understand.

15     BY MR. KUNDMUELLER:

16          Q.     Okay.  How are you claiming Ally

17     has harmed you?

18          A.     Well, due to the credit report,

19     not -- being like it is, being -- I think it

20     had a lot to do with not being able to purchase

21     a house.

22                The whole process was very

23     frustrating.  When I called and didn't receive

24     it back, I mean, I felt, like, belittled a

25     little bit.  I felt defeated.
```

Page 192

BRIANNA DULWORTH

1

2          I don't know.  I explained it

3    earlier, and it makes me very emotional.

4          I just think it took our chances of

5    even purchasing a house during that time away.

6          I think he froze.  Going to blow my

7    nose.

8          MR. RAPP:  When we comes back, if

9    we can take a quick break.

10          (A DISCUSSION WAS HELD OFF THE

11    RECORD.)

12    BY MR. KUNDMUELLER:

13       Q.    In connection with your attempt to

14    purchase a home, when did you begin your search

15    for or attempt to purchase a home?

16          MR. RAPP:  Objection to the form of

17    the question.

18          You can answer, if you can.

19          THE WITNESS:  Well, I -- I spoke to

20    it earlier.  You know, I looked into it, mid-

21    to late 2019 what it would take, and that is

22    when I started pulling credit reports and

23    seeing what was wrong and continued -- and then

24    called and -- I mean, I already said all of

25    this, and it --

Page 193

```
 1                    BRIANNA DULWORTH

 2   BY MR. KUNDMUELLER:

 3        Q.     Who, specifically, did you call?

 4        A.     Ally.

 5        Q.     Concerning -- concerning purchasing

 6   a house, who did you call?

 7        A.     At the time my son was purchasing a

 8   home, so I talked to his -- his mortgage -- his

 9   mortgage broker in regards to our situation

10   with the bankruptcy and to get more details of

11   it.  It was just a -- a goal that I had.

12        Q.     And who was that mortgage broker?

13        A.     I'd have to ask my son what his

14   name was.

15        Q.     Did you specifically discuss the

16   Ally account with the mortgage broker?

17        A.     No.  At this point I just called to

18   ask what would have to happen, like, when could

19   I get a house if that was the case.

20              We were in a lease.  I just needed

21   additional information as far as what needs to

22   happen, what does our credit score need to

23   have, I mean, what does -- are there different

24   loans for different things.

25              It was just informational.  And so
```

Page 194

```
 1                        BRIANNA DULWORTH
```

 2    after I gathered the information, I started

 3    looking things up on our credit report to make

 4    sure that things are aligned to see what the

 5    score was, et cetera.

 6         Q.    So did you actually make an attempt

 7    to purchase a house in this timeframe?

 8         A.    Well, no, because Ally did not call

 9    me back and did not fix the problem; and so our

 10   time ran out.  The window ran out and our lease

 11   was up, and the housing market was going nuts;

 12   and so we made the decision to move in with our

 13   son.

 14              And I hate that because I am his

 15   mom.  I'm sorry.

 16              Our children are supposed to be

 17   able to depend on us, not the other way around.

 18        Q.    So despite the -- the reporting of

 19   the Ally account, you didn't make any attempts

 20   during the -- the window of time you described

 21   to try to find a house or to purchase a house,

 22   correct?

 23        A.    Well, that's like the cart before

 24   the horse or however it says.

 25              I could not because I hadn't met

Page 195

1                        BRIANNA DULWORTH

2     the qualifications to do so.  I was working on

3     getting those qualifications to do so to go

4     forward with a house.

5                 I talked to a realtor about the

6     pricing of houses.  I did all that homework,

7     and I just thought we was going to be able to

8     do that.

9        Q.    And what qualifications were you

10    told -- or what -- what qualifications do you

11    believe you needed in order to purchase a home?

12       A.    It's a credit score of at least a

13    640.  I was told about the rural loans.

14                There was all sorts of information

15    that I was told.  Yeah.

16                And a pre-approval can happen at 18

17    months after a bankruptcy discharge, but it

18    cannot close until two years.

19                And so our lease of our house that

20    we was in was ending the end of February, and

21    so I had contacted our property management

22    group to see if I could -- if we could get all

23    that process started, if I could sign just,

24    like, a six-month lease because then it would

25    have fell right into place to where we could

```
 1                    BRIANNA DULWORTH

 2     have closed on a house.  So I was quite excited

 3     about it.

 4          Q.     When -- when you say a "640," what

 5     did you mean?

 6          A.     Credit score, a 640.

 7          Q.     And when you say "640," is there a

 8     particular -- particular entity who's creating

 9     that credit score that you're referring to?

10              Is that a TransUnion score?  An

11     Experian score?

12          A.     I have no idea.  That's not -- that

13     wasn't -- we didn't discuss that.

14          Q.     If you could please take a look at

15     what I've marked as Ally 5, and I believe this

16     will be Exhibit 23 to the deposition now.

17              (EXHIBIT 23 WAS MARKED FOR

18     IDENTIFICATION.)

19     BY MR. KUNDMUELLER:

20          Q.     And if you need a moment, you

21     can -- please let me know.

22          A.     I'm fine.  I just want this to be

23     over with.

24          Q.     Can you identify, please, for me,

25     what this document is?
```

Page 197

1                     BRIANNA DULWORTH

2          A.     It looks like my Equifax credit

3     report at that time that I pulled it.

4          Q.     Okay.  What's the -- what's the

5     time for this particular report?

6          A.     It says June 25th, 2021.

7          Q.     Okay.  And if you look down at

8     the -- the bottom right-hand corner, it's

9     marked Dulworth '134.

10         A.     Uh-huh.

11         Q.     Do you know if this was a document

12    that was produced by you or your attorneys in

13    this matter?

14         A.     I think it's one that I pulled and

15    sent, that I requested and received.

16         Q.     Okay.  What's the -- the credit

17    score that's shown?

18         A.     654.

19         Q.     Do you know how that's calculated?

20         A.     I have no idea.

21         Q.     Is that higher than what you were

22    told you would need in order to qualify for

23    purchasing a home?

24         A.     Without having -- with having a

25    20-percent down payment.  Like, it wasn't just

Page 220

                           BRIANNA DULWORTH

1

2    BY MR. KUNDMUELLER:

3         Q.     This information that's shown that

4    we just went over --

5         A.     Uh-huh.

6         Q.     -- do you have any knowledge as to

7    how this affects the credit scores shown on

8    this document?

9         A.     I mean --

10               MR. RAPP:  Same objections, but you

11   can feel free --

12               THE WITNESS:  I don't know.  Like,

13   I don't -- I don't really understand what

14   you're referring to, and you're making me feel

15   very uncomfortable.

16   BY MR. KUNDMUELLER:

17        Q.     Okay.  Well, it's a -- it's a

18   yes-or-no question, really.

19               This information we just went

20   over --

21        A.     And I already tried to tell you,

22   like, what I think about that, as far as the --

23   I mean, the knowledge.

24               I can't tell you that that specific

25   thing, but I can't tell you that it didn't

Page 221

```
 1                    BRIANNA DULWORTH

 2     either because of it.  Like, it --

 3          Q.     And that's why --

 4          A.     You're just trying to get me to say

 5     something that I feel like is not true, and I

 6     don't feel comfortable with that.

 7          Q.     I'm asking you a simple yes-or-no

 8     question on this one.

 9          A.     And I answered that.

10                 I'm just going to say I don't know.

11          Q.     Thank you.

12                 I'd like to move on to what was in

13     the -- in the listing as Ally 8, please.  I

14     believe this will be Exhibit 26.

15                 (EXHIBIT 26 WAS MARKED FOR

16     IDENTIFICATION.)

17     BY MR. KUNDMUELLER:

18          Q.     Let me know when you have it.

19          A.     I have it.

20          Q.     Okay.  Have you seen this document

21     before?

22          A.     I think one of the other ones had

23     parts of it, and I don't -- I don't know.

24          Q.     Can you identify what this is for

25     me?
```

Page 222

```
 1                   BRIANNA DULWORTH

 2        A.     It is a denial letter from Teachers

 3   Credit Union.

 4        Q.     What's the date of the denial?

 5        A.     July 17th, 2021.

 6        Q.     And you were seeking credit from

 7   Teachers Credit Union?

 8        A.     It was for the auto loan.

 9               I did not do it.  It was the -- the

10   car dealership.

11        Q.     Well, when this application was put

12   out there, was Craig Dulworth a co-applicant?

13        A.     Yes.  He always is.  He's my

14   husband.

15        Q.     And it says that you were -- the

16   amount of the loan you were seeking was 42,200.

17               Was this --

18        A.     Okay.

19        Q.     -- the purchase price of a specific

20   vehicle?

21        A.     Yes.

22        Q.     Was that the vehicle you ultimately

23   ended up purchasing?

24        A.     Yes.

25        Q.     In looking at this document, it's
```

Case 1:22-cv-00469-JMS-MJD   Document 181-1   Filed 10/06/23   Page 121 of 140 PageID #:
Case: 24-2066   Document: 38   1186   Filed: 12/20/2024   Pages: 262

Page 223

1                     BRIANNA DULWORTH

2    not just a straight denial, correct?

3              Is there an offer that's made to

4    you?

5         A.    Hold on.  Let me read it.

6              Okay.  Yes.  There's an offer made.

7         Q.    And did you accept that offer?

8         A.    No.

9         Q.    What was the -- is there a reason

10   disclosed for Teachers Credit Union's decision?

11             MR. RAPP:  Objection to the form of

12   the question.  The document speaks for itself.

13             But you can still answer, if you

14   can.

15             THE WITNESS:  I have to find it.

16   BY MR. KUNDMUELLER:

17        Q.    Do you see at the very beginning it

18   says:  "We are unable to offer you credit on

19   the terms you requested for the following

20   reasons"?

21        A.    No, I don't see that -- oh, you

22   mean at the very top?  Yes.

23             "Insufficient credit file after

24   bankruptcy."

25        Q.    Do you believe that this decision

Page 224

```
 1                    BRIANNA DULWORTH

 2    was affected by Ally's reporting of its account

 3    following your bankruptcy?

 4          A.    Yes.

 5          Q.    What's your basis for believing

 6    that?

 7          A.    Because it's -- because we would

 8    have had more credit if it would have been

 9    reported as it should be.

10               And I know you're going to ask me

11    where I base my opinion, and I'm just going to

12    tell you, I don't know because I don't know how

13    to -- you say it's a yes-or-no question -- or

14    answer; but to me it's not.

15          Q.    Is your opinion as to the effect of

16    Ally's credit reporting based on anything other

17    than what your attorney has told you?

18          A.    What my attorneys told me?  I told

19    them.

20               MR. RAPP:  Objection, misstates the

21    testimony -- previous testimony.

22               But go ahead.  She already

23    answered.

24    BY MR. KUNDMUELLER:

25          Q.    I'm going to move on to what's
```

Page 225

1                    BRIANNA DULWORTH

2     listed as Ally 9, which I believe will be

3     Exhibit 27 for those of you keeping score at

4     home.

5                    (EXHIBIT 27 WAS MARKED FOR

6     IDENTIFICATION.)

7     BY MR. KUNDMUELLER:

8          Q.     Let me know when you have it.

9          A.     I have it.

10          Q.     Okay.  Have you seen this document

11    before?

12          A.     Yes.

13          Q.     Can you tell us what it identifies

14    for us, please?

15          A.     A denial of a credit limit

16    increase.

17          Q.     Okay.  And from whom did you seek a

18    credit limit increase?

19          A.     The Comen- -- the Comenity Bank.

20          Q.     And just to be clear, was this a

21    credit card account?

22          A.     Yes.

23          Q.     And was Craig Dulworth a

24    co-applicant for this request?

25          A.     No.

Page 226

1                      BRIANNA DULWORTH

2         Q.      And I believe you said that your --

3         A.      Of a loan.  This is Lane Bryant,

4    for overweight women.  So it's not a loan.  So

5    no, his name is not on my credit card for

6    overweight women.

7         Q.      If I could just finish my question.

8    Sorry.

9         A.      Please do.

10        Q.      I believe you testified before

11   that, this specific request for an increase in

12   your credit limit is not part of the damages

13   you're claiming in this matter?

14        A.      When did I say that?  And what -- I

15   don't even know what you're talking about at

16   this point.

17        Q.      Well, okay.  I believe we -- we

18   discussed this one earlier.

19        A.      Next time you do this, have them --

20   ask them if you can go first, so that way the

21   client's not so flustered and tired.

22        Q.      What was the reason for -- given

23   for not granting your request for additional

24   credit?

25        A.      Which one -- which one are we

Page 227

```
 1                   BRIANNA DULWORTH
 2   talking about.
 3        Q.    On the -- the question -- the
 4   Comenity one -- on the exhibit were on right at
 5   this moment.
 6        A.    I'm not on the wrong one.  Let me
 7   move on over here to this one.
 8        Q.    I can share my screen, if that
 9   would help.
10        A.    It was recently -- I -- I have it.
11              It was recently opened is why.
12        Q.    So when was this account opened?
13        A.    I don't know.
14        Q.    Okay.
15        A.    Does it show on here?
16        Q.    And it states:  "We would like to
17   see a consistent payment pattern established
18   with an existing credit limit before adding
19   additional credit," correct?
20        A.    Yes, it says that.
21        Q.    Okay.  Are you claiming that Ally's
22   reporting of the Ally account caused this
23   credit denial?
24        A.    I don't know.
25              MR. RAPP:  Objection, asked and
```

```
 1                    BRIANNA DULWORTH

 2   answered.

 3   BY MR. KUNDMUELLER:

 4        Q.    How did the denial of this request

 5   for credit limit increase harm you?

 6        A.    I don't know.

 7              MR. RAPP:  Objection, asked and

 8   answered.

 9   BY MR. KUNDMUELLER:

10        Q.    I would like to move on to Ally 10,

11   please, which will be Exhibit 28.

12              (EXHIBIT 28 WAS MARKED FOR

13   IDENTIFICATION.)

14   BY MR. KUNDMUELLER:

15        Q.    Please let me know when you have

16   it.

17        A.    I've got it.

18        Q.    Can you identify what this is for

19   me, please?

20        A.    Looks like a -- a denial to approve

21   a request.

22        Q.    Okay.  Who is the denial from?

23        A.    The Financial Center.

24        Q.    Is that a -- a company with whom

25   you regularly do business?
```

Page 229

```
 1                    BRIANNA DULWORTH

 2       A.     No.  That had to be a car thing,

 3  where the dealership puts it through.

 4       Q.     What's the date of this particular

 5  denial?

 6       A.     7/23/21.

 7       Q.     Okay.  This is your -- your recent

 8  incorrect auto application.

 9              So that would have been through

10  the -- the dealer where you were trying to

11  purchase a new vehicle?

12       A.     Yes.  Yes.  And I -- I mean, I

13  looked at several, like, dealerships.  It

14  wasn't just one --

15       Q.     Okay.

16       A.     -- to look for the Jeep and filled

17  out an application on a couple of them.  That's

18  why the days aren't just the same.  I tried to

19  find the best deal that I could.

20       Q.     What -- what reasons are given for

21  the denial on this letter?

22              MR. RAPP:  Objection to the form of

23  the question.  The document speaks for itself.

24              But you can still free to answer.

25              THE WITNESS:  Bankruptcy and
```

Page 230

1                          BRIANNA DULWORTH

2      delinquent past or present credit obligation.

3    BY MR. KUNDMUELLER:

4          Q.      Here was your Ally account ever

5      delinquent?

6          A.      No.   When it showed paid.

7          Q.      So could the reporting of the Ally

8      account have -- be part of the reason for this

9      credit denial?

10              MR. RAPP:   Objection, calls for

11     speculation, form of the question.

12              You can still answer, if you can.

13              THE WITNESS:   I don't know.

14    BY MR. KUNDMUELLER:

15         Q.      You did end up purchasing a new

16     vehicle in July of 2021, correct?

17         A.      I believe so, or it was the first

18     of August.   It was right there.

19         Q.      How did this specific denial cause

20     you harm?

21         A.      I don't know which -- what interest

22     rate that they would have offered.   And plus

23     it's just embarrassing, honestly.   Humiliating.

24         Q.      So you don't know whether Financial

25     Center would have offered a more favorable

Page 231

```
 1                    BRIANNA DULWORTH

 2   interest rate than the one you obtained when

 3   you -- when you purchased the Jeep?

 4              MR. RAPP:  Objection, asked and

 5   answered, and calls for speculation, form of

 6   the question.

 7   BY MR. KUNDMUELLER:

 8        Q.    When you made this application, did

 9   you apply for a loan at a specific interest

10   rate?

11        A.    Did I apply for a loan at a

12   specific interest rate?

13              I don't know what the lady did when

14   she applied for us.

15        Q.    I'd like to look at what's -- what

16   we labeled Ally 11, which I believe will be

17   Exhibit 29.

18              (EXHIBIT 29 WAS MARKED FOR

19   IDENTIFICATION.)

20   BY MR. KUNDMUELLER:

21        Q.    Please let me know when you have it

22   open.

23        A.    Okay.

24        Q.    Can you identify this document for

25   me, please?
```

Page 232

1                          BRIANNA DULWORTH

2          A.      Uh-huh.   It's a Teachers Credit

3    Union denial.

4          Q.      What's the date of this denial?

5          A.      July 4th, 2021.

6          Q.      And was this, again, a request for

7    an auto loan?

8          A.      Yes.

9          Q.      And Craig Dulworth was a

10   co-applicant?

11         A.      Of course.  Yes.

12         Q.      What was the amount of credit that

13   you were seeking in this particular loan?

14         A.      It says $42,925.

15         Q.      Is that consistent with the cost of

16   the vehicle you ended up purchasing?

17         A.      Yeah, with warranties and fees, I

18   would assume, pretty close.

19         Q.      What reasons are listed for -- for

20   the denial on this letter?

21         A.      The insuf- -- insufficient credit

22   file after bankruptcy and bankruptcy.

23         Q.      Do you believe this decision was

24   affected by the reporting of the Ally account?

25         A.      I don't know.

Page 233

1                          BRIANNA DULWORTH

2          Q.     How were you damaged by the denial

3     of this particular loan?

4                 MR. RAPP:  Objection to the form of

5     the question, calls for speculation, asked and

6     answered.

7                 But you can still answer, if you

8     can.

9                 THE WITNESS:  At that time I didn't

10    know how many he sent out; so when I was

11    actually buying the car, honestly, it -- it

12    bothered me a bit.

13                But several weeks after when I

14    continued getting them in the mail and I was

15    able to see the denial, yeah, that bothered me

16    emotionally.  It just reminded me of

17    everything.

18    BY MR. KUNDMUELLER:

19         Q.     Do you know if -- the interest rate

20    that was being sought in this application, do

21    you know if it was lower than the interest rate

22    you eventually obtained?

23         A.     I don't know.  I'm not the female

24    who done that.

25         Q.     When shopping with the different

Page 237

```
1                     BRIANNA DULWORTH

2    BY MR. KUNDMUELLER:

3         Q.     You can answer.

4              MR. RAPP:  Again, we're covering

5    the same ground, Mark.

6              Can we -- can we move forward?

7              MR. KUNDMUELLER:  I'm trying to.

8              MR. RAPP:  I'm just not going to

9    let you sit here and ask the same questions

10   again that we've been going over all day.  I'm

11   going to instruct her not to answer any more

12   questions about why she disputed the Ally

13   account.

14             MR. KUNDMUELLER:  Well, she

15   disputed it because it was included in the

16   bankruptcy, correct?

17             MR. RAPP:  I'm not here to testify.

18   And I'm telling you that my client has already

19   testified repeatedly.

20   BY MR. KUNDMUELLER:

21        Q.     The Ally account could not possibly

22   have caused excessive obligations at this

23   point, correct?

24        A.     I don't know.

25             MR. RAPP:  Object to the form of
```

Page 238

```
 1                    BRIANNA DULWORTH

 2    the question.

 3                   Feel free to answer, if you can.

 4                   THE WITNESS:  I don't know.

 5    BY MR. KUNDMUELLER:

 6        Q.    Okay.  The value or type of

 7    collateral not sufficient is another reason

 8    provided.

 9                   That doesn't have anything to do

10    with the reporting of the Ally account, does

11    it?

12        A.    I don't know.

13        Q.    Do you believe this decision was

14    affected by the reporting of the Ally account?

15        A.    Did you ask a question?

16        Q.    Do you believe this decision, the

17    IU Credit Union Adverse Action Notice, was

18    affected by the reporting of the Ally account?

19        A.    I don't know.

20        Q.    Okay.  I would like you to turn,

21    please, to Ally 13.  I believe this will be

22    Exhibit 31.

23                   (EXHIBIT 31 WAS MARKED FOR

24    IDENTIFICATION.)

25
```

Page 239

                    BRIANNA DULWORTH

1

2    BY MR. KUNDMUELLER:

3         Q.      Please let me know when you have

4    it.

5         A.      Yes, I have it.

6         Q.      Could you identify this document

7    for me, please?

8         A.      It is another denial from Financial

9    Center dated for 7/30/21 with the reasons as

10   follows:  Bankruptcy, delinquency, past and

11   present credit obligations.

12        Q.      And Craig Dulworth, again, was --

13   was a co-applicant on this request?

14        A.      Yes, sir.

15        Q.      And this was also a -- an auto loan

16   application, correct?

17        A.      Yes, sir.

18        Q.      Do you believe this decision was

19   affected by the reporting of the Ally account?

20        A.      I don't know.

21        Q.      Other than the six that we've gone

22   over today, have you received any other Adverse

23   Action Notices since your bankruptcy filing in

24   2018?

25        A.      I don't know.

Page 240

1                          BRIANNA DULWORTH

2                 MR. RAPP:  Objection, asked and

3     answered.

4                 She still answered anyway, but...

5                 MR. KUNDMUELLER:  I'm sorry?

6                 MR. RAPP:  She did answer that she

7     didn't know, but I was -- while I was

8     objecting.

9   BY MR. KUNDMUELLER:

10        Q.    Do you have any additional Adverse

11    Action Notices in your possession at all?

12        A.    I don't know.

13                MR. RAPP:  Objection, asked and

14    answered repeatedly today.

15                MR. KUNDMUELLER:  I just want to

16    make sure that this is the -- the universe of

17    the ones that have been produced.

18  BY MR. KUNDMUELLER:

19        Q.    You don't have any more that

20    haven't been produced to us?

21        A.    I don't know.

22        Q.    Have you sought treatment from any

23    counselors or mental health professionals as a

24    result of emotional distress or distress

25    resulting from the -- the things you're

Case 1:22-cv-00469-JMS-MJD   Document 181-1   Filed 10/06/23   Page 136 of 140 PageID #:
Case: 24-2066   Document: 38   1201   Filed: 12/20/2024   Pages: 262

Page 241

1                    BRIANNA DULWORTH

2    claiming in this lawsuit from -- from Ally's

3    reporting?

4         A.    I've spoke to my medical doctor in

5    regards to stress, overwhelming stress in my

6    life, which includes the financial piece and my

7    housing situation.

8         Q.    Any other medical professionals

9    other than your -- your family doctor?

10        A.    Huh-uh.  No.

11        Q.    Are you claiming any physical

12   symptoms as a result of your emotional

13   distress?

14             MR. RAPP:  Objection to the form of

15   the question.

16             You can still answer.

17             THE WITNESS:  I mean, there's all

18   sorts of things that I experience due to the

19   stress, health wise.

20   BY MR. KUNDMUELLER:

21        Q.    Well, what are those things?

22        A.    Due to stress?

23             Well, I mean, I have high blood

24   pressure and anxiety.  I've had some anxiety

25   issues, like sadness and depression, if you

Page 242

```
 1                    BRIANNA DULWORTH

 2    really -- I mean, all of this is very

 3    uncomfortable to even share with you; but yeah.

 4    It's a lot.  It did up end being a lot, moving

 5    in with my son.  So...

 6         Q.     Did your -- can you tell me,

 7    please, the name of your doctor that you spoke

 8    to?

 9         A.     Mary Beth Hensley.

10         Q.     And did Dr. Hensley prescribe

11    anything for you related to the -- your -- your

12    stress or anxiety?

13         A.     She sent me to have some blood work

14    done on my vitamins and stuff, and my female

15    hormones, if you -- if you need to know.

16         Q.     Now, did the -- the symptoms you're

17    suffering, you mentioned high blood pressure,

18    did that start prior to your -- your

19    bankruptcy, or is that a recent --

20         A.     No, it started a few years ago -- a

21    few years ago.

22                The -- the depression and all that

23    has started since we moved into here.

24         Q.     Okay.  Have you -- have you had any

25    medication or anything of that nature
```

Page 243

```
 1                    BRIANNA DULWORTH
 2   prescribed for the depression?
 3        A.     No medication changes.
 4               We did diet and exercise and
 5   some -- she recommended me to see a mental
 6   health counselor.
 7        Q.     Have you done that?
 8        A.     Huh-uh.  No.
 9        Q.     Do -- do you plan on doing that in
10   the future?
11        A.     I think I -- I hope so, yes.
12               Even my executive director
13   recommended it to me a couple weeks, so I hope
14   I can soon.
15        Q.     When you say your "executive
16   director," is that someone you work with?
17        A.     My executive director of our
18   agency, yes.  My supervisor.
19        Q.     Okay.  And -- and they recommended
20   that you seek some additional treatment?
21        A.     Yeah.  Yeah.  Just talk to
22   somebody.
23               MR. KUNDMUELLER:  I don't have
24   anything else at the moment.
25               MR. RAPP:  David or Katherine, did
```

Page 244

                          BRIANNA DULWORTH

1    you guys want to swing back on something?

2              MS. ROBINSON:  No.  I think I'm

3    good.

4              MR. SANDEFER:  I have a few

5    follow-up questions, if you don't mind.

6              THE WITNESS:  Of course.

7              MR. SANDEFER:  But they should be

8    relatively brief.

9

10

11                      EXAMINATION

12

13   BY MR. SANDEFER:

14       Q.    Apologies.  I feel like -- or

15   apologies Mrs. Dulworth, I think I've taken up

16   much of your day today.

17       A.    You are the number one, I think;

18   but it's okay.

19              MR. SANDEFER:  And are we still on

20   the record?

21              THE REPORTER:  Yes, we are.

22              MR. SANDEFER:  Okay.

23   BY MR. SANDEFER:

24       Q.    Thank you for sticking in there,

25   Mrs. Dulworth.  I wanted to touch on something

Page 245

```
 1                    BRIANNA DULWORTH

 2    that we discussed earlier today during my

 3    session, and I believe -- and perhaps Ally

 4    Financial's and Equifax's as well.

 5              If you still have your binder in

 6    front of you -- and what I wanted to refer to

 7    was the dispute letters again, if you could

 8    turn to Tab 9 -- or, I guess, it's also

 9    Exhibit 9.

10       A.    I'm so impressed by this binder,

11    David.  Did you create it?

12       Q.    I wish I could take credit for it.

13    I -- I organized it, but I did not put it

14    together.

15       A.    Okay.

16       Q.    And when you mentioned earlier that

17    you reviewed the letters, these two dispute

18    letters are the ones I wanted to discuss with

19    you in particular, I wanted to ask:  What did

20    you mean when you said you reviewed these

21    letters?

22       A.    Well, after we communicated about

23    it, we wrote it together; and then when we were

24    finished putting in whatever needed to be the

25    legal stuff, terms, then they sent it back; and
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

CRAIG DULWORTH and BRIANNA
DULWORTH,
                    Plaintiff,
        v.
EQUIFAX INFORMATION SERVICES LLC
and EXPERIAN INFORMATION
SOLUTIONS INC.,
                    Defendants

Case No. 1:22-cv-00469-JMS-MJD

**FILED UNDER SEAL**

# EXHIBIT 9

## Excerpts of 30(b)(6) Deposition Testimony of Christina Hamilton, Experian Representative (1/5/2023) – Confidential

## FILED IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT AND SUPPORTING BRIEF

## FILED UNDER SEAL

9

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE SOUTHERN DISTRICT OF INDIANA

3    INDIANAPOLIS DIVISION

4

5    CRAIG DULWORTH and

6    BRIANNA DULWORTH,

7                  Plaintiffs,        Case No.

8    vs.                              1:22-cv-00469-JMS-MJD

9    EXPERIAN INFORMATION SOLUTIONS,

10   INC., EQUIFAX INFORMATION

11   SERVICES, LLC, and ALLY

12   FINANCIAL, INC.,

13                  Defendants.

14   VIDEOCONFERENCE DEPOSITION OF EXPERIAN INFORMATION

15   SOLUTIONS, INC., a Defendant, through their

16   designated representative CHRISTINA HAMILTON,

17   a witness, taken on behalf of the Plaintiffs,

18   pursuant to Notice, on January 5, 2023 before

19

20                  KAY L. MERLEY

21

22   Registered Merit Reporter, Certified Realtime

23   Reporter, Certified in Kansas and Missouri, the

24   jurisdiction of the reporter having been waived by

25   the parties.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

Young Court Reporting
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 153

```
 1            APPEARANCES (VIA VIDEOCONFERENCE)

 2   For the Plaintiffs:

 3       MR. MATTHEW S. ROBERTSON
         STECKLEIN & RAPP, CHARTERED
 4       748 Ann Avenue, Suite 101
         Kansas City, Kansas  66101
 5       msr@kcconsumerlawyer.com
         (913) 371-0727
 6
     For the Defendant Experian Information Solutions,
 7   Inc.:

 8       MR. DAVID J. SANDEFER
         JONES DAY
 9       110 North Wacker Drive, Suite 4800
         Chicago, Illinois  60606
10       dsandefer@jonesday.com
         (312) 269-1544
11
     For the Defendant Equifax Information Services, LLC:
12
         MS. SAMIN HESSAMI
13       SEYFARTH SHAW, LLP
         700 Milam Street, Suite 1400
14       Houston, Texas  77002-2797
         shessami@seyfarth.com
15       (713) 238-1847

16   For the Defendant Ally Financial, Inc.:

17       MR. ETHAN G. OSTROFF
         MR. MARK D. KUNDMUELLER
18       TROUTMAN PEPPER, LLP
         222 Central Park Avenue, Suite 2000
19       Virginia Beach, Virginia  23462
         ethan.ostroff@troutman.com
20       mark.kundmueller@troutman.com
         (757) 687-7541
21

22                   STIPULATIONS
             It was stipulated and agreed by and between
23   counsel that there is no objection to the deposition
     officer administering a binding oath to the witness
24   by videoconference.

25
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

Y C R  Young Court Reporting
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 154

1                    TABLE OF CONTENTS

2     EXAMINATION

3     Questions By Mr. Robertson                        5

4     Questions By Mr. Sandefer                        72

5     Questions By Mr. Robertson                       78

6

7     EXHIBITS

8     1  - Notice to Take Deposition                   11

9     2  - Experian documents 1-18                     17

10    3  - Experian documents 43-54                    24

11    4  - Experian's Responses and Objections         33

12    5  - Dulworth 657-666                            44

13    6  - Dulworth 667                                50

14    7  - Dulworth 919-934                            52

15    8  - Dulworth 935                                56

16    9  - Dulworth 686-697                            57

17    10 - Dulworth 698                                59

18    11 - Dulworth 954-970                            60

19    12 - Dulworth 971                                63

20

21    CERTIFICATE OF REPORTER                          82

22    ERRATA SHEET                                     83

23    SIGNATURE PAGE                                   84

24

25

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

YOUNG COURT REPORTING
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 155

```
 1              TABLE OF CONTENTS (continued)

 2   Reporter's Note:  The electronic exhibits provided
     by counsel were made OCR searchable (PDF),
 3   downsampled to 600 dpi, digitally labeled if not
     previously labeled, flattened, archived as original
 4   exhibits, and provided electronically to all
     ordering counsel.  Processing electronic exhibits
 5   can change the file size, resolution, and metadata
     of files originally provided.

 6

 7   (ph) indicates a phonetic spelling.

 8   [sic] indicates the text is as stated.

 9   Quoted text is as stated by the speaker.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

YOUNG COURT REPORTING
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 156

1          (The deposition commenced at 9:33 a.m.)

2               CHRISTINA HAMILTON,

3     a witness, being first duly sworn, testified under

4     oath by videoconference as follows:

5               EXAMINATION

6     BY MR. ROBERTSON:

7          Q.   Good morning, Ms. Hamilton.  My name is

8     Matthew Robertson.  I'm one of the attorneys for the

9     plaintiffs in the case of Brianna and Craig Dulworth

10    versus Experian Information Solutions, Incorporated,

11    and several others currently pending in the U.S.

12    District Court for the Southern District of Indiana.

13          Do you know who I am, or do you understand

14    who I am and who I represent?

15          A.   Yes, I do.

16          Q.   Can I ask you to please state and spell

17    your name for the record.

18          A.   Yes, Christina, C-h-r-i-s-t-i-n-a, I go by

19    Cris, C-r-i-s, and last name is Hamilton,

20    H-a-m-i-l-t-o-n.

21          Q.   May I call you Cris today?

22          A.   That's fine.

23          Q.   Thank you.  My name's Matt, by the way.  I

24    go by Matt.

25          Cris, how many times have you been deposed

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

Young Court Reporting
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 157

```
 1          Q.    Topic 16.

 2          A.    Yes.

 3          Q.    Topic 17.

 4          A.    Yes.

 5          Q.    Topic 18, there was an objection on

 6    Topic 18.

 7          A.    Yes.

 8          Q.    Topic 19.

 9          A.    Yes.

10          Q.    And then Topic 20.

11          A.    Yes.

12          Q.    Okay.  Thank you, Cris.  You can go ahead

13    and set Exhibit 1 aside.  Moving forward, I'd like

14    to ask you, what is Experian's understanding of the

15    claim that the plaintiffs have brought?

16          A.    My understanding is there is an auto loan

17    that is reflecting as discharged in bankruptcy, and

18    they are stating it was reaffirmed.

19          Q.    Essentially, yes.  I would ask that you

20    open and have in front of you Deposition Exhibit --

21    what I've marked for identification as Deposition

22    Exhibit 2.

23          A.    Okay.  I have that up.  Sorry.

24          Q.    Okay.  I'll represent to you this is

25    actually part of Experian's production.  This is
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

Y C R  Young Court Reporting
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 158

1    Bates stamped as Dulworth-EXP, a number of leading

2    zeros, 1 through 18.  Do you see that?

3        A.   Yes, I do.

4        Q.   Okay.  If I refer to these Bates stamps in

5    the bottom right-hand corner of each page of the PDF

6    just by the number and drop the leading zeros,

7    you'll understand what I mean?

8        A.   Yes, I will.

9        Q.   If I can ask you to go to the top of page

10   2 of the PDF.

11       A.   Okay, I'm there.

12       Q.   Well, actually, let me ask you generally.

13   Have you seen this document before?

14       A.   Yes, I have.

15       Q.   What is this document?

16       A.   This is a disclosure or credit report

17   provided to this plaintiff.

18       Q.   And this is Plaintiff Brianna Dulworth;

19   accurate?

20       A.   Yes, correct.

21       Q.   And this disclosure marked as Exhibit 2 is

22   dated January 12th, 2022; accurate?

23       A.   Yes, it is.

24       Q.   Okay.  Now going back to the top of page

25   2, I'd like to direct your attention to the Ally

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

Young Court Reporting
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 159

1   Financial account, the tradeline, rather, for Ally

2   Financial.  I'll give you a moment to look through

3   that.  Can you let me know when you're prepared to

4   discuss it?

5        A.   Yes, I'm ready.

6        Q.   This tradeline is showing as a potentially

7   negative account.  Is that accurate?

8        A.   Yes, that's correct.

9        Q.   And the status of this account --

10  tradeline is that it's discharged through a Chapter

11  7.  Is that accurate?

12       A.   Yes, correct.

13       Q.   Is it Experian's position that the Ally

14  Financial account actually was discharged in the

15  plaintiffs' bankruptcy?

16            MR. SANDEFER:  Objection.  Calls for a

17  legal conclusion.

18       A.   This is the information that's been

19  provided to us, yes, that it was discharged in

20  bankruptcy.

21       Q.   (By Mr. Robertson)  Can I ask you, is the

22  reporting of this account based on what Experian

23  knows now accurate as that term is used in the Fair

24  Credit Reporting Act?

25            MR. SANDEFER:  Objection.  Calls for a

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

YOUNG COURT REPORTING
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 160

 1   legal conclusion.

 2       A.   We don't have any reason to doubt its

 3   authenticity.

 4       Q.   (By Mr. Robertson)  Does Experian have any

 5   information suggesting that this account was not

 6   reaffirmed in plaintiffs' bankruptcy?

 7            MR. SANDEFER:  Objection.  Vague.  Calls

 8   for a legal conclusion.

 9       A.   Can you repeat that question?

10       Q.   (By Mr. Robertson)  Absolutely.  Does

11   Experian have any information -- well, let me back

12   up a little bit.  Strike that.

13            I'm not trying to trick you.  I'm just

14   trying to get to the facts behind the reporting.

15   Does Experian have any information suggesting that

16   the plaintiffs did not reaffirm this account?

17            MR. SANDEFER:  Objection.  Calls for a

18   legal conclusion.

19       A.   We don't have any information to

20   contradict that they -- I lost my wording.  I

21   apologize.

22            Other than knowing what they're stating

23   that it was reaffirmed, we have no reason to doubt

24   the accuracy of what's reported to us that it was

25   discharged.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

YOUNG COURT REPORTING
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 161

1        Q.    Can you explain to me generally why this

2    tradeline is showing as reported as discharged

3    through a Chapter 7 bankruptcy?

4        A.    This is the status the date of furnisher

5    has for this account and that's the state reported

6    to us.

7        Q.    And the data furnisher is Ally Financial?

8        A.    Yes, correct.

9        Q.    What, if anything, does Experian do to

10   verify the accuracy of consumer credit information

11   affected by a bankruptcy?

12              MR. SANDEFER:  Objection.  Vague.

13       A.    To verify the accuracy, can you pinpoint a

14   little closer what you're looking for?

15       Q.    (By Mr. Robertson)  Sure.  Experian relies

16   on Ally Financial to tell it what the status of this

17   account is.  Is that accurate?

18       A.    Right, yes.

19              MR. SANDEFER:  Objection.  Misleading.

20       Q.    (By Mr. Robertson)  Is it fair to say,

21   then, that Experian relies on its data furnishers to

22   provide it information relating to consumer accounts

23   affected by a bankruptcy?

24       A.    Yes, data furnishers are to report

25   accurate information so that that is -- the account

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

Y
C   R
Y

YOUNG COURT REPORTING
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 162

1    is what was provided to us with this one.

2        Q.    Does Experian receive information related

3    to a consumer's bankruptcy from any other source

4    than the data furnisher?

5        A.    We receive the public record information

6    itself from LexisNexis.

7        Q.    Can you describe for me what the public

8    record information is?

9        A.    That is the actual details of the

10    bankruptcy itself, the filing date, discharge date,

11    bankruptcy docket number.

12        Q.    Other than the filing date, the discharge

13    date, and the docket number, what other information

14    does, if any, does LexisNexis supply to Experian

15    related to consumer bankruptcies?

16        A.    Well, part of that would encompass the

17    status, whether we have -- it's just filed as a

18    Petition or discharged, but just the bankruptcy

19    details itself is what we receive.

20        Q.    Does Experian receive notifications that

21    an account was reaffirmed in a bankruptcy from

22    LexisNexis?

23        A.    No.    That's not information that we

24    receive.

25        Q.    Do you know why not?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

YOUNG COURT REPORTING
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 163

1              MR. SANDEFER:  Objection.  Speculation.

2         A.   No, I don't know.

3         Q.   (By Mr. Robertson)  Do you know who would

4    know?

5         A.   Not offhand, no.

6         Q.   Assume for me that the account was

7    reaffirmed in the consumer's bankruptcy.  Is it

8    accurate, then, to report the account as discharged?

9         A.   If an account is reaffirmed, then, no, it

10   would show the current status of the account rather

11   than discharged.

12             MR. SANDEFER:  I'm going to object for --

13   object on the grounds of incomplete hypothetical.

14   Apologies for not saying that ahead of time.

15        Q.   (By Mr. Robertson)  Cris, you reviewed the

16   status of the Ally Financial account as reported by

17   Experian in preparation for today's deposition.  Is

18   that accurate?

19        A.   Yes, correct.

20        Q.   Other than the notation that it was

21   discharged in bankruptcy, is there any other

22   indication that the reporting of the Ally Financial

23   account would be potentially negative?

24        A.   No.

25             MR. SANDEFER:  Objection.  Vague.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

Y R  YOUNG COURT REPORTING
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 164

1    Q.    (By Mr. Robertson)  I'm sorry.  There was

2    a little bit of an overlap there.  Is your answer

3    no?

4    A.    No.  I don't see any other indications to

5    point it to a negative account.

6          (Exhibit No. 3 was marked for

7    identification.)

8    Q.    (By Mr. Robertson)  Okay.  You can put

9    Exhibit 2 aside.  I'm going to mark for

10   identification Plaintiffs' Exhibit 3, Deposition

11   Exhibit 3.  If I could ask you to open -- it was

12   previously circulated in the chat box -- ask you to

13   open it and let me know when you have it in front of

14   you, and you're prepared to discuss it.

15   A.    I have it in front of me.

16   Q.    Have you seen Exhibit 3 before?

17   A.    Yes, I have.

18   Q.    What is Exhibit 3?

19   A.    This is a credit report or disclosure for

20   Craig Dulworth.

21   Q.    And the date of this disclosure is

22   January 12th, 2022.  Is that accurate?

23   A.    Yes, that's correct.

24   Q.    For the record, this is part of Experian's

25   document production.  It is Bates stamped 43 through

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

YOUNG COURT REPORTING
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 165

Case 1:22-cv-00469-JMS-MJD Document 183-4 Filed 10/06/23 Page 15 of 29 PageID #: 25
Case: 24-2066 Document: 38 Filed: 12/20/2024 Pages: 262

Christina Hamilton 01/09/2023
1692

 1   54.  Cris, if I could ask you to turn to the second

 2   page of the PDF.  This is Bates stamped 44 and let

 3   me know when you're at that page.

 4        A.   Okay.  I'm there.

 5        Q.   And, again, at the top of the second page

 6   of the PDF, you have the Ally Financial tradeline.

 7   Do you see that?

 8        A.   Yes, I see that.

 9        Q.   Is there any difference between the

10   reporting of the Ally tradeline on this disclosure

11   and the disclosure that we just looked at in

12   Exhibit 2 for Brianna Dulworth?

13        A.   One second, let me look.  Craig's file

14   also has a dispute comment listed.

15        Q.   Yeah, let's talk about that.  What is a

16   dispute comment?

17        A.   This type of comment is added by the data

18   furnisher when they've been contacted by the

19   consumer to question or dispute something about the

20   account.

21        Q.   I've heard something akin to this being

22   described before as a condition compliance code.  Is

23   that what we're discussing right now?

24        A.   Yes, that's correct.

25        Q.   Can you tell me what a condition

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

YOUNG COURT REPORTING
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 166

1    compliance code is?

2         A.   It's an additional detail code that a data

3    furnisher can add to an account to provide further

4    information or detail.

5         Q.   And the comment that you're referring to

6    here states "completed investigation of FCRA

7    dispute - consumer disagrees."  Did I read that

8    correctly?

9         A.   Yes, correct.

10        Q.   Can you tell me what that phrase means?

11        A.   What that means to us is that the consumer

12   has contacted the data furnisher to question or

13   dispute something about the account.  They have

14   processed an investigation on their end, and they

15   are acknowledging that the consumer's disagreeing

16   with their conclusion.

17        Q.   Is this a comment that only the data

18   furnisher can add to a tradeline?

19        A.   Yes, it's only added by the data

20   furnisher.

21        Q.   Experian can't add one of these

22   themselves, can it?

23        A.   No.  This is reserved for the data

24   furnisher's use.

25        Q.   And then same questions as we had for

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

YOUNG COURT REPORTING
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 167

1   Brianna Dulworth's disclosure, do you see anything

2   on this tradeline that would indicate, other than

3   the discharge through Chapter 7 Bankruptcy CII, that

4   indicate this is a potentially negative account?

5            MR. SANDEFER:  Objection.  Vague.  Calls

6   for speculation.

7       A.   Looking at this, no, I don't see anything

8   else that would point to being negative.

9       Q.   (By Mr. Robertson)  Assuming that Craig

10  Dulworth did reaffirm this account in his

11  bankruptcy, is it accurate to report the account is

12  discharged through bankruptcy?

13           MR. SANDEFER:  Objection.  Calls for a

14  legal conclusion.

15      A.   If he did, in fact, reaffirm it, then it

16  should show a current status as opposed to

17  discharged.

18      Q.   (By Mr. Robertson)  It should show

19  current?

20      A.   The current status, whatever the current

21  status.

22      Q.   Just so I'm clear, again, not trying to

23  trick you.  I'm sorry.  If this account was

24  reaffirmed, how would it be reported in the status

25  field?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

Y  C  R  Young Court Reporting
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 168

1          MR. SANDEFER:   Same objection.   Calls for

2    speculation.   Calls for a legal conclusion.

3          A.   In looking at this reporting right here

4    since there's not any late payments appearing, it

5    would show as open never late, but that would be the

6    data furnisher, whatever they currently have for the

7    account that would display those reaffirms.

8          Q.   (By Mr. Robertson)   Okay.   Cris, I'd like

9    to -- you can set what's been marked for

10   identification as Exhibit 3 aside.   I'd like to ask

11   you generally about Experian's reinvestigation or

12   investigation procedures.

13          Can you tell me, when a consumer disputes

14   directly to Experian the reporting of a tradeline,

15   what does Experian do?

16          MR. SANDEFER:   Objection.   Vague.

17          A.   As generally speaking, if they are

18   contacting us to dispute something about the

19   tradeline that is inaccurate, if there's

20   documentation that's been sent to us, we will review

21   that to see if we're able to use it internally.   If

22   not, we will initiate an ACDV to be sent to the data

23   furnisher and attach that documentation, if there

24   was any, for the data furnisher to review as well.

25          Q.   What is an ACDV?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

YOUNG COURT REPORTING
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 169

1          A.    That is the Automated Consumer Dispute

2    Verification Form that would be sent to the data

3    furnisher.  It would list how we have the account

4    currently displaying, the consumer's dispute for it,

5    and ask them to verify the information they have on

6    file.

7          Q.    When you say "them," you mean ask the data

8    furnisher to verify the information it has?

9          A.    Correct.  Based on what the consumer's

10   saying is inaccurate.

11         Q.    The process that you described, I've heard

12   that called in the past the ACDV exchange.  If I

13   refer to it as the "ACDV exchange," will you

14   understand what I'm talking about?

15         A.    Yes.

16         Q.    So after Experian sends an ACDV to its

17   data furnisher, what happens next?

18         A.    They have 30 days to do their own review

19   or investigation, whatever they do on their end and

20   make a response to us with any changes they feel

21   need to be made, or if they feel, you know, they

22   show it's accurate as to what we have, then they let

23   us know that as well.

24         Q.    If the data furnisher identifies changes

25   to be made, what does Experian do at that time?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

YOUNG COURT REPORTING
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 170

1       A.   We will implement those changes.

2       Q.   The process that you just described, does

3  anything about that process change if a consumer's

4  disputing the postbankruptcy reporting of a

5  reaffirmed account?

6       A.   No.  The documents -- or any documents

7  that they would have sent us are attached to that

8  dispute, and we will still send it off to the data

9  furnisher to review.

10      Q.   And how does a data furnisher verify --

11  well, strike that.  At the conclusion of a data

12  furnisher's investigation if they decide to tell

13  Experian that an account was reaffirmed, what would

14  that look like?

15           MR. SANDEFER:  Objection.  Calls for

16  speculation.  Vague.

17      A.   Generally speaking if they let us know an

18  account showing as discharged was reaffirmed, then

19  the bankruptcy detail line would be suppressed from

20  view, and it would allow the status to appear on the

21  account.

22      Q.   (By Mr. Robertson)  Do you know what a

23  consumer information indicator is?

24      A.   Yes.

25      Q.   What is a consumer information indicator?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

YOUNG COURT REPORTING
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 171

 1       A.    That is hand in hand with the bankruptcy
 2   detail information.
 3       Q.    Could you expand on that?
 4       A.    We actually refer to it as a BKCII, so
 5   that entire field is the bankruptcy detail where the
 6   account would be marked with the status of the
 7   bankruptcy and any appropriate dates.
 8       Q.    When you say the status of the
 9   bankruptcy -- well, strike that.  I heard BKCII.  Is
10   that accurate?
11       A.    Yes, that's correct.
12       Q.    For bankruptcy CII; fair?
13       A.    Yes, that's fine.
14       Q.    When you say the status of the bankruptcy,
15   you're referring to whether it's discharged or
16   whether an account is reaffirmed.  Is that accurate?
17       A.    Correct.  If the account is displaying as,
18   let's say, a Petition for Bankruptcy or discharged
19   in the bankruptcy, it will give the status of that
20   bankruptcy correlating to that account.
21       Q.    I may have already asked you this.  Who is
22   it that supplies the BKCIIs to Experian?
23       A.    That can come on our files one of two
24   ways.  The data furnisher can report the account in
25   the bankruptcy status, and we also have systems in

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

YOUNG COURT REPORTING
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 172

1  place to automatically update accounts that meet a

2  certain criteria to include it in bankruptcy.

3      Q.   Can you describe what those criteria are

4  when Experian automatically updates a CII?

5      A.   An account would be updated once the

6  bankruptcy comes on file.  Let's say an account is

7  more than 30 days late.  It was opened prior to the

8  filing of the bankruptcy.  It would automatically be

9  updated to reflect as included.

10     Q.   We previously talked about Experian

11 receives notice of a bankruptcy filing through its

12 public records vendor LexisNexis.  Is that accurate?

13     A.   Yes, that's correct.

14     Q.   So to summarize, when LexisNexis informs

15 Experian that a bankruptcy has been filed, that's an

16 example of when Experian would update the CIIs on a

17 tradeline?

18     A.   Correct.  It's done according to a time

19 frame cycle, so it's not immediate as far as that

20 same day, but I believe it's the first Monday of the

21 month, if I remember correctly.

22     Q.   (By Mr. Robertson)  Cris, we've been going

23 about an hour.  However, we've taken a

24 not-insignificant technical break in the middle of

25 that.  I'm going to leave it up to you.  Would you

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

Young Court Reporting
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 173

1   like to take a break at this time, or would you like

2   to keep going forward?

3        A.   I'm okay to keep going for now.

4             MR. ROBERTSON:  Okay.  So counsel are

5   aware also, I've thrown the last -- or next set of

6   exhibits in the chat box.

7             (Exhibit No. 4 was marked for

8   identification.)

9        Q.   (By Mr. Robertson)  I'm going to mark for

10  identification Exhibit 4.  Cris, can I ask you to

11  download, save, and open Exhibit 4 and let me know

12  when you have it in front of you?

13       A.   Okay.  I have Exhibit 4.

14       Q.   Have you seen what's been marked for

15  identification as Exhibit 4 before?

16       A.   Give me one second.  Yes, I have.

17       Q.   Okay.  What is Exhibit 4?

18       A.   This is objections and responses.

19       Q.   To Plaintiffs' First Set of

20  Interrogatories; accurate?

21       A.   Yes, correct.

22       Q.   I would like to direct your attention to

23  page 11 of the PDF.  I'm going to ask you a question

24  about Interrogatory 7, and the response, then, is a

25  confidential response to Interrogatory 7.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

YOUNG COURT REPORTING
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 174

1          So this begins at kind of the midpoint of

2    page 11 and continues through the midpoint of page

3    12.  Could I ask you to please take a moment, review

4    Interrogatory No. 7 and the responses, and let me

5    know when you're ready to talk about them.

6          A.   Sure.  (Reviews document.)  Okay.  I'm

7    ready.

8          Q.   Okay.  I would like to begin by discussing

9    the last paragraph of the confidential answer to

10   Interrogatory 7.  This is in the middle of page 12.

11   And specifically I'd like to direct your attention

12   to the last sentence, and I want to read it for you:

13   "As part of Experian's mail-sorting processes

14   intended to classify disputes received from its

15   consumers, Experian also seeks to identify disputes

16   that have indicia that they were prepared and mailed

17   by someone other than the consumer because the FCRA

18   does not require reinvestigations of such disputes."

19          I want to ask you about the mail-sorting

20   processes that that sentence references.  Are you

21   familiar with the mail-sorting processes described

22   in this -- or referenced in this response?

23          A.   Yes, I am.

24          Q.   Can you just walk me through generally

25   what those processes are?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

YOUNG COURT REPORTING
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 175

1    A.    Generally when mail is received, it is

first evaluated to sort through anything that may

have not been sent by a consumer to things that

were, and then they go into separate transaction

areas, so to speak, on how they're handled.

6    Q.    Okay.  Let's break that down, then.  Let's

talk about mail that Experian has designated as

coming from the consumer.  What happens there?

9    A.    If it's been identified as coming from the

consumer, then the item is uploaded into our digital

system and sent to the proper queue for processes.

12    Q.    So, for example, if it's a disclosure

request from a consumer, would go to the disclosure

request queue?

15    A.    Correct, yes.

16    Q.    And if it were a dispute from the

consumer, would go to the appropriate queue at that

point as well?

19         MR. SANDEFER:  I'll object to these

questions as outside the scope of the deposition

topics.

22    A.    Yes, that's correct.

23    Q.    (By Mr. Robertson)  And then let's talk

about mail that is not sent, that Experian

designates as not being sent by the consumer.  What

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

YOUNG COURT REPORTING
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 176

1   happens to that mail?

2       A.   It goes through an evaluation process.

3   Generally speaking when we receive mail that is

4   identified as such, there is quite a lot of it that

5   is matching envelope-wise, and they will take a

6   random sampling from that tray to check the inside

7   of the mail, and if it matches each other's, then

8   they're set aside.

9       Q.   Can you tell me what you mean by "set

10  aside"?

11      A.   I don't know for certain what happens at

12  that point.  All I know is it's set aside for -- it

13  does not get processed.  It does not get uploaded

14  into our system for processing.

15      Q.   Do you know who would know what happens to

16  that mail?

17      A.   Probably our mail room, our mail room

18  operators would.

19      Q.   Do you know who's in charge of Experian's

20  mail room?

21      A.   Yes, I know the supervisor's name.

22      Q.   What is the supervisor's name?

23      A.   Rita Diosdado.

24      Q.   I'm sorry.  We've been doing a pretty good

25  job of not interrupting each other.  Can you restate

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

YOUNG COURT REPORTING
C Y R
Y
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 177

1    your answer, please?

2         A.    One of them is Rita and her last name is

3    Diosdado, and the other one is Erika Pernell.

4         Q.    So the record is clear, could I ask you to

5    try or to spell those names?

6         A.    Yes, Rita, R-i-t-a, her last name is

7    D-i-o-s-d-a-d-o, I believe, and then Erika,

8    E-r-i-k-a P-e-r-n-e-l-l.

9         Q.    You mentioned a second ago that a random

10   sampling of mail was opened and tested to see if it

11   was the same.  Can I ask you to explain what you

12   meant by that?

13        A.    Yes, generally speaking if, let's say,

14   the -- that bulk of mail, that tray of mail or batch

15   of mail, however you want to refer to it, the

16   envelopes are all matching, postmarked the same,

17   handwriting the same, they will take a sample of

18   five of those envelopes.  They will open them up and

19   compare them to each other and if they are all

20   matching in form, if there's not a valid signature,

21   they will treat that whole batch as third -party.

22        Q.    And then to use your words, that batch of

23   mail is set aside?

24        A.    That's correct, yes.

25        Q.    Do you know if after that mail is set

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

YOUNG COURT REPORTING
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 178

1    aside, does Experian attempt to contact the

2    individual or entity that sent the mail?

3        A.    No, they don't.

4        Q.    Going back to the last sentence on

5    Exhibit 4, and you've given me some examples

6    already, but just so that I'm clear, the clause that

7    begins, "Experian also seeks to identify disputes

8    that have indicia they were prepared and mailed by

9    someone other than the consumer," can you tell me

10   what indicia Experian is looking at?

11       MR. SANDEFER:    Objection.    Vague.

12       A.    I will be honest, and I don't know what

13   that word means.

14       Q.    (By Mr. Robertson)  Let me rephrase the

15   question.  My understanding here is that Experian

16   will seek to evaluate the characteristics of the

17   mail it receives to determine if they were prepared

18   or mailed by somebody else.  Do you know what

19   characteristics or elements would indicate to

20   Experian that the mail was not prepared and mailed

21   by the consumer?

22       A.    Some examples of -- that we see are, like

23   I said, an envelope is matching the others, the

24   handwriting is matching, the postmark is all the

25   same on them, inside they all have a digital

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

Y
C    R    YOUNG COURT REPORTING
Y    Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 179

1    signature.  It's all formatted exactly the same with

2    just the details of each disputed item are

3    different.  They just look identical with just

4    personal information changed.

5        Q.   Do you know why Experian has this process?

6             MR. SANDEFER:  Objection.  Speculation.

7    Calls for a legal conclusion.  Vague.

8        Q.   (By Mr. Robertson)  I'll rephrase the

9    question.  I'm sorry.

10       A.   Go ahead.  I'm sorry.

11       Q.   I'll rephrase the question.  I'm not

12   asking you to speculate.  I'm just asking you if you

13   know.

14            Do you know why Experian decides to

15   segregate out disputes that have the characteristics

16   of not being prepared or mailed by a consumer?

17            MR. SANDEFER:  I'll just state the same

18   objections.

19       A.   I don't know specific reasons, other than

20   processing disputes that are directly sent from the

21   consumer.

22       Q.   (By Mr. Robertson)  This mail-sorting

23   process that we are discussing, is it in place at

24   all of Experian's facilities?

25            MR. SANDEFER:  Objection.  Exceeds the

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.youngcourtreporting.net

YOUNG COURT REPORTING
Quality Services You Can Count On

(913) 735-5133
office@youngcourtreporting.net

Suppl. App. 180

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

CRAIG DULWORTH and BRIANNA
DULWORTH,

     Plaintiffs,

 v.

EQUIFAX INFORMATION SERVICES LLC
and EXPERIAN INFORMATION
SOLUTIONS INC.,

     Defendants.

Case No. 1:22-cv-00469-JMS-MJD

**EQUIFAX INFORMATION SERVICES, LLC'S AND EXPERIAN INFORMATION
SOLUTIONS, INC.'S BRIEF IN SUPPORT OF THEIR JOINT
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiffs Craig and Brianna Dulworth ("Plaintiffs") filed for Chapter 7 Bankruptcy in

October 2018. Two months later, in December 2018, Plaintiffs filed a document in their

bankruptcy proceeding indicating an intent to reaffirm an auto loan they had with Ally Financial

("Ally"). Defendants Equifax Information Services LLC ("Equifax") and Experian Information

Solutions, Inc. ("Experian," and together with Equifax, the "Defendants") were not a party to either

Plaintiffs' bankruptcy or the contract Plaintiffs entered with Ally related to the attempted

reaffirmation of Plaintiffs' auto loan. Nearly three years later, Plaintiffs repeatedly, and

unsuccessfully, tried to convince Ally that it was incorrect to inform Defendants that their auto

loan was discharged in bankruptcy. Rather than go to the bankruptcy court to resolve whether the

reaffirmation agreement was valid, Plaintiffs then hired counsel to assist in filing fee-shifting

claims against Defendants under the Fair Credit Reporting Act ("FCRA"). But Plaintiffs' claims

disregard years of legal precedent prohibiting plaintiffs from raising such legal disputes under the

FCRA. Further, Plaintiffs' claims in this case are identical to those this Court rejected only a year

ago in *Myers v. Equifax Information Services, LLC*, No. 1:20-cv-00392-JMS-TAB, 2022 WL 4292179 (S.D. Ind.) (Sept. 16, 2022) (Magnus-Stinson, J.). Just as in *Myers*, the Plaintiffs here attempt to use the FCRA to interject credit reporting agencies into disputes over the validity of reaffirmation agreements. But, the case law has not changed in the year since this Court granted summary judgment in *Myers* and, accordingly, demands the same result here. Moreover, even if the Court were to depart from *Myers* and related case law, Plaintiffs have still failed to establish they were damaged under the FCRA or that either Defendant willfully violated the FCRA.

## BACKGROUND

### I.   THE FAIR CREDIT REPORTING ACT

The FCRA seeks "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007). The FCRA generally requires that credit reporting agencies ("CRAs") like Equifax and Experian use "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e. The FCRA also requires CRAs to "conduct a reasonable reinvestigation" if a consumer disputes the accuracy of credit information. 15 U.S.C. § 1681i.

The FCRA, however, is not a strict liability statute. *See, e.g., Sarver v. Experian Info. Sols.*, 390 F.3d 969, 971 (7th Cir. 2004). Instead, to recover under § 1681e(b) or § 1681i, the consumer must show that inaccurate information was included due to the CRA's failure to follow reasonable procedures. *See id.* at 971–72 ("A credit reporting agency is not liable under the FCRA if it followed 'reasonable procedures to assure maximum possible accuracy,' but nonetheless reported inaccurate information in the consumer's credit report.").

2

II.     STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

A.     Plaintiffs' Ally Account and Chapter 7 Bankruptcy.

On July 27, 2018, Plaintiffs took out an automobile loan with Ally secured by a 2016 Kia Sedona. Filing No. 181-1 at 39, 40, 106–07 (Brianna Dulworth Dep. at 57:24–25, 58:2–5, 174:24–25, 175:8–13). Fewer than three months later, on October 12, 2018, Plaintiffs filed a joint Voluntary Petition for Chapter 7 Bankruptcy in the U.S. Bankruptcy Court for the Southern District of Indiana. *In Re Craig Scott Dulworth and Brianna Lashell Dulworth*, No. 18-07856-JMC-7 (Bankr. S.D. Ind.); *see also* Filing No. 181-2 (2018 Bankruptcy Docket); Filing No. 181-3 (2018 Bankruptcy Petition). At the time, Plaintiffs were generally familiar with bankruptcy procedures, having filed for bankruptcy three other times, in 1996, 2003, and 2009. Filing No. 181-1 at 15, 19, 22, 24 (Brianna Dulworth Dep. at 33:16–25, 37:3–15, 40:7–14, 42:2–22).

Plaintiffs' 2018 Bankruptcy Petition listed two creditors holding secured claims (that is, claims secured by some collateral such as real or personal property): (1) Ally (secured by the 2016 Kia Sedona) and (2) One Main (secured by a 2006 Chevrolet Silverado). Filing No. 181-3 at 20 (2018 Bankruptcy Petition); Filing No. 181-1 at 39 (Brianna Dulworth Dep. at 57:17–25). Plaintiffs sought to reaffirm the Ally debt because Plaintiff Brianna Dulworth needed a vehicle to get to work. *Id.* at 42–43 (Brianna Dulworth Dep. at 60:24–25, 61:1–3). On December 20, 2018, a reaffirmation agreement between Plaintiffs and Ally was filed by the creditor. *Id.* at 50 (Brianna Dulworth Dep. at 73:6–15); *see also* Filing No. 181-4 (Bankruptcy Dkt. 20) (Bankruptcy Reaffirmation Agreement). Per the agreement, Plaintiffs were required to make regular payments of $449.90/month over the course of 74 months beginning November 25, 2018. Filing No. 181-4 at 2 (Bankruptcy Dkt. 20) (Bankruptcy Reaffirmation Agreement). The agreement included various instructions to Plaintiffs — and stated that if the steps were not to be completed, "the

3

reaffirmation agreement is not effective, even though you have signed it." *Id.* at 8. The agreement went on to explain that Plaintiffs could "rescind (cancel) your reaffirmation agreement" by providing notice to the creditor "at any time before the bankruptcy court enters [the] discharge, or during the 60-day period that begins on the date your reaffirmation agreement is filed with the court, whichever occurs later." *Id.* at 8. The dates of the apparent signatures on the reaffirmation agreement differ — Plaintiffs' attorney signed on November 16, 2018, Plaintiffs signed on December 4, 2018, and a representative of Ally signed on December 11, 2018. *Id.* at 7.

On January 17, 2019, an Order discharging Plaintiffs' Chapter 7 bankruptcy was entered on the bankruptcy docket. Filing No. 181-5 at 6–7 (Bankruptcy Dkt. 24) (Discharge Order). The two-page Order of Discharge explained that "[m]ost . . . but not all" debts are covered by the discharge; it did not include a list of Plaintiffs' discharged and reaffirmed debts. *Id.* at 6; *see also Myers*, 2022 WL 4292179, at *5 (addressing identical discharge order that "did not list which of [Plaintiff's] debts were discharged versus reaffirmed"). The Order cautioned that creditors could not "make any attempt to collect a discharged debt" and explained that the bankruptcy discharge "does not prevent the debtors from paying any debt voluntarily or from paying reaffirmed debts according to the reaffirmation agreement." Filing No. 181-5 at 6 (Bankruptcy Dkt. 24) (Discharge Order). Finally, the Order reiterated that it was "only a general summary of the bankruptcy discharge[.]" *Id.* at 7. Because "some exceptions exist" and "the law is complicated," the Order advised that "you should consult an attorney to determine the exact effect of the discharge in this case." *Id.*

### B.   The Defendants' Procedures to Assure Maximum Possible Accuracy of Debts Discharged and Reaffirmed in Bankruptcy.

The Defendants are not consumer lenders and are generally not parties to consumer bankruptcies or reaffirmation agreements. Instead, Defendants have extensive procedures in place

for assuring the maximum possible accuracy of such information. *See Myers*, 2022 WL 4292179, at *2 ("Before the CRAs will accept information from a particular data furnisher, the furnisher goes through a vetting process."). Given the legal and factual complexity inherent in consumer bankruptcies,[1] Defendants generally rely on both data furnishers and consumers — the actual parties to a consumer's bankruptcy and those holding debts that may be affected by the bankruptcy — to inform them whether an account was discharged in bankruptcy. Filing No. 183-1 at 7–8 (Pam Smith Dep. at 18:21–24, 19:1–8); Filing No. 183-4 at 11–12 (Christina Hamilton Dep. at 21:20–22:1); *see also* Filing No. 183-2 ¶ 17  (explaining "Equifax does not have firsthand knowledge of a consumer's credit tradelines or other legal status of individual tradelines as they relate to that bankruptcy"); Filing No. 183-2 ¶ 39   ("Because Equifax is not a party to the bankruptcy, Equifax has no way of knowing whether a particular tradeline in a consumer's bankruptcy proceeding is subject to a Reaffirmation Agreement unless the data furnisher reports this information to Equifax, or the consumer disputes the tradeline as having been affirmed. Equifax relies on data furnishers who are the most reliable source of this information to report the reaffirmation of a debt."); Filing No. 183-3 ¶ 7  (explaining "Experian has no other viable means of learning when a reaffirmation has occurred"). In addition to relying on data furnishers and consumers, Defendants have developed and implemented an automated procedure to update accounts to report as discharged following entry of a Chapter 7 bankruptcy discharge order. Filing No. 183-2 ¶ 54; Filing No. 183-3 ¶¶ 13–17. This procedure, which is referred to as the bankruptcy

---

[1] The Defendants receive high level information related to consumer bankruptcies — including the consumer's name, the type of bankruptcy filed (i.e., Chapter 7 or Chapter 13), the date the consumer filed bankruptcy, and the court in which the consumer filed for bankruptcy — from their respective public records vendors. Filing No. 183-3 ¶¶ 9–10; Filing No. 183-2 ¶ 18. The vendors will also inform the Defendants when a bankruptcy has been discharged or dismissed. Filing No. 183-3 ¶ 10; Filing No. 183-2 ¶ 18. The data the Defendants receive from their vendors does not include information about particular tradelines. Filing No. 183-3 ¶ 9–10; Filing No. 183-2 ¶ 39. Consequently, Defendants can only learn that a particular account was subject to a reaffirmation agreement if it receives that information from the furnisher or the consumer.

"scrub," was developed pursuant to an injunctive order entered in *White v. Experian Information Solutions, Inc.*, No. 8:05-cv-01070, 2008 WL 11518799 (C.D. Cal. Aug. 19, 2008) ("White Injunction"). *See* Filing No. 183-2 ¶ 54; Filing No. 183-3 ¶ 13. The scrub was not triggered in this case because Ally was already reporting Plaintiffs' account as included in their Chapter 7 bankruptcy. Filing No. 183-2 ¶ 54; Filing No. 183-3 ¶ 17. Pursuant to the *White* Injunction, if a furnisher is already reporting to a CRA that an account was included in bankruptcy, as occurred here, the CRA will either retain that reporting during the pendency of the bankruptcy and update the reporting to discharged in bankruptcy once the discharge order is entered or simply retain the "included in bankruptcy" status post-discharge. Filing No. 183-2 ¶ 54; Filing No. 183-3 ¶ 17.

### i.    Reaffirmation Information from Data Furnishers.

Similar to the Defendants, data furnishers are subject to the FCRA, which mandates that they "shall not furnish any information relating to a consumer to any consumer reporting agency if [they] know[ ] or [have] reasonable cause to believe that the information is inaccurate." 15 U.S.C. § 1681s-2. Furnishers report data to Defendants in accordance with an industry-wide manual known as the Credit Reporting Resource Guide ("CRRG"). Filing No. 183-3 ¶ 7; Filing No. 183-2 ¶ 19. The CRRG explains precisely how furnishers are required to report accounts that are reaffirmed, included in, or discharged in bankruptcy — namely through the use of Consumer Information Indicators ("CIIs"). Filing No. 183-3 ¶ 7; Filing No. 183-2 ¶ 20. Data furnishers can report a CII of "A" to indicate that an account was included in a consumer's Chapter 7 bankruptcy petition and a CII of "E" to indicate that a debt has been discharged.[2] Filing No. 183-3 ¶ 11; Filing No. 183-2 ¶ 21. Alternatively, data furnishers can report that an account was reaffirmed using the

---

[2] If a data furnisher reports an account as discharged (i.e., with a CII of "E"), the Defendants will display no recent balance, no past-due amount, and no current payment amount, and will suppress any post-petition payment information the furnisher has reported. Filing No. 183-3 ¶ 11; Filing No. 183-2 ¶ 22.

CII code of "R." 183-3 ¶ 11; Filing No. 183-2 ¶ 24.[3] If at any point a furnisher updates the reporting to reflect a CII of "R" (including where the furnisher previously reported a CII of "A" or "E"), the Defendants will update the account to reflect that status. Filing No. 183-3 ¶ 11; Filing No. 183-2 ¶ 26.

Before Defendants will accept consumer data from a particular furnisher, the furnisher goes through a vetting process. The Defendants "will provide consumer reports and accept consumer credit data only from those data furnishers [the Defendants] have determined are reasonably reliable based upon the [Defendants'] own investigation, the data furnisher's reputation in the community, and/or [the Defendants'] longstanding business relationships with them," and each data furnisher signs an agreement certifying it will comply with all FCRA requirements. Filing No. 183-2 ¶ 27; *see also* Filing No. 183-3 ¶ 6. The Defendants do not report information from furnishers that they believe to be unreliable; if at any point Defendants learn that a furnisher is not providing accurate information, they would take immediate steps to remediate, up to and including terminating the furnisher. Filing 183-3 ¶ 6; Filing No. 183-2 ¶ 28.

---

[3] If a data furnisher reports an account as reaffirmed in bankruptcy (i.e., with a CII of "R"), the Defendants will continue to display the balance and payment information for that tradeline. Filing No. 183-3 ¶ 11; Filing No. 183-2 ¶ 23.

ii.        **Reaffirmation Information from Consumers.**

The Defendants also rely on consumers to inform them if the consumer believes the information on their credit report is inaccurate.[4] If a consumer contacts Defendants and provides either inadequate documentation, or no documentation at all to support their claim that an account should report as reaffirmed in bankruptcy, the Defendants will thoroughly review the dispute and any supporting documentation, before then contacting the data furnisher to verify the accuracy of its reporting through the Automated Consumer Dispute Verification ("ACDV") process. Filing No. 183-3 ¶ 19; Filing No. 183-2 ¶ 31; Filing No. 183-4 at 18 (Christina Hamilton Dep. at 28:13–24); Filing No. 183-1 at 12 (Pam Smith Dep. at 23:4–18). If the data furnisher then informs Defendants that the account should report as reaffirmed, the consumer's credit report will be updated accordingly. Filing No. 183-3 ¶ 19; Filing No. 183-2 ¶ 32; Filing No. 183-1 at 12 (Pam Smith Dep. at 23:20–25).

C.        **The Defendants' Reporting of Plaintiffs' Ally Account.**

Approximately two and a half years after Plaintiffs' bankruptcy discharge, which was entered on January 15, 2019, Plaintiffs obtained copies of their Equifax and Experian reports and discovered that Equifax was reporting the Ally account as included in bankruptcy with no payment history and Experian was reporting the Ally account as discharged through bankruptcy and never late. Filing No. 72 ¶¶ 15–17. The Defendants were not reporting a monthly payment amount or any balance on the Ally account. Filing No. 183-3 ¶ 11; Filing No. 183-2 ¶ 22. This was because Ally reported to Defendants that Plaintiffs' auto loan was included in their Chapter 7 bankruptcy, and Defendants relied on that reporting; further, the tradeline was not scrubbed pursuant to the White Injunction, as further discussed above. Filing No. 183-3 ¶ 17; Filing No. 183-2 ¶ 54.

---

[4] The Defendants do not receive copies of reaffirmation agreements from its public records vendor. *See supra* footnote 1.

Additionally, Defendants were also correctly reporting Plaintiffs' discharged Chapter 7 bankruptcy public record. Filing No. 183-3 ¶ 9. Filing No. 183-2 ¶ 37; Filing No. 183-1 at 8 (Pam Smith Dep. 19:13–25).

### D. Plaintiffs' Retention of Stecklein & Rapp.

Plaintiffs reached out to Ally "[u]p to seven [times]" in an effort to correct Ally's reporting; only once they realized Ally would not correct its reporting did they hire counsel to assist them with sending disputes to the CRAs. *See* Filing No. 181-1 at 84–85, 89–90 (Brianna Dulworth Dep. at 121:16–122:16; 126:25–127:13). In other words, Plaintiffs *knew* that Ally did not believe the reaffirmation agreement was valid *before* Plaintiffs chose to use the FCRA as a means to collaterally attack Ally's understanding of the reaffirmation agreement. Plaintiffs hired Stecklein & Rapp Chartered, a law firm that advertises its credit repair services and expertise under the FCRA. *See* Stecklein & Rapp, https://giveyourselfcredit.com/, last accessed October 2, 2023 ("Let's correct your credit and identity today!"); Michael Rapp, *Your Right to Dispute Errors on Your Credit Report* (Jan 18, 2021), https://www.giveyourselfcredit.com/blog/your-right-to-dispute-errors-on-your-credit-report/ ("If you're facing damaging information on your credit report that is making it difficult for you to obtain loans — or even employment . . . contact our team of credit report error attorneys at Stecklein & Rapp. We will work with you to correct or remove false data and restore your credit.").

### E. Reinvestigation of Plaintiffs' Disputes to Equifax.

Equifax received identical dispute letters from Plaintiffs in September 2021 (Plaintiffs' "September 2021 Dispute"). Filing No. 183-2 ¶¶ 55, 61; Filing No. 181-10 (Brianna Dulworth September 2021 Dispute); Filing No. 181-11 (Craig Dulworth September 2021 Dispute). In the September 2021 dispute letters, each plaintiff stated that Equifax was incorrectly reporting the Ally

account as included in bankruptcy with no payment history because the account was reaffirmed in bankruptcy. Filing No. 183-2 ¶¶ 56, 62; Filing No. 181-10 (Brianna Dulworth September 2021 Dispute); Filing No. 181-11 (Craig Dulworth September 2021 Dispute). Plaintiffs' September 2021 dispute included a copy of the reaffirmation agreement that was filed with the bankruptcy court. Filing No. 183-2 ¶¶ 58, 64; Filing No. 181-10 at 8–13 (Brianna Dulworth September 2021 Dispute); Filing No. 181-11 at 8–13 (Craig Dulworth September 2021 Dispute). Upon receipt of the September 2021 disputes, and after locating Plaintiffs' credit files, Equifax opened a CCMS case for each plaintiff to track the process of the reinvestigation. Filing No. 183-2 ¶¶ 57, 63.

The Equifax agent who reviewed Plaintiff Brianna Dulworth's September 2021 dispute did not contact Ally via ACDV as required by Equifax's policies and procedures. Filing No. 183-2 ¶ 58. It appears from Equifax's records that the agent misinterpreted Plaintiff Brianna Dulworth's dispute. Filing No. 183-1 at 22 (Pam Smith Dep. at 33:10–17); Filing No. 183-2 ¶ 59. Nevertheless, the agent addressed the Ally account and confirmed that it was reporting as included in bankruptcy. Filing No. 183-1 at 22–23 (Pam Smith Dep. at 33:19–25, 34:1–6); Filing No. 183-2 ¶ 60; Filing No. 182-1 (Brianna September 2021 Results Letter).

The Equifax agent who reviewed Plaintiff Craig Dulworth's September 2021 dispute notified Ally via the ACDV process and requested Ally investigate the account and verify whether the account was reaffirmed in bankruptcy.[5] Filing No. 183-2 ¶ 64; Filing No. 184-1 (September 2021 Craig Dulworth ACDV to Ally) . Ally returned its investigation results advising that the account was accurately reporting as included in bankruptcy.  Filing No. 183-2 ¶  64. On October

---

[5] While the FCRA and legal precedent does not require the CRAs to determine the validity of a complex legal documents such as reaffirmation agreement in a bankruptcy proceeding, even if this was not the case, Plaintiffs submitted a reaffirmation agreement from December 2018 to Equifax in September 2021; neither the documents nor the bankruptcy docket would have provided Equifax with a current account status, history, and payment information. Filing No. 183-1 at 30 (Pam Smith Dep. 82:2–13). It was therefore necessary for Equifax to contact the furnisher, Ally, for updated and current account information.

12, 2021, Equifax informed Plaintiff Craig Dulworth of the results of its investigation and verified that the account was correctly reporting as included in bankruptcy. Filing No. 183-2 ¶ 65; Filing No. 182-3 (Craig Dulworth September 2021 Results Letter).

Equifax subsequently received a second dispute from Plaintiff Brianna Dulworth in December 2021 (the "December 2021 Dispute"). Filing No. 183-2 ¶ 66; Filing No. 181-12 (Brianna Dulworth December 2021 Dispute). In the December 2021 Dispute, Plaintiff Brianna Dulworth stated that the Ally account continued to report inaccurately and re-submitted the reaffirmation agreement that was filed with the bankruptcy court. Filing No. 183-2 ¶ 67; Filing No. 181-12 (Brianna Dulworth December 2021 Dispute).

The Equifax agent who reviewed Plaintiff Brianna Dulworth's December 2021 Dispute notified Ally via the ACDV process and requested Ally investigate the account and verify whether the account was reaffirmed in bankruptcy. Filing No. 183-2 ¶ 69; Filing No. 182-4 (Brianna's December 2021 ACDV). Ally returned its investigation results advising that the account was accurately reporting as included in bankruptcy. Filing No. 182-4 (Brianna's December 2021 ACDV). On December 30, 2021, Equifax informed Plaintiff Brianna Dulworth of the results of its investigation and verified that the account was correctly reporting as included in bankruptcy. Filing No. 183-2 ¶ 70; Filing No. 182-5 (Brianna's December 2021 Results Letter).

### F.  Plaintiffs' disputes to Experian.

Plaintiffs claim that they sent letters to Experian dated September 7, 2021 and November 1, 2021 disputing the Ally tradeline. *See* Filing No. 72 ¶¶ 22, 26. However, as Experian investigated the matter, it became clear that the dispute letters were identified by Experian as not originating from Plaintiffs and were accordingly not processed per Experian's mail processing procedures. Filing No. 183-3 ¶ 22. In accordance with Experian's Global Security Policy, Experian

Suppl. App. 191

implemented these policies designed to evaluate mail it receives and to differentiate between disputes actually sent from a consumer or their attorney, and those sent by third parties, including credit clinics. *Id.* Under these policies, Experian employees evaluate outside envelopes and compare them to other mail received, as third parties tend to send their mail in bulk, with similar features apparent from the outside. *Id.* Letters identified as likely third party or credit clinic mail are then opened and reviewed to determine if they appear to have been sent directly by a consumer. *Id.* Letters determined to be third party or credit clinic mail are not processed as disputes. *Id.* By contrast, when Experian receives letters from a consumer, or an attorney representing a consumer who identifies themselves as an attorney representing the consumer, Experian processes that mail according to the requirements of the FCRA. *Id.* ¶ 23.

Experian's third-party mail sorting policy was created to ensure that Experian was only sending consumer credit information to consumers or those entities who have a statutorily approved purpose for obtaining that information. *Id.* ¶ 22. Not only does this policy serve to protect consumers by preventing unauthorized access to their credit reports, but it is in accordance with administrative guidance. *See* Federal Trade Commission, 40 Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations, 2011 WL 3020575, at *70 (July 1, 2011) ("A CRA need not investigate a dispute about a consumer's file raised by a third party.").

The dispute letters purportedly sent by Plaintiffs were identified by Experian as third-party mail and, accordingly, Experian did not conduct a further reinvestigation. *See* Filing No. 183-3 ¶ 21–22. Plaintiffs have confirmed that they did not send any letters to Experian disputing the Ally tradeline but rather relied extensively on Stecklein & Rapp to do so. For example, Brianna Dulworth testified on multiple occasions that she did not draft the dispute letters that were sent to

Experian. *See, e.g.*, Filing No. 181-1 at 71–72 (Brianna Dulworth Dep. at 108:22–109:13) ("Q: And did you draft these letters? A: No, I did not draft them. . . . Like, I helped write them, if that makes any sense. But to actually put it on paper . . . I had counsel to help me figure that out."). And, Brianna Dulworth testified that she did not mail the dispute letters to Experian. *Id.* at 62 (Brianna Dulworth Dep. at 93:11–14) ("Q: Can you be clear as to did you send the letters, or did your counsel send the letters? A: Well, my -- my counsel mailed them."). Moreover, even though the dispute letters were delivered to Experian by a third-party process server known as Case Mail, Brianna Dulworth admitted that she did not know of Case Mail. *Id.* at 76–77 (Brianna Dulworth Dep. at 113:25–114:3) ("Q: Do you know what 'Case Mail Digital Post Service' is? A: No."). Yet, Stecklein & Rapp never identified themselves as Plaintiffs' counsel in their letters or used firm letterhead to identify themselves.

Roughly a month after Plaintiffs filed suit in state court, and before Ally was named as a Defendant, Experian notified Ally of Plaintiffs' disputes via the ACDV process and requested Ally investigate the account and verify whether the account was reaffirmed in bankruptcy. Filing No. 183-3 ¶ 20. As with Equifax's disputes discussed *supra* Section II.D, Ally returned its reinvestigation results and advised Experian that Plaintiffs' Ally account was accurately reported by Experian as discharged in bankruptcy. *Id.*

### G.  Plaintiffs' Alleged Damages.

Following the discharge of their Chapter 7 bankruptcy, Plaintiffs acknowledged that the bankruptcy filing had harmed their credit and were therefore not surprised when several applications for new credit cards and loans resulted in denials or unfavorable interest rates. Filing No. 181-1 at 8, 10, 57, 69 (Brianna Dulworth Dep. at 26:18–22, 28:5–9, 88:6–22, 106:4–25). Particularly, after the discharge of their Chapter 7 bankruptcy, Plaintiffs attempted to obtain an

automobile loan through a car dealership. Filing No. 181-1 at 98 (Brianna Dulworth Dep. at 166:2–23). During the application process, Plaintiffs received two sets of denials dated July 17, 2021 and July 24, 2021 from Teachers Credit Union that were based on their Equifax credit file. Filing No. 72 ¶ 46; Filing No. 181-1 at 97–98 (Brianna Dulworth Dep. at 165:21–25, 166:2–7); Filing No. 183-5 at 2–3, 7–8 (Credit Denial Letters). The denials dated July 17, 2021 were not a straight denial and only stated that the lender was unable to offer Plaintiffs credit on the terms requested due to an "Insufficient credit file after Bankruptcy." Filing No. 183-5 at 2–3 [Credit Denial Letters]. In fact, the July 17, 2021 letters offered Plaintiffs a loan with alternative terms, which Plaintiffs did not accept. Filing No. 181-1 at 121 (Brianna Dulworth Dep. at 223:3–8); Filing No. 183-5 at 2–3 (Credit Denial Letters). The July 24, 2021 letters, on the other hand, did not provide alternative terms but stated that the principal reasons for credit denial were "Bankruptcy" and "Insufficient credit file after Bankruptcy." Filing No. 183-5 at 7–8 (Credit Denial Letters). Notably, despite these letters, Plaintiffs still obtained an automobile loan through Capital One Finance around July 2021. Filing No. 181-1 at 99 (Brianna Dulworth Dep. at 167:4–15). Also of note, the denial letters produced by Plaintiffs did not reference the reporting of any specific account as discharged in Plaintiffs' bankruptcy or the Ally account at issue. Filing No. 183-5 (Credit Denial Letters).

Plaintiffs allege that they have suffered emotional and mental anguish, frustration, and annoyance. Filing No. 182-7 at 8–9 (Plaintiff Craig Dulworth's Response to Equifax's Interrogatory 10); Filing No. 182-6 at 9–10 (Plaintiff Brianna Dulworth's Response to Equifax's Interrogatory 10); Filing No. 182-8 at 19–20 (Plaintiffs' Responses to Experian's Interrogatories). Plaintiff Brianna Dulworth described the sadness and embarrassment associated with filing for bankruptcy, and the frustrating repeated attempts with Ally to convince it that their auto loan was

14

reaffirmed and that it should report it to the CRAs as such. Filing No. 181-1 at 30–32, 83–85 (Brianna Dulworth Dep. at 48:4–50:11, 120:23–25, 121:6–25, 122:2–16). The only record evidence of medical treatment relates to a discussion between Brianna Dulworth and her family doctor stemming from the stress Brianna Dulworth attributed to *Ally*. Filing No. 181-1 at 135–36 (Brianna Dulworth Dep. 240:22–241:10). But, Plaintiffs have not sought medical treatment as a result of Defendants' reporting of the Ally account, nor is there any evidence they spoke to a mental health professional. *Id.*; Filing No 182-7 at 9 (Plaintiff Craig Dulworth's Response to Equifax Interrogatory 11).

### III.   Plaintiffs' Claims Against Defendants.

Plaintiffs allege that Defendants negligently and/or willfully violated: (1) 15 U.S.C. § 1681e(b) by not following reasonable procedures to assure maximum possible accuracy and (2) 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation of Plaintiffs' disputes. Filing No. 72 ¶¶ 33–38. Specifically, Plaintiffs contend that Defendants erroneously reported their Ally automobile loan account as "'INCLUDED IN BANKRUPTCY' with no payment history" or "Discharged through Bankruptcy Chapter 7/Never late" when the account was reaffirmed and they were making payments toward the balance of the loan after the bankruptcy discharge. *Id.* ¶¶ 15–17. Plaintiffs further allege that they submitted disputes to Defendants regarding the erroneous reporting, but Defendants continued to report the Ally account as included in bankruptcy and discharged thorough bankruptcy. *Id.* ¶¶ 22–28. In their Second Amended Complaint, Plaintiffs seek actual damages, statutory damages, punitive damages, and cost and attorneys' fees allegedly attributable to Defendants. *Id.* ¶ 49.

Defendants move for summary judgment on Plaintiffs' claims that they allegedly violated § 1681e(b) and willfully violated § 1681e(b) and § 1681i of the FCRA.

## <u>SUMMARY JUDGMENT STANDARD</u>

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Crawford v. Countrywide Home Loans, Inc.*, 647 F.3d 642, 647 (7th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). Viewing "the evidence in the light most favorable to the nonmoving party, . . . [a] genuine issue of material fact exists only where there is enough evidence that a reasonable jury could return a verdict in favor of the non-moving party." *Collins v. Am. Red Cross*, 715 F.3d 994, 997 (7th Cir. 2013). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (internal citations omitted).

## <u>ARGUMENT</u>

### IV.    PLAINTIFFS ALLEGE A LEGAL INACCURACY THAT IS NOT ACTIONABLE UNDER THE FCRA

Plaintiffs' claims hinge on a textbook example of a legal inaccuracy that, as the Seventh Circuit has unequivocally recognized, is not actionable under the FCRA against a CRA.[6] In *Denan v. Trans Union LLC*, 959 F.3d 290, 294 (7th Cir. 2020), and again in *Chuluunbat v. Experian Info. Sols., Inc.*, 4 F.4th 562, 565 (7th Cir. 2021), the Seventh Circuit distinguished "factual

---

[6] In *Myers v. Equifax Information Services et al.*, this Court recently upheld Seventh Circuit precedent that while "the filing of [a] reaffirmation agreement is a factual issue [ ] the mere filing of [a] reaffirmation agreement does not necessarily mean that it was valid." *Myers,* No. 2022 WL 4292179, at *15.

16

inaccuracies," which can support a claim under the FCRA, from "legal inaccuracies," which

cannot.[7] Factual inaccuracies, according to the Seventh Circuit, are things like the amount a

consumer owes, when a debt was incurred, and the date a consumer made a payment. *Chuluunbat*,

4 F.4th at 568. These "do not require the consumer reporting agencies to make any legal

determinations about the facts or legal judgments." *Id.* "Legal inaccuracies," by contrast, present

issues that do require such determinations and judgments. *Id.* This Court dealt with an identical

fact pattern in *Myers* and correctly held that regardless of whether the underlying reaffirmation

agreement was valid, a dispute over the validity of a reaffirmation agreement "requires the CRAs

to apply law to facts . . . [which] the CRAs are not required to [do] under the FCRA." *Myers*, 2022

WL 4292179, at *15.

In distinguishing between factual and legal inaccuracies, "the central question is whether

the alleged inaccuracy turns on applying law to facts or simply examining the facts alone."

*Chuluunbat*, 4 F.4th at 567. CRAs are competent to do the latter but not the former; "they do not

reach legal conclusions like courts and other tribunals do." *Id.*; *see also DeAndrade v. Trans Union

LLC*, 523 F.3d 61, 68 (1st Cir. 2008) (contrasting factual inaccuracies, which can be "uncovered

by a reasonable reinvestigation," with legal issues that CRAs are "neither qualified nor obligated

to resolve under the FCRA"). "Because CRAs are ill equipped to adjudicate contract disputes,

courts have been loath to allow consumers to mount collateral attacks on the legal validity of their

debts in the guise of FCRA reinvestigation claims." *Carvalho v. Equifax Info. Servs., LLC*, 629

F.3d 876, 891 (9th Cir. 2010). Such disputes "require[ ] resolution by a court of law, not a credit

---

[7] This puts the Seventh Circuit in good company. "All circuit courts to have opined on whether accuracy in the FCRA context includes legal inaccuracies are unanimous: 'The claimed inaccuracy must be factual, not legal.'" *Sessa v. Linear Motors, LLC*, No. 19-cv-9914, 2021 WL 6052134 (S.D.N.Y. Dec. 20, 2021) (quoting *Sobenes v. Trans Union Data Sols.*, No. 19-CV-7114, 2021 WL 214640, at *2 (N.D. Ill. Jan. 21, 2021), and collecting cases).

reporting agency." *Batterman v. BR Carroll Glenridge, LLC*, 829 F. App'x 478, 481 (11th Cir. 2020).

Plaintiffs' claims present legal issues related to the validity of their reaffirmation agreement with Ally that are not suitable for resolution by Defendants. But, "[a] reaffirmation agreement is a contract between a debtor and a creditor, to which conventional contract principles apply." *In re Eiler*, 390 B.R. 920, 924 (Bankr. E.D. Wis. 2008) (citing *In re Turner*, 156 F.3d 713, 718 (8th Cir. 1998)). The only two parties to the reaffirmation agreement at issue in this case are Plaintiffs and Ally, and the record evidence shows that they disagreed as to whether the debt was discharged. *See* Filing No. 182-4 (December 2021 Brianna Dulworth ACDV to Ally); Filing No. 184-1 (September 2021 Craig Dulworth ACDV to Ally) ; Filing No. 181-4 (Bankruptcy Reaffirmation Agreement) (Bankruptcy Dkt. 20). Plaintiffs claim that the debt was not discharged, but Ally verified the debt as reporting accurately, including after this litigation was filed. Filing No. 72 ¶¶ 18–19; Filing No. 183-2 ¶¶ 64, 69; Filing No. 183-3 ¶ 20.

Furthermore, determining whether there is an enforceable contract between a furnisher and a consumer turns on complex questions of bankruptcy law that far "exceed[ ] the competencies of consumer reporting agencies." *Denan*, 959 F.3d at 295. As discussed in Section I, *supra*, a reaffirmation agreement is invalid unless it "strictly complies" with the requirements set forth in the Bankruptcy Code. *In re Golladay*, 391 B.R. 417, 421 (C.D. Ill. 2008). Assessing whether Plaintiffs' agreement satisfied those requirements would require Defendants to consider the facts surrounding the reaffirmation agreement in light of applicable bankruptcy law — to make "legal determinations about the facts [and] legal judgments." *Chuluunbat*, 4 F.4th at 568. This goes far beyond what the FCRA requires.

Plaintiffs could have gone to the bankruptcy court and obtained an order clearly resolving their dispute with Ally. If they had done so, the enforceability of Plaintiffs' reaffirmation agreement would become a question of fact Defendants would be competent to ascertain. *See Denan*, 959 F.3d at 296. Instead, Plaintiffs expected Defendants to determine the validity of an ambiguous contract entered into in December 2018, nearly three years later, in September 2021. Filing No. 181-4 (Bankruptcy Reaffirmation Agreement) (Bankruptcy Dkt. 20); Filing No. 181-10 (Brianna Dulworth September 2021 Dispute); Filing No. 181-11 (Craig Dulworth September 2021 Dispute). But, the FCRA imposes no such duties on Defendants. *See Denan*, 959 F.3d at 295 (holding the FCRA does not require CRAs to determine the validity of legal agreements that "[o]nly a court can fully and finally resolve" and rejecting "attempt[s] to graft responsibilities of data furnishers and tribunals onto . . . consumer reporting agenc[ies]"); *Carvalho*, 629 F.3d at 892 ("We agree that reinvestigation claims are not the proper vehicle for collaterally attacking the legal validity of consumer debts.").

## V.    PLAINTIFFS CANNOT SHOW THAT THEY SUFFERED ACTUAL DAMAGES

"Before any discussion of the reasonableness of [Defendants' procedures] is necessary . . . [Plaintiffs] must show that [they] 'suffered damages as a result of the inaccurate information.'" *Ruffin-Thompkins*, 422 F.3d 603, 608 (7th Cir. 2005) (quoting *Sarver*, 390 F.3d at 971). Plaintiffs cannot make this showing as there is no evidence that Defendants' reporting of the Ally debt caused any of Plaintiffs' alleged damages.

Plaintiffs have presented no evidence that Defendants' allegedly inaccurate reporting of the Ally loan — as opposed to Plaintiffs' poor credit and most recent bankruptcy discharge — caused them any credit harm. Plaintiffs were fully aware when they filed for bankruptcy that doing so would damage their credit for years and make it difficult to obtain new

19

credit. Filing No. 181-1 at 25–26 (Brianna Dulworth Dep. at 43:22–44:2 ("Q. [I]s it also correct . . . that you and your husband were aware that filing for bankruptcy would hurt your credit? A: Well, yes."). As Brianna Dulworth admitted during her deposition, she and her husband are still affected by their decision to file their most recent bankruptcy as they "live with [their] son, [ ] have high interest rate credit cards[,] and [ ] get turned down [for] a lot of things." *Id.* at 7 (Brianna Dulworth Dep. at 25:11–14); *see also* Filing No. 182-9 at 7 (Craig Dulworth Dep. at 54:22–24) ("Q: And how does [the bankruptcy] affect you and your wife? A: Well, [we're] not getting the credit we should have been getting."); *Jaras v. Equifax Inc*., 766 F. App'x 492, 494 (9th Cir. 2019) ("Plaintiffs here do not make any allegations about how the alleged misstatements in their credit reports would affect any transaction they tried to enter or plan to try to enter—and it is not obvious that they would, given that Plaintiffs' bankruptcies themselves cause them to have lower credit scores with or without the alleged misstatements."); Lucy Lazarony, *What Happens to Your Credit Score After Bankruptcy?*, Credit.com (Mar. 10, 2020), http://www.credit.com/credit-scores/3-things-bankruptcy-does-to-your-credit-score/ ("After bankruptcy, your credit score can plummet. . . . Bankruptcy will have a devastating impact on your credit health."); Consumer Fin. Prot. Bureau, Key Dimensions and Processes in the U.S. Credit Reporting System 12 (Dec. 2012), http://files.consumerfinance.gov/f/201212_cfpb_credit-reporting-white-paper.pdf (showing 250 point drop in credit score due to filing bankruptcy). And Craig Dulworth admitted during his deposition that the accounts they discharged in their last bankruptcy negatively affected their ability to obtain credit as well. *See* Filing No. 182-9 at 25 (Craig Dulworth Dep. at 205:17–21).

After filing bankruptcy, Plaintiffs were denied credit "a lot." Filing No. 181-1 at 57 (Brianna Dulworth Dep. at 88:11). Indeed, and as expected, Plaintiffs received a number of credit

denials in the wake of their bankruptcy; Plaintiffs produced *eleven* credit denial letters in total. Filing No. 183-5 (Credit Denial Letters). But, despite the many credit denials, Plaintiffs have no evidence that any of those denials were connected to Defendants' reporting of the Ally loan. *Id.* Seven of these denial letters rely only on credit information furnished by another CRA and, therefore, cannot show that Defendants caused Plaintiffs harm. Filing No. 183-5 at 7–14 (Credit Denial Letters). Of the remaining two sets of letters, which are dated in July 2021 and reference information provided by Equifax regarding an auto loan application, all four letters provide only the following as reasons for the denial: "Bankruptcy" and "[i]nsufficient credit file after Bankruptcy." Filing No. 183-5 at 2–3, 7–8 (Credit Denial Letters). Notably, none of these letters reference Plaintiffs' outstanding debts or the Ally account as justification for the denials. *Id.* Moreover, Plaintiffs still managed to obtain an auto loan almost immediately afterwards — proving that neither of these denial letters caused Plaintiffs any damages. Filing No. 181-1 at 128 (Brianna Dulworth Dep. at 230:15–18). And, just as notably, Plaintiffs have not produced a *single* credit denial letter linking information reported by Experian to an adverse credit action. *See generally* Filing No. 72 (failing to allege any concrete adverse action attributable to Experian's credit reporting). However, these letters do serve to show that any damages for which Plaintiffs blame Defendants are likely attributable to their bankruptcy and not the Defendants' reporting. In fact, all of the credit denial letters referencing information provided by Trans Union specifically mentioned Plaintiffs' bankruptcy as a principal reason for the declination. Filing No. 183-5 at 4– 6, 9–14 (Credit Denial Letters).

Without proof of financial harm, Plaintiffs' only remaining hope for proving damages lies in showing that they are entitled to compensable emotional distress damages — but such claims fail as well. Brianna Dulworth testified that filing for bankruptcy in 2018 made her "fe[el] like a

failure, and [that] [she] couldn't get things together." Filing No. 181-1 at 30 (Brianna Dulworth

Dep. at 48:10–11). Moreover, both Craig and Brianna Dulworth blamed Ally as the root cause of

their emotional harms. *See id.* at 114, 137 (Brianna Dulworth Dep. at 194:6–17; 242:16–23)

(stating Plaintiffs "made the decision to move in with their son" because "Ally did not call [ ] back

[or] . . fix the problem" and attributing "the depression and all that" to moving into their son's

home); Filing No. 182-9 at 16 (Craig Dulworth Dep. at 136:4–9) (stating Plaintiffs were

emotionally aggravated due to "not be[ing] able to get approved" and being unable "to fix things").

Brianna Dulworth, in particular, testified that she called Ally "[u]p to seven times" and that Ally's

steadfast refusal to revise its reporting "was very frustrating" and led to her feeling "defeated."

Filing No. 181-1 at 84, 111–12 (Brianna Dulworth Dep. at 121:20; 191:22–25). As Brianna

Dulworth testified, "the reason why [she] sought legal counsel" in the first instance was because

she was unable to correct the error by calling Ally and was frustrated by Ally's unresponsiveness.

*See* Filing No. 181-1 at 89–90 (Brianna Dulworth Dep. at 126:25–127:13). All this testimony

shows that to the extent Plaintiffs suffered emotional damages, those emotional damages are

attributable to their bankruptcy proceedings and actions by Ally.

Further, the garden-variety stresses that Plaintiffs claim to have experienced are exactly the

sort that courts in the Seventh Circuit reject as failing to meet the Seventh Circuit's "strict standard

for a finding of emotional damage because they are so easy to manufacture." *Sarver*, 390 F.3d at

971 (internal citations omitted); *see also, e.g.*, *Jackson v. Experian Info. Sols., Inc.*, 236 F. Supp.

3d, 1058, 1064 (N.D. Ill. 2017) (testimony that plaintiff was "irritable and agitated" and had "sleep

issues" not sufficient at summary judgment); *Matson v. Edfinancial Servs. LLC*, No. 14-CV-1052-

JPS, 2015 WL 5010515, at *8 (E.D. Wis. Aug. 21, 2015) (same for Plaintiff's testimony that she

experienced "fear" and the "greatest emotional distress of her life"); *Bagby v. Experian Info. Sols.,*

*Inc.*, 162 Fed. Appx. 600, 605 (7th Cir. 2006) (same for testimony that plaintiff "stress[es]," gets tension headaches, and clashes with her fiancé). Accordingly, Plaintiffs' failure to establish a "causal relation between the violation of the statute and the loss of credit, or some other harm" is fatal to their claim that Defendants violated the FCRA. *Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 664 (7th Cir. 2001).

**VI.   DEFENDANTS WERE ENTITLED TO RELY ON INFORMATION FURNISHED BY ALLY**

> **A.   Plaintiffs Cannot Show that Defendants Violated Section 1681e(b) of the FCRA.**

Legal precedent has been clearly established in this Circuit. CRAs "collect consumer information supplied by furnishers, compile it into consumer reports, and provide those reports to authorized users." *Denan*, 959 F.3d at 295; *see also Carvalho*, 629 F.3d at 891–92 (explaining same and that a consumer reporting agency is merely "a third party, lacking any direct relationship with the consumer"). Just as the FCRA does not require CRAs to resolve legal disputes between a consumer and his furnisher, CRAs comply with § 1681e(b) as a matter of law by reporting information provided to them by furnishers following safeguards that are in place to ensure maximum possible accuracy of reporting consumer information. *Sarver*, 390 F.3d at 972 (citing *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284–85 (7th Cir. 1994)) ("[o]ne can see how, even with safeguards in place, mistakes can happen. But given the complexity of the system and the volume of information involved, a mistake does not render the procedures unreasonable."); *accord Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 945 (11th Cir. 2021); *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). This is especially true when the issue is whether a consumer is liable to repay a debt, because "[o]nly furnishers are tasked with accurately reporting liability" under the FCRA. *Denan*, 959 F.3d at 295 (citing 12 C.F.R. § 1022.41(a)). "And it makes sense

that furnishers shoulder this burden: they assumed the risk and bear the loss of unpaid debt, so they are in a better position to determine the legal validity of a debt." *Id.*

Defendants had no reason to believe that Ally was an unreliable furnisher. Filing No. 183-2 ¶ 38; Filing No. 183-3 ¶ 6; *see Ruffin-Thompkins v. Experian Info. Solutions, Inc.*, 422 F.3d 603, 608 (7th Cir. 2005) (liability to reinvestigate a tradeline under the FCRA is not triggered when the CRA had no reason to believe that the furnisher was unreliable). On the contrary, Ally has a strong track record of providing the CRAs with accurate information about the status of its debts following a Chapter 7 bankruptcy. In *Myers*, a putative class action, the Court ordered Equifax, Experian, and Trans Union to produce a randomly selected list of 100 consumers with a Chapter 7 bankruptcy on file. *Myers*, 2022 WL 4292179, at *6. An analysis of these 300 files showed that Ally's reporting was facially consistent with bankruptcy records, or was otherwise determined to be accurate, in 299 instances. *Id*. Accordingly, Plaintiffs have offered no evidence to suggest that Ally cannot be relied upon.

Additionally, if Defendants were required to second-guess the information provided by a furnisher like Ally, *Sarver* and its progeny would lose all meaning. "[E]ach of the nationwide consumer reporting agencies receive information . . . on over 1.3 billion consumer credit accounts or trade lines on a monthly basis." *Denan*, 959 F.3d at 294. "The increased cost to [the CRAs] to examine each of these entries individually would be enormous." *Sarver*, 390 F.3d at 972. "'In turn, they would be forced to pass on the increased costs to their customers and ultimately to the individual consumer.'" *Sarver*, 390 F.3d at 972 (quoting *Henson*, 29 F.3d at 285). Plaintiffs' suggestion that Defendants should independently review all information provided by furnishers would be untenable and at odds with Congress's goal of creating a credit-reporting system suitable for "meeting the needs of commerce." 15 U.S.C. § 1681(b).

**B.      Plaintiffs cannot show that Equifax Violated Section 1681i of the FCRA.**

As discussed above, Plaintiffs' disputes involved a legal inaccuracy, and therefore, no amount of investigation by Equifax would have uncovered an inaccuracy in their credit reports. *See Denan*, 959 F. 3d at 297 ("[N]o amount of resources could empower [a CRA] to assume the role of a tribunal."). Nonetheless, Equifax utilized the resources at its disposal for a thorough reinvestigation of Plaintiffs' disputes, and its reinvestigations were therefore reasonable. *See Henson*, 29 F.3d at 286–87. "As for Equifax's reinvestigation procedures, all three of the major credit reporting agencies have similar ones, and the ACDV approach has been upheld as a matter of law by other courts." *Shannon v. Equifax Info. Servs., LLC*, 764 F. Supp. 2d 714, 725–26 (E.D. Pa. 2011); (citing *Podell v. Citicorp Diners Club*, 112 F.3d 98, 105 (2d Cir. 1997); *see also Morris v. Trans Union LLC*, 420 F. Supp. 2d 733, 756 (S.D. Tex. 2006), *aff'd* 224 Fed. Appx. 415 (5th Cir. 2007); *Benson v. Trans Union LLC*, 387 F. Supp. 2d 834, 843 (N.D. Ill. 2005); *Anderson v. Trans Union LLC*, 367 F. Supp. 2d 1225, 1233 (W.D. Wis. 2005); *Schmitt v. Chase Manhattan Bank, N.A.*, No 03-3295, 2005 WL 2030483, at *3 (D. Minn. Aug. 23, 2005); *Perry v. Experian Info. Solutions, Inc.*, No. 05–1578, 2005 WL 2861078, at *5 (N.D. Ill. Oct. 28, 2005)).

Equifax received a total of three disputes from Plaintiffs. Filing No. 183-2 ¶¶ 55–70; Filing No. 181-10 (Brianna Dulworth September 2021 Dispute); Filing No. 181-11 (Craig Dulworth September 2021 Dispute); Filing No. 181-12 (Brianna Dulworth December 2021 Dispute). The first disputes were received in September 2021. Filing No.  ¶¶ 55, 61; Filing No. 181-10 (Brianna Dulworth September 2021 Dispute); Filing No. 181-11 (Craig Dulworth September 2021 Dispute). In their disputes, Plaintiffs identified the Ally account, stated that they filed for bankruptcy in October 2018, and provided a copy of the reaffirmation agreement, filed in December 2018. Filing No. 183-2 ¶¶ 55–70; Filing No. 181-10 (Brianna Dulworth September 2021 Dispute); Filing No.

181-11 (Craig Dulworth September 2021 Dispute). In other words, in September 2021, Plaintiffs informed Equifax that according to a contract that they entered into during their bankruptcy petition in 2018, the Ally account should report as reaffirmed with a payment history. Not knowing whether the reaffirmation contract was enforceable, what happened between 2018 and 2021, and how the account should report as of September 2021 as neither the documents nor the bankruptcy docket would have provided Equifax with a current status, history, and payment information, Equifax reinvestigated Plaintiffs' disputes with Ally.[8] Filing No. 183-2 ¶¶ 64, 69; *see also* Filing No. 183-1 at 30 (Pam Smith Dep. 82:2–13). In return, Ally verified that the account was included in bankruptcy. Filing No. 183-2 ¶¶ 64, 69. The Seventh Circuit has established precedent that prevents consumers from using the FCRA to collaterally attack the validity of a debt by challenging a CRA's reinvestigation procedure. *See Humphrey v. Trans Union LLC*, 759 F. App'x 484 (7th Cir. 2019).

### C.     Plaintiffs cannot show that Experian Violated Section 1681i of the FCRA.

As discussed *supra* in Section IV, Plaintiffs' disputes involved only an alleged legal inaccuracy, and therefore, any reinvestigation by Experian would have been futile as Plaintiffs' disputes — at their core — challenged Ally's interpretation of the reaffirmation agreement. *See Denan*, 959 F. 3d at 297 ("[N]o amount of resources could empower [a CRA] to assume the role of a tribunal."); *Humphrey*, 759 F. App'x at 488 (holding "[t]he information the CRAs reported about [Plaintiff]'s [debt] was accurate because the information 'did not state any factual deficiency that could have been resolved by a reasonable reinvestigation' conducted by any of the credit bureaus." (quoting *DeAndrade*, 523 F.3d at 68)). Accordingly, Plaintiffs' claims again Experian under § 1681i also fail.

---

[8] Equifax did not contact Ally during its reinvestigations of Plaintiff Brianna Dulworth's September 2021 Dispute. *See supra* Section II.f. Nevertheless, Equifax reviewed the credit file and addressed the Ally account. *Id.*

26

However, even if the Court were to depart from established Seventh Circuit caselaw and deem Plaintiffs' disputes as alleging a factual dispute, the Court should still grant summary judgment in favor of Experian on Plaintiffs' claim that Experian *willfully* violated § 1681i. Under Seventh Circuit precedent, "[a] willful violation [of the FCRA] is one committed with actual knowledge or reckless disregard for the FCRA's requirements." *Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1195 (7th Cir. 2021). The standard for willfulness under the FCRA is stringent, requiring, among other things, a threshold showing that the defendant's interpretation of the FCRA as permitting its conduct is so clearly wrong as to be "objectively unreasonable" — *i.e.*, a showing that it violated an FCRA rule that is "clearly established." *Safeco Ins. Co. of Am.*, 551 U.S. at 70 (citing *Saucier v. Katz*, 533 U.S. 194, 202, (2001)). Since Plaintiffs' dispute letters bore numerous indications that they were written by someone other than Plaintiffs (which was in fact the case) — and both court opinions and administrative guidance have indicated CRAs need not reinvestigate such disputes — Plaintiffs cannot show Experian willfully violated § 1681i. *See* Filing No. 183-3 ¶ 21; Filing No. 181-1 at 62, 71–72 (Brianna Dulworth Dep. at 93:11–14, 108:22–109:13) (admitting Plaintiffs did not draft nor send dispute letters to Experian).

Numerous courts have held that credit reporting agencies, like Experian, "need not investigate a dispute about a consumer's file raised by a third party—such as a 'credit repair organization' . . . because the obligation under this section arises only where file information is disputed 'by the consumer' who notifies the agency 'directly of such dispute.'" *See, e.g.*, *In re Experian Info. Sols., Inc.*, No. CV-15-01212-PHX-GMS, 2017 WL 3559007, at *5 (D. Ariz. Aug. 17, 2017) (quoting Federal Trade Commission, 40 Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations, 2011 WL 3020575, at *70 (July 1, 2011)); *Turner v. Experian Info. Sols., Inc.*, No. 3:16-CV-630, 2017 WL 2832738, at *7

(N.D. Ohio June 30, 2017) (same). And as recently as 2020, the Bureau of Consumer Financial Protection expressly reminded Experian and other credit bureaus of administrative guidance on the issue within the context of the COVID-19 pandemic: "The Bureau reminds furnishers and consumer reporting agencies that they may take advantage of statutory and regulatory provisions that eliminate the obligation to investigate disputes submitted by credit repair organizations and disputes they reasonably determine to be frivolous or irrelevant." Bur. Cons. Fin'l Prot., Statement on Supervisory and Enforcement Practices Regarding the Fair Credit Reporting Act and Regulation V in Light of the CARES Act, April 1, 2020 (available at https://files.consumerfinance.gov/f/documents/cfpb_credit-reporting-policy-statement_cares-act_2020-04.pdf) (rescinded on Apr. 1, 2021). Along similar lines, courts have held that where a consumer "played almost no role in submitting the dispute letter," liability under 15 U.S.C.§ 1681i cannot be established. *Warner v. Experian Information Solutions, Inc.*, 931 F.3d 917, 921 (9th Cir. 2019). This is because the text of § 1681i of the FCRA permits a plaintiff to file suit under the provision only if "the completeness or accuracy of any item of information . . . *is disputed by the consumer and the consumer notifies the agency directly*." 15 U.S.C. 1681i(a)(1)(A) (emphasis added).

Here, not only were Plaintiffs' dispute letters sent to Experian by a third-party mailing house instead of by Plaintiffs, but Experian has even received dispute letters in the past, purportedly from other consumers, "formatted exactly the same with just the details of each disputed item [being] different." Filing No. 183-4 at 28–29 (Christina Hamilton Dep. at 38:14–39:4); *compare* Filing No. 183-6 (Exemplar Case Mail Dispute Letters Received By Experian), *with* Filing No. 183-7 (Plaintiffs' Dispute Letters Sent On September 3, 2023). Furthermore, these nearly identical dispute letters — which have the same headers, the same verbiage, the same

28

formatting, and are all addressed to the same administrative building — have given rise to nearly identical cases filed by Plaintiffs' counsel. *See, e.g., Madison Parry v. Procollect, Inc.*, No. 4:22-cv-00283 (W.D. Mo.); *Michael Riley v. Experian Information Solutions, Inc.*, No. 1:21-cv-03092 (S.D. Ind.); *see also* Filing No. 183-3 ¶ 21.

Experian has put in place mail sorting procedures to identify such form dispute letters that are sent by third parties. *See* Filing No. 183-3 ¶ 22; Filing No. 183-4 at 24–26 (Christina Hamilton Dep. at 34:24–35:5, 35:23–36:8). But, Plaintiffs cannot establish that those mail sorting procedures are willfully in violation of the FCRA, particularly where those procedures correctly identified that Plaintiffs did not draft or send dispute letters to Experian. In fact, as the Eleventh Circuit has recently explained, providing credit information to a third party who submitted a dispute on behalf of a consumer would likely violate provisions of the FCRA that impose a duty on CRAs to avoid providing a consumer report to third parties who lack a permissible purpose. *See Younger v. Experian Info. Sols., Inc.*, 817 F. App'x 862, 870 (11th Cir. 2020) ("Experian's policy allows it to sort out claims that do not appear to come 'directly' from consumers. With these considerations in mind, we cannot say that [Plaintiff] provided sufficient evidence to establish that Experian recklessly disregarded the reinvestigation duty."). Thus, it could not be willful for Experian to decline to process disputes that appeared to come from a third party, including those at issue here, because doing so would force Experian to trade compliance with one provision of the FCRA on pain of violating another.

## VII.   PLAINTIFFS CANNOT SHOW DEFENDANTS WILLFULLY VIOLATED SECTION 1681e(b)

As discussed above, "[a] willful violation [of the FCRA] is one committed with actual knowledge or reckless disregard for the FCRA's requirements." *Persinger*, 20 F.4th at 1195. And, a willful violation of the FCRA can be established only by showing that the defendant's

interpretation of the FCRA as permitting its conduct is so clearly wrong as to be "objectively unreasonable." *Safeco Ins. Co. of Am.*, 551 U.S. at 70 (citing *Saucier*, 533 U.S. at 202).

Accordingly, if "the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation," statutory and punitive damages may not be imposed on "a defendant who merely adopts one such interpretation." *Id.* at 70 n.20. Specifically, CRAs do not violate the FCRA if they "followed an interpretation that could reasonably have found support in the courts, whatever their subjective intent may have been." *Id.* For example, a company does not willfully violate the FCRA by following the interpretation of one federal appellate court even when another has reached the opposite conclusion. *Murray v. New Cingular Wireless Servs., Inc.*, 523 F.3d 719, 726 (7th Cir. 2008). This standard is akin to the one utilized "[i]n the qualified immunity context," *Syed v. M-I, LLC*, 853 F.3d 492, 504 (9th Cir. 2017), which protects "'all but the plainly incompetent or those who knowingly violate the law.'" *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Defendants' procedures for reporting debts following consumers' discharges from Chapter 7 bankruptcy are governed in a federal injunction entered in the *White-Hernandez* class action. *White v. Experian Info. Sols., Inc.*, No. 8:05-cv-01070, 2008 WL 11518799 (C.D. Cal. Aug. 19, 2008). The *White* Injunction requires Defendants to implement a "scrub" to automatically update qualifying pre-bankruptcy debts to report as discharged in bankruptcy without being asked to do so by either a creditor or consumer. *Id.* at *4, 10 (¶¶ 2.2; 3.2(b)). At the same time the injunction, recognizing that consumers like Plaintiffs may choose to except pre-bankruptcy debts from the effect of their discharge, requires Defendants to exclude "Current Status" accounts from this update. *Id.* at *10 (¶ 3.2(b)(ii)(E)). But the *White* Injunction provides only a default rule: when a

furnisher reports that a consumer has discharged a debt in bankruptcy, the information supplied by the furnisher controls. *Id.* (¶¶ 3.2(b)(ii)(B)–(D)).

Defendants perfectly followed the *White* Injunction in this case: They did not assume that Plaintiffs discharged their current-status Ally loan in bankruptcy and reported it as discharged in bankruptcy only because Ally instructed them to do so. *See supra* Section I.D; Filing No. 183-2 ¶ 36; Filing No. 183-3 ¶ 17. As courts have consistently found, compliance with the *White* Injunction defeats a consumer's willfulness claims. *See Coleman v. Experian Info. Sols., Inc.*, No. 1:21-CV-1095-CAP, 2023 WL 2366609, at *15 (N.D. Ga. Feb. 6, 2023) ("I agree with Judge Story and Experian that its reliance on the *White* Order 'effectively forecloses that claim, as it relied on an interpretation of Section 1681e(b) that a federal court approved.'" (citation omitted)); *Peterson v. Experian Info. Sols., Inc.*, No. CV 20-606, 2021 WL 3116073, at *4 (D. Minn. July 22, 2021) *aff'd sub nom. Peterson v. Experian Info. Sols.*, 44 F.4th 1124 (8th Cir. 2022) ("Experian's reliance on the procedures approved in *White* establishes that Experian's reporting was not willful or reckless."); *Coleman v. Experian Info. Sols., Inc.*, No. 1:21-CV-1095-CAP, 2023 WL 2366609, at *15 (N.D. Ga. Feb. 6, 2023); *Campbell v. Experian Info. Sols., Inc.*, No. CV 20-2498 (DSD/BRT), 2022 WL 3716982, at *6 (D. Minn. Aug. 29, 2022); *Lynch v. Experian Info. Sols., Inc.*, No. 20-CV-2535 (KMM/JFD), 2022 WL 16857078, at *10 (D. Minn. Nov. 10, 2022); *Ferrin v. Experian Info. Sols., Inc.*, 617 F. Supp. 3d 998, 1010 (D. Minn. 2022); *Beers v. Experian Info. Sols., Inc.*, No. 20-cv-1797, 2022 WL 891620, at *4–5 (D. Minn. Mar. 25, 2022); *Laura v. Experian Info. Sols., Inc.*, No. 20-cv-01573, 2022 WL 823853, at *4 (N.D. Ill. Mar. 18, 2022); *Benjamin v. Experian Info. Sols., Inc.*, No. 1:20-CV-2466, 2021 WL 4260887, at *21 (N.D. Ga. Sept. 20, 2021); *Hernandez v. Experian Info. Sols., Inc.*, No. 20-cv-09908, 2021 WL 2325019, at *3–4 (C.D. Cal. June 4, 2021); *Sunseri v. Experian Info. Sols., Inc.*, No. 20-cv-08932, 2021 WL 2327934, at *3–4

31

(C.D. Cal. June 4, 2021); *Wheeler v. Trans Union LLC*, No. 20-cv-11710, 2021 WL 2290575, at *4 (C.D. Cal. June 4, 2021). If Defendants do not willfully violate the FCRA by following an interpretation that "could reasonably have found support in the courts," *Safeco*, 551 U.S. at 70 n.20, then, *a fortiori*, they do not do so by following a detailed federal injunction.

Further, even apart from the *White* Injunction, § 1681e(b) requires that when preparing a consumer report, CRAs follow "reasonable procedures to assure the maximum possible accuracy of the information about the individual whom the report relates." 15 U.S.C. § 1681e(b). Applicable FTC guidance provides that a CRA complies with this provision principally by "accurately transcrib[ing], stor[ing] and communicat[ing] consumer information received from a source that it reasonably believes to be reputable, in a manner that is logical on its face." Fed. Trade Comm'n, *40 Years of Experience With the Fair Credit Reporting Act*, at 67 (2011), *available at* https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf. *Sarver* adopted the same interpretation, holding that CRAs comply with § 1681e(b) as a matter of law if they correctly report information supplied by financial institutions like Ally absent prior notice that the information is inaccurate. *Sarver*, 390 F.3d at 972.

Consistent with *Sarver* and FTC guidance, Defendants accurately relayed the information provided to them by Ally. Ally's report that Plaintiffs' auto loan was discharged in bankruptcy was credible, particularly in light of Plaintiffs' recent bankruptcy, and Defendants had every reason to believe Ally was capable of accurately reporting the bankruptcy status of its debts. Moreover, Defendants reported the Ally tradeline consistent with the guidance this Court provided in *Myers*. *See Myers*, 2022 WL 4292179, at *19–20. In other words, Defendants' interpretation of § 1681e(b) was not "objectively unreasonable" and, indeed, is rooted in binding Seventh Circuit precedent

and this Court's prior holding in *Myers*. Plaintiffs' claim that Defendants willfully violated the FCRA fails as a result.

## **CONCLUSION**

For the foregoing reasons, Equifax and Experian respectfully request that this Court grant Defendants' Motion for Summary Judgment and dismiss all of Plaintiffs' claims with prejudice.

Dated: October 6, 2023                    Respectfully submitted,

*/s/ Alexandra Robinson French*
Alexandra Robinson French
alexandra.french@btlaw.com
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, IN 46204
Telephone:  (317) 231-7248
Facsimile:  (317) 231-7433

*/s/ David J. Sandefer*
David J. Sandefer (admitted *pro hac vice*)
dsandefer@jonesday.com
JONES DAY
110 N. Wacker Drive, Suite 4800
Chicago, IL  60606
Telephone:  (312) 269-1544

*Counsel for Defendant*
*Experian Information Solutions, Inc.*

*/s/ Samin Hessami*

Samin Hessami (admitted *Pro hac vice*)
SEYFARTH SHAW LLP
700 Milam Street, Suite #1400
Houston, TX  77002-2812
Telephone: (713) 225-2300
Facsimile: (713) 225-2340
shessami@seyfarth.com

Warren F. Cangany
SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 800
Chicago, IL 60606-6448
Telephone:  (312) 460-5000
Facsimile:  (312) 460-7000
wcangany@seyfarth.com

*Counsel for Defendant*
*Equifax Information Services LLC*

34

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

CRAIG DULWORTH and
BRIANNA DULWORTH,

        Plaintiffs,

v.                        CIVIL ACTION NO. 1:22-cv-00469-JMS-MJD

EQUIFAX INFORMATION
SERVICES LLC; and
EXPERIAN INFORMATION
SOLUTIONS, INC.,

        Defendants.

---

**PLAINTIFFS' OPPOSITION TO EQUIFAX INFORMATION**
**SERVICES LLC'S AND EXPERIAN INFORMATION SOLUTIONS, INC.'S**
**<u>JOINT MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

OVERVIEW ...................................................................................................6

FACTUAL BACKGROUND .............................................................................7

LEGAL FRAMEWORK .................................................................................12

   I.    FCRA Provisions at Issue ................................................................12

   II.   Summary Judgment Standard ..........................................................14

ARGUMENTS AND AUTHORITIES ............................................................14

   I.    Genuine Issues Of Material Fact Exist As To The Accuracy Of Defendants' Reporting Of The Account ...........................................................................................14

      A. Phantom Distinction Between Legal And Factual Questions Does Not Absolve Defendants Of Their FCRA Duties ...........................................14

      B. Defendants Also Cannot Rely On The "Bankruptcy Is Hard" Defense As A Reason To Habitually Violate The FCRA ...........................................22

   II.   Genuine Issues of Material Fact Preclude Entry of Summary Judgment on the Issues of Whether the Plaintiffs Suffered Actual Damages ...........................................23

   III.  Genuine Issues Of Material Fact Exist As To The Reasonableness Of Defendants' Investigations Of Plaintiffs' Disputes ...........................................25

      A. Experian Conducted No Investigations At All Because It Improperly Decided—With No Real Evidence—That Plaintiffs' Disputes Did Not Come From Them ...............................27

      B. Equifax Has Not Shown Its Investigations Were Reasonable As A Matter Of Law Because All Equifax Did Was Transmit The Disputes To Ally And Wait For Ally's Response ...........................................29

         1.    Regardless of what Ally was telling Defendants, they have their own FCRA obligations to investigate and verify information. ...........................................29

   IV.  Defendants Have Not Shown As A Matter Of Law That A Jury Could Not Conclude They Acted Willfully In Violating Section 1681e(b) ...........................................34

      A. Following The White Injunction Does Not Save Defendants As A Matter Of Law ........34

      B. Defendants Have Not Shown What Reading Of The FCRA They Adopted And Applied To The Reporting Of Plaintiffs' Ally Account ...........................................37

      C. Defendants Have Not Shown Willfulness Lacking As A Matter Of Law As To Their Perfunctory Investigations Of Plaintiffs' Disputes ...........................................40

         1.    Experian has not proven as a matter of law that no reasonable jury could find it was willful in failing to investigate Plaintiffs' disputes. ...........................................40

         2.    Equifax likewise fails to establish that no reasonable jury could find its complete reliance on Ally was willful. ...........................................44

CONCLUSION ...........................................................................................44

Suppl. App. 216

## TABLE OF AUTHORITIES

**Cases**

*Alley v. First Am. Credco, Inc.*, No. 05 C 2130, 2007 WL 188036 (N.D. Ill. Jan. 19, 2007) ...... 27

*Bagby v. Experian Info. Sols., Inc.*, 162 F. App'x 600 (7th Cir. 2006) ........................................ 32

*Bailey v. Experian Info. Sols., Inc.*, No. 1:21-cv-00465-BLW, 2023 WL 6317443 (D. Idaho Sept. 28, 2023) .................................................................................................................................... 37

*Beers v. Experian Info. Sols., Inc.*, No. 20-cv-1797 (WMW/JFD), 2022 WL 891620 (D. Minn. Mar. 25, 2022) ................................................................................................................................ 36

*Benjamin v. Experian Info. Sols., Inc.*, 561 F. Supp. 3d 1330 (N.D. Ga. 2021) ........................... 36

*Benson v. Trans Union LLC*, 387 F. Supp. 2d 834 (N.D. Ill. 2005) ............................................. 30

*Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066 (D. Or. 2011) .................. 32

*Bruan v. Client Servs., Inc.*, 14 F. Supp. 3d 391 (S.D.N.Y. 2014) .............................................. 23

*Buckley v. Afni, Inc.*, 133 F. Supp. 3d 1140 (S.D. Ind. 2016) ...................................................... 13

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874 (E.D. Va. Mar. 18, 2011) ............................................................................................................................... 23

*Campbell v. Experian Information Solutions, Inc.*, No. CV 20-2498(DSD/BRT), 2022 WL 3716982 (D. Minn. Aug. 29, 2022) .................................................................................................. 36

*Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469 (2d Cir. 1995) ............................................. 24

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................. 14

*Chaitoff v. Experian Information Solutions, Inc.*, 79 F.4th 800 (7th Cir. 2023) ............... 16, 17, 26

*Choudhury v. Citibank, N.A.*, No. 18-cv-02188 (RJD) (ST), 2018 WL 11447942 (E.D.N.Y. Dec. 7, 2018) ........................................................................................................................................... 33

*Cisneros v. U.D. Registry, Inc.*, 39 Cal. App. 4th 548 (1995) ....................................................... 27

*Cohen v. Equifax Info. Servs.*, 2019 WL 5200759 (S.D.N.Y. Sept. 13, 2019) ............................. 28

*Coleman v. Experian Info. Sols., Inc.*, __ F. Supp. 3d __, No. 1:21-cv-1095-CAP, 2023 WL 2366609 (N.D. Ga. Feb. 6, 2023) ................................................................................................... 36

*Collins v. Experian Information Solutions, Inc.*, 775 F.3d 1330 (11th Cir. 2015) .......... 20, 26, 34

*Cortez v. Trans Union, LLC*, 617 F.3d 688 (3d Cir. 2010) .......................................................... 13

*Crabill v. Trans Union, L.L.C.*, 259 F.3d 662 (7th Cir. 2001) ............................................... 26, 34

*Crump v. Carrington Mortg. Servs., LLC*, No. 18 C 2302, 2019 WL 118490 (N.D. Ill. Jan. 7, 2019) ............................................................................................................................................... 34

*Cushman v. Trans Union Corp.*, 115 F.3d 220 (3d Cir. 1997) ..................................................... 13

*Dennis v. BEH-1, LLC*, 520 F.3d 1066 (9th Cir. 2008) ......................................................... 20, 34

*Edeh v. Midland Credit Mgmt.*, 748 F. Supp. 2d 1030 (D. Minn. 2010) ..................................... 13

*Ferrin v. Experian Info. Sols., Inc.*, 617 F. Supp. 3d 998 (D. Minn. 2022) .......................... 36, 37

*Fickel v. Clearwater Credit Union*, No. 21-cv-798-SMY, 2023 WL 2456116 (S.D. Ill. Mar. 10, 2023) ............................................................................................................................................... 34

*Grigoryan v. Experian Info. Sols. Inc.*, 84 F. Supp. 3d 1044 (C.D. Cal. 2014) ........................... 12

*Gross v. CitiMortgage, Inc.*, 33 F.4th 1246 (9th Cir. 2022) ........................................................ 15

*Henry v. Freedom Mortg. Corp.*, 2020 WL 8921079 (D. Ariz. Apr. 27, 2020) ........................... 28

*Henson v. CSC Credit Servs.*, 29 F.3d 280 (7th Cir. 1994) ......................................................... 31

*Hines v. Equifax Info. Servs., LLC*, No. 19-cv-6701 (RPK) (RER), 2022 WL 2841909 (E.D.N.Y. July 16, 2022) ................................................................................................................................. 21

*Houston v. TRW Info. Servs., Inc.*, 707 F. Supp. 689, 691 (S.D.N.Y. 1989) ............................... 12

*Hurocy v. Direct Merchants Credit Card Bank, N.A.*, 371 F.Supp.2d 1058 (E.D. Mo. 2005) ..... 23

*In re Helmes*, 336 B.R. 105 (Bankr. E.D. Va. 2005) ............................................ 15

*Jackson v. Experian Info. Sols., Inc.*, 236 F. Supp. 3d 1058 (N.D. Ill. 2017)......................... 14

*James M. v. Saul*, No. 20-cv-183, 2021 WL 2820532 (S.D. Ind. July 7, 2021) .......................... 44

*Kester v. Menard, Inc.*, No. 3:20-cv-50289, 2021 U.S. Dist. LEXIS 235824 (N.D. Ill. Dec. 9, 2021) ...................................................................................................................... 14

*King v. Asset Acceptance, LLC*, 452 F. Supp. 2d 1272 (N.D. Ga. 2006) ..................................... 25

*Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405 (7th Cir. 2019)..................................... 44

*Laura v. Experian Info. Sols., Inc.*, No. 20-cv-01573, 2022 WL 823853 (N.D. Ill. Mar. 18, 2022) .................................................................................................................. 36

*Losch v. Nationstar Mortgage, LLC*, 995 F.3d 937 (11th Cir. 2021) ........................ 19, 20, 26, 34

*Lynch v. Experian Info. Sols., Inc.*, No. 20-cv-2535 (KMM/JFD), 2022 WL 16857078 (D. Minn. Nov. 10, 2022) ........................................................................................................ 36

*Matter of Equifax, Inc.*, 96 F.T.C. 844, 1980 WL 338977 (F.T.C. Dec. 15, 1980) ..................... 22

*McKeown v. Sears Roebuck & Co.*, 335 F. Supp. 2d 917 (W.D. Wis. 2004) ............................... 24

*Milbauer v. TRW, Inc.*, 707 F. Supp. 92 (E.D.N.Y. 1989)....................................................... 27

*Myers v. Equifax Info. Servs., LLC*, No. 1:20-cv-00392-JMS-DLP, 2022 WL 4292179 (S.D. Ind. Sept. 16, 2022) .................................................................................................... 30, 31

*Neclerio v. Trans Union, LLC*, 983 F. Supp. 2d 199 (D. Conn. 2013)......................................... 23

*Norman v. Trans Union, LLC*, 2023 WL 2903976, at *17 (E.D. Pa. Apr. 11, 2023)...................... 28

*Ostrowski v. Lake County*, Nos. 21-1674, 21-2580, 2022 U.S. App. LEXIS 12673 (7th Cir. May 11, 2022) .................................................................................................................. 14

*Perry v. Experian Info. Solutions, Inc.*, No. 05-1578, 2005 WL 2861078 (N.D. Ill. Oct. 28, 2005) .................................................................................................................. 30

*Peterson v. Experian Information Solutions, Inc.*, No. CV 20-606 (DSD/ECW), 2021 WL 3116073 (D. Minn. July 22, 2021)...................................................................................... 36

*Pfeffer v. Nat'l Credit Sys., Inc.*, 2017 WL 3600437 (S.D. Ohio Aug. 18, 2017) ....................... 28

*Philbin v. Trans Union Corp.*, 101 F.3d 957 (3d Cir.1996) ...................................................... 23

*Pinner v. Schmidt*, 805 F.2d 1258 (5th Cir. 1986).................................................................... 27

*Plotzker v. Equifax Info. Servs. LLC*, No. 19 C 4554, 2020 WL 1548956 (N.D. Ill. Apr. 1, 2020) ................................................................................................................ 15, 16

*Ricketson v. Experian Information Solutions, Inc.*, 266 F. Supp. 3d 1083 (W.D. Mich. 2017) .. 42, 43

*Rivera v. Equifax Info. Servs., LLC*, 341 F.R.D. 328 (N.D. Ga. 2022)........................................ 28

*Roybal v. Equifax*, 2008 WL 4532447 (E.D. Cal. Oct. 9, 2008) ............................................... 28

*Ruffin-Thompkins v. Experian Info. Sols., Inc.*, 422 F.3d 603 (7th Cir. 2005) ............................ 31

*Safeco Insurance Co. v. Burr*, 551 U.S. 47 (2007) ..................................................... 13, 14, 37, 42

*Salem v. Legal Liaison Serv.*, No. 16-cv-3927, 2019 WL 1057371 (N.D. Ill. Mar. 6, 2019). 14, 31

*Searcy v. eFunds Corp.*, No. 08 C 985, 2010 WL 3894165 (N.D. Ill. Sept. 30, 2010)............... 34

*Sessa v. Trans Union, LLC*, 74 F.4th 38 (2d Cir. 2023) ........................................................ 17, 18

*Shannon v. Equifax Information Services, LLC*, 764 F. Supp. 2d 714 (E.D. Pa. 2011) .............. 30

*Stevenson v. TRW Inc.*, 987 F.2d 288 (5th Cir. 1993)................................................................ 33

*Terri N. White v. Experian Information Solutions, Inc.*, No. 05-cv-1070 (C.D. Cal.)........ 8, 34, 35

*Twumasi-Ankrah v. Checkr, Inc.*, 954 F.3d 938 (6th Cir. 2020) ................................................. 13

*United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739 (2023)........................ 37, 38, 39, 40

*Warner v. Experian Information Solutions, Inc.*, 931 F.3d 917 (9th Cir. 2019)........................... 28

*Wright v. Experian Info. Sols. Inc.*, 805 F.3d 1232, 1239 (10th Cir. 2015).................................. 13

4

**Statutes**

15 U.S.C. § 1681 ................................................................................................ 6

15 U.S.C. § 1681(b) .......................................................................................... 12

15 U.S.C. § 1681e(b) ................................................................................. 12, 15

15 U.S.C. § 1681i ....................................................................................... 33, 41

15 U.S.C. § 1681i(a) .................................................................................. 13, 15

15 U.S.C. § 1681i(a)(1)(A) ............................................................................. 13

15 U.S.C. § 1681i(a)(5)(A) ............................................................................. 21

15 U.S.C. § 1681i(a)(5)(A)(i) ......................................................................... 26

42 U.S.C. § 3729(a)(1)(A) .............................................................................. 38

Pub. L. No. 104-208 § 2409 ........................................................................... 28

Pub. L. No. 91-508 § 611(a) ........................................................................... 28

Suppl. App. 219

Plaintiffs Craig and Brianna Dulworth ("Plaintiffs") oppose the Joint Motion for Summary Judgment filed by Defendants Equifax Information Services LLC and Experian Information Solutions, Inc. (ECF 180.) Because genuine issues of material fact exist as to each element on which Defendants move, the Court should decline to take this case away from the jury. The Court should therefore deny Defendants' Motion.

**OVERVIEW**

The summary judgment record shows that Plaintiffs disputed the erroneous reporting of a reaffirmed and never late automobile loan with two of the national consumer reporting agencies ("CRAs") in eight separate letters and were still unable to convince Equifax and Experian to correct their reporting. In response to Plaintiffs' disputes, Defendants doubled down on their mistakes by either completely ignoring the disputes, or by re-verifying the reaffirmed account as discharged in Plaintiffs' 2018 bankruptcy, despite information in both the public record and Defendants' own files contradicting their reporting. Despite their behavior in this case, the Defendants are sophisticated entities well aware of their obligations under the federal Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq*. ("FCRA").

Genuine issues of fact preclude the entry of summary judgment on Plaintiffs' claims for negligent and willful violations of the FCRA. Issues relating to the reasonableness of the Defendants' procedures for reporting reaffirmed loans post-bankruptcy discharge, and the investigations or lack thereof, into the inaccurate reporting, in addition to whether the Defendants acted willfully, are jury questions in the overwhelming number of cases. This case is not the exceptional case that would warrant the Court removing these questions from the jury's consideration.

## Factual Background

Plaintiffs are Indiana citizens who, on or about October 12, 2018, filed a joint bankruptcy under Chapter 7 of the bankruptcy code, case number 18-077856-JMC-7, in the Southern District of Indiana. ECF No. 194-1 (Ex. A - Plaintiffs' Bankruptcy Petition). Plaintiffs received a bankruptcy discharge on or about January 15, 2019. ECF No. 194-3 (Ex. B - Discharge Order). As part of the bankruptcy proceedings, Plaintiffs reaffirmed an automobile loan for a 2016 Kia Sedona with former Defendant Ally Financial/Ally Bank ("Ally") on or about December 20, 2018 in document twenty (20) of the bankruptcy. ECF No. 194-2 (Ex. B - Reaffirmation Agreement). In addition to being signed by the Plaintiffs, the reaffirmation agreement was signed by an Ally representative and was filed by Ally's counsel. Id. at 6. The reaffirmation agreement was timely filed under the Rules of Bankruptcy Procedure. Rule 4008(a).

At all relevant times Plaintiffs maintained current payments on the account. ECF No. 195-3 (Ex. S - Hays Depo) ¶ 69:17–70:7 (noting that the account was current and "paid in full"). Because of Plaintiffs excellent payment history and the reaffirmation of the Ally loan, the account should have been reported as "reaffirmed" in the Plaintiffs' bankruptcy with a positive payment history instead of discharged. The inaccuracy is material because by reporting the account as "included in bankruptcy" the Defendants are taking an account which should have been positive, and turned it into a negative account. See ECF No. 195-5 (Ex. U - Hamilton Depo) ¶23:20–24:5.

Approximately a year after their bankruptcy, Plaintiff Brianna Dulworth reviewed her credit reports because she and Mr. Dulworth were interested in buying a house. ECF No. 194-4 (Ex. D [Brianna Depo] ¶ 30:4–23). During this time, Ms. Dulworth discovered that Defendants Equifax and Experian reported the reaffirmed Ally loan as "included in bankruptcy." Id. ¶ 120:23–121:12). The reporting of the loan as "discharged" in bankruptcy is inaccurate as the loan should

Suppl. App. 221

have been reported as a current, timely-paid credit obligation and/or with a remark that the account was reaffirmed in bankruptcy.

Notwithstanding the maximum possible accuracy requirement Section 1681e(b),[1] Defendants reported the debt owed to Ally as discharged or included in bankruptcy after Plaintiffs reaffirmed the debt. *See e.g.*, ECF No. 194-10 (Ex. J - Craig Dulworth Sept. 2021 Dispute). Defendants' reporting the Ally loan as discharged or included in the Plaintiffs' bankruptcy is inaccurate. Plaintiffs set out to correct this misreporting first by contacting Ally, up to seven times, and requesting they correct the misreported loan information. ECF No. 194-4 (Ex. D [Brianna Depo] ¶ 121:13–122:16). After it became clear that continuing to dispute directly to Ally was futile, the Plaintiffs went to the CRA Defendant by each submitting dispute letters to Equifax and Experian on September 7 and November 1, 2021 (totaling eight disputes, four to Experian and

---

[1] Defendants repeatedly reference the Agreed Bankruptcy Coding procedures for reporting post-discharge credit information that came into being through the 2008 settlement of the case *Terri N. White v. Experian Information Solutions, Inc.*, No. 05-cv-1070 (C.D. Cal.) (the "*White* Settlement"). There the national CRAs agreed to a procedure for reporting post-discharge debts that predated the bankruptcy filing. The procedure for reporting pre-petition debt, after the entry of the bankruptcy discharge, as agreed to by the consumer reporting agencies, is generally outlined as follows:

a) Defendants would first identity all accounts in a consumer's credit file which is in a collections status, and not reported as a closed account, and has an opening date that pre-dates or is equal to, the date of the bankruptcy filing.

b) After identifying these accounts, Defendants would exclude certain accounts which must be reported pursuant to statute or policy (*e.g.*, family or child support obligations, government fines, etc.).

c) For the remaining collection accounts, Defendants would apply the Agreed Bankruptcy Coding procedure which includes reducing the balance to zero (or a blank balance) and including a status notation of "included in bankruptcy" on the account.

ECF No. 194-17 (Ex. V - *White* Settlement Order) at 18. This procedure was not applied in this case, for two reasons. First, Ally reported the account as included in bankruptcy and therefore this account was excluded from the post-bankruptcy scrub. Second, even if Ally had not reported the account as included in bankruptcy the CRAs still would not have applied the bankruptcy scrub procedures to the Ally account because it was in a positive (i.e., not delinquent) pay status at the time the bankruptcy was filed. Consequently, the procedures mandated to by the *White* settlement are completely inapposite for purposes of determining whether the reporting procedures here were reasonable.

Equifax each). *See generally*, ECF Nos. 194-6; 194-8; 194-10; 194-12 (Exs. F; H; J; L - Plt

Disputes to Equifax); ECF Nos. 194-7; 194-9; 194-11; 194-13 (Exs. G; I; K; M - Plt Disputes to

Experian).

To assist them with the dispute process, Plaintiffs retained the Kansas City based law firm

of Stecklein & Rapp Chartered. Ms. Dulworth testified that she was the one who noticed the

inaccuracies during her own review of her credit reports ECF No. 194-4 (Ex. D [Brianna Depo]

¶ 192:19–25); that she provided information to her attorneys to help them draft the dispute letters

*Id.* ¶ 110:3–7); that she reviewed the dispute letters for accuracy (*Id.* ¶ 110:8–13); that she signed

the dispute letters *Id.* ¶ 118:19–25).

Plaintiffs' disputes included personal identifying information for the Plaintiffs. *See e.g.*,

ECF No. 194-6 Ex. F (Brianna Dulworth Sept. Dispute to EFX). The disputes were also signed by

the Plaintiff. *Id.* at 8. The disputes also included a detailed description of the inaccurate Ally

account (*see id.* at 4–5), a copy of each Plaintiff's driver's license (*id.* at 9), and a copy of the

reaffirmation agreement. *Id.* at 10–15.

Of the four total disputes sent to Experian, none were investigated because Experian, by

its own admission, had categorized them as coming from an entity other than the consumers. ECF

No. 183-3 (Hamilton Declaration) ¶ 21–22. Experian did not contact the Plaintiffs at all as a result

of its decision to ignore their letters. ECF No. 194-16 (Ex. R - EXP responses to Plt Second RFA)

¶ 26. Experian's disposal of Plaintiffs' dispute letters was definitive in that Experian has no record

of ever receiving the disputes from the Plaintiffs. ECF No. 195-5 (Ex. U - Hamilton Depo)

¶ 42:16–43:17 (Q. "Experian has no record of receiving communication from the plaintiffs, either

plaintiff regarding the Ally account?" A. "Correct, yes."). However, it cannot be disputed that an

Experian mail room technician, James Swanson, signed for Plaintiffs' certified disputes,

evidencing that they were, at a minimum, received by Experian. *See id.* ¶ 52:1–13; ECF No. 194-15 (Ex. Q - Experian resp to Plt first RFA) ¶ 3 ("Experian admits that James Swanson was an employee of Experian Information Solutions, Inc. between August 1, 2021 and December 1, 2021").

Of the four total disputes sent to Equifax, three were received. One for Plaintiff Craig Dulworth, and two for Plaintiff Brianna Dulworth. ECF No. 194-14 (Ex. P - EFX Responses to Plt 1st IROGs) at 2. As part of its general investigation procedures for the three disputes which were received, Equifax did not contact its public records vendor, nonparty LexisNexis, which supplies it with general bankruptcy information. ECF No. 195-4 (Ex. T - Smith Depo) ¶ 25:6–20. Equifax also does not check PACER for the bankruptcy docket, which would have confirmed that the Dulworths' reaffirmation agreement was timely filed and valid. *Id.* ¶ 24:21–25:5. The only thing that Equifax does is send an ACDV to the furnisher, Ally Financial in this case, to confirm the accuracy of its own reporting.

The first Equifax investigation was Plaintiff Brianna Dulworth's September 2021 dispute. For this dispute, Equifax did not even do the one thing it says it supposed to do, which is send an ACDV to the furnisher to conduct its own investigation of the reporting. ECF No. 195-4 (Ex. T - Smith Depo) ¶ 32:25–34:6. Equifax explains this error away as the agent responsible for reading the dispute potentially "misinterpret[ing]" the document. *Id.* ¶ 33:7–16; *see also* ECF No. 183-2 (Cobb Declaration) ¶ 57–59.

Plaintiff Craig Dulworth's September 2021 dispute was better interpreted. For this dispute, Equifax prepared an ACDV and sent it to Ally Financial, who verified that the account should be reporting as "included in bankruptcy." ECF No. 195-4 (Ex. T - Smith Depo) ¶ 43:6–13; see also ECF No. 195-1 (Ex. N - October 11 ACDV). This same ACDV also informed Equifax that the

account had a balance, was not past due, and had an account status of "11" meaning "current account" meaning that it was not in a delinquent status. *Id.* at 1. Without taking any other investigatory steps, Equifax informed Plaintiff Craig Dulworth that the inaccurate reporting would remain on his credit reports. ECF No. 195-4 (Ex. T - Smith Depo) ¶¶ 39:10–16; 52:1–7.

Equifax's investigation into Plaintiff Brianna Dulworth's November 2021 dispute proceeded exactly as had Plaintiff Craig Dulworth's September 2021 dispute. Equifax created and sent an ACDV to Ally Financial, who received the ACDV and responded that the account should continue to report as included in bankruptcy. ECF No. 195-2 (Ex. O - December 11, 2021 ACDV). Equifax informed Plaintiff Brianna Dulworth of that result. ECF No. 195-4 (Ex. T - Smith Depo) ¶ 72:14–19. Equifax did not take any additional steps to investigate Plaintiff Brianna Dulworth's November dispute, even after receiving and completing its investigation of Plaintiff Craig Dulworth's September dispute. *Id.* ¶ 63:19–65:4.

The effect of being informed that their meritorious disputes as to the misreporting of the Ally loan were rejected caused the Dulworths significant distress. Ms. Dulworth testified that she suffers "high blood pressure and anxiety," "sadness and depression," and that she spoke with her medical doctor regarding the "overwhelming stress" in her life. ECF No. 194-4 (Ex. D - Brianna Depo) ¶ 240:22–242:15. These problems were compounded by the repeated failure to correct the inaccurate reporting of the reaffirmed Ally Loan in that Ms. Dulworth testified that she was frustrated with the dispute process with Experian and Equifax, and that the process was "exhausting." *Id.* ¶ 127:4–15. Mr. Craig Dulworth testified that his distress stems from "us trying to fix things, it never happened, so its very frustrating." ECF No. 194-5 (Ex. E - May 9 Craig Depo) ¶ 135:23–136:9. He testified to feeling helpless that "no one" would help with correcting the misreporting. *Id.*

As a final attempt to correct the misreporting of the reaffirmed Ally loan, Plaintiffs filed suit in the Johnson Superior Court on February 1, 2022. ECF No. 1-1. This case was removed to this Court by Defendant Experian on March 10, 2022. ECF No. 1.

<strong>LEGAL FRAMEWORK</strong>

## I.      The FCRA Provisions At Issue.

Plaintiffs allege that Defendants acted with reckless disregard of their statutory duties by allowing the inaccurate reporting to appear on their consumer reports in violation of 15 U.S.C. § 1681e(b). Plaintiffs further allege that Defendants acted with reckless disregard of their statutory duties by failing to conduct reasonable investigations into Plaintiffs' disputes of the inaccurate reporting. Plaintiffs allege that Defendants' failure to correct the misreporting after notice and Plaintiffs' disputes violates Section 1681i of the FCRA.

The FCRA was enacted to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681(b). Section 1681e(b) provides, "[w]henever a consumer reporting agency prepares a consumer credit report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

"The threshold question in a § 1681e(b) action is whether the challenged information is inaccurate." *Houston v. TRW Info. Servs., Inc.*, 707 F. Supp. 689, 691 (S.D.N.Y. 1989). An allegation of an actual inaccuracy is one that challenges the factual accuracy of the information provided by a furnisher to a CRA. *See Grigoryan v. Experian Info. Sols. Inc.*, 84 F. Supp. 3d 1044 (C.D. Cal. 2014). "[T]he distinction between 'accuracy' and 'maximum possible accuracy' is . . .

12

quite dramatic." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 709 (3d Cir. 2010). The use of the phrase "maximum possible accuracy" thus "suggests that Congress wanted to hold CRAs to a higher standard than mere technical accuracy." *Twumasi-Ankrah v. Checkr, Inc*., 954 F.3d 938, 942 (6th Cir. 2020).

15 U.S.C. § 1681i(a) requires that, when a consumer notifies a CRA of a dispute regarding "the completeness or accuracy of any item of information contained in the consumer's file," the CRA must "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate." *Edeh v. Midland Credit Mgmt*., 748 F. Supp. 2d 1030, 1039 (D. Minn. 2010); 15 U.S.C. § 1681i(a)(1)(A). A claim for violations of § 1681i requires that; (1) the consumer disputes to the consumer reporting agency of an; (2) inaccuracy in their; (3) consumer report, and the consumer reporting agency; (4) failed to follow reasonable procedures for reinvestigating the consumer's dispute about their report. *Wright v. Experian Info. Sols. Inc*., 805 F.3d 1232, 1239 (10th Cir. 2015); *Cushman v. Trans Union Corp*., 115 F.3d 220, 225 (3d Cir. 1997). "Courts have consistently held a reasonable investigation requires more than 'making only a cursory investigation into the reliability of information that is reported to potential creditors.'" *Wright*, 805 F.3d at 1242 (citing *Cortez*, 617 F.3d at 712–13)).

Here, Plaintiffs bring claims for both negligent and willful violations of the FCRA. "To willfully violate the FCRA, a company must do so recklessly." *Buckley v. Afni, Inc*., 133 F. Supp. 3d 1140, 1147 (S.D. Ind. 2016) (citing *Safeco Insurance Co. v. Burr*, 551 U.S. 47, 69 (2007)). "A company does not act in reckless disregard of the FCRA, however, unless the action it takes is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was

merely careless." *Jackson v. Experian Info. Sols., Inc*., 236 F. Supp. 3d 1058, 1065 (N.D. Ill. 2017) (quoting *Safeco*, 551 U.S. 47, 69 (2007)).

## II.     Summary Judgment Standards.

"Summary judgment is warranted when there are no genuine disputes of material fact between the parties and no reasonable factfinder could find for the non-movant on an essential element on which it bears the burden of proof at trial." *Ostrowski v. Lake County*, Nos. 21-1674, 21-2580, 2022 U.S. App. LEXIS 12673, at *8 (7th Cir. May 11, 2022) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The burden to make such a showing is on the movant. *Kester v. Menard, Inc*., No. 3:20-cv-50289, 2021 U.S. Dist. LEXIS 235824, at *3-4 (N.D. Ill. Dec. 9, 2021). "Material facts are those that might affect the outcome of the suit." *Id*. (quoting *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 248 (1986)). "The Court must construe the 'evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made.'"). *Id*. (quoting *Rickher v. Home Depot, Inc*., 535 F.3d 661, 664 (7th Cir. 2008)). "'Summary judgment is only warranted if, after doing so, [the court] determine[s] that no jury could reasonably find in the nonmoving party's favor.'" *Id*. (quoting *Blasius v. Angel Auto, Inc*., 839 F.3d 639, 644 (7th Cir. 2016)). Defendants fail to meet their burden.

ARGUMENT AND AUTHORITIES

## I.     Genuine Issues Of Material Fact Exist As To The Accuracy Of Defendants' Reporting Of The Account.

### A.     The Phantom Distinction Between Legal And Factual Questions Does Not Absolve Defendants Of Their FCRA Duties.

Claims under Section 1681e(b) and 1681i both have accuracy components. *Salem v. Legal Liaison Serv.*, No. 16-cv-3927, 2019 WL 1057371, at *3 (N.D. Ill. Mar. 6, 2019). A report can be inaccurate if it is patently false, or misleading such that it can be expected to adversely impact

14

credit decisions. *Plotzker v. Equifax Info. Servs. LLC*, No. 19 C 4554, 2020 WL 1548956, at *3 (N.D. Ill. Apr. 1, 2020). Defendants' centerpiece argument on accuracy is that whether the affirmation agreement between Plaintiffs and Ally is valid and should result in reporting the Account differently than Ally indicated is a legal dispute into which CRAs cannot wade. (ECF 186 at 16–18.) Defendants cling to this argument, pretending they are not able to arrive at such supposed legal conclusions, despite the fact that they did just that—again and again—by reporting the Account as included or discharged in bankruptcy. That reporting is the epitome of a legal conclusion, *In re Helmes*, 336 B.R. 105, 107 (Bankr. E.D. Va. 2005), which Defendants make every day in their regular reporting processes. Defendants accept and repeat such conclusions from furnishers like Ally as though it were gospel truth and despite the fact that bankruptcy filings and Defendants' own records show otherwise. So Defendants make and report legal conclusions constantly when it suits them, but when they are sued they and want to avoid liability retreat to the legal/factual distinction that has some traction in courts, but no basis whatsoever in the statute. *See* 15 U.S.C. §§ 1681e(b), 1681i; *see also Gross v. CitiMortgage, Inc.*, 33 F.4th 1246, 1253 (9th Cir. 2022) ("The distinction between 'legal' and 'factual' issues is ambiguous, potentially unworkable, and could invite furnishers to 'evade their investigation obligation by construing the relevant dispute as a 'legal' one.'").

There is however, an additional problem for Defendants that does not depend on the legal versus factual distinction. Defendants could have included within Plaintiffs' credit reports a notation that they were making payments pursuant to an agreement even if Defendants had doubts about its validity. Defendants possessed the Agreement, as Plaintiffs submitted it with their disputes. *See generally*, ECF Nos. 194-6; 194-8; 194-10; 194-12 (Exs. F; H; J; L Plt Disputes to Equifax); ECF Nos. 194-7; 194-9; 194-11; 194-13 (Exs. G; I; K; M Plt Disputes to EXP).  As

Experian is aware, the Seventh Circuit recently considered this precise issue in *Chaitoff v. Experian Information Solutions, Inc.*, 79 F.4th 800 (7th Cir. 2023). In that case, the plaintiff fell into financial difficulties, and signed an agreement with his mortgage company to stave-off foreclosure called a Trial Period Plan, or TPP. *Id.* at 808. Chaitoff's credit reports, however, did not reflect the payments made pursuant to the agreement—they stated his account was delinquent. *Id.* Chaitoff disputed the reporting with Experian, and when it did not correct the reporting, he sued, like Plaintiffs, under Sections 1681e(b) and 1681i of the FCRA. *Id.* at 810–11.

Experian moved for summary judgment and argued, as here, its reporting was accurate because "the existence and effect of Chaitoff's TPP were both legal questions beyond its competency to resolve" but, even if the reporting was inaccurate, its reporting and investigation procedures were reasonable as a matter of law. *Id.* The district court granted the motion, agreeing that Chaitoff's complaint was the legal accuracy of his loan modification, not the factual accuracy of it. *Id.* at 811. The court alternatively agreed that the reporting and dispute procedures were reasonable regardless of the accuracy of the reporting. *Id.*

The Seventh Circuit reversed that decision. It concluded that Experian's failure to mention the TPP in Chaitoff's credit reports was a material omission, rendering the reporting short of the "maximum possible accuracy" standard imposed by Section 1681e(b) of the FCRA. *Id.* at 813–14. As the court put it: "The debtor without the TPP has no evidence that she can make timely and complete payments, but the debtor who completed the TPP does." *Id.* It added a remark from the Sixth Circuit, which noted "[r]eporting that a consumer 'was delinquent on his loan payments without reporting the TPP implies a much greater degree of financial irresponsibility.'" *Id.* (quoting *Pittman v. Experian Info. Sols.*, 901 F.3d 619, 639 (6th Cir. 2018)); *see Plotzker*, 2020 WL 1548956, at *3 (noting that a report can be inaccurate if it is misleading in a way that would

16

Suppl. App. 230

adversely impact credit decisions). The court further explained, in discussing Experian's (and also

Defendants' here) foundational argument that such reporting involved a legal dispute it could not

resolve:

> Whether Chaitoff's TPP existed is a factual question because Experian was not
> asked to apply law to facts. Nothing in Chaitoff's complaint can be read to
> collaterally attack his Ocwen mortgage. Rather, Chaitoff asked that his credit report
> reflect his TPP, something well within Experian's capabilities. It is, after all, a
> credit reporting agency. Nothing about Chaitoff's alleged inaccuracy required
> Experian to investigate beyond the face of the documents it was provided. *Henson*
> [*v. CSC Credit Services*, 29 F.3d 280 (7th Cir. 1994)] held that CRAs act reasonably
> when they rely on legal documents of unquestioned authenticity. *Chuluunbat* [v.
> *Experian Information Solutions*, 4 F.4th 562 (7th Cir. 2021)] recognized the flip
> side of the rule: a CRA might be liable if it ignores or overlooks documents of
> unquestioned authenticity, even if they relate to a legal dispute. Such is the case
> here. The existence of Chaitoff's TPP was a factual—not legal—dispute, and the
> district court was wrong to conclude otherwise.

*Id.* at 815.

Little is different here. First, it cannot be definitively said that Plaintiffs present a purely

legal issue in their inaccuracy disputes. Courts regularly recognize that the quintessential "legal

dispute is when a consumer argues that although his debt exists and is reported in the right amount,

it is invalid due to a violation of law.'" *Id.* (quoting *Chuluunbat*, 4 F.4th at 567). Or, more simply,

"legal disputes amount to collateral attacks on the disputed debt." *Id.* Nothing like that is happening

here. In fact, this case presents the opposite scenario—Plaintiffs claim that they *do* owe the debt,

yet Defendants are reporting that fact inaccurately. Plaintiffs are not collaterally attacking

anything.

Other decisions have poked further holes into the legal-versus-factual-question debate. In

*Sessa v. Trans Union, LLC*, 74 F.4th 38 (2d Cir. 2023), a dispute about whether a CRA accurately

reported as a debt a balloon-payment option at the end of a vehicle lease where no such payment

was truly due, saw the Second Circuit again reverse a summary judgment for the CRA. *Id.* at 40.

The court held "there is no bright-line rule providing, as the District Court concluded, that only purely factual or transcription errors are actionable under the FCRA." *Id.* at 43. Instead, the court reasoned:

> The question of whether a debt is objectively and readily verifiable will <u>sometimes</u>, as it did in <u>Mader</u>, involve an inquiry into whether the debt is the subject of a legal dispute. There, the issue of whether Mader's debt had been discharged presented an "unresolved legal question" under bankruptcy law, which "render[ed] his claim non-cognizable under the FCRA." <u>Id.</u> at 270. But that does not mean that any dispute that might arguably turn on a question of law is non-cognizable under the FCRA. As the <u>Mader</u> Court explained, CRAs may be "required by the FCRA to accurately report information derived from the readily verifiable and straightforward application of law to facts."

*Id.* (emphasis in original). Thus, the question in *Sessa*, like here, has nothing to do with the legal import of the balloon payment or lease terms, just whether the balloon payment existed. Since it did not, the CRA could have easily figured that out without needing to resort to any application of law to facts.

So too here. Defendants did not have to concern themselves with the validity of the reaffirmation agreement, only whether it existed. It did. When Defendants learned that, the FCRA obligated them to do something about what they were reporting so that it was maximally accurate. Noting on Plaintiffs' credit files that the reaffirmation agreement existed and Plaintiffs were making payments pursuant to it required almost no effort by Defendants, and would have given them cover in the case of a lawsuit like this one. Rather than make any meaningful change, Defendants acted as if Ally's interpretation of what happened to the debt in bankruptcy deserved more weight than Plaintiffs'. And they did that despite having other, verifiable and objective evidence that Plaintiffs were making payments as if the agreement existed. <u>ECF No. 195-3 (Ex. S - Hays Depo) ¶ 69:17–70:7</u> (noting that the account was current and "paid in full"); <u>ECF No. 195-1 (Ex. N – October 2021 ACDV)</u> (noting that the account status was "current" with no past due

amounts). Defendants' conclusion is based at best on conflicting information, and *Chaitoff* confirms it is inappropriate for Defendants to have reacted as they did.

Another case in which Experian was a party and raised this same defense, *Losch v. Nationstar Mortgage, LLC*, 995 F.3d 937 (11th Cir. 2021), further supports a denial of Defendants' Motion. *Losch* involved the opposite of what is present here—the consumer claimed that he entered into a reaffirmation agreement relating to a debt in bankruptcy, but then withdrew that agreement. *Id.* at 941. Experian continued to report the debt as past due, and Losch disputed and explained that he had "rescinded the reaffirmation in 2018 and the court approved that so [he] no longer own this debt." *Id.* Experian would not correct the inaccuracy, relying just on the furnisher's responses to the ACDVs Experian sent. *Id.* Losch then sued Experian and the furnisher, asserting the same FCRA claims—Sections 1681e(b) and 1681i—against Experian as Plaintiffs do here. *Id.* The district court granted summary judgment to Experian, holding that all Experian had to do was notify the furnisher of the consumers' disputes, which Experian did; Losch did not provide Experian with enough information for it to decide the disputes his way; and Losch's theory of liability would require CRAs to review and determine the legal effect of court orders and documents. *Id.* at 941–42.

The Eleventh Circuit reversed, finding that Experian's reliance on just the answer of its furnisher, without "conduct[ing] *any* independent investigation" was not reasonable as a matter of law. *Id.* at 946–47 (emphasis in original). All Experian would have to do was consult the bankruptcy docket to confirm whether Losch indeed withdrew the reaffirmation agreement, yet it did not do that despite Losch's detailed disputes showing what Experian would need to investigate. *Id.* Experian argued in *Losch* that his bankruptcy was "confusing and unusual," and it could not reach the right conclusion after consulting the docket. *Id.* at 946. Here, it takes the opposite

approach, arguing it does not have to do anything regarding the docket, as what Ally provides is enough to insulate it from liability. Wrong, again.

The *Losch* court also discussed *Collins v. Experian Information Solutions, Inc.*, 775 F.3d 1330 (11th Cir. 2015), and *Dennis v. BEH-1, LLC*, 520 F.3d 1066 (9th Cir. 2008), two cases that supported its decision. *Collins* likewise involved a case in which Experian relied solely on the furnisher for its investigation, circumstances the district and circuit found to create an issue of fact as to the reasonableness of Experian's decision to disregard the information the plaintiff provided in favor of the verification of its furnisher. *Losch*, 995. F.3d at 946.

The court characterized *Dennis* as "similar," as it involved Experian reporting on the plaintiff's credit that a judgment had been entered against him where, in fact, the case had been dismissed. *Id.* Experian again did nothing to investigate, relying instead on a third-party vendor for that. The vendor did not correct the information, but instead confirmed it. *Id.* The Ninth Circuit found reasonableness to be a jury question, as a simple check of the bankruptcy docket would have confirmed Experian's and the vendor's mistake. *Id.* Aligning *Losch* with *Dennis*, the court noted that Experian could not have known what it would have found in the bankruptcy docket without looking there based on what Losch provided. Yet it did not, dooming its request for summary judgment as to reasonableness. *Id.*

This case presents the same scenario—Defendants want the Court to conclude that relying on the furnisher was reasonable as a matter of law when Defendants knew they had conflicting information about the Ally account and might have resolved the confusion by checking the bankruptcy docket. Defendants did not do that, or anything else, relying solely on Ally instead. The Court should conclude that these are not the facts to grant summary judgment to Defendants.

Suppl. App. 234

Second, and more to the point, Plaintiffs' disputes did not require Defendants to decide if the reaffirmation agreement was valid. After all, the FCRA does not necessarily require Defendants to take that step in investigating a dispute and the information from the consumer and the furnisher conflicts. Instead, Section 1681i demands Defendants take other steps when they cannot verify information:

> (i) promptly *delete that item of information* from the file of the consumer, or *modify that item of information*, as appropriate, based on the results of the reinvestigation; and

> (ii) promptly notify the furnisher of that information that the information has been modified or deleted from the file of the consumer.

15 U.S.C. § 1681i(a)(5)(A) (emphasis added). In other words, if Defendants cannot figure out whether the reaffirmation agreement is valid, they cannot simply soldier on—they have to modify the reporting or delete it. Here, Defendants did neither, despite acknowledging their inability to determine who was right—Plaintiffs or Ally. The FCRA, however, does not contain a provision that applies to "ties"—the CRA must continue to meet the maximum-possible-accuracy demand. Modification of the Ally account in Plaintiff's credit file would at least have brought the reporting in line with *Chaitoff*, a case Experian knows about because the same Counsel represents it here as did there, yet Experian seems to have not taken anything from that holding. But modification is not all Defendants could have, or should have, done. They could have rightly deleted the account as an alternative. 15 U.S.C. § 1681(a)(5)(A); *Hines v. Equifax Info. Servs., LLC*, No. 19-cv-6701 (RPK) (RER), 2022 WL 2841909, at *21 (E.D.N.Y. July 16, 2022) ("If disputed information is found to be inaccurate or incomplete, or if it cannot be verified pursuant to a reinvestigation, it must be deleted from the consumer's credit report."). Doing nothing does not meet the FCRA's accuracy requirement or reasonable-investigation demand. Defendants are therefore not entitled to summary judgment on the accuracy element of either claim.

Suppl. App. 235

**B.      Defendants Also Cannot Rely On The "Bankruptcy Is Hard" Defense As A Reason To Habitually Violate The FCRA.**

There is no requirement in the FCRA that anyone—creditors, the credit bureaus, or courts—engage in credit reporting. Defendants earn billions every year trading information about consumers that the consumers have no hand in providing or controlling. Yet, they pepper their brief with complaints of "the legal and factual complexity inherent in consumer bankruptcies," "the FCRA and legal precedent does not require the CRAs to determine the validity of a complex legal documents such as reaffirmation agreement in a bankruptcy proceeding," and "determining whether there is an enforceable contract between a furnisher and a consumer turns on complex questions of bankruptcy law that far 'exceed[ ] the competencies of consumer reporting agencies.'" (ECF 186 at 5, 10 n.5, 18.) Perhaps if this area of law is so complex and difficult, Defendants should stop including it in the reports they make so much money selling.

The rigor required of a CRA by § 1681e(b) is well-recognized. As the Federal Trade Commission ("FTC") long ago explained, the "provision require[s] reporting agencies to do whatever is reasonable under the circumstances to minimize the chances that consumers will be harmed by inaccurate reporting." *Matter of Equifax, Inc*., 96 F.T.C. 844, 1980 WL 338977, at *142 (F.T.C. Dec. 15, 1980). "If an agency employs a procedure which does not offer the best assurance of producing the most accurate reports, it ought to have a strong justification for doing so." *Id.* More recently, yet still long enough ago for Experian to have changed its procedures, another court reiterated those duties, explaining,

> In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth, as they apply to this case, in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A). Section 1681e(b) sets forth the CRAs' overall duly:

(b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

*Burke v. Experian Info. Sols., Inc*., No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011). The most-significant import of these instructions is that Defendants are statutorily obligated to get things right. If they cannot, they should stop reporting this difficult category of information so they can otherwise meet the maximum possible accuracy standard the FCRA imposes.

## II.   Genuine Issues of Material Fact Preclude Entry of Summary Judgment on the Issues of Whether the Plaintiffs Suffered Actual Damages.

"In order to survive a summary judgment motion on a claim of negligent violation of the FCRA, a plaintiff must provide some evidence from which a reasonable fact-finder could conclude that she suffered actual damages as a result of the defendant's actions." *Neclerio v. Trans Union, LLC*, 983 F. Supp. 2d 199, 208 (D. Conn. 2013); *see also Hurocy v. Direct Merchants Credit Card Bank, N.A.*, 371 F.Supp.2d 1058, 1061 (E.D. Mo. 2005) ("Actual damages under the FCRA may include damages for humiliation or mental distress, even if the consumer has suffered no out-of-pocket losses, as well as damages for injury to reputation and creditworthiness."). That the Dulworths have suffered "actual damages" is an essential element of their claim for negligent violations of FCRA. *Bruan v. Client Servs., Inc*., 14 F. Supp. 3d 391, 397–98 (S.D.N.Y. 2014) (collecting cases holding that actual damages are a necessary element to a claim for negligent violation of the FCRA).

A long, unbroken line of courts recognize that emotional distress and mental anguish are actual damages and the Dulworths are not required to have sought medical assistance to prove these types of damages. *See Philbin v. Trans Union Corp*., 101 F.3d 957, 963 n.3 (3d Cir.1996)

("Given the amorphous nature of the damages at issue, we do not consider it necessary that [the plaintiff] state his damages with any greater degree of particularity."); *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 474 (2d Cir. 1995) ("[T]he District Court properly recognized that 'actual damages' may include humiliation and mental distress, even in the absence of out-of-pocket expenses.").

Plaintiff Brianna Dulworth has testified extensively as to the emotional distress she suffered and that she observed her husband suffering as a result of the credit reporting inaccuracies, and the Defendants' failure to correct the inaccuracy after dispute. Specifically, Mrs. Dulworth testified that she suffers "high blood pressure and anxiety," "sadness and depression," and that she spoke with her medical doctor regarding the "overwhelming stress" in her life. ECF No. 194-4 (Ex. D - Brianna Depo) ¶ 240:22–242:15. Mrs. Dulworth testified that she was frustrated with the dispute process with Experian and Equifax, and that the process was "exhausting." *Id*. ¶ 127:4–15.

For his part, Mr. Dulworth testified that his distress stems from "us trying to fix things, it never happened, so it's very frustrating." ECF No. 194-5 (Ex. E - May 9 Craig Depo) ¶ 135:23–136:9. He testified to feeling helpless that "no one" would help with correcting the misreporting. *Id.* That the misreporting of Plaintiffs' reaffirmation with Ally continued dispute multiple disputes and opportunities for the Defendants to correct the error, is a classic case of emotional distress. "A consumer may suffer distress if he has difficulty in correcting his credit history or trouble managing his finances until his history is corrected; this is true regardless whether his erroneous information was actually published to a third party." *McKeown v. Sears Roebuck & Co*., 335 F. Supp. 2d 917, 933 (W.D. Wis. 2004) ("Other courts have routinely assumed or suggested that emotional distress damages are available when a party experiences a significant frustration and anxiety brought on by failed attempts to have the errors corrected.").

Thus, the Dulworths have presented sufficient evidence of actual damages to present their claims for negligent violations of the FCRA to the jury. *See King v. Asset Acceptance, LLC*, 452 F. Supp. 2d 1272, 1281 (N.D. Ga. 2006) ("Plaintiff claims to have suffered emotional distress damages, including embarrassment, frustration, and irritability as a result of Defendant's violations of the FCRA. Plaintiff has provided his testimony in support of his allegations. Based on this evidence, the Court cannot say, as a matter of law, that Plaintiff is not entitled to recover damages for emotional distress"). Summary judgment on this issue is therefore improper.

**III.   Genuine Issues Of Material Fact Exist As To The Reasonableness Of Defendants' Investigations Of Plaintiffs' Disputes.**

Defendants' factual recitation and arguments claim they were unable to, and should not be required to, decide whether the Account was included in or discharged by Plaintiffs' bankruptcy or reaffirmed through the agreement with Ally. (ECF 186 at 17–18.) As Defendants put it:

> Plaintiffs' claims present legal issues related to the validity of their reaffirmation agreement with Ally that are not suitable for resolution by Defendants. The only two parties to the reaffirmation agreement at issue in this case are Plaintiffs and Ally, *and the record evidence shows that they disagreed as to whether the debt was discharged*. Plaintiffs claim that the debt was not discharged, but Ally verified the debt as reporting accurately, including after this litigation was filed.

(*Id.* at 18 (emphasis added, citations omitted).) Rather than take Plaintiffs' word as to the validity of the reporting of the Account, which was supported by their detailed disputes (*see e.g.*, ECF Nos. 194-6; 194-8; 194-10; 194-12 (Exs. F; H; J; L Plt Disputes to Equifax)) and Defendants' records that Plaintiffs continued to pay on the account even after the supposed discharge (ECF No. 195-3 (Ex. S - Hays Depo) ¶ 69:17–70:7 (noting that the account was current and "paid in full"), Defendants took Ally's side. But since there is no "tie goes to the furnisher" provision in the FCRA, unless Defendants' own Section 1681i investigations—not Ally's supposed investigation that it must independently undertake under Section 1681s-2(b)—verified that the account was

Suppl. App. 239

included in or discharged in Plaintiffs' bankruptcy, Defendants were required by the FCRA to "promptly delete" it. 15 U.S.C. § 1681i(a)(5)(A)(i). Yet, despite their supposed utter inability to determine which party was correct, Defendants went with their paying customer, Ally. The reasonableness of that conduct must go to the jury. *Losch*, 995 F.3d at 937 (finding genuine issues of material fact as to Experian's reliance on furnisher in dispute over reporting of account extinguished in bankruptcy, noting Experian "did nothing, although it easily could have done *something* with the information that [plaintiff] provided") (emphasis in original); *Collins*, 775 F.3d at 1333 (11th Cir. 2015) (denying summary judgment because "an issue of material fact remained as to whether Experian's investigation was reasonable when it disregarded the . . . information [plaintiff] provided and instead relied solely on [the furnisher] to verify the debt"); *see Chaitoff*, 79 F.4th at 818 (discussing *Collins* and *Losch*, and citing their holdings favorably).

While the term "verify" is defined as "to establish the truth, accuracy, or reality of," and "to confirm or substantiate in law by oath,"[2] Defendants did nothing close to this. Instead, as they readily admit, Equifax just transmitted Plaintiffs' disputes to Ally and waited to see what Ally said in return (ECF 186 at 9–11), and Experian did nothing at all (*id.* at 11–13). Both scenarios confirm that fact issues exist as to the reasonableness of this conduct. This is particularly true in light of the Seventh Circuit's long-held belief that reasonableness is a question for the jury in the majority of cases. *Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 664 (7th Cir. 2001) ("The determination of the 'reasonableness' of the defendant's procedures, like other questions concerning the application of a legal standard to given facts (notably negligence, a failure to exercise reasonable care), is treated as a factual question even when the underlying facts are undisputed. It therefore cannot be resolved on summary judgment unless the reasonableness or unreasonableness of the

---

[2] https://www.merriam-webster.com/dictionary/verify.

procedures is beyond question . . . ."); *Alley v. First Am. Credco, Inc.*, No. 05 C 2130, 2007 WL 188036, at *5 (N.D. Ill. Jan. 19, 2007) (declining to award summary judgment because of fact questions as to reasonableness).

### A. Experian Conducted No Investigations At All Because It Improperly Decided—With No Real Evidence—That Plaintiffs' Disputes Did Not Come From Them.

Experian takes the cavalier position that it did not need to do anything with Plaintiffs' disputes because they came from Plaintiffs' Counsel, which Experian claims—with no genuine basis in fact—is a "credit repair organization." (ECF 186 at 27.) That being supposedly true, the argument goes, the disputes did not come "directly" from Plaintiffs, so Experian's Section 1681i investigation obligation was never triggered. (*Id.* at 27–29.) Experian therefore did not investigate those disputes as required by Section 1681i. While Experian's arguments focus on what Experian thinks it knows about the similarity among letters and the processor used to actually mail them, there is much more to the analysis of whether a dispute came "directly" from a consumer than the one in which Experian engages.

For the first quarter century after Congress enacted the FCRA, courts regularly, and logically, recognized that consumers' credit-reporting disputes are often crafted with the help of counsel. *See Pinner v. Schmidt*, 805 F.2d 1258, 1262 (5th Cir. 1986) ("Once [the credit reporting agency] received notice of the dispute . . . from [the plaintiff's] attorney[,] it was obligated to re-verify the accuracy of the delinquent entry."); *Milbauer v. TRW, Inc.*, 707 F. Supp. 92, 94–95 (E.D.N.Y. 1989) (credit-reporting agencies "are not privileged to ignore a consumer's dispute simply because" it was submitted by a consumer's attorney); *Cisneros v. U.D. Registry, Inc.*, 39 Cal. App. 4th 548, 573 n.12 (1995) ("[A] representative working on behalf of the consumer can convey the consumer's position on disputed information and the requirements of response and

Suppl. App. 241

reinvestigation [under the FCRA] apply."). While Congress changed the language of this portion of the FCRA, from the FCRA's original requirement that a credit-reporting agency conduct a reinvestigation of disputed information if "such dispute is directly conveyed to the consumer reporting agency by the consumer," Pub. L. No. 91-508 § 611(a), to amended language providing that a reinvestigation must take place if "the consumer notifies the agency directly of such dispute," Pub. L. No. 104-208 § 2409. This alteration is at most stylistic, as it cannot be read to meaningfully change a CRA's obligation to investigate a dispute based on its origin.

Even since the changes to the FCRA, courts have approached the "directly" modifier as they did before—assistance from a lawyer, family member, or even a credit-repair organization does not eliminate a CRA's reinvestigation obligations. *Norman v. Trans Union, LLC*, 2023 WL 2903976, at *17 (E.D. Pa. Apr. 11, 2023); *Rivera v. Equifax Info. Servs., LLC*, 341 F.R.D. 328, 347 (N.D. Ga. 2022); *Henry v. Freedom Mortg. Corp*., 2020 WL 8921079, at *4 (D. Ariz. Apr. 27, 2020); *Cohen v. Equifax Info. Servs*., 2019 WL 5200759, at *6 (S.D.N.Y. Sept. 13, 2019); *Pfeffer v. Nat'l Credit Sys., Inc*., 2017 WL 3600437, at *6 n.1 (S.D. Ohio Aug. 18, 2017); *Roybal v. Equifax*, 2008 WL 4532447, at *6 n.6 (E.D. Cal. Oct. 9, 2008); *cf. Warner*, 931 F.3d at 921. Experian hopes for a different result here, but has little to support it.

The fundamental problem with Experian's approach is that it makes a decision—that a dispute did not directly come from a consumer—without knowing anything specific about the consumer's role in the submission of the dispute. And that is everything, as even Experian's cited case, *Warner v. Experian Information Solutions, Inc*., 931 F.3d 917, 921 (9th Cir. 2019), confirms by its statement that the Section 1681i dispute obligation is not triggered only where the consumer plays *almost no role* in the dispute process. (ECF 186 at 28.) Here, by contrast, Plaintiffs were meaningfully involved in the creation of their disputes and directed their Counsel to submit them

Suppl. App. 242

to the CRAs. <u>ECF No. 194-4 (Ex. D [Brianna Depo] ¶ 115:16–116:10)</u> ("I gave them information. They communicated often. We did paperwork together. I signed. They sent.").

What is more, Experian did not learn anything that could rationally support its decision about Plaintiffs' disputes until it took Plaintiffs' depositions after they sued. It can therefore say little about the propriety of the conclusion that the disputes came from a credit repair organization, as not only was it wrong at the time Experian made it, and it remains wrong even after Experian had the chance to ask Plaintiffs about it.

In sum, genuine issues of material fact exist as to whether Experian reasonably investigated Plaintiffs' disputes. The Court should therefore deny summary judgment on this claim.

### B. Equifax Has Not Shown Its Investigations Were Reasonable As A Matter Of Law Because All Equifax Did Was Transmit The Disputes To Ally And Wait For Ally's Response.

#### 1. Regardless of what Ally was telling Defendants, they have their own FCRA obligations to investigate and verify information.

Nothing in the FCRA permits CRAs to shirk their investigation responsibilities in favor of simply regurgitating what a furnisher tells the CRA about an account. Here, rather than take Plaintiffs' word as to the validity of the reporting of the Account, which was supported by their detailed disputes and Defendants' records that Plaintiffs continued to pay on the account even after the supposed discharge (<u>ECF No. 195-3 (Ex. S - Hays Depo) ¶ 69:17–70:7</u>), Defendants took Ally's. That approach was improper as explained above and highlighted by *Losch*, *Dennis*, and *Collins*, but there is yet more to address.

While the term "verify" has legal heft and is meaningful in the FCRA context, Equifax readily admits that it just transmitted Plaintiffs' disputes to Ally and waited to see what Ally said in return (ECF 186 at 9–11), and Experian did nothing as discussed just above (*id.* at 11–13). Both scenarios confirm that fact issues exist as to the reasonableness of this conduct.

Equifax argues that its dispute investigations—just sending ACDVs to Ally and doing nothing other than waiting for a response—were reasonable because "the ACDV approach has been upheld as a matter of law by other courts." (ECF 186 at 25 (collecting cases).) That is wrong, as Equifax's cited cases confirm. *Shannon v. Equifax Information Services, LLC*, 764 F. Supp. 2d 714, 725–26 (E.D. Pa. 2011), did not hold the ACDV process was reasonable as a matter of law. It held the opposite—"[the court] will similarly submit Equifax's § 1681i(a) claim to a jury." *Id.* at 724. *Benson v. Trans Union LLC*, 387 F. Supp. 2d 834, 843 (N.D. Ill. 2005) is no more helpful, as it merely held that Trans Union's use of the ACDV process was sufficient because Benson did not show what other information a more-robust investigation would have turned up. *Id.* at 843. *Perry v. Experian Info. Solutions, Inc.*, No. 05-1578, 2005 WL 2861078, at *5 (N.D. Ill. Oct. 28, 2005), is similar, as there the court found the use of ACDVs as lone form of investigation by Experian was reasonable "based on the scant information [the consumer] provided" with his disputes.[3]

Equifax also does not address a key difference between this case and the others it cites— here, Equifax was on notice that Ally could not be trusted as a furnisher when it comes to reaffirmation agreements. That lack-of-reliability notice came from two sources: Plaintiffs, through their multiple, detailed disputes, and the litigation of *Myers v. Equifax Info. Servs., LLC*, No. 1:20-cv-00392-JMS-DLP, 2022 WL 4292179, at *1 (S.D. Ind. Sept. 16, 2022), a case on which Defendants rely heavily. Despite being let off the hook in *Myers*, these Defendants were

---

[3] The remaining cases are not as much assistance as Equifax hopes. *Morris v. Trans Union LLC*, 420 F. Supp. 2d 733, 756 (S.D. Tex. 2006), *aff'd*, 224 Fed. Appx. 415 (5th Cir. 2007), was a case with a single dispute, not multiple disputes like this case, *Anderson v. Trans Union LLC*, 367 F. Supp. 2d 1225, 1233 (W.D. Wis. 2005), involved a disputed inaccuracy that was corrected after one dispute, and *Schmitt v. Chase Manhattan Bank, N.A.*, No 03-3295, 2005 WL 2030483, at *3 (D. Minn. Aug. 23, 2005), was a case wherein the furnisher and CRA made multiple mistakes in failing to correct inaccurate notation the consumer was deceased.

Suppl. App. 244

certainly aware that Ally did not know what it was doing when consumers entered into reaffirmation agreements with it. Plaintiffs' disputes here confirm that.

The facts here also distance this case from *Myers*, as that case did not involve any disputes of the Ally reporting. *Myers*, 2022 WL 4292179, at \*6–8 ("Mr. Myers never disputed his Ally account with Equifax. . . . Mr. Myers never submitted a dispute to Experian regarding the reporting of the Ally account and never provided Experian with a copy of the Ally reaffirmation agreement. . . . Mr. Myers never contacted Trans Union regarding the reporting of the Ally account."). Plaintiffs' multiple disputes place this case much further from *Myers* than Defendants would have the Court conclude.

The Seventh Circuit has long recognized that notice of inaccuracies changes how CRAs and furnishers must approach disputes:

> A credit reporting agency that has been notified of potentially inaccurate information in a consumer's credit report is in a very different position than one who has no such notice. As we indicated earlier, a credit reporting agency may initially rely on public court documents, because to require otherwise would be burdensome and inefficient. However, such exclusive reliance may not be justified once the credit reporting agency receives notice that the consumer disputes information contained in his credit report.

*Henson v. CSC Credit Servs.*, 29 F.3d 280, 286 (7th Cir. 1994). While Defendants will certainly point out that *Henson* was decided at the Rule 12(b)(6) stage and not summary judgment, courts within this Circuit have nonetheless applied it in the summary judgment context. *Salem v. Legal Liaison Serv.*, No. 16-cv-3927, 2019 WL 1057371, at \*5 (N.D. Ill. Mar. 6, 2019) (finding reliance on ACDVs alone was insufficient to comply with Section 1681i because the plaintiff provided sufficient information to put Equifax on notice that the furnisher was supplying inaccurate information); *see Ruffin-Thompkins v. Experian Info. Sols., Inc.*, 422 F.3d 603, 608 (7th Cir. 2005) (discussing *Henson* in an appeal of a summary-judgment ruling, and noting "[b]ecause Experian

Suppl. App. 245

had no reason to believe that U.S. Bank was an unreliable source, Experian's period of liability did not begin until December 23, 2002, when it received notice of [plaintiff]'s dispute"). These courts are not alone, as it is largely recognized that "where a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation." *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073–74 (D. Or. 2011) (collecting cases from the Third and Ninth Circuits so holding).

Courts applying *Henson* look at two factors to determine whether the CRA was duty bound to look at more than what the furnisher was telling it: (1) whether the Plaintiffs informed the CRAs that Ally may have been an unreliable source or the CRAs knew or should have known that; and (2) the cost to the CRA of verifying the accuracy of the information versus the possible harm the inaccurate information could have caused Plaintiffs. *Bagby v. Experian Info. Sols., Inc.*, 162 F. App'x 600, 606 (7th Cir. 2006). Defendants do not discuss either factor, other than to say they had no reason to believe Ally was an unreliable furnisher. (ECF 186 at 24.) This lack of analysis confirms there are issues of fact as to whether Defendants should have done more with their investigations.

On the first point, Defendants argue just that because a sample of 300 consumers' bankruptcy files that contained Ally accounts in *Myers* revealed just one error, Ally is *per se* reliable. (ECF 186 at 24.) But there is no discussion of whether any of those accounts involved reaffirmation agreements, as did *Myers* and this case. Since between *Myers* and Plaintiffs the CRAs had at least three examples of Ally furnishing questionable information about accounts to which those agreements applied, Defendants were on notice of this specific, identifiable problem with this exact furnisher.

Suppl. App. 246

Regarding the cost of verification, the second element of the test, Defendants offer nothing solid about that it would take to verify with Ally whether Plaintiffs' agreements were valid. (*See* ECF 186 at 24.) Defendants therefore resort to hyperbole, arguing "Plaintiffs' suggestion that Defendants should independently review all information provided by furnishers would be untenable and at odds with Congress's goal of creating a credit-reporting system suitable for 'meeting the needs of commerce.'" (*Id.*) That of course is not what Plaintiffs suggest. Instead, Plaintiffs' focus is on verifying just the challenged information, which the FCRA requires that Defendants do when consumers dispute. 15 U.S.C. § 1681i. Defendants provide nothing for the Court to consider that establishes such an inquiry would be prohibitively costly as a matter of law. And, as explained above, Defendants always have the option to delete information they cannot verify, an option that costs virtually nothing. Based on Defendants' failure to meaningfully discuss and address these factors, the Court should decline to grant summary judgment on them.

What Defendants engaged in by sending the ACDVs to Ally and waiting to see its responses as a proxy for their Section 1681i investigations is what courts refer to as "parroting." As one court put it: "The FCRA imposes on CRAs a 'grave responsibility' to refrain from 'merely parroting information received from other sources' where a consumer has alerted it to the possibility that a creditor may be unreliable." *Choudhury v. Citibank, N.A.*, No. 18-cv-02188 (RJD) (ST), 2018 WL 11447942, at *5 (E.D.N.Y. Dec. 7, 2018) (citing *Cushman v. Trans Union Corp.*, 115 F. 3d 220, 225 (3d Cir. 1997) and *Henson*, 29 F.3d at 286–87). This outcome is entirely logical, given the long-held notion that "[i]n a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson v. TRW Inc.*, 987 F.2d 288, 293 (5th Cir. 1993). Certainly, where Defendants are on notice from multiple disputes from consumers and other litigation involving the

same problem and furnisher, they must do more than simply sit on their hands and await the unreliable furnisher's response. *Crump v. Carrington Mortg. Servs., LLC*, No. 18 C 2302, 2019 WL 118490, at *6 (N.D. Ill. Jan. 7, 2019) ("Once a CRA receives notice that information in a consumer report may be inaccurate, 'the statutory duty [to reinvestigate under § 1681i(a)(1)] click[s] in, and at that point the continued sending of [the contested information] to creditors might be viewed as a failure to maintain reasonable procedures for assuring accuracy' under § 1681e(b).") (quoting *Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 664 (7th Cir. 2001), alterations in original); *see also Losch*, 995. F.3d at 946; *Collins*, 775 F.3d at 1331–33; *Dennis*, 520 F.3d at 1068–70.

## IV.   Defendants Have Not Shown As A Matter Of Law That A Jury Could Not Conclude They Acted Willfully In Violating Section 1681e(b).

Courts in this Circuit generally hold that willfulness is ill-suited for summary judgment because it involves consideration of Defendants' state of mind. *Fickel v. Clearwater Credit Union*, No. 21-cv-798-SMY, 2023 WL 2456116, at *3 (S.D. Ill. Mar. 10, 2023) ("And whether Clearwater's investigation or protocol may qualify as a willful violation giving rise to statutory or punitive damages is an issue for a jury as well."); *Searcy v. eFunds Corp.*, No. 08 C 985, 2010 WL 3894165, at *6 (N.D. Ill. Sept. 30, 2010) (denying motion for summary judgment on willfulness, and collecting cases supporting the conclusion that willfulness is a jury question). This case should follow that logical conclusion.

### A.   Following The *White* Injunction Does Not Save Defendants As A Matter Of Law.

Defendants' principal argument is that their conduct was not willful because they applied the requirements of an agreed-upon injunction entered in earlier litigation styled *White v. Experian Information Solutions, Inc.*, No. 8:05-cv-01070, 2008 WL 11518799 (C.D. Cal. Aug. 19, 2008).

(ECF 186 at 30–31.) That order required Defendants to do several things relating to post-bankruptcy debts, including "assume that certain categories of pre-bankruptcy consumer debts have been discharged in Chapter 7 bankruptcies based on the statistical likelihood of discharge of these categories of debt, and without either the affected creditors or Consumers reporting the debt to Defendants as having been discharged." *White*, 2008 WL 11518799, at *13, ¶ 5.1. As Defendants note, this requires them to scrub and "automatically update qualifying pre-bankruptcy debts to report as discharged in bankruptcy without being asked to do so by either a creditor or consumer." (ECF 186 at 30.) But, as Defendants further note, "the *White* Injunction provides only a default rule: when a furnisher reports that a consumer has discharged a debt in bankruptcy, the information supplied by the furnisher controls." (*Id.* at 30–31.) Put another way, as Defendants explain earlier in their brief, "[t]he scrub was not triggered in this case because Ally was already reporting Plaintiffs' account as included in their Chapter 7 bankruptcy." (*Id.* at 6.) So, Defendants did nothing to "comply" with the *White* Injunction because, in their view, nothing was required because Ally was reporting the debt the way it was.

Defendants claim that "courts have consistently found [ ] compliance with the *White* Injunction defeats a consumer's willfulness claims." (*Id.* at 31 (collecting cases).) The problem with this argument and the cases Defendants cite to underpin it is fundamental—Defendants did not do anything the *White* Injunction required other than listen to their furnishers' reporting of the debt in the first instance. That is much different from, for example, complying with the scrub aspect of the Injunction only to be told by the consumer that the reporting was inaccurate. In that circumstance, Defendants could plausibly claim they were relying on the requirements of the Injunction, a prior court order, so there is nothing wrong with having done that in favor of what the consumer was telling them. Here, things are different because the Injunction does not say, and

Defendants do not meaningfully argue, that they are without FCRA liability if they repeatedly adopt their furnisher's and reject the consumer's view of how a debt is to be reported post-bankruptcy. All the Injunction says about the way Ally was originally reporting the account is Defendants do not have to scrub that data. The Injunction does not say that Defendants are free to disregard their FCRA accuracy and investigation duties if a consumer tells them something about a post-bankruptcy debt.

Defendants' cited cases bear this conclusion out. None of them deal with a situation like this one, where they had no need to scrub the data from the furnisher. Instead, the majority of cases deal with how something was reported post-scrub. *Coleman v. Experian Info. Sols., Inc.*, __ F. Supp. 3d __, No. 1:21-cv-1095-CAP, 2023 WL 2366609, at *3 (N.D. Ga. Feb. 6, 2023); *Lynch v. Experian Info. Sols., Inc.*, No. 20-cv-2535 (KMM/JFD), 2022 WL 16857078, at *9 (D. Minn. Nov. 10, 2022); *Ferrin v. Experian Info. Sols., Inc.*, 617 F. Supp. 3d 998, 1002 (D. Minn. 2022); *Beers v. Experian Info. Sols., Inc.*, No. 20-cv-1797 (WMW/JFD), 2022 WL 891620, at *1 (D. Minn. Mar. 25, 2022); *Laura v. Experian Info. Sols., Inc.*, No. 20-cv-01573, 2022 WL 823853, at *1 (N.D. Ill. Mar. 18, 2022); *Benjamin v. Experian Info. Sols., Inc.*, 561 F. Supp. 3d 1330, 1348 (N.D. Ga. 2021), *motion for relief from judgment denied*, No. 1:20-cv-2466-RWS, 2022 WL 1690539 (N.D. Ga. Mar. 21, 2022).[4] These decisions are even less helpful to Defendants because, as the

---

[4] Two cases decided by the same judge, *Peterson v. Experian Information Solutions, Inc.*, No. CV 20-606 (DSD/ECW), 2021 WL 3116073, at *4 (D. Minn. July 22, 2021), *aff'd sub nom. Peterson v. Experian Information Solutions*, 44 F.4th 1124 (8th Cir. 2022) and *Campbell v. Experian Information Solutions, Inc.*, No. CV 20-2498(DSD/BRT), 2022 WL 3716982, at *6 (D. Minn. Aug. 29, 2022), do not explain what aspect of the *White* Injunction Experian applied to the plaintiffs' credit files. They therefore add little to the analysis.

Three other cases, again decided by the same judge (although a different judge than *Peterson* and *Campbell*), *Hernandez v. Experian Information Solutions, Inc.*, *Sunseri v. Experian Information Solutions, Inc.*, and *Wheeler v. Trans Union LLC*, saw the Ninth Circuit reverse Experian's victories on motions to dismiss. *Hernandez*, No. LA CV 20-09908-DOC (RAOx), 2021 WL 2325019, at *4 (C.D. Cal. June 4, 2021), *rev'd & remanded*, No. 21-55588, 2022 WL 1315306 (9th Cir. May 3, 2022); *Sunseri*, No. LA CV 20-08932-DOC (RAOx), 2021 WL 2327934, at *3 (C.D. Cal. June 4, 2021), *rev'd & remanded*, No. 21-55583, 2022 WL 1315303 (9th Cir. May 3, 2022); *Wheeler*, No. LA CV 20-11710 DOC (RAOx), 2021 WL 2290575, at *4 (C.D. Cal. June 4, 2021), *rev'd & remanded sub nom. Wheeler v. Experian Info. Sols., Inc.*, No. 21-55585, 2022 WL 1315301 (9th Cir. May 3, 2022).

*Ferrin* court noted, "[t]he Ninth Circuit recently addressed the *White* Order in three cases [*Sunseri*, *Wheeler*, and *Hernandez*], explaining that '[r]easonableness is not a static issue, and procedures that met the high bar of [Section] 1681e(b) fourteen years ago may not today.'" *Ferrin*, 617 F. Supp. 3d at 1007 (first two alterations added). The *Ferrin* court is not alone, with a subsequent decision declining to grant Experian summary judgment on willfulness, where Experian argued it complied with the *White* Injunction. *Bailey v. Experian Info. Sols., Inc.*, No. 1:21-cv-00465-BLW, 2023 WL 6317443, at *10 (D. Idaho Sept. 28, 2023) (noting this same quote from the Ninth Circuit, and refusing to grant summary judgment on willfulness as to one account Experian argued was scrubbed as provided by the *White* Injunction). In those cases, then, the CRAs manipulated the bankruptcy data in a way that complied with the requirements of the Injunction. Yet, in *Bailey* they did not prevail on willfulness. Here, they did not do anything to the bankruptcy data, even after Plaintiffs disputed. Simply citing to *White* and claiming to have followed it is not enough to establish a lack of willfulness, particularly where, like here, Defendants offer solely that argument and no on-point case in support.

### B.  Defendants Have Not Shown What Reading Of The FCRA They Adopted And Applied To The Reporting Of Plaintiffs' Ally Account.

The Supreme Court established the standard for FCRA willfulness in *Safeco Insurance Company of America v. Burr*, 551 U.S. 47 (2007). Though *Safeco* came down in 2007, the Court recently revisited that decision's willfulness analysis in *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 747 (2023). That case, brought under the False Claims Act, considered whether pharmacies who submitted claims for reimbursement for drugs provided to Medicare or Medicaid insureds falsely certified those claims as true when the disclosed a higher price for the drugs than the insureds allegedly actually paid. *Id.* at 744–46. According to the plaintiffs, the pharmacies ran a discount program that was popular enough that its discounted prices became, by default, the

pharmacies' "usual and customary" prices. *Id.* at 745–46. Yet, plaintiffs claimed, when the

pharmacies sought Medicare or Medicaid reimbursement and were required to submit their "usual

and customary" prices, they allegedly used the higher, non-discounted prices. *Id.* at 746–47. If

plaintiffs were correct, these claims for reimbursement violated the FCA.

Under the FCA, liability attaches when one "knowingly presents . . . a false or fraudulent

claim for payment or approval." 42 U.S.C. § 3729(a)(1)(A). Such a claim has two elements: "(1)

the falsity of the claim and (2) the defendant's knowledge of the claim's falsity." *Schutte*, 598 U.S.

at 747. In *Schutte* the pharmacies prevailed on summary judgment, with the district court finding

the claims submitted were indeed false because they reflected the non-discounted prices but that

the pharmacies did not act "knowingly." *Id.* The Seventh Circuit affirmed, relying "heavily" on

the *Safeco* willfulness analysis. *Id.* at 748. As the Supreme Court explained:

> [T]he Seventh Circuit read *Safeco* to dictate a two-step inquiry for ascertaining
> whether a defendant acted recklessly or knowingly. At step one, the Seventh Circuit
> took Safeco to ask whether a defendant's acts were consistent with any objectively
> reasonable interpretation of the relevant law that had not been ruled out by
> definitive legal authority or guidance. This step, the Seventh Circuit held, applied
> regardless of whether the defendant actually believed such an interpretation at the
> time of its claims. Only if the defendant's acts were not consistent with any
> objectively reasonable interpretation would the court proceed, at step two, to
> consider the defendant's actual subjective thoughts. Thus, under the Seventh
> Circuit's approach, a claim would have to be objectively unreasonable, as a legal
> matter, before a defendant could be held liable for "knowingly" submitting a false
> claim, no matter what the defendant thought.

*Id.* The Seventh Circuit affirmed the grants of summary judgment, finding that the pharmacies'

conduct was "consistent with an objectively reasonable interpretation of the phrase 'usual and

customary.'" *Id.* The court held the pharmacies *could* have interpreted the phrase to mean their

non-discounted prices, even if the correct understanding meant the discounted prices. *Id.* The

Seventh Circuit believed that what mattered instead "was that someone else, standing in [the

pharmacies]' shoes, may have reasonably thought that the retail prices were what counted." *Id.*

Suppl. App. 252

The Supreme Court granted review, framing the question presented as:

> If respondents' claims were false and they actually thought that their claims were false—because they believed that their reported prices were not actually their "usual and customary" prices—then would they have "knowingly" submitted a false claim within the FCA's meaning? Or is the Seventh Circuit correct—that respondents could not have "knowingly" submitted a false claim unless no hypothetical, reasonable person could have thought that their reported prices were their "usual and customary" prices?

*Id.* at 748–49. After discussing the scienter element of the FCA, the Court turned to *Safeco* and the pharmacies' argument that an objective analysis of their conduct controlled. *Id.* at 743.

The Court rejected that argument, holding that "*Safeco* did not purport to set forth the purely objective safe harbor that respondents invoke." *Id.* at 755. Rather, the Court explained, "*Safeco* stated that a person is reckless if he acts '*knowing* or having reason to know of facts which would lead a reasonable man to realize' that his actions were substantially risky." *Id.* (quoting *Safeco*, 551 U.S. at 69, emphasis in original). The Court also noted *Safeco*'s alternative explanation, "the common law of recklessness contained an objective standard because it encompassed actions involving 'an unjustifiably high risk of harm that is *either* known *or* so obvious that it should be known.'" *Id.* (emphasis in original). The Court concluded:

> Thus, as we have stated previously, "[n]othing in *Safeco* suggests that we should look to facts that the defendant neither knew nor had reason to know at the time he acted." By a similar token here, *we do not look to legal interpretations that respondents did not believe or have reason to believe at the time they submitted their claims*.

*Id.* at 755 (emphasis added, citation omitted). Thus, the defendant's particular understanding, or "reading" as *Safeco* and *Schutte* put it, of the statute at issue means everything regarding the defendant's state of mind.

*Schutte* confirms that context matters. And it matters more when considering a party's state of mind at some point in the past. Defendants' Motion argues, essentially, "we followed the *White*

Suppl. App. 253

injunction" as to Section 1681e(b) and, for Experian, "we thought Plaintiffs did not draft their disputes" as to Section 1681i, so they could not have acted willfully. (ECF 186 at 27–28, 30–31.)[5] Yet, as the Supreme Court pointed out in *Schutte*, whether there is now something Defendants' counsel has unearthed that it can argue objectively supports what Defendants did, that does not preclude a finding that Defendants still knew what they were doing violated the FCRA. *Schutte*, 598 U.S. at 754–55. And, of course, Defendants must show they had some reading of the FCRA they adopted as a defense to willfulness. They have not done so.

Defendants' Motion bears this analysis out. They spill considerable ink explaining authorities they claim support the inaccurate reporting and investigations Experian did not do, but they do not show that they considered any of these things when they implemented the systems to which Plaintiffs were subjected. *Safeco*, as refined by *Schutte*, requires that showing yet Defendants fail to make it. They do not even try. In other words, Defendants ask the Court to grant them summary judgment based on facts or legal authorities Defendants do not show they considered (or even knew about) at the time they implemented the reporting and investigation systems at issue. *Schutte*, 598 U.S. at 755. The Court should not.

### C.     Defendants Have Not Shown Willfulness Lacking As A Matter Of Law As To Their Perfunctory Investigations Of Plaintiffs' Disputes.

#### 1.     Experian has not proven as a matter of law that no reasonable jury could find it was willful in failing to investigate Plaintiffs' disputes.

With the overarching, substantive failure on willfulness for both Defendants set forth above, there is little else to discuss on the point. Experian bases the entire argument on the falsity that Plaintiffs' Counsel is a credit repair organization, an issue on which it has no proof, even now, and therefore Experian was entitled to disregard those disputes entirely. (ECF 186 at 27–28.) These

---

[5] Equifax does not move for summary judgment on the willfulness aspect of Section 1681i.

Suppl. App. 254

arguments—that its mail sorting complied with some un-revealed standard and therefore was not willful, is not even supported by Experian's hand-crafted evidence.

At the outset, there is a meaningful difference between the requirement that Experian investigate a dispute, and the problem Experian claims will result without its mail-sorting policy— the providing of consumer reports "to third parties who lack a permissible purpose." (ECF 186 at 29.) Section 1681i requires Experian to investigate all disputes that come from consumers, 15 U.S.C. § 1681i, and nothing permits Experian to inject false barriers into that process. Experian can accomplish the investigation requirement and determine whether it is providing the results to the correct consumer *after* it has investigated. Instead, Experian has chosen a cost-reducing option that it believes allows it to forego disputes entirely when, in reality, it could investigate and then confirm the identity of the person to whom it is providing the results.

Under these circumstances, a reasonable jury could conclude that Experian recklessly violated Section 1681i by relying on some unspecified mail sorting process to inaccurately conclude that Plaintiffs' dispute letters did not come from Plaintiffs. Experian's own declarant cannot explain any specifics that led to Experian's conclusions about the letters, providing such bland explanations as "Experian employees examine outside envelopes and compare them to other mail received, as credit clinics tend to send their mail in bulk, with similar features apparent from the outside." (ECF 183-3 ¶ 22.) What features are those—are they things impossible to be reproduced except by a bulk-mailing house? Or what are the "indications of third-party mail, including that the dispute letters were sent by a third-party mailing house and appeared to have been prepared by someone other than Plaintiffs"? (*Id.*) No one knows, apparently, but Experian would have the Court conclude that Experian has imposed an ironclad, error-free system for identifying such mail that should be interpreted to eminently trustworthy without the need to truly

discuss the details regarding how the system works, what parameters Experian's employees apply in making decisions under the policy, error rate, or anything that would allow the Court to meaningfully analyze it. Nothing about Experian's argument convincingly rules out that by instituting a process for identifying mail that supposedly comes from someone other than a consumer—without any outside verification such as from the consumer himself—Experian "ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Safeco*, 551 U.S. 47 at 50.

Separately, yet just as meaningful, nothing to which Experian points conclusively establishes that it did not knowingly violate Section 1681i. After all, resorting to its mail-sorting protocol could be a move aimed entirely at cost saving—fewer disputes processed means fewer dollars Experian sinks into that process. So if Experian has a pretextual reason to cull some number of disputes from the list of those it actually investigates, it spends less money. Just as with recklessness, nothing Experian provides about its shadow mail-sorting process confirms that Experian implemented it and did not know doing so would violate Section 1681i.

Experian's summary-judgment loss on willfulness in *Ricketson v. Experian Information Solutions, Inc.*, 266 F. Supp. 3d 1083, 1095 (W.D. Mich. 2017), confirms willfulness should go to the jury here. In *Ricketson*, the plaintiff-consumer disputed inaccurate credit information to Experian in writing, and Experian, like here, determined that letter to be "suspicious" as not coming from plaintiff, and did no Section 1681i investigation at all. *Id.* at 1086–87. Unlike here, Experian claimed its conclusion that the letter was suspicious was a mistake, yet—in keeping with its suspicious mail policy—it sent Ricketson a letter stating it had received a suspicious letter and stated it would not investigate, and asked him to call Experian if he was truly needing to dispute a

debt. *Id.* at 1087. Experian later removed the tradeline on its own, but did not inform Ricketson

that it did. *Id.* Ricketson sued, alleging Section 1681e(b) and 1681i claims.

On summary judgment, Experian claimed its application of the suspicious letter process to

Ricketson's dispute was a mistake and therefore could not be willful. *Id.* at 1095. Ricketson argued

that there were jury questions about "whether [Experian]'s policies and procedures for handling

and sorting 'suspicious' mail render its conduct reckless in light of § 1681i's requirements, and

therefore willful." *Id.* at 1095–96. In discussing the competing arguments, the court noted that

Experian "did not simply ignore Plaintiff's letter after receiving it" but, instead, tried to contact

Ricketson and determine its authenticity. *Id.* at 1096. The court sided with Ricketson on summary

judgment as to willfulness, finding Experian's claim of mistake was not shown to be a violation

of its policies and procedures and, moreover, that Experian did not explain how the policy was an

objectively reasonable way to discharge its responsibilities to investigate under Section 1681i. *Id.*

Experian's conduct here differs slightly from *Ricketson* in that Experian simply threw

Plaintiffs' disputes in the trash and performed no investigation at all. (ECF 183-3 ¶ 22.) Yet, like

*Ricketson*, Experian has not explained how its insufficiently detailed mail-sorting policy assists it

in discharging its Section 1681i duties. (*See* ECF 186 at 28–29.) And, more importantly, Experian

has not even proven as a matter of law that its mail-sorting policy caused the lack of investigation

of Plaintiffs' disputes. Rather, as its witness notes, "Plaintiffs' dispute letters contained such

indications of third-party mail, including that the dispute letters were sent by a third-party mailing

house and appeared to have been prepared by someone other than Plaintiffs, and, accordingly,

were *likely* not processed for reinvestigation." (ECF 183-3 ¶ 22 (emphasis added).) Certainly, to

achieve summary judgment as to willfulness on this point, Experian must prove what it *actually*

*did* with Plaintiffs' letters, other than fail to investigate after receiving them. "Likeliness" of

something cannot carry the day on summary judgment, as all reasonable inferences go to Plaintiffs, not Experian. But in line with *Ricketson*, Experian has failed to show how its mail-sorting policy allows it to meet its Section 1681i investigation mandates. This failure by Experian should not result in a summary judgment in its favor as to willfulness.

### 2. Equifax likewise fails to establish that no reasonable jury could find its complete reliance on Ally was willful.

As also noted above, Equifax has not moved for summary judgment on the willfulness element of Plaintiffs' Section 1681i claim. The Court therefore should not grant Equifax's Motion as to that element. *Kreg Therapeutics, Inc. v. VitalGo, Inc*., 919 F.3d 405, 416 (7th Cir. 2019) (noting "[t]he district court could not have erred by not granting summary judgment on grounds that VitalGo failed to raise.").[6]

## CONCLUSION

For the reasons set forth above, the Court should deny Defendants' Motion for Summary Judgment.

Dated: November 3, 2023                Respectfully submitted,

                                       By:      /s/ *Michael Rapp*
                                       Michael H. Rapp
                                       Matthew S. Robertson
                                       STECKLEIN & RAPP CHARTERED
                                       748 Ann Avenue, Suite 101
                                       Kansas City, Kansas 66101
                                       Phone: (913) 371-0727
                                       Fax:    (913) 371-0727
                                       Email:  mr@kcconsumerlawyer.com
                                               msr@kcconsumerlawyer.com

---

[6] Equifax will no doubt claim that the sentence "Defendants move for summary judgment on Plaintiffs' claims that they allegedly violated § 1681e(b) and willfully violated § 1681e(b) and § 1681i of the FCRA" (ECF 186 at 15) means that it has moved on willfulness as to Section 1681i, but nowhere in Defendants' brief is there any actual argument by Equifax on Section 1681i willfulness. (*See generally id.*) The Court should therefore decline to conclude that this lone statement contains sufficient factual support to garner summary judgment for Equifax on that element. *James M. v. Saul*, No. 20-cv-183, 2021 WL 2820532, at *2 (S.D. Ind. July 7, 2021) (noting "perfunctory and undeveloped arguments are waived").

John T. Steinkamp, #19891-49
JOHN STEINKAMP
5214 South East Street, Suite D-1 Indianapolis,
Indiana 46227
(317) 780 -8300
john@johnsteinkampandassociates.com

Leonard A. Bennett, admitted *pro hac vice*
Craig C. Marchiando, admitted *pro hac vice*
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, Virginia 23601
Email: lenbennett@clalegal.com
        craig@clalegal.com
Telephone: 757-930-3660
Facsimile: 757-930-3662
**Attorneys for Plaintiffs**